5/21/2018 11:28 AM
Chris Daniel - District Clerk Harris County
Envelope No. 24719179
By: DELTON ARNIC
Filed: 5/21/2018 11:28 AM

**CAUSE NO. 2016-87708**

| | | |
|---|---|---|
| **HASSELL CONSTRUCTION CO., INC., et al,** | § | **IN THE DISTRICT COURT OF** |
| *Plaintiffs* | § | |
| | § | |
| **v.** | § | **HARRIS COUNTY, TEXAS** |
| | § | |
| **ROYCE HASSELL, et al,** | § | |
| *Defendants.* | § | **113th JUDICIAL DISTRICT** |

**ROYCE HASSELL'S ANTI-SLAPP MOTION TO DISMISS**

<u>(i)</u>

**<u>TABLE OF CONTENTS</u>**

**Page**

<u>INDEX OF EXHIBITS</u>.................................................................................................................(iv)(v)(vii)

<u>INDEX OF AUTHORITIES</u>.......................................................................................................(vii)-(x)

<u>SUMMARY/REQUESTED RELIEF</u>...........................................................................................1

**<u>I.</u>**    **<u>FACTUAL BACKGROUND</u>**

A.  By a 1986 gift, the JCH Trust, of which Royce Hassell is an equal beneficiary
with his siblings, is the majority shareholder of Hassell
Construction Co., Inc......................................................................................................3

B.  HCCI is just one of many Hassell Family related companies: *However*, It Is the
only company in which together, all five Hassell siblings own an Interest....................4

C.  HCCI and Royce Hassell's companies entered into multiple Joint Ventures
Beginning in 2008..........................................................................................................5

D.  In 2011, the Springwoods Project (in which HCCI owned a profit only interest
and Royce Hassell's companies bore 99% of the risk of loss) went horribly awry
due to the District's defective plans..............................................................................5

E.  Phillip Hassell Proposed the Hassell 2012 Joint Venture Before the Springwoods
Project was finished in consultation with attorneys who were loyal to
Exxon and the District...................................................................................................6

F.  Mr. Rose's law firm, simultaneously counsel for HCCI and Exxon, participated
In non-suiting HCCI's claims against the District even though Mr. Rose Is a
government official Director of the District...................................................................7

G.  Unaware his siblings had entered an alternate universe run by Exxon
(which was liable to the taxpayers of the District HCCI had just sued),
Royce Hassell agreed to his brother's Proposal to combine his own companies
with HCCI in a partnership; only to have HCCI, the partnership
and his companies destroyed through false narratives perpetuated by lawyers
loyal to Exxon and the District. .....................................................................................8

(ii)

**TABLE OF CONTENTS (Continued)**

Page

H.  This latest suit by his siblings evidences they believed they personally stood to
    benefit (the quid pro quo) by striking a secret deal with lawyers loyal to Exxon and
    the District to blame Royce Hassell for the Springwoods Project losses.......................................8

I.  In September of 2013, when Royce Hassell first learned Coats Rose agreed to be
    HCCI's corporate counsel, Royce Hassell objected and has been objecting ever since..............9

J.  As co-counsel with HCCI's corporate lawyers (who were also Exxon's lawyers)
    Bogdan Rentea took over, non-suited, and refiled the same claims against the
    District four and a half years after the original suit, only to lose 99% of the claims
    by summary judgment on limitations.................................................................................................10

K.  Complicit with HCCI's corporate counsel, the District's lawyers, Engvall and Lopez and
    Allen Boone & Humphries, worked with lawyers they knew to be simultaneously
    Exxon's lawyers and HCCI's lawyers, to defend against HCCI's suit..........................................11

L.  Like the Springwoods Project, the Hassell 2012 Joint Venture ended disastrously
    For Royce Hassell while conflicted lawyers benefitted from the partnership
    Profits HCCI now owes Royce Hassell's companies.....................................................................12

M.  Royce Hassell did not discover his siblings' duplicity until it was too late to
    stop them from non-suiting the District or squandering hard earned money
    on conflicted lawyers leaving HCCI apparently destitute............................................................13

**Introduction to Legal Argument**.....................................................................................................14

**II.     ARGUMENT AND AUTHORITIES**..............................................................................................15

   **A.  THE TCPA**..................................................................................................................................15

   **B.**  First Prong:  The New Legal Action Against Royce Hassell Must be Dismissed
        Because It is Based On, Relates To, and Is in Response to Royce Hassell's Exercise
        of the Right to Petition and Free Speech and His Freedom of Association............................17

        (i)      The Right to Petition and Free Speech...........................................................................17

        (ii)     The Right of Association.................................................................................................19

   **C.**  Second Prong:  This Suit Must Be Dismissed Because HCCI's Controlling Owners
        Have No Evidence-Much Less "Clear and Specific" Proof-To Support Each Element
        of Their Claims Against Royce Hassell........................................................................................20

(iii)

## TABLE OF CONTENTS (Continued)

Page

|     |      |                                                                                    |    |
| --- | ---- | ---------------------------------------------------------------------------------- | -- |
|     | (i)  | The Law: "Clear and Specific" Evidence                                              | 20 |
|     | (ii) | Alleged Breach of Fiduciary Duty                                                    | 20 |
|     | (iii)| Alleged Fraudulent Inducement                                                       | 23 |
|     | (iv) | Claim for Alleged False Affidavit in Support of Garnishment Petition                | 27 |

**D.** The Legal Action Against Royce Hassell Must Be Dismissed Under the TCPA Because Royce Hassell Has Established Each Essential Element of An Affirmative Defenses to This Suit ........................................................................................ 27

|       |        |                                                    |    |
| ----- | ------ | -------------------------------------------------- | -- |
|       | (i)    | Section 27.005(d) of the TCPA                       | 27 |
|       | (ii)   | Lack of Standing and/or Capacity                   | 27 |
|       | (iii)  | Limitations                                        | 28 |
|       | (iv)   | Res Judicata                                       | 29 |
|       | (v)    | Estoppel                                           | 34 |
|       |        | (a) Estoppel by Record or Judicial Estoppel        | 35 |
|       |        | (b) Estoppel by Contract                           | 35 |
|       |        | (c) Equitable Estoppel                             | 36 |
|       |        | (d) Promissory Estoppel                            | 37 |
|       |        | (e) Quasi Estoppel                                 | 37 |
|       | (vi)   | Accord and Satisfaction; Settlement                | 38 |
|       | (vii)  | Waiver                                             | 38 |
|       | (viii) | Ratification                                       | 39 |

**E.** Because Dismissal is Proper, the TCPA Requires the Court to Award Royce Hassell His Court Costs, Attorney's Fees and Expenses, and to Sanction Michael Hassell, Phillip Hassell, Shawn Hassell Potts and Jason Hassell ................................................ 39

**III.** **Proof** ........................................................................................................................ 41

Prayer ............................................................................................................................. 41

Certificate of Service ..................................................................................................... 42

(iv)

**INDEX OF EXHIBITS**

Exhibit 1:       Final Arbitration Award.

Exhibit 2:       Final Judgment Confirming the Arbitration Award.

Exhibit 3:       Motion to Strike Intervention of HCCI's Controlling Owners Following Arbitration.

Exhibit 4:       Order Striking Intervention.

Exhibit 5:       Bankruptcy Court Memorandum Opinion of May 11, 2015, Declaring Partnership.

Exhibit 6:       Transcript of Emergency Bankruptcy Hearing of March 9, 2018, Finding HCCI's Controlling Owner's In Bad Faith.

Exhibit7:        Phillip Hassell "To all" letter, August 2012.

Exhibit 8:       Shawn Hassell Potts, Coats Rose e-mail, June 28, 2012.

Exhibit 9:       Coats Rose's Privilege Log.

Exhibit 10:      Pascal Piazza's Original Petition of HCCI.

Exhibit 11:      Richard Rose's E-Mail Commenting on HCCI's Suit Against the District.

Exhibit 12:      Richard Rose's E-Mail Inquiring About Mediation Results Between the District and HCCI.

Exhibit 13:      Phillip Hassell's Letter Designating Exxon's Lawyers as HCCI's "Corporate Counsel."

Exhibit 14:      Audit Confirmations Requested by Shawn Hassell Potts For HCCI.

Exhibit 15:      May 2013, Letter Requested By Phillip Hassell.

Exhibit 16:      Patrick Gaas's E-Mail of October 2013, "The answer of Tyler & Das Notwithstanding."

Exhibit 17:      Micky Das's Opposition to Royce Hassell's Motion to Disqualify Exxon's Lawyers.

Exhibit 18:      Coats Rose's Letter of July 2014 That Royce Hassell Has No Authority.

Exhibit 19:      Order Designating Bogdan Rentea as a Responsible Third Party to HCCI in Malpractice Suit He Filed for HCCI.

Exhibit 20:      Phillip and Royce Hassell's Joint Letter of March of 2013, Objecting to Coats Rose's conflicts.

Exhibit 21:      Coats Rose's May 2014 Letter, Responding to HCCI's Conflict of Interest Objection.

(v)

**INDEX OF EXHIBITS (con't.)**

Exhibit 22:    Phillip Hassell's Letter Recanting His Earlier Letter Objections to Coats Rose's Conflicts of Interest.

Exhibit 23:    Coats Rose Engagement Letter of January 2012.

Exhibit 24:    Micky Das' Consolidation Motion Asking That All Hassell Family Disputes Be Compelled to Arbitration.

Exhibit 25:    CommunityBank Letter Admitting the Bank Gave Royce Hassell's Private Banking Information to His Siblings Without Authority.

Exhibit 26:    Affidavits Drafted by Exxon's Lawyers Declaring that HCCI and Royce Hassell's Family was adverse to Him "At All Times" Beginning in January of 2012.

Exhibit 27:    Bogdan Rentea's September of 2014, Answer for HCCI (Verified by Phillip Hassell) That HCCI and Royce Hassell's Companies Have Never Been Partners "At Any Time."

Exhibit 28:    Bogdan Rentea's October 3, 2016, Nonsuit of HCCI's Claims Against the District.

Exhibit 29:    Micky Das' March 2014 Response to Various Motions of Royce Hassell's Companies.

Exhibit 30:    Transcript of Bankruptcy Hearing of March 25, 2015.

Exhibit 31:    Post Arbitration Brief Filed By Exxon's Attorneys with Bogdan Rentea (Page 1).

Exhibit 32:    Judge Carter's Orders of 2014 Compelling Arbitration and Consolidating Other Claims Into Arbitration.

Exhibit 33:    Judge Carter's Self-Recusal Order After Citing "A History" With Bogdan Rentea.

Exhibit 34:    Arbitration Demands of Exxon's Lawyers On Behalf of HCCI Pertaining to the Springwoods Project.

Exhibit 35:    Arbitration Demands of Exxon's Lawyers Against RHP.

Exhibit 36:    Proposal of Exxon's Lawyers to Dismiss Claims Against RHP as a trade.

Exhibit 37:    Micky Das' Motion to Compel Arbitration.

Exhibit 38:    Texas Secretary of State Comptroller's Office Public Information Regarding "MDPG Holdings" Jointly Owners by Micky Das and Patrick Gaas.

Exhibit 39:    "No funds to distribute," and false lien on Stellar Project.

**(vi)**

**INDEX OF EXHIBITS (con't.)**

Exhibit 40:      Bogdan Rentea's Privilege Log

Exhibit 41:      Richard Rose's Government Officer Conflict Disclosure.

Exhibit 42:      Coats Rose's "Forget Conflicts" Settlement Offer.

Exhibit 43:      The District's Open Records Act response denying documents exist (and the documents
                 they were denying existed).

Exhibit 44:      Coats Rose representing siblings in AAA.

Exhibit 45:      Phillip Hassell's Verification of CJVA validity for HCCI.

Exhibit 46:      Phillip Hassell's Verification of CJVA validity for HMS.

Exhibit 47:      HCCI's Audited Financial Statement Notes.

Exhibit 48:      Joel Massey Referral of Royce Hassell's siblings to Coats Rose as "potential" adversaries
                 (January of 2012).

Exhibit 49:      Arbitrator Removal for Evident Partiality.

Exhibit 50:      Summary Judgment of 99% of HCCI's claims against the District on limitations.

(vii)

**TABLE OF AUTHORITIES**

Page

**CASES**

*Adams v. Starside Custom Builders, LLC.,* 042018 TXSC, 16-0786 (Tex. 2018)............................14, 17

*Alphonso v. Deshotel,* 417 S.W. 3d 194 (Tex. App.-El Paso 2013, no pet.)...................................40

*Amstadt v. United State Brass Corp.,* 919 S.W. 2d 644 (Tex, 1966)....................................30

*Aquaplex, Inc. v. Rancho La Valencia, Inc.,* 297 S.W. 3d 768 (Tex. 20009)....................................24

*Barr v. Resolution Trust Corp.,* 837 S.W. 2d 627 (Tex. 1992)....................................30

*Better Business Bureau of Metropolitan Houston, Inc. v. John Moore Services, Inc.,*
500 S.W. 3d 26 (Tex. App.-Houston [1st Dist.] 2016, no pet.)....................................16, 20

*Cotton v. Weatherford Bancshares, Inc.,* 187 S.W. 3d 687 (Tex. App.-Fort Worth 2006,
pet. denied.)....................................23

*Hersh v. Tatum,* 526 S.W. 3d 462 (Tex. 2017)....................................14

*Ernst & Young, LLP v. Pacific Mut. Life Ins. Co.,* 51 S.W. 3d 573 (Tex. 2001)....................................29

*Exxon Corp. v. Emerald Oil & Gas Co.,* 348 S.W. 3d 194 (Tex. 2011)....................................24

*Ferguson v. Building Materials Corp.,* 295 S.W. 3d 642 (Tex. 2009)....................................35

*Fitness Evolution, L.P. v. Headhunter Fitness, LLC,* 05-13-00506-CV, (Tex. App.-Dallas
(5th Dist.) 2015)....................................28

*Frazier v. GNRC Realty, LLC,* 476 S.W. 3d 70 (Tex. App.-Corpus Christi 2014, pet denied.) ....................................38

*In re Lipsky,* 460 S.W. 3d 579, 591 (Tex. 2015)....................................16, 17, 20, 40

*Italian Cowboy Partners, Ltd. V. Prudential Ins. Co. of Am.,* 341 S.W. 3d 323 (Tex. 2011)....................................24

*Jain v. Cambridge Petroleum Grp., Inc.,* 395 S.W. 3d 394 (Tex. App. -Dallas 2013, no pet.)....................................16

*Jamail v. Thomas,* 481 S.W. 2d 485  (Tex. App.-Houston [1st Dist.] 1972, writ ref'd n.r.e.)....................................39

*Johnson & Higgins v. Kenneco Energy, Inc.,* 962 S.W. 2d 507 (Tex. 1998)....................................36

(viii)

**TABLE OF AUTHORITIES (Continued)**

Page

*Kanon v. Methodist Hosp.,* 9 S.W. 3d 365 (Tex. App.-Houston [14th Dist.] 1999, no pet.)........................29

*Kerlin v. Sauceda,* 263 S.W. 3d 920 (Tex. 2008)...................................................................................28

*Lopez v. Munoz, Hockema & Reed, LLP,* 22 S.W. 3d 857 (Tex. 2000).....................................................37, 38

*Marsh USA, Inc. V. Cook, 354 S.W. 3d 764 (Tex. 2011)*......................................................................15

*Mathews v. Sun Oil Co.,* 411 S.W. 2d 561 (Tex. Civ. App.-Amarillo 1996), aff'd,
425 S.W. 2d 330 (Tex. 1968).........................................................................................................36

*Nagle v. Nagle,* 633 S.W. 2d 796 (Tex. 1982)..................................................................................37

*Ohrt v. Union Gas Corp.,* 398 S.W. 3d 315 (Tex. App.-Corpus Christi 2012, pet. denied).........................38

*Rehak Creative Servs., Inc. v. Witt,* 404 S.W. 3d 716 (Tex. App.- Houston [14th Dist.] 2013,
pet denied)................................................................................................................................16, 17

*Rio Grande H20 Guardian,* No. 04-13-00441-CV, 2014 WL 309776, at *3,
(Tex, App.-San Antonio, Jan. 29, 2014, no pet.)...............................................................................19

*Sawnk v. Cunningham, 258 S.W. 3d 647 (Tex. 2008)*.......................................................................28
.
*Sefzik, v. City of McKinney,* 198 S.W. 3d 884 (Tex. App.-Dallas 2006, no pet.)...........................................36

*Texas Water Rights Comm'n v. Crow Iron Works,* 582 S.W. 2d 768 (Tex. 1979).........................................30

*Walker v. Schion,* 420 S.W. 3d 454 (Tex. App.-Houston [14th Dist.] 2014, no pet.)....................................15
.
*Wingate v. Hajdik,* 795 S.W. 2d 717 (Tex. 1990).............................................................................28

(ix)

**TABLE OF AUTHORITIES (Continued)**

Page

**Statutes**

Tex. Bus. & Com. Code – Chapter 15

Section 15.04................................................................................................................15

Section 15.05(a).....................................................................................................15, 20

Section 15.05(b).............................................................................................................20

Tex. Civ. Prac. & Rem. Code

Section 16.004(a)(4)......................................................................................................28

Section 27.001(1)...........................................................................................................18

Section 27.001(3)...........................................................................................................18

Section 27.001(4)...........................................................................................................18

Section 27.001(6).............................................................................................................1

Section 27.001(7)(B).....................................................................................................15

Section 27.001(8)...........................................................................................................18

Section 27.001(9)(c).......................................................................................................18

Section 27.002.........................................................................................................14, 15

Section 27.003.........................................................................................................14, 15

Section 27.005................................................................................................................15

Section 27.005(b).....................................................................................................16, 17

Section 27.005(b)(2)......................................................................................................19

Section 27.005(c)......................................................................................16, 20, 23, 26

Section 27.005(d)....................................................................................................17, 27

**(x)**

**TABLE OF AUTHORITIES (Continued)**

Page

Section 27.006............................................................................................................15

Section 27.009............................................................................................................40

Section 27.009(a)(1)....................................................................................................40

Section 27.009(a)(2)....................................................................................................40

Section 27.011............................................................................................................16

**CAUSE NO. 2016-87708**

| | | |
|---|---|---|
| **HASSELL CONSTRUCTION CO., INC., et al,** | § | **IN THE DISTRICT COURT OF** |
| *Plaintiffs* | § | |
| | § | |
| **v.** | § | **HARRIS COUNTY, TEXAS** |
| | § | |
| **ROYCE HASSELL, et al,** | § | |
| *Defendants* | § | **113th JUDICIAL DISTRICT** |

<u>**ROYCE HASSELL'S ANTI-SLAPP MOTION TO DISMISS**[1]</u>

1.    Four individuals[2] bring a new legal action as a Strategic Lawsuit Against Public Participation, which is exactly what the Texas Citizens Participation Act[3] (the "TCPA") is designed to prevent.

2.    Specifically, on April 17, 2018, four of five Hassell family siblings who, together, own a controlling majority interest in Hassell Construction Co., Inc. ("HCCI"), the plaintiff corporation which initiated this lawsuit over a year ago, bring claims in their own names against their brother, minority HCCI owner Royce Hassell.  The four siblings, Michael Hassell, Phillip Hassell, Shawn Hassell Potts, and Jason Hassell (together hereinafter jointly referred to as HCCI's "Controlling Owners"), filed their "Original Answer, Counterclaim and Third-party Petition of Phillip Hassell, Michael Hassell and Shawn Potts Hassell and Joinder of Jason Hassell" (hereinafter referred to as "Joinder Petition")[4] less than sixty days ago.

3.    By this suit his siblings seek to punish Royce Hassell for exercising his constitutional rights.   More specifically, their own pleadings evidence they seek to punish Royce Hassell for petitioning to confirm and

---

[1] Royce Hassell files this motion subject and without waiver of his right to move to compel arbitration in the event this legal action is not dismissed.

[2] Three of the Controlling Owners, *i.e.,* Michael Hassell, Phillip Hassell, and Shawn Hassell Potts, join as counter-plaintiffs, and one Controlling Owner, *i.e.,* Jason Hassell, joins as an original third-party plaintiff.

[3] Tex. Civ. Prac. & Rem. Code, Chapter 27, Actions Involving the Exercise of Certain Constitutional Rights.

[4] The Joinder Petition bringing new "counterclaims,""cross-claims" and "third party claims" fall within the TCPA definition of a "legal action" which "means a lawsuit, cause of action, petition, complaint, cross-claim or counterclaim or any other judicial pleading or filing that requests legal or equitable relief." Tex. Civ. Prac. & Rem. Code §27.001(6).

seek to collect an arbitration award against HCCI in a separate case;[5] wherein he has attempted to speak freely by signing an affidavit in support of a garnishment action against HCCI's bank.  *See* Joinder Petition para. 2.i, *et seq*.  They also seek to have Royce punished for freely associating with Terry Tauriello, a witness in the arbitration who is an owner and employee of R. Hassell Properties, Inc., a corporation, which was non-suited out of the family dispute in 2016.  *See,* Joinder Petition, paragraphs 2.c and 3.g.

4.    HCCI's Controlling Owners attempt to refile, rehash and repackage the same baseless claims that were dreamed up and asserted by lawyers loyal to Exxon who had multiple egregious conflicts with the Hassell family and their companies in an arbitration which ended in July of 2017.  The final arbitration award was confirmed in a Final Judgment by Harris County District Judge Fredericka Phillips on March 26, 2018,[6] just before the four siblings attempted to refile the same claims in the concluded arbitration, and then in a new bankruptcy involuntary case they brought against the partnership they claim in this case is not real.  Their belated arbitration attempt was stricken,[7] and United States Bankruptcy Judge Marvin Isgur found they acted in bad faith.

5.    The pretext for this suit, that the value of their stock in HCCI has been diminished on grounds the partnership was not "real" and not "for profit," contradicts even HCCI's own audited financial statements prepared by auditors from information provided by HCCI's Controlling Owners which in turn they provided to banks, insurance companies and sureties for years before filing this suit.[8]

---

[5] Cause No. 2013-61995; *R. Hassell & Company, Inc., et al v. Hassell Construction Co., Inc., et al*, in the 61st Judicial District Court of Harris County, Texas.

[6]  *See,* Exhibit "1", Final Arbitration Award;

[7] *See,* Exhibit "2", Final Judgment and Exhibit "3" Motion to Strike Intervention and Exhibit "4" Order Striking Intervention.

[8] *See, for example* Exhibit "47" notes to financial statement of HCCI FYE June 30, 2014, (one year after Royce Hassell's lockout), page 14:  "On July 1, 2012, the Company entered into a joint venture agreement with the related companies of R. Hassell & Co., Inc., R. Hassell Builders, Inc., and G.R. Group Resources, Inc. (R. Hassell) . . .  The joint venture agreement called for sharing of profits with R. Hassell receiving 25% of the net profits on completed contracts . . .

6.    The allegations they make herein are also an attempt to collaterally attack Judge Isgur's now three year old May of 2015, Memorandum Opinion,[9] finding the partnership Royce Hassell's siblings complain of herein was "for profit"--a decision the siblings never chose to appeal--and the arbitration.

7.    Undeterred by bad faith finds, an arbitration award, or the revelations of their own misconduct, HCCI's Controlling Owners now file this TCPA barred suit.  <u>Importantly, in this suit they openly threaten they will file more like it in the future.[10]</u>

8.    By this legal action HCCI's Controlling Owners improperly attempt to chill and stifle Royce Hassell's right to petition on his own behalf and individually on behalf of the family corporation of which he is part owner and an equal beneficiary, as well as his rights to speak freely and associate freely with business associates.  This legal action is, therefore, based on, relates, to and/or in response to Royce Hassell's exercise of his constitutional right to petition, free speech and free association.

9.    Under the TCPA, immediate dismissal of the legal action is mandatory unless HCCI's Controlling Owners provide "clear and specific" evidence to support each element of their claims.  And, even if HCCI's Controlling Owners could provide "clear and specific" evidence of each element of each of their claims— and they cannot— immediate dismissal of this case is still mandatory under the TCPA because Royce Hassell has established each essential element of his affirmative defenses to the claims of HCCI's Controlling Owners.  The Controlling Owners' legal action must be dismissed under the TCPA.

**I.    FACTUAL BACKGROUND**

   **A.  By a 1986 gift, the JCH Trust, of which Royce Hassell is an equal beneficiary with his five siblings, is the majority shareholder of <u>Hassell Construction Company, Inc.</u>**

10.  James Hassell founded Hassell Construction Co., Inc. ("HCCI") in 1976.  In 1986, James Hassell gifted all the appreciating stock of HCCI equally to his five children via the James C. Hassell Intervivos

---

[9]  *See,* Exhibit "5", Memorandum Opinion dated May 11, 2015; and Exhibit "6," Transcript of Emergency Bankruptcy Hearing, March 9, 2018.
[10] *See,* Joinder Petition footnote 5.

[Irrevocable] Trust ("JCH Trust").  At the same time, James Hassell froze the value of his own interest in HCCI at $800,000 for estate planning purposes.  His five children, the five equal beneficiaries of the JCH Trust, are:

- Royce Hassell who is James Hassell's only son from his first marriage;
- Michael Hassell, Phillip Hassell and Shawn Hassell Potts (Counter-plaintiffs in this Anti-Slapp case) who are James Hassell's children from his second marriage; and,
- Jason Hassell (Third Party Plaintiff in this Anti-Slapp case) who is James Hassell's son from his third marriage.

11. The JCH Trust is the majority shareholder of HCCI.  Michael Hassell, has been the trustee of the JCH Trust for over 25 years.

**B.  HCCI is Just One of Many Hassell Family Related Companies:  *However, It is the Only Company In Which Together, All Five Hassell Siblings Own An Interest.***

12. HCCI is a business in which all five Hassell siblings own an interest.  On and off since its inception each Hassell sibling has worked for HCCI or run it in a management position going back to before the JCH Trust was formed more than thirty years ago.  In turn, from time to time each of the siblings has also had business interests outside HCCI and sometimes their separate companies joint-ventured work with HCCI.

13. In 1991, Royce Hassell, separately founded his own company, R. Hassell & Co., Inc. ("RHC"), a general contracting firm.  He also later expanded his business by forming R. Hassell Builders, Inc.  ("RHB"), a company dedicated solely to building projects.  R. Hassell Holding Company, Inc. ("RHHC") is a holding company which holds the stock of RHC and RHB. Royce Hassell also started G.R. Group, a container hauling company.  Years afterward, Royce also started and solely owned a custom home building company, R. Hassell Properties, Inc.  ("RHP") which was dedicated to building custom homes in West University Place and Bellaire, Texas, before the company became dormant in 2010.

14. In approximately 1997, Michael Hassell and two siblings, Phillip Hassell and Shawn Hassell Potts, started a new company with their father, Hassell Management Services, LLC ("HMS").  At first, HMS was said to be an employee leasing company to lease management employees to HCCI; But sometime latter, HMS acquired real estate and hired HCCI to develop the properties.  During that time, Michael Hassell,

4

Phillip Hassell, Shawn Hassell Potts, were employed and paid by HMS, but were leased to HCCI as its management personnel. By June 30, 2012, HMS owed HCCI over $1.6 million.

15. In approximately, 2003, Michael Hassell, Phillip Hassell and Jason Hassell formed a separate general contracting company, "Hassell Contractors, Inc." Sometime later, it appears that some of the siblings including Jason Hassell, Michael Hassell and Phillip Hassell may have tried to merge Hassell Contractors, Inc. with HCCI.

16. Since 1991, and particularly from 2008-present, Royce Hassell's siblings have jointly exerted majority control of HCCI acting as its controlling officers and directors. To Royce Hassell's knowledge, during most of that time Jason Hassell, worked for HCCI's competitor, Webber, Inc.

### C. HCCI and Royce Hassell's companies entered into multiple Joint Ventures after 2008.

17. In relationships which started up following the 2008 economic crash, Royce Hassell's companies and HCCI joint ventured about $40 million in construction yielding HCCI profits of about $1,000,000 before the Hassell 2012 Joint Venture partnership was formed. The corporate relationship allowed RHC and RHB to capitalize on HCCI's unused bonding capacity, and allowed Royce Hassell's companies to compete for bigger projects in the scarce construction market of that time.

### D. In 2011, the Springwoods Project (in which HCCI owned a profit only interest and Royce Hassell's companies bore 99% of the risk of loss) went horribly awry due to the District's defective plans.

18. In July of 2011, under the oral agreement they had been operating under since 2008, HCCI contracted a project to be performed in joint venture with Royce Hassell's companies, wherein Royce Hassell's companies bore 99% of the risk of loss. While the contracting parties were HCCI and a pubic entity, Harris County Improvement District No. 18 (the "District"), the District was contracting for the benefit of Exxon whose funds were escrowed to pay the upfront construction costs of HCCI pursuant to an agreement negotiated by Richard Rose as attorney for Exxon. Later, Richard Rose helped administer

5

that agreement as a Director of the District, the public entity which contracted with HCCI.  However, because the District's plans were defective, a question arose as to whether the construction costs of Exxon would be reimbursable, and later resulted in HCCI's multi-milliondollar claim against the District filed on July 27, 2012, Mr. Rose, as Exxon's attorney and a District director, was personally involved in defending against HCCI's claims, including deliberating with the District's litigation counsel in private sessions against HCCI.  While HCCI was asserting claims against the District for defective plans, Mr. Rose allowed his law firm to become involved in a secret eighteen-month operation with HCCI and Royce Hassell's siblings to obtain "documents" the law firm later used to argue that HCCI's claims against the District were grossly inflated, that Royce Hassell was dishonest, and that only his siblings controlled the claims against the District.  During the time the relationship was concealed from Royce Hassell, he continued responding to the District's allegations regarding HCCI's performance on the project (Exhibit "15").  Ultimately, the secret relationship was followed by a public relationship wherein Mr. Rose's law firm agreed to act as  HCCI's "corporate counsel" over Royce Hassell's objections, propounding the position that Royce Hassell is not an owner of HCCI and is not authorized to speak for HCCI derivatively thereby forcing Royce Hassell to pursue the District as an outsider.

> **E. Phillip Hassell Proposed the Hassell 2012 Joint Venture Before the Springwoods Project was finished in consultation with attorneys who were loyal to Exxon and the District.**

19.  In August of 2012, in the middle of his clandestine relationship with Mr. Rose's law firm, Phillip Hassell proposed a new comprehensive, combining of resources, partnership between HCCI and Royce Hassell's companies.  He started off by handing Royce Hassell a letter addressed "To all" and followed up the proposal in meetings held at Royce Hassell's office.  Phillip Hassell's letter occurred during a period of family turmoil which followed Royce Hassell directing HCCI to file suit against the District through the family's long time attorney, Pascal Piazza.  Exhibit "10."  The filing of the lawsuit following a failed July 2, 2012, mediation between HCCI and the District over which it was agreed Royce Hassell had the final say although he invited his brother, Phillip Hassell, to attend not knowing Phillip Hassell was sharing HCCI's

confidential information with lawyers loyal to the District and Exxon.  See, Exhibit "8", June 28, 2012, e-mail.

20.  Immediately after the failed mediation, Royce Hassell's family, in consultation with Mr. Rose's law firm, sent Royce Hassell a letter telling him he had _no authority_ to speak for HCCI.  Later, Royce Hassell discovered this communication was made in consultation with Mr. Rose's law firm (Exhibit 9, entries of July and August 2012).

21.  In late August of 2012, seemingly out of the blue, Phillip Hassell proposed a "combining of assets" and "joining of forces" partnership with his brother.  Using financial coercion related to this partnership, Mr. Rose's law firm shut down Royce Hassell's authority, shut him out of HCCI's suit against the District, shut Royce Hassell out of his $100,000,000 partnership with HCCI, and shut Hassell out of HCCI itself. (*See,* Exhibit 39 "no funds to distribute," and false lien on Stellar Project.)

22.  Mr. Rose's law firm is interested in HCCI's suit against the District although they have repeatedly denied having anything to do with it. For example, Mr. Rose expressed fears in an e-mail about how much the suit would cost [the District and/or Exxon];  (Exhibit "11"); he assisted John Engvall with legal strategies (Exhibit "11" redacted e-mails); he hid his own involvement (Exhibit "41" conflict disclosure); behind the scenes he communicated with the District attorneys about events in mediation against HCCI through Lynn Humphries of Allen Boone & Humphries who did attend the mediation; Exhibit "12"; and he allowed his firm to secretly solicit documents from Royce Hassell's siblings without his knowledge and consent which his firm later used to discredit, ridicule and embarrass Royce Hassell, his family, and most of all HCCI by a huge loss in the arbitration, all the while being paid with Royce Hassell's share of the Hassell 2012 Joint Venture profits, all the while the firm charged HCCI exorbitant fees.  This Court can also take judicial notice of the official minutes of the District reflecting Mr. Rose's activities.

   **F.   Mr. Rose's law firm, simultaneously counsel for HCCI and Exxon, participated in non-suiting HCCI's claims against the District even though Mr. Rose is a government official Director of the District.**

23.     Ultimately, the District defeated HCCI by the self-inflicted wounds brought on by an improper relationship of Royce Hassell's siblings with Exxon's lawyers who also directed the District. *See, for example,* Exhibit "40" Bogdan Rentea's Privilege Log.  This non-suit was made without authorization of Royce Hassell even though the lawyers were aware they were charging his companies with 99% of the risk of loss on the Springwoods Project.

> **G.     Unaware His Siblings had entered an alternate universe run by Exxon (which was liable to the taxpayers of the District HCCI had just sued), Royce Hassell agreed to his brother's proposal to combine his own companies with HCCI in a partnership; only to have HCCI, the partnership and his companies destroyed through false narratives perpetuated by lawyers loyal to Exxon and the District.**

24. Eight months into the Hassell 2012 Joint Venture, a partnership Phillip Hassell proposed while conspiring with Mr. Rose's law firm to find ways to take away Royce Hassell's authority, his siblings locked the doors against Royce and threw away the keys.  Not long afterward, Royce Hassell's siblings also locked him out of the Springwoods lawsuit, the Hassell 2012 Joint Venture and HCCI, and now by this suit they are seeking to lock him out of the JCH Trust.  As HCCI's corporate counsel Mr. Rose's law firm successfully ran a campaign to discredit Royce Hassell  by deliberately publishing false narratives such as:

- That Royce Hassell is not an owner of HCCI and thus has no authority to speak for HCCI.
- That the debt on HCCI's Line of Credit was not caused by Springwoods Project losses, but was instead caused by Royce Hassell's incompetence, dishonesty and breaches of duty to HCCI.
- That HCCI's claims against the District are grossly inflated and not supportable.
- That Royce Hassell should not have any say in HCCI's lawsuit against the District because Royce Hassell's companies are "mere" Subcontractors to HCCI on the Springwoods Project.
- That HCCI should non-suit its claims against the District or risk being accused of being a "sham contractor."
- That Royce Hassell, HCCI's primary fact witness and a damage expert against the District, is untrustworthy and incompetent as at length particularly alleged arbitration demands, affidavits, and discovery responses prepared by lawyers loyal to the District and Exxon.

> **H.   This latest suit by his siblings evidences they believed they personally stood to benefit (the quid pro quo) by the striking a secret plan with lawyers loyal to Exxon and the District to blame Royce Hassell for the Springwoods Project losses.**

25. The June 28, 2012, e-mail between Shawn Hassell Potts and Phillip Hassell, coming just days before HCCI's pre-suit mediation against the District tells it all:  Royce Hassell's siblings believed they would gain by having  Coats Rose started "seize[ing]" Royce Hassell's assets. (Exhibit "8').  Similarly, Coats Rose pre-conditioned acting for Royce Hassell's siblings on getting documents which would satisfy them it was time to act against Royce Hassell.  *See,* Exhibit "26" Patrick Gaas affidavit.

26.  Among other documents Mr. Rose's law firm collected Joinder Petition Exhibits "A" and "C" which Bogdan Rentea, their co-counsel, now uses to argue Royce Hassell was attempting to defraud them.

27.  Other "documents" Royce Hassell provided his siblings, not knowing they were sharing them with Mr. Rose's law firm, include *HCCI's confidential mediation statement against the District, <u>a draft of HCCI's suit against the District to which his siblings proposed changes,</u>* projected cash flows of the Springwoods Project and a multitude of other confidential communications about HCCI's positions in the litigation.

**I.    In September of 2013, when Royce Hassell first learned Coats Rose agreed to be HCCI's corporate counsel, Royce Hassell objected and has been objecting ever since.**

28.  After Royce Hassell's wife, an attorney, called Richard Rose directly objecting to his firm's relationship with HCCI (the extent of which was yet unknown) lawyers from his firm instructed his wife and Royce Hassell that they were not permitted to contact family members except through Coats Rose. That conversation was at the same time Coats Rose instructed HCCI's attorney against the District, Pascal Piazza, to "tread lightly;"  Coats Rose informing Royce Hassell all negotiations had to go through them;  Coats Rose announcing anything said about the Springwoods Project was public information as if publishing it in a newspaper; Coats Rose having Royce Hassell removed as an officer and director of HCCI at Coats Rose offices; Coats Rose making a settlement demand for HCCI which required Royce Hassell to "forget conflict."  *See* Exhibit "42", Coats Rose settlement proposal for HCCI "forget conflict."

29.  Mr. Rose's lawyers used surrogates such as Micky Das, a business partner of Coats Rose Vice President Patrick Gaas in a separate venture (Exhibit "38"), to file pleadings in court arguing conflict of interest issues were "moot," all the while those surrogates allowed Coats Rose attorneys to control

negotiations and pull the strings behind the scenes.  *For example see,* Exhibit "16" I'll be representing;" and simultaneous Exhibit "17" paragraphs 12 and 13, Micky Das telling Judge Carter conflict of interest issues raised by Royce Hassell were "moot."

> **J.   As Co-Counsel with HCCI's corporate lawyers (who were also Exxon's lawyers) Bogdan Rentea Took Over, Non-Suited, and refiled the same claims against the District four and half years after the original suit, only to lose 99% of the claims by summary judgment on limitations.**

30.  After sending yet another letter alleging Royce Hassell had no authority for HCCI regarding the Springwoods lawsuit (Exhibit "18" July 2014 Coats Rose letter), Mr. Rose's law firm successfully ousted Pascal Piazza as HCCI's attorney and replaced him with Bogdan Rentea.

31.  At the time of his hiring, Bogdan Rentea was separately suing the R-7 arbitrator's law firm for conflict of interest malpractice, at the same time the arbitrator was considering Royce Hassell's conflict of interest objections to Richard Rose's law firm.  The R-7 arbitrator allowed the conflicted lawyers to continue acting for HCCI based on affidavits prepared by Mr. Rose's law firm alleging that _HCCI and Royce Hassell's companies had been adverse to each other "at all times" after January of 2012, which was the date they began their  clandestine relationship with Royce Hassell's siblings._   Of course, Royce Hassell's siblings did not disclose the fact they intended to remain adverse to Royce Hassell when they invited him into the $100,000,000 partnership while they secretly interfered with HCCI's claims against the District which they knew were 99% to Royce Hassell's account.

32.  In light of their duplicity, Bogdan Rentea's exoneration of the District and its engineers on October 3, 2016, by a simple one page non-suit is not now surprising.  A privilege log of Bogdan Rentea shows he filed the non-suit in coordination lawyers from Mr. Rose's law firm.  Exhibit "40" entry of October 3, 2016.

33.  At arbitration preliminary hearings of December 15 and 16 of 2016, with Coats Rose lawyers and Bogdan Rentea simultaneously claiming to represent HCCI's interests as well as the interests of Royce Hassell's siblings, just two months after HCCI's non-suit of the District, the lawyers agreed to dismiss and sever claims against Royce Hassell related to RHP and, to non-suit RHP.  This non-suit agreement was

immediately preceded by the arbitrators, once again, denying Royce Hassell's requests for HCCI that Mr. Rose's law firm and Bogdan Rentea be disqualified, and severing Royce Hassell's derivative claims against the lawyers from the arbitration.  During those hearing Royce Hassell specifically told Bogdan Rentea that he intended to sue him for HCCI for wrongfully non-suiting the District without Royce Hassell's knowledge or consent.  Bogdan Rentea had, days prior to the hearing refiled HCCI's suit against the District.  (Bogdan Rentea lost 99% of that suit months later on summary judgment-*by limitations.*  Exhibit "50.")

34. Days after this confrontation with Royce Hassell at arbitration hearings Bogdan Rentea initiated this suit for HCCI which is unverified, seeking an "injunction" against Royce Hassell from asserting derivative claims for HCCI.  The suit alleges Royce Hassell is not an owner because his stock was bought out in a transaction dreamed up by Coats Rose in September of 2013 after Royce Hassell objected to Coats Rose's conflicts.  Thus, the original suit is a preemptive defensive measure against Royce Hassell to prevent him from petitioning on behalf of HCCI against conflicted lawyers which include Bogdan Rentea.

35. Also following the December 2016 arbitration hearings, Bogdan Rentea filed suit (for HCCI) against Royce Hassell's wife who is an attorney, and Pascal Piazza the attorney Royce Hassell selected to represent HCCI which Coats Rose instructed to "tread lightly."  In that suit, "HCCI" purports to allege that Pascal Piazza and Royce Hassell's wife beached their fiduciary duty to HCCI.  Needless to say Pascal Piazza has successfully moved to have Bogdan Rentea joined as a responsible third party for any damages HCCI may claim it has suffered in that suit which is currently still pending but abated by agreement with Bogdan Rentea.  Exhibit "19'.

> ### K.  Complicit with HCCI's corporate counsel, the District's lawyers, Engvall & Lopez and Allen Boone & Humphries, worked with lawyers they knew to be simultaneously Exxon's lawyers and HCCI's lawyers, to Defend Against HCCI's Suit.

36. Throughout these events, evidence shows Coats Rose's president, Richard Rose, has worked with the District's other lawyers against HCCI.  *(See,* communications between Richard Rose, John Engvall's firm and Allen Boone & Humphries.).

37. In turn, Allen Boone & Humphries the District's counsel has actively concealed documents evidencing its own participation in the drafting of Richard Rose's conflict disclosure statement about his firm's relationship with HCCI *which incredibly asserts that he is not aware of his firm's representation of HCCI.* Coats Rose's own privilege log proves differently. *See,* Exhibit "43" the District's response to Royce Hassell's Open Records Act request and later surfacing documents; and Exhibit "9" entry 109.

38. In separate proceedings Coats Rose has been permitted by Exxon, HCCI, Liberty Mutual and the District to assert the attorney/client and work-product privileges for each of those parties regarding the events described in this motion. As a result, Richard Rose has yet to produce his firm's "memorandum (includes all  drafts)" about his firm's conflicts which he was sent in March of 2013. This memorandum was prompted by having to respond to a joint letter written by Royce Hassell and his brother, Phillip Hassell  during the clandestine relationship of which only Royce Hassell had no idea, together objecting to Coats Rose's conflicts. Phillip Hassell's signing of the March 2013 joint conflict objection letter was an obvious ruse to conceal what was going on between Coats Rose and Royce Hassell's siblings. See, Exhibit "20," Joint Letter of Phillip and Royce; Exhibit "9" Coats Rose Privilege Log noting a call between Phillip Hassell and Patrick Gaas on , page 9 entry 86 "Notes of Conversation with Phil Hassell today [April 1, 2013] and entry "109;" Exhibit "21", Coats Rose response to conflict letter of May 2013; and Exhibit "22," Phillip Hassell's September 2013, retraction of his March 2013 conflict objection letter.

39. This TCPA barred claim by Royce Hassell's siblings is a continuation of the attempts to prevent him from petitioning for HCCI, and merely continues the cover-ups and attacks on Royce Hassell's credibility devised by conflicted attorneys as defensive strategies to protect Exxon and the District from ever having to pay HCCI's claims against the District. *See,* Exhibit "23, Coats Rose engagement letter of January 2012.

> **L.   Like the Springwoods Project, the Hassell 2012 Joint Venture ended disastrously for Royce Hassell while the District and conflicted lawyers benefitted from the partnership profits HCCI now owes Royce Hassell's companies.**

40. in July of 2013, following more clandestine meetings with lawyers of Mr. Rose's firm,  HCCI's Controlling Owners locked Royce Hassell and his companies out of all joint businesses with HCCI.  Months later, those same lawyers told Royce Hassell the partnership had no funds to distribute to its members (Exhibit 39); filed false claims against RHB (Exhibit 39) and demanded through a surrogate that Royce Hassell undergo a prohibitively expensive process to arbitrate his claims against Exxon's lawyers who were claiming that Royce Hassell caused the Springwoods Project losses through dishonesty, incompetence and fraud.  In that arbitration which was initiated by Mr. Rose's law frim in 2014 and HCCI vows to appeal, lawyers loyal to Exxon and the District _sought over $10,000,000 in damages from Royce Hassell and his companies for alleged breaches of fiduciary duty to HCCI which they lost_.

41.  In 2014 Patrick Gaas presented the false narratives against Royce Hassell and his companies that they had "concocted" the partnership to get insurance using Joinder Exhibit "C."  This preposterous story was rejected by a federal bankruptcy judge (where Coats Rose refused to become "of record" while supervising discovery (Exhibit 39), and the arbitrators- even though it was Patrick Gaas himself who personally told them story while cross-examining Royce Hassell.

> **M. Royce Hassell Did Not Discover his siblings' duplicity in time to stop them from non-suiting the District or squandering hard earned money on conflicted lawyers loyal to Exxon and the District leaving HCCI apparently destitute.**

42.  On March 8, 2018, Bogdan Rentea newly filed an involuntary bankruptcy petition against the Hassell 2012 Joint Venture, the partnership he argues in this case is "not real;" then confessing to Judge Isgur that HCCI does not have $1.2 million dollars to pay Royce Hassell's judgment.  _See,_ Exhibit "6," Transcript of Emergency Bankruptcy Hearing, March 9, 2018, p. 17, ll. 17-18, Mr. Rentea:  "There's no $1.2 million to deposit, Your Honor."  Much of the money went to pay conflicted lawyers.

43.  While being paid with Hassell 2012 Joint Venture profits and HCCI's profits from that venture, conflicted lawyers continue to help Royce Hassell's siblings perpetuate a false narrative rejected by multiple tribunals, to destroy and tarnish Royce Hassell's ability to petition for HCCI.

44. The arbitration was compelled by Micky Das (Patrick Gaas' business partner) arguing that consolidation of all Hassell family disputes into the arbitration was proper because "all involve the same family members and entities, as well as a common set of facts and disputes." *See,* Exhibit "24", para. 4.) In those arguments Micky Das cited from from the AAA's R-7 arbitrator's assessment that:

> "All of the disputes involve family members or entities that are owned or controlled by family members.  They involve a course of dealing over time.  Fragmented proceedings would be expensive, inefficient, may lead to inconsistent results, and ultimately be more costly."

Exhibit "24," para. 10.

45.  These new legal actions of his siblings through Bogdan Rentea, co-counsel to Mr. Rose's law firm, are patently frivolous and are based on, related to, and in response to Royce Hassell's exercise of his constitutional rights to petition, speak freely and associate freely.

**Introduction to Legal Argument.**

46.  Royce Hassell is constitutionally permitted to exercise his constitutional rights to petition, speak freely and associate freely.  The stated purpose of the TCPA is to "encourage and safeguard the constitutional rights of persons to petition, speak freely, [and] associate freely" therefore, "if a legal action is based on, relates to, or is in response to a party's exercise of the right of free speech, right to petition, or right of association, that party may file a motion to dismiss the legal action."  Tex. Civ. Prac. & Rem. Code §§ 27.002 and 27.003.  "The unique language of the TCPA directs courts to decide its applicability based on a holistic review of the pleadings . . . Our focus . . . has been on the pleadings and on whether, as a matter of law, they are based on or relate to a matter of public concern. 'When it is clear from the plaintiff's pleadings, that the action is covered by the Act, the defendant need show no more." *Adams v. Starside Custom Builders, LLC., supra, citing Hersh v. Tatum,* 526 S.W. 3d 462, 467 (Tex. 2017).

47. The constitution and the TCPA protect Royce Hassell's right to sign an affidavit in support of a petition for a Writ of Garnishment in state district court.  A groundless lawsuit punishing him for doing so violates the TCPA.

48.  The constitution also protects Royce Hassell's freedom of speech and association.   Thus, a groundless lawsuit filed to punish a party for "activating a business in competition with HCCI" is a matter of public concern and properly the subject of a TCPA motion to dismiss. (*See,* the TCPA's definition of "matter of public concern" which "includes an issue *related to . . . economic* well-being."  Tex. Civ. Prac. & Rem.  Code 27.001(7)(B). *Also see, for example,* laws which prohibit restraint of trade or commerce such as Chapter 15 of the Tex. Bus. & Com. Code the purpose of which is "to maintain and promote economic competition in trade and commerce" Tex. Bus. & Com. Code § 15.04; and Section 15.05(a) of the Business and Commerce Code, wherein "the Legislature included a policy limitation on the freedom between employers and employees to contract: 'Every contract, combination, or conspiracy in restraint of trade or commerce is unlawful.'"  *Marsh USA, Inc. V. Cook, 354 S.W. 3d 764 (Tex. 2011)).*

## II.      ARGUMENT AND AUTHORITIES

### A.    THE TCPA

49. The TCPA exists "to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury."  Tex. Civ. Prac. & Rem. Code §27.002.  To prevent "Strategic Lawsuits Against Public Participation" from achieving their intended purpose of chilling and stifling these constitutional rights, the TCPA permits early dismissal after little or no discovery if a suit is "based on, relates to, or is in response to" a party's exercise of these specifically-enumerated rights."  *See,* Tex. Civ. Prac. & Rem. Code §27.003, §27.005, and §27.006; *see also Walker v. Schion,* 420 S.W. 3d 454, 458-59 (Tex. App.-Houston [14[th] Dist.] 2014, no pet.);

*Rehak Creative Servs., Inc. v. Witt,* 404 S.W. 3d 716, 719 (Tex. App.- Houston [14th Dist.] 2013, pet denied), *disapproved of on other grounds by In re Lipsky,* 460 S.W. 3d 579, 591 (Tex. 2015).

50.  The TCPA "indicates a legislative intent for an expedited resolution of a defendant's assertion that a frivolous lawsuit has been filed against him in retaliation for the exercise of his constitutional right of free speech, right to petition, or right of association." *Jain v. Cambridge Petroleum Grp., Inc.,* 395 S.W. 3d 394, 396-97 (Tex. App. -Dallas 2013, no pet.)(footnote omitted).  If plaintiff's theory, even if true, implicates constitutional rights specified in the TCPA, then the TCPA permits dismissal. *See* Tex. Civ. Prac. & Rem. Code §27.005(b); *In re Lipsky,* 411 S.W. 3d 530, 543 (Tex. App.-Fort Worth 2013, orig. proceeding). "The quick route to appeal the statute prescribes ensures that a reviewing court considers whether the plaintiff's suit would chill a defendant's protected constitutional right and the merit of claims implicating them near the inception of the case rather than later in the suit." *Better Business Bureau of Metropolitan Houston, Inc. v. John Moore Services, Inc.,* 500 S.W. 3d 26 at 37 [1st Dist.} 2016.

51. In deciding whether to grant a TCPA motion and thus dismiss a lawsuit against a moving defendant, the statute directs the trial court to engage in a two-step inquiry. *Rehak,* 404 S.W. 3d at 723. First, the defendant seeking dismissal must show "by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the party's exercise of (1) the right of free speech; (2) the right to petition; or (3) the right of association." Tex. Civ. Prac. & Rem. Code §27.005(b).  For this first prong, doubts must be resolved in favor of the TCPA's application, as under its own terms the TCPA "shall be construed liberally to effectuate its purpose and intent fully." Tex. Civ. Prac. & Rem. Code §27.011.

52. Once the moving defendant shows that the plaintiffs' claims relate to the right to petition, the right of freedom of speech, or the right to associate freely, the burden shifts to the nonmovant to establish "by clear and Specific evidence a prima facie case for each essential element of the claim in question." Tex. Civ. Prac. & Rem Code §27.005(c).  If the nonmovant does not meet this burden, then the case against the moving defendant "shall" be dismissed. *Id* at §27.005(b).

53. However, even if a nonmovant is able to meet its "clear and specific" burden, the Court nevertheless "shall dismiss a legal action against the moving party if the moving party establishes by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim." *Id.* at §27.005(d). An appellate court reviews *de novo* both prongs of a trial court's determination of a TCPA motion to dismiss. *See, Better Bus. Bureau of Metro Hous., Inc. v. John Moore Servs., Inc.,* 441 S.W. 3d 345, 353 (Tex. App. -Houston [1ˢᵗ Dist.] 2013, pet. Denied) disapproved of on other grounds by *In re Lipsky,* *460* S.W. 3d at 591; *see also Rehak,* 404 S.W. 3d at 726-27.

54. This suit is another attempt to chill Royce Hassell's constitution right to petition, the right of free speech, and the right of association. Thus, the new plaintiff's claims against Royce Hassell must be dismissed under the TCPA and HCCI's Controlling Owners must be sanctioned to prevent future violation of the TCPA.

**B.** **First Prong:  The New Legal Action Against Royce Hassell Must be Dismissed Because It is Based On, Relates To, and Is in Response to Royce Hassell's Exercise of the Right to Petition and Free Speech and His Freedom of Association.**

55. "The TCPA casts a wide net." *Adams v. Starside Custom Builders, LLC,* 16-0786 (Tex. 2018). A party who moves to dismiss under the TCPA must first show by a preponderance of the evidence the claim is based on, relates to, or in response to the movant's exercise of the right to petition, the right of free speech, or the right of association. Tex. Civ. Prac. & Rem. Code §27.005(b).

**(i)** **The Right to Petition and Free Speech**

56. The TCPA defines the "[e]xercise of the right to petition" to mean any of the following:

(A)  A communication in or pertaining to;
    (i)     A judicial proceeding;
    (ii)    An official proceeding, other than a judicial proceeding, to administer the law;
(B)  A communication in connection with an issue under consideration or review by a legislative, executive, judicial, or other governmental body or in another governmental or official proceeding;
    ………………..

(E)  any other communication that falls within the protection of the right to petition government under the Constitution of the United States or the constitution of this state.

Tex. Civ. Prac. & Rem. Code §27.001(4).

57.  An "official proceeding" is defined as "any type of administrative, executive, legislative, or judicial proceeding that may be conducted before a public servant."  *Id.,* §27.001(8).  "Public servant" is defined as [among others] "an arbitrator, referee, or other person who is authorized by law or private written agreement to hear or determine a cause or controversy."  *Id.* §27.001(9)(c).  And, "[c]ommunication includes the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic."  *Id. at* §27.001(1).

58.  The "exercise of the right of free speech" is defined as "a communication made in connection with a matter of public concern."  Tex. Civ. Prac. & Rem. Code Ann §27.001(3).

59.  A "'[m]atter of public concern' includes an issue related to: (A) health or safety; (B) environmental, <u>economic,</u> or community well-being; (c) the government; (D) a public official or public figure; or (E) a good, product or service in the marketplace."  *Id. §27.005(d). (Emphasis added).*

60.  Because this legal action seeks to chill Royce Hassell's right to petition to enforce the arbitration award and Final Judgment, including petitioning for a Writ of Garnishment against HCCI's bank and signing an affidavit in support thereof, it impinges on Royce Hassell's freedom to petition and to speak freely.

61.  The allegations in this new legal action evidence that they are based on, relate to and are in response to Royce Hassell's exercise of constitutional right his to petition and free speech.  Specifically, the legal action alleges that Royce Hassell "continues to take actions," which include "as recently as April 10, 2018, Royce Hassell supported an application for a writ of garnishment against HCCI's bank account. . . Knowing that all the funds in those bank accounts were subject to a lien by the bank, and that he would never obtain a dime from the garnishment, he nevertheless obtained one for the sole purpose of harming the family business."  Joinder Petition, pg. 3, (para. 2(i).

62. Thus, the legal action itself is evidence of the basis of this legal action includes a communication by Royce Hassell via in an affidavit used to support a petition for writ of garnishment in a judicial proceeding.  *See, Rio Grande H2O Guardian,* No. 04-13-00441-CV, 2014 WL 309776, at *3, (Tex, App.-San Antonio, Jan. 29, 2014, no pet.) (mem. Op.)(holding that pleadings may be considered as evidence for purposes of TCPA motions to dismiss).  Because petitioning for a writ of garnishment and the making of an affidavit is a constitutionally protected activity, HCCI's Controlling Owners legal action should be dismissed under the TCPA for this reason alone.  Tex. Civ. Prac. & Rem. Code §27.005(b)(2).

        **(ii)      The Right of Association.**

63. The TCPA defines the "exercise of the right of association" to mean "a communication between individuals who join together to collectively express, promote, pursue, or defend common interests."

64. The legal action brought by Royce Hassell's siblings, who control HCCI, asserts claims that Royce Hassell for "activat[ed] a business in competition with HCCI, under the corporate name of R. Hassell Properties, Inc.". . . and that thereafter "RHP and Tauriello [his business associate], took actions designed to damage HCCI and its owners, by, inter alia, diverting assets and business opportunities rightfully belonging to HCCI."  Joinder Petition, Para. 2(c) and Para. 3(g).  These allegations state no cause of action. Instead, they evidence that the legal action is in retaliation for Royce Hassell's exercise of his right of association with others, including Terry Tauriello and RHP, "to collectively express, promote, pursue or defend common [economic] interests" which are TCPA protected communications.  (It is also noteworthy that while HCCI's Controlling Owners wish to punish Royce Hassell for competing with HCCI, at the same time they caused HCCI to bring the original suit in December of 2016, which asked this Court to enjoin Royce Hassell from speaking for or petitioning on behalf of HCCI; the reason, HCCI's purported and significantly unverified claim that Royce Hassell is not an owner of HCCI.  It would, therefore,, appear that the combined practical effect of the original suit by the corporation they control and this new legal action

19

brought by the corporation's controlling owners is that they wish Royce Hassell not to be an owner of HCCI and also never be allowed to compete with HCCI.

65. Attempted economic restraint of trade is obviously a matter of public concern.  (*For example,* "Every contract, combination, or conspiracy in restraint of trade or commerce is unlawful."  Tex. C. Prac. & Rem Code § 15.05(a).; "It is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce." Id. § 15.05(b).  *See, also, Better Business Bureau of Metropolitan Houston, Inc. v. John Moore Services, Inc*., 500 S.W.3d 26, ([1st Dist.] 2016).)

66.  Royce Hassell, RHP and Terry Tauriello are constitutionally permitted to communicate with each other in association with RHP for the purpose of "expressing, promoting, pursuing, or defending" their common interests and, obviously, the claims asserted in the Joinder Petition are based on, related to and are in response to Royce Hassell's Exercise of constitutionally protected rights.

67. The legal action should be dismissed because it seeks to chill Royce Hassell's constitutional right of free association.

## C.  Second Prong:  This Suit Must Be Dismissed Because HCCI's Controlling Owners Have No Evidence-Much Less "Clear and Specific" Proof-To Support Each Element of Their Claims Against Royce Hassell.

### (i)  The Law: "Clear and Specific" Evidence.

68. As described above, this case must be dismissed unless HCCI's Controlling Owners present the Court with "clear and specific" evidence to support each element of each cause of action that they bring against Royce Hassell.  Tex. Civ. Prac. & Rem. Code §27.005(c).  This is a heightened standard that requires the non-movant to show with evidence specifically "when, where and .. . how" the movant's conduct was actionable and how it resulted in injury.  *In re Lipsky,* 460 S.W. 3d at 590-91 (Tex. 2015).

### (ii)  Alleged Breach of Fiduciary Duty.

69. To establish a claim for breach of fiduciary duty HCCI's Controlling Owners must establish by clear and specific evidence the following elements:

(1) Royce Hassell owed his siblings a Fiduciary Duty;
(2) Royce Hassell breached that duty;
(3) Causation; and
(4) Damages.

70. The legal action allegations and exhibits of HCCI's Controlling Owners do not evidence any facts to support a claim that Royce Hassell owed his siblings who as a group with their father, controlled HCCI to the exclusion of Royce Hassell. Royce Hassell's duties ran to HCCI, HCCI sued him for breach of fiduciary duty, and the arbitrators, who were presented with all the evidence HCCI's Controlling Owners could amass which amounted to literally hundreds of thousands of documents, denied HCCI's claims that Royce Hassell violated any fiduciary duties to HCCI.

71. None of the documents amassed by Royce Hassell's siblings during their eighteen-month clandestine relationship with conflicted lawyers evidence a confidential relationship, and equally fail to show they "trusted" Royce Hassell.  Just the opposite the evidence actually shows that:

- six years ago, his siblings embarked on a mission with conflicted lawyers to "seize" his assets through lies and subterfuge (*see, for example,* Exhibit "48" Joel Massey referral to Coats Rose;
- Even before then during the time Royce Hassell was gravely ill his siblings and Liberty Mutual through its attorney in fact Rosalyn Hassell insisted that all revenue from joint projects flow through HCCI's banks accounts over which only Royce Hassell's siblings had signature authority even while the siblings were telling Royce Hassell they truly wanted to be his partner;
- Shawn Hassell Potts persistently in trying to physically, move her office, her accounting staff, and even her own separate home care business into Royce Hassell's own offices;
- Shawn Hassell Potts personally went to Royce Hassell's ailing mother's house after his mother suffered a fall under the guise of providing paid home health care through Blue Iris/Avionn, a company owned by Shawn Hassell Potts, and pumped his mother for information;
- His siblings required him to sign deed of trust liens on all his personal real estate as a pre-condition to "helping" him, which they refuse to released even today even after having lost in the arbitration;
- His siblings unlawfully asked a CommunityBank President and officer to give them Royce Hassell's private banking information, *which he provided without Royce Hassell's consent.* (*See,* Exhibit "25" letter of explanation from CommunityBank to Royce Hassell.
- Merged Hassell Contractors with HCCI after an unsuccessful attempt to buy Royce Hassell out of the JCH Trust.

72. Royce Hassell's siblings cannot provide any proof, much less clear and convincing proof that they had a relationship of trust or confidence with Royce Hassell after he left HCCI in 1991. *See,* Exhibit "26" affidavits alleging HCCI and Royce Hassell's siblings were adverse at all times to him; Exhibit "27" HCCI Answer Verified by Phillip Hassell when Royce Hassell attempted to protect HCCI's case against the District from being destroyed by conflicted lawyers. *See also,* Exhibit "28" HCCI's non-suit of the District.

73. Exhibits "A" and "B" were created in February of 2012 and April of 2013, respectively. The exhibits fail to raise even a scintilla of evidence, much less clear and convincing evidence, that his siblings had a "confidential" relationship with him or trusted him in any way. Far from it, Exhibit "A" is a rehashed 2/17/2012, handwritten note which was admitted in the Bankruptcy cases as Document 106-26 in Case No. 15-32751 on 2/05/2016; and also used in the arbitration by HCCI, which Royce Hassell testified was mostly dictated by his sister Shawn Hassell Potts while he was on medications following lifesaving transplant surgery. And, more importantly, it was a document she had earlier agreed to try to get for Mr. Rose's law firm so it would begin "seiz[ing]" *his assets to pay for the Springwoods Project losses.* The idea that this note, which in part states, "I, Royce James Hassell, propose this Action plan to reduce our debt and to preserve our ability to pay off our obligations going forward" and includes statements that he must "Help Phillip/Shawn/Mike in anyway possible from running the office to mopping the floors and to oversee projects for us to be profitable to pay our obligations" supports the notion they trusted him is untenable in light of the fact they locked him after he wrote it.

74. Joinder Petition Exhibit "B," similarly does not evidence trust in Royce Hassell but mistrust in him. As evidenced by the multiple exhibit stamp markings his siblings also brought up Exhibit "B" on behalf of their controlled corporation, HCCI, as Document 106-25 in Bankruptcy case 15-32751 filed of record on 2/05/2016; and also relied on as Exhibit "HCCI 124" in the arbitration. There is no evidence of trust in statements and accusations of Phillip Hassell as follows:

- [Y]ou did not pay the bills that you said you were going to, furthermore you paid bills that were not on your aging report which makes what we talked

about not correct.  Living expenses are not bills to vendors or subcontractors.
(Joinder Petition, Exhibit "B," Page 1.)

- Yes I am disappointed because I don't understand what you are doing, the
  hole keeps getting deeper.  (Joinder Petition, Exhibit B, page 1.)
- I have a meeting with Dad tomorrow about my meeting with the bonding
  company next week, he is going to blow a gasket with the bills not being paid
  like I presented to him."   (Joinder Petition Exhibit C, page 3.)

75.  "B" does show his siblings were controlling *Royce Hassell's own monies in the joint ventures which already had been received from the owners, although his siblings were telling him they were making him "advances."  At that time in Royce Hassell's illness his siblings were lying to him about the monies coming in on his behalf and what they were doing with it.  In the meantime, Exhibit "B" evidences that during that time Royce Hassell was having to beg his siblings for his own money to pay his living expenses*.

76. Jason Hassell has presented no evidence, and has none, that he trusted Royce Hassell or had confidence in him.  If he did, he waived those claims on September 2, 2013, when Jason told Royce Hassell in an e-mail "I no longer wish to be contacted about these "TRUST" issues any further."

77.  Corporate officers do not owe a fiduciary duty to individual shareholders absent a contract or special relationship between them in addition to the corporate relationship.  *Cotton v. Weatherford Bancshares, Inc.,* 187 S.W. 3d 687, 698 (Tex. App.-Fort Worth 2006, pet. denied.)    HCCI's Controlling Owners present no clear and convincing evidence of such a relationship or contract.

78. Additionally, even if a cause of action existed for diminution of stock value, HCCI's Controlling Owners cannot produce evidence, clear and convincing or otherwise, that Royce Hassell's conduct caused HCCI damages and thus diminished the value in HCCI stock.

79.  Because HCCI's Controlling Owners cannot provide the required proof of each of the elements of their breach of fiduciary duty claim, the claim must be dismissed under the TCPA.  Tex. Civ. Prac. & Rem. Code § 27.005(c).

     **(iii)**     **Alleged Fraudulent Inducement.**

80. To establish a fraud claim, HCCI's Controlling Owners must establish by clear and specific evidence that:

    (1) Royce Hassell made a material representation of fact;
    (2) The representation of fact was false;
    (3) When the representation of fact was made, the speaker knew that it was false or made the representation recklessly without any knowledge of its truth and as a positive assertion;
    (4) The speaker made the representation with the intent that the person to whom the representation was made act upon it;
    (5) The person to whom the representation was made acted in justifiable reliance on the representation; and
    (6) The representation caused damages.

*Exxon Corp. v. Emerald Oil & Gas Co.,* 348 S.W. 3d 194, 217 (Tex. 2011); *Italian Cowboy Partners, Ltd. V. Prudential Ins. Co. of Am.,* 341 S.W. 3d 323, 337 (Tex. 2011); *see also, Aquaplex, Inc. v. Rancho La Valencia, Inc.,* 207 S.W. 3d 768, 774 (Tex. 2009).

81. Royce Hassell's siblings have no evidence that Royce Hassell made any false representations to induce them to agree that HCCI enter into the Hassell 2012 Joint Venture, much less evidence of false representations by him that the partnership was for insurance purposes only.

82. Far from showing Royce Hassell was induced any partnership, Joinder Exhibit "C," is a note Phillip Hassell asked Royce Hassell while Phillip Hassell was fifteen months into an eighteen-month sting operation to spy on Royce Hassell for Mr. Rose's law firm, and while he was in constant secret communications with them.  Further the note does not say the partnership, which was already months into operation, is not for profit but states accounting was to continue "as is." Since the partnership was induced by Phillip Hassell and not Royce Hassell (*see, Exhibit "7" Phillip Hassell's "To All" letter)*, and Phillip Hassell now says the agreement was not intended to "be real," if anything Exhibit "C" evidences that Royce Hassell's siblings wrongfully induced him and not the other way around.  Royce Hassell was induced to perform his obligations under a partnership of corporations he, a United States Bankruptcy Judge, two state court judges and a panel of three arbitrators believe "is real."  To that end Royce Hassell trustingly combined his life earned resources, including his companies' contracts, employees, equipment and

goodwill, into the partnership which his siblings then allowed conflicted lawyers to destroy as HCCI's corporate counsel.  *See,* Exhibit "13".

83. Those same conflicted lawyers fabricated false narratives around Exhibit "C."  As early as 2013, conflicted lawyers began keeping the Hassell's fighting between themselves by funneling all Hassell matters into an arbitration stacked with an arbitrator willing to hide his relationship with the lawyers who later, after it was too late, was removed for evident partiality.  (Exhibit "49").  Before the arbitration, in a mediation Judge Carter ordered after Micky Das told Judge Carter Coats Rose lawyers were not involved, Coats Rose lawyers and a large supporting staff showed up and presented Exhibit "C" as the focal point of a forty-page power point presentation they prepared to show Royce Hassell lacked credibility.  At the February 2014 mediation laughter emanated from the room occupied by conflicted lawyers and Royce Hassell's siblings following a joint session wherein Royce Hassell confronted the lawyers face to face with evidence that they were conflicted and should withdraw because they were harming HCCI's suit against the District.

84. In court after the mediation Micky Das once again led Judge Carter to believe Coats Rose lawyers were not involved by writing:  "Nothing has changed since the Defendants [HCCI, HMS, James Hassell] sought arbitration, or since this Court ordered mediation and subsequently granted the motion to compel arbitration. . . This lawsuit involves a dispute arising from and related to the business relationship among the parties.  That business relationship was memorialized in one, written joint-venture agreement, which contains an arbitration provision.  The dispute comes within the scope of that provision, and there is no argument or evidence before this Court that contests the validity of the written provision or its enforceability. Exhibit "29," Defendant's Response to Plaintiffs' Various Motions . . ."

85. Further, the idea that Royce Hassell would combine his life earned companies into HCCI just so they could get insurance is fantastical.  Even assuming that story could be believed, which it cannot, had Phillip Hassell even suggested the possibility of such a scheme to his wife, Rosalyn Hassell who is the

licensed insurance agent responsible for obtaining insurance for the venture, she would have been committing insurance fraud by seeking to obtain insurance on that basis.

86. HCCI's Controlling Owners cannot produce any evidence, much less clear and convincing evidence, of what they claim that Royce Hassell represented that he wanted or needed a partnership for insurance purposes "ONLY" or that the Hassell 2012 Joint Venture was anything but a "for profit" partnership.  Judge Isgur specifically overruled such ridiculous notions at a transcribed hearing (*see, Exhibit "30" below*) before issuing a written Memorandum Opinion, now more than three years old and un-appealed, upholding the validity of the agreement which HCCI's owners newly attack herein.  (Exhibit "5," Memorandum Opinion dated May 11, 2015).

> **THE COURT:**  Well, up until this morning I thought that your clients [HCCI, HMS and James Hassell] disputed that the joint venture agreement had assets that it pertained to.
> **MR. KITCHENS:**  We don't believe that it does have assets.
> **THE COURT:**  Well - -
> **MR. KITCHENS:**  I mean we believe that it was formed - - -
> **THE COURT**:  -- it had contracted - -
> **MR. KITCHENS:**  - -for the purpose of allowing Mr. Royce Hassell to get insurance.
> **THE COURT:**  No, it had a profit and loss sharing agreement - - if I were to stop the testimony now, then there's an agreement that certain contracts are going to have profit and loss sharing arrangement between the joint venturers.
> **MR. KITCHENS:**  For tax purposes, Your Honor.
> **THE COURT:**  Not for tax purposes, for money purposes.  And as to whether that makes for a partnership is the argument we're going to have.  But I hadn't understood that until today.
> **MR. KITCHENS**:  Okay.

87. Exhibit "30", Transcript of Hearing March 25, 2015, Page 127, ll. 8 through 128, ll. 3.

88. HCCI's Controlling Owners cannot provide the required proof of each of the elements of their claim that Royce Hassell fraudulently induced the Hassell 2012 Joint Venture by representing that the partnership "was never meant to be a real agreement to split profits on construction jobs." In fact, the opposite is res judicata.  The claim must be dismissed under the TCPA.  Tex. Civ. Prac. & Rem. Code § 27.005(c).

**(iv)      Claim for Alleged False Affidavit in Support of Garnishment Petition.**

89. HCCI's Controlling Owners present no evidence to support their TCPA barred third set of claims beginning at Joinder Petition paragraph 2.i. which complains that Royce Hassell signed an affidavit which "supported an application for a writ of garnishment against HCCI's bank account, by intentionally giving misleading information therein." Royce Hassell is constitutionally permitted to garnish a judgment debtor's bank when the judgment debtor has not superseded the judgment.

90.   The allegations of Royce Hassells brothers and sister do not state a claim upon which relief can be granted but, even more compelling is the fact that HCCI's Controlling Owners do not identify any particular statement in Royce Hassell's affidavit which is false or show how it is untrue.    In any event, Royce Hassell stands by his affidavit which he has sworn is true in all respects. The allegations are evidence that his siblings desire to stop Royce Hassell from petitioning to enforce the Final Judgment.  Therefore, the allegations are proof that this action is based on, relates to and is in response to Royce Hassell's exercise of his constitutional rights to petition and free speech.

**D.   The Legal Action Against Royce Hassell Must Be Dismissed Under the TCPA Because Royce Hassell Has Established Each Essential Element of An Affirmative Defenses to This Suit.**

**(i)      Section 27.005(d) of the TCPA.**

91.  Under section 27.005(d) of the Act, "the court shall dismiss a legal action against the moving party if the moving party establishes by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim."  Tex. Civ. Prac. & Rem. Code § 27.005(d).   This is true even if the nonmovant satisfies its "clear and specific" burden of proof discussed above.  *Id.*

**(ii)      Lack of Standing and/or Capacity.**

92. HCCI's owners lack capacity to bring the corporation's claims on their own behalf. By filing this motion Royce Hassell does not waive his objection to the lack of capacity of HCCI's Controlling

Shareholders to bring claims for damages of HCCI simply because the arbitration award diminishes the value of their stock in the corporation.  Even if getting a judgment against a corporation could be considered a wrong, "[a] cause of action against one who has injured a corporation belongs to the corporation and not to the shareholders.  A corporate stockholder cannot recover damages personally for a wrong done solely to the corporation even though he may be injured by that wrong."  *Sawnk v. Cunningham, I258 S.W. 3d 647 (Tex. 2008) citing Wingate v. Hajdik,* 795 S.W. 2d 717, 719 (Tex. App.-Fort Worth 2007, pet denied).  Here, HCCI's Controlling Owners sue Royce Hassell because he is attempting to collect a judgment against HCCI for profits he is owed from a partnership between HCCI and his corporations.  Even if he had committed some wrong, which he denies, "[t]he individual shareholders have no separate and independent right of action for wrongs done to the corporation that merely result in depreciation in the value of their stock."  *Swank, supra, at 661*.

93.  "The question of standing is a legal question regarding subject-matter jurisdiction which cannot be waived."  *Fitness Evolution, L.P. v. Headhunter Fitness, LLC, 05-13-00506-CV, (Tex. App.-Dallas (5ᵗʰ Dist.) 2015)*.  However, since a challenge to a party's capacity to participate in a suit may be waived (*Id.),* Royce Hassell chooses not to waive them.  *See, Fitness Evolution, L.P. v. Headhunter Fitness, LLC, 05-13-00506-CV, (Tex. App.-Dalls [5ᵗʰ Dist.] 2015)*.

        **(iii)**       **Limitations.**

94.  The purpose of limitations is to prevent stale or fraudulent claims.  *Kerlin v. Sauceda,* 263 S.W. 3d 920, 925 (Tex. 2008).  The statute of limitations bars the new suit by HCCI's Controlling Owners brought more than seven years after the evidence they proffer shows they suspected Royce Hassell of wrongdoing. Section 16.004(a)(4) of the Civil Practice and Remedies Code provides a "[p]erson must bring suit on [fraud or breach of fiduciary duty] not later than four years after the date the action accrues."  *Id. (4) and (5)*. Exhibit "B" to the legal action is an e-mail chain of March 2011, which evidences that far from trusting Royce Hassell his siblings believed he had misapplied funds.  Additionally, there is evidence that as far

back as 2011, HCCI's Controlling Owners were even spying on him by unlawfully requesting his private banking information from a bank president of CommunityBank, the subject to the writ of garnishment Royce Hassell's siblings want to stop him from pursuing.  Exhibit "25".

95.  Evidence that no confidential relationship existed includes between Royce Hassell and his siblings during this time includes affidavits of Phillip Hassell prepared by conflicted lawyers representing their own interests which aver that from January of 2012, HCCI and his siblings were "adverse" to Royce Hassell and his companies "at all times."  *See, Exhibit "26."*  It is now more than six years later and any claims for breach of fiduciary duty, fraudulent inducement, and unfair competition against Royce Hassell are clearly barred by limitations.  Just the opposite, Royce Hassell's siblings promises him they would watch his back while he was sick.

96. A misrepresentation constitutes fraudulent concealment when it prevents the plaintiff from discovering a wrong.  *Kanon v. Methodist Hosp.,* 9 S.W. 3d 365, 369 (Tex. App.-Houston [14th Dist.} 1999, no pet.) *disapproved on other grounds, Ernst & Young, LLP v. Pacific Mut. Life Ins. Co.,* 51 S.W. 3d 573 (Tex. 2001).  Royce Hassell's siblings were hiding a relationship with and following the directions of Mr. Rose' law firm from January of 2012 forward with the intent of taking what belonged to Royce Hassell and his companies for themselves.

97. The "counterclaims" made by Michael Hassell, Phillip Hassell and Shawn Hassell Potts do not arise out of the same action or occurrence that is the basis of Royce Hassell's defending counterclaims he asserted when his siblings caused the family corporation, HCCI, to sue him in December of 2016, in the middle of the arbitration.  HCCI's suit falsely alleges Royce Hassell is not an owner.

98. Jason Hassell brings an original suit, not by way of counterclaims, arguing the same thing his controlled corporation argued in bringing this original suit.

**(iv)    Res Judicata**

99.  "Res judicata precludes relitigation of claims that have been finally adjudicated, or that arise out of the same subject matter and that could have been litigated in the prior action."  *Amstadt v. United State Brass Corp.,* 919 S.W. 2d 644 (1966), citing *Barr v. Resolution Trust Corp.,* 837 S.W. 2d 627, 628 (Tex. 1992).  Res judicata entails proof of a final judgment on the merits by a court of competent jurisdiction; identity of parties or those in privity with them; and a second action based *on the same claims as were raised or could have been raised in the first action*.  *See, Texas Water Rights Comm'n v. Crow Iron Works,* 582 S.W. 2d 768, 771-72 (Tex. 1979).  Although ["[g]enerally people are not bound by a judgment in a suit to which they were not parties, the doctrine of res judicata creates an exception to this rule by forbidding a second suit arising out of the same subject matter of an earlier suit by those in privity with the parties in the original suit."  *Amstadt, pg. 653.*

100.      In the arbitration Post Hearing Brief of HCCI prepared by conflicted lawyers including Mr. Rose's law firm listed the "parties" on the claimants' side as follows:

Claimants are James C. Hassell ("JCH") and Hassell Construction Company, Inc. ("HCCI"). Counter-Respondents are Hassell Management Services, LLC ("HMS"), Shawn Potts, James C. Hassell, and HCCI.  (Because Respondent Royce Hassell has brought a derivative claim on behalf of HCCI against HCCI's and HMS' officers and directors, putative Counter-Respondents are also those officers and directors, *i.e.,* Phillip Hassell and Michael Hassell.)  Claimants and Counter-Respondents will be collectively referred to as Claimants when their individual names are not used."

Exhibit "31", Claimants' Post Hearing Brief, pg. 1.

101.      Prior to filing that brief Mr. Rose's law firm admitted it represented selected HCCI owners, including three of the four siblings now bringing a new suit as HCCI.  (Exhibit "44").

102.      As hereinbefore set out, HCCI's Controlling Shareholders were in privity with HCCI in the arbitration and were actually, if not virtually represented.  As a result, the claims they now brought again for breach of fiduciary duty and fraudulent inducement on the part of Royce Hassell are barred by res judicata.

103.	In fact, the only new claims asserted in the Joinder Petition are that Royce Hassell wrongly petitioned for a writ of garnishment and wrongfully competes against HCCI, which claims evidence this is a TCPA barred suit to punish Royce Hassell for exercising his constitutional rights.  As a result, those claims must be dismissed pursuant to the TCPA.

104.	Claims of breach of fiduciary duty by Royce Hassell to HCCI which were pursued in the arbitration were denied.  *See, Exhibit "1", December 7, 2017, Arbitration Award, pg. 4 "The award is in full settlement of all claims related to the Joint Venture Agreement and the business relationship between the parties.  All claims not expressly granted herein . . . are hereby DENIED."*

105.	The decision of the arbitrators, that the agreement between HCCI and Royce Hassell's companies is a valid agreement, was initially argued for HCCI and its controlling owners by Micky Das and was relied on by Judge Kyle Carter to compel arbitration.  Since then then another state district court judge, Frederika Phillips, a United States Bankruptcy Court Judge (Judge Marvin Isgur), and the arbitrators have upheld the validity of the agreement.

- *See, Exhibit 1, Final Arbitration Award;*

- *See,* Exhibit "32" State District Judge Kyle Carter's Orders Compelling Consolidation and Arbitration at HCCI's request based on the validity of the CJVA and its arbitration clause;

- *See,* Exhibit "*5,"* Memorandum Opinion dated May 11, 2015, of United States Bankruptcy Court Judge Marvin Isgur; *Also see,* Exhibit "30", Transcript of hearing preceding the Memorandum Opinion wherein Judge Isgur overruled HCCI's attempts to limit the terms of the CJVA for "insurance purposes" or for "tax purposes" as follows:

	*See, Exhibit "2" Final Judgment entered by Harris County District Judge Frederika Phillips confirming the Final Arbitration Award.*

106.	Recently, in two bankruptcy court cases filed by these same siblings attempting to re-open issues decided years ago, U.S. Bankruptcy Judge Isgur found them to be in bad faith.  *See,* Exhibit "6", Transcript of Emergency Bankruptcy Hearing, March 9, 2018, page 17, ll.  20-21 The Court: "I find this case was removed in bad faith, never should have been removed."  This ruling came after attorney Bogdan

Rentea could not explain to Judge Isgur why he had filed the involuntary petition or the removal action and finally confessed it is because HCCI does not have the funds to pay the arbitration award.   (*See Exhibit "6", Transcript Emergency Bankruptcy Hearing, March 9, 2018, pg. 17, ll. 17-18.*).

107.       Hours after Bogdan Rentea told Judge Isgur he would like to have the case remanded to Judge Carter's Court, Judge Carter recused himself from the case which he had originally compelled to arbitration in March of 2014, citing "a history" with Bogdan Rentea.  (*See,* Exhibit "33," Judge Carter's self recusal order).

108.       On the same day Judge Carter recused himself, the arbitration case was transferred to a new Harris County Judge, the Honorable Frederika Phillips (Exhibit "33").  In due course, Judge Phillips struck the siblings belated attempts to officially intervene in the arbitration.  (Exhibit "4").  She then confirmed the arbitration award in a Final Judgment (Exhibit "2") which HCCI's Controlling Owners now do not wish HCCI to pay.

109.       Wishing to do over the failed outcome of the arbitration, which they themselves caused to be compelled in the first place, to do over the results of their bad faith Bankruptcy Court removal attempt which they initiated, and to do over their failed belated attempt to intervene in the arbitration by collaterally attacking the judgment through a separate action, Michael Hassell, Shawn Hassell Potts, Phillip Hassell and Jason Hassell filed their Joinder Petition.  The Joinder Petition claims of fraud and breach of fiduciary duty related to the relationship of HCCI with Royce Hassell's companies have been previously filed and decided.  *See, for example,* Exhibit "34", HCCI's "Demand for Arbitration" filed on May 2, 2014, alleging Royce Hassell's "Breach of Fiduciary Duty" (para. 39) and "Fraud" (para. 38); and, "HCCI's First Amended Demand for Arbitration" making claims against him for "Breach of Contract," "Fraud," "Negligent Misrepresentation," "Breach of Fiduciary Duty," and "Business Disparagement," at pages 39-43;  and HCCI's "Supplemental Arbitration Demand.

110.     This legal action asserts no new claims but seeks to rehash arguments and "documents" used repeatedly by Mr. Rose's law firm and its co-counsel Bogdan Rentea in other proceedings.  The three exhibits to the Joinder Petition evidence by their markings repeated prior use in other courts and in the arbitration.  (*See,* Joinder Petition Exhibits A, B, and C).

111.     HCCI's Controlling Owners have no evidence that any funds of HCCI were diverted to RHP. In fact, the claims are such a frivolous and obvious attempt to financially coerce Royce Hassell that even Coats Rose and Bogdan Rentea agreed to drop those claims in the arbitration after Royce Hassell sought an emergency hearing.

112.     It is not surprising HCCI chose to drop those claims, since Royce Hassell did nothing wrong by recapitalizing a dormant company with a business associate he could trust after Royce Hassell's own siblings locked out of HCCI and his own partnership's contracts.  The newly asserted, time barred claims are frivolous and are not supported by any evidence much less clear and convincing evidence.  The claims are based on facts known to Royce Hassell's siblings since July of 2013, more than four years before the claims were asserted.  *See, for instance,* HCCI's May 2, 2014, Demand for Arbitration describing events in July of 2013, alleged that "on July 15, 2013, Phil Hassell would meet with Royce Hassell the RHC offices to again discuss reduction of forces, the line of credit, and equipment, and to create a plan on what needed to happen.  It was at this meeting Royce Hassell would bring up to Phil that he had several people that wanted to invest in a new company with him completely separate from HCCI and Royce's other entities . . . A few days later at a meeting with HCCI, Mr. Hassell would confront Royce Hassell about starting another company . . . Royce Hassell would storm out of the meeting, gather his things from his office and tell Phil he was done – he refused to work for HCCI any longer and he quit." Exhibit "34", Demand for Arbitration (para. 30)(emphasis added); Exhibit "35" Petition against RHP; and Exhibit "36" proposal of Coats Rose and Bogdan Rentea to non-suit RHP in arbitration, which they did.

113.     Moreover, the value of the stock of HCCI's controlling owners actually increased as a result of the portion of the Final Arbitration Award wherein the arbitrators awarded HCCI an offset against Royce Hassell's share of the partnership profits equal to the debt HCCI claimed was owed on the line of credit which Royce Hassell argued was owed because of the Springwoods Project losses. *See, also,* same day audit confirmations Royce Hassell was asked to sign with the Springwoods Project claims as collateral. Exhibit "14."  That benefit was obtained for them by Mr. Rose's law firm in the arbitration!

114.     Royce Hassell's siblings are estopped from arguing the Hassell 2012 Joint Venture was not real after they argued in other cases "[i]n 2012, Claimant HCCI, and Respondents R. Hassell Holding Company, Inc. R. Hassell & Company, Inc., R. Hassell Builders, Inc. and G.R. Group Resources LLP *formed a joint venture and executed a Construction Joint Venture Agreement (the "JVA") dated July 1, 2012"* with no mention of RHP, new claims against RHP are frivolous. *See, for example*, documents such as, Exhibit "37", Motion to Compel Arbitration at para. 1; Exhibit "34", HCCI's Arbitration Demand at para. 3; HCCI's First Amended Demand for Arbitration of January 12, 2015[11]; and, HCCI's Supplement Arbitration Demand.

115.     Importantly, Royce Hassell's siblings are bound by the successful arguments of their own lawyers (especially since they were simultaneously Exxon's Lawyers and loyal to the District) that the CJVA binds non-signatories' "factually related to and factually intertwined" claims which are "significantly related to and factually intertwined with the JVA" (*See,* Exhibit "34", HCCI's Arbitration Demand at para. 4, and HCCI's First Amended Arbitration Demand at para. 6.)  No question exists that the Joinder Petition claims are factually related and factually intertwined with the CJVA.

    (v)     **Estoppel**

---

[11] The certificate of service on HCCI's "First Amended Demand for Arbitration" is erroneously dated January 12, 2014, but was served on  January  12, 2015.

116.     HCCI's Controlling Owners are estopped at law and in equity from asserting claims that Royce Hassell breached his fiduciary duties in relation to the CJVA or that the CJVA is "not real:"

    **(a) Estoppel by Record or Judicial Estoppel:**   A party is estopped from asserting a position contrary to that taken under oath in an earlier judicial proceeding to gain an unfair advantage. *Ferguson v. Building Materials Corp.,* 295 S.W. 3d 642, 643 (Tex. 2009).

117.     The verified pleadings, signed affidavits, deposition testimony, court testimony, sworn arbitration testimony as well as the explanations of counsel made by HCCI's Controlling Owners in earlier proceedings contradict the positions the siblings now assert regarding the validity of the CJVA.

118.     Specifically, Phillip Hassell has repeated verified the CJVA is a valid, enforceable agreement with a valid, enforceable arbitration clause and caused his controlled corporation HCCI to take the same position.  For example, Phillip Hassell verified both for HCCI and Phillip Hassell's HCCI's Motion to Compel Arbitration which states "[i]n 2012, Plaintiffs and Defendants formed a joint venture and executed a Construction Joint Venture Agreement ("the JVA") dated July 1, 2012.  The JVA contains a broad arbitration provision that mandates the arbitration of all disputes that arise between the parties. . . Accordingly, Plaintiffs' claims are subject to binding arbitration. . . Plaintiffs' attempt to avoid their contractual obligation to arbitrate their claims should not be countenanced. Whether a valid arbitration agreement exists is a question of law. . . Because a valid, enforceable arbitration agreement exists between Plaintiffs and Defendants, this Court has no discretion but to compel arbitration . . . "  Exhibit "37", Motion to Compel, pages 1 and 3; and Phillip Hassell's verifications for HCCI and HMS (a company in which Royce Hassell has no ownership).  Phillip Hassell's verification swears under oath that "he has personal knowledge of the facts contained [in the motion to compel] and that all factual statements are true and correct."  Exhibit "45", Phillip Hassell's verification for HCCI and Exhibit "46", page 10, Phillip Hassell's Verification for HMS.

    **(b) Estoppel by Contract:**  A party may not deny the terms of a valid contract which has not been set aside by fraud, accident or mistake.

119.        The only two signatories to the CJVA, Phillip Hassell and Royce Hassell, have both given

sworn testimony that the CJVA is a valid enforceable contract.

120.        The CJVA has not been set aside by fraud, accident or mistake.  HCCI's attorneys have

argued in various courts and the arbitration the agreement is valid before and after deciding to not appeal

Judge Isgur's 2015 Memorandum Opinion, so holding.  Royce Hassell's siblings cannot now deny the terms

of the contract they have repeatedly caused their controlled corporation to embrace for purposes of

obtaining relief.  *Mathews v. Sun Oil Co.,* 411 S.W. 2d 561, 564 (Tex. App.-Amarillo 1996), aff'd., 425 S.W.

2d 330 (Tex. 1968).  Now that Royce Hassell and his companies have acted in reliance on the agreement

his siblings may not be permitted to disavow his just compensation for the acts he did in performance of

the contract.  *31 C.J.S. Estoppel and Waiver §70-73.*

> **(c)  Equitable Estoppel:**  Equitable estoppel prevents a party from changing its position after
> misrepresenting or concealing facts which the other party relied on to its detriment.  *Sefzik,*
> *v. City of McKinney,* 198 S.W. 3d 884, 895 (Tex. App.-Dallas 2006, no pet.).  **The elements of**
> **the equitable estoppel defense are:**  1) the plaintiff made a false representation to, or
> concealed a material fact from, the defendant; 2) the plaintiff intended that its representation
> or concealment be acted on; 3) the plaintiff knew or had the means of knowing the real facts;
> 4) the defendant neither knew nor had *the means* of knowing the real facts; 5) the defendant
> relied on the representation or concealment to its detriment.  *Johnson & Higgins v. Kenneco*
> *Energy, Inc.,* 962 S.W. 2d 507, 515-16 (Tex. 1998).

121.        HCCI's Controlling Owners engaged in knowing concealment and false representations

with intent that Royce Hassell act without knowledge of the true facts and in reliance on the false

representations.  Phillip Hassell proposed the Hassell 2012 Joint Venture in the presence of Mike Hassell

in August of 2012.  After the partnership began operations Shawn Hassell Potts told the accountant for

the partnership, Steve Ligon, that the partnership was real; HCCI's Controlling Owners told the insurance

company the agreement was real; and HCCI's Controlling Owners made repeated representation to Royce

Hassell that it was real.

122.        Although HCCI's Controlling Owners now claim they intended the agreement to be fake

they were misrepresenting and concealing the fact they thought it was fake from Royce Hassell, who had

no means of knowing they believed the agreement was fake, and who relied on the agreement to his grave detriment.

123.     Because HCCI's Controlling Owners caused Royce Hassell (and other third parties) to believe the agreement was real and Royce Hassell relied on those representations to his detriment, HCCI's Controlling Owners are estopped from denying the validity of the agreement.

> **(d) Promissory Estoppel:**  Promissory estoppel ("justifiable reliance") is an affirmative defense which prevents a party from claiming that a contract is invalid or unenforceable.  *Nagle v. Nagle,* 633 S.W. 2d 796, 800 (Tex. 1982).  **The elements of promissory estoppel are** 1) a promise by the plaintiff to the defendant; 2) the defendant reasonably and substantially relied on the plaintiff's promise to its detriment; 3) the plaintiff know or should have known its promise would lead the defendant to some definite and substantial injury; and 4) injustice can be avoided only by enforcing the plaintiff's promise.

124.     In December of 2010, when Royce Hassell was gravely ill, Phillip Hassell, Michael Hassell, and Shawn Hassell Potts gave Royce Hassell a letter written by Phillip Hassell's wife, Rosalyn Hassell, that they "truly" wanted to be his partner if Royce Hassell would turn over the running of the finances on jobs with HCCI over to them, which he did, *i.e., see Joinder Petition exhibits "A" and B."*  In July of 2012, while conspiring with conflicted attorneys Phillip Hassell proposed a sharing of profits combining of resources partnership if HCCI could have 75% of the profits from the venture and Royce Hassell would take 25% which Royce Hassell accepted.  HCCI's owners claim herein the agreement was not real.  However, Royce Hassell relied on the agreement to his great detriment and injustice can only be avoided by enforcing the promises they made.  HCCI's Controlling Owners are estopped from asserting the CJVA is a fake.

> **(e) Quasi Estoppel:** Quasi estoppel is an equitable doctrine that prevents a party from asserting to another's disadvantage, a right that is inconsistent with a position previously taken by that party.  *Lopez v. Munoz, Hockema & Reed, LLP,* 22 S.W. 3d 857, 864 (Tex. 2000).  **The elements of quasi-estoppel are**: 1) the plaintiff acquiesced to or accepted a benefit under a transaction; 2) the plaintiff's present position is inconsistent with its earlier position when it acquiesced to or accepted the benefit of the transaction; 3) it would be unconscionable to allow the plaintiff to maintain its present position, which is to another's disadvantage.  *Id.*

125.     Here, HCCI's Controlling Owners have taken 75% plus Royce Hassell's share of the Hassell 2012 Joint Venture profits and used them to pay conflicted attorneys Royce Hassell warned them about

in 2013.  HCCI also accepted the benefits of the Hassell 2012 Joint Venture combing of assets including Royce Hassell's long time employees, the use of his equipment and the use of his real estate equity to shore up their out of control spending.  It would be unconscionable to allow HCCI's Controlling Owners to maintain their present position in this case to the grave disadvantage of Royce Hassell.

> **(vi)    Accord and Satisfaction; Settlement.**

126.      Any claimed debt of Royce Hassell or his companies to HCCI has been paid with Hassell 2012 Joint Venture profits.  Thus, there is no debt for which Royce Hassell and his companies are responsible.

127.      Further, any claims HCCI might have had against Royce Hassell as a result of his association with RHP were compromised and settled by attorneys Patrick Gaas and Bogdan Rentea, on behalf of the Hassell's they represent during the same hearings they agreed to drop all claims against RHP as well as their threat to make claims against Royce Hassell's 86-year-old mother-in-law and his two sons, in exchange for Royce Hassell dropping his objections to the arbitration on the grounds of inability to pay. Their clients which include Royce Hassell's siblings are bound by that agreement which this suit violates because Royce Hassell performed his end of the bargain to his detriment.  *Lopez v. Munoz, Hockema & Reed, LLP,* 22 S.W. 3d 857, 863 (Tex. 2000).

> **(vii)    Waiver**

128.      Waiver is the intentional relinquishment of a know right or conduct inconsistent with claiming that right.  *Frazier v. GNRC Realty, LLC,* 476 S.W. 3d 70 (Tex. App.-Corpus Christi 2014, pet denied.) The elements of waiver are:

> (1)  Existing right, benefit or advantage;
> (2)  actual or constructive knowledge of its existence; and
> (3)  an actual intent to relinquish the right inferable from the conduct.

*Ohrt v. Union Gas Corp.,* 398 S.W. 3d 315 (Tex. App.-Corpus Christi 2012, pet. denied).

129.      HCCI and Royce Hassell's siblings, through the own lawyers, intentionally waived any rights to sue Royce Hassell based on his ownership of RHC, and waived the right to sue RHP or any of its owners and a host of other parties they had threatened to sue such as Royce Hassell's 86 year-old mother-in-law and his two sons, Royce Hassell's secretary and Royce Hassell's brother in law, in exchange for Royce Hassell going into debt to pay the arbitration costs for an arbitration which benefit the District and Exxon.

130.      Moreover, HCCI's Controlling Owners claimed the rights, benefits and advantages of the CJVA on numerous occasions.  As a result, even if they once believed it was a fraudulently induced agreement-which it was no on the part of Royce Hassell- they exhibited conduct of actual intent to relinquish the right inferable from claiming the agreement was invalid.  By relying on the terms CJVA to obtain benefits, not the least of which was the arbitration they compelled by it, HCCI's Controlling Owners have waived the right to now claim the agreement is "not real."

                    **(viii)      Ratification; Detrimental Reliance; Ultra Vires Contract and Unclean Hands.**

131.      **The elements of ratification** include (1) approval by act, word, or conduct; (2) with full knowledge of the facts of the earlier act; and (3) with the intention of giving validity to the earlier act. *Jamail v. Thomas,* 481 S.W. 2d 485, 490 (Tex. App.-Houston [1st Dist.] 1972, writ ref'd n.r.e.).

132.      Beginning with repeatedly asserting the validity of the CJVA and also of its arbitration clause in 2013, HCCI's Controlling approved the terms of the contract (to include a sharing of profits) with full knowledge of the facts *they now claim* mean the agreement was not for "for profit" but for purposes of deceiving an insurance company of which Phillip Hassell's wife, Rosalyn Hassell is "attorney in fact." Having ratified the CJVA, HCCI's Controlling Owners have ratified its terms which the arbitrators found entitles Royce Hassell's companies to profits which HCCI now owes.

    **E.      Because Dismissal is Proper, the TCPA Requires the Court to Award Royce Hassell His Court Costs, Attorney's Fees and Expenses, and to Sanction Michael Hassell, Phillip Hassell, Shawn Hassell Potts and Jason Hassell.**

133.     If the Court dismisses this new suit under the TCPA, then it "shall" award Royce Hassell his "court costs, reasonable attorney's fees, and other expenses incurred in defending against the legal action as justice and equity may require." Tex. Civ. Prac. & Rem Code § 27.009(a)(1).  In other words, the TCPA "mandates" the award of fees and costs and expenses to a successful movant.  *See Alphonso v. Deshotel,* 417 S.W. 3d 194, 200 (Tex. App.-El Paso 2013, no pet.), *disapproved of on other grounds by In re Lipsky,* 460 S.W. 3d at 591.

134.     Furthermore, the TCPA requires "sanctions against the party who brought the legal action as the court determines <u>sufficient to deter the party who brought the legal action from bringing similar actions described in this chapter.</u>" Tex. Civ. Prac. & Rem. Code § 27.009(a)(2).  HCCI's Controlling Owners are already the subject of sanctions proceedings in federal bankruptcy court for their bad faith filings. (See Exhibit "6", Transcript of Emergency Bankruptcy Hearing, March 9, 2018, pp. 17-19.)  Because this is not the first, or second or third time HCCI's Controlling Owners have made the same claims, an award of sanctions should be entered to reduce the likelihood of future misconduct by HCCI's Controlling Owners.

135.     The true gist and new claims of the legal action surfaces wherein HCCI's Controlling Owners complain against Royce Hassell allegedly for "support[ing] an application for a writ of garnishment against HCCI's bank account, by intentionally giving misleading information therein." (Joinder Petition, Para. 2(i)) and taking "actions designed to damage HCCI and its owners, by, inter alia, diverting assets and business opportunities rightfully belonging to HCCI."   The obvious import of these legal actions is that they are based on, relate to, and/or are in response to Royce Hassell's exercise of his constitutional right to petition for a writ of garnishment, right to free speech for making a supporting affidavit, and right to associate with RHP and Terry Tauriello for the purposes of making a living.

136.     In threatening that they will "add, after discovery, any additional parties, including, but not limited to, the officers and directors of RHP, including Cindy Grooms and Ricardo Todeschini, or any other person that aided and abetted in the formation of RHP and contributed to the damages alleged

herein" (Joinder Petition, Page 2, *5) HCCI's Controlling Owners call for this Court to use its TCPA's sanctioning authority to deter these parties, through significant sanctions, from engaging in future violations of the TCPA.

137.     Accordingly, in addition to dismissing claims of HCCI's Controlling Owners, the Court should award Royce Hassell sanctions as well as his court costs and attorney's fees and expenses.  Tex. Civ. Prac. & Rem. Code § 27.009.

**III.**     **Proof.**

138.     In support of this motion, Royce Hassell relies on the pleadings on file, including the live petition of HCCI's Controlling Owners, and the exhibits identified on the index of exhibits that precedes this motion.  The exhibits are attached hereto and incorporated herein for all purposes.  Additionally, Royce Hassell asks the Court to take judicial notice of the pleadings in and judgments of other courts in matters related to this case and of the arbitration.

**Prayer.**

139.     Royce Hassell prays the Court grant this motion, to dismiss with prejudice the legal action asserted against him by HCCI's Controlling Owners, to award Royce Hassell his costs, attorney's fees, and other expenses under the TCPA, and to sanction HCCI's Controlling Owners in accordance with the terms of the TCPA.  Royce Hassell requests any other, further, or alternative relief to which it may be legally or equitably entitled.

Respectfully submitted,

By:  _/s/ Silvia T. Hassell_
Texas Bar No. 09205200
12807 Haynes Rd., Bldg. C
Houston, Texas 77066
Tel.  713-665-2442
Fax. 713-665-0369
E-Mail:  sehassell@aol.com

Attorney for Royce Hassell

41

**CERTIFICATE OF SERVICE**

I hereby certify that on 19th By day of May, 2018, a true and correct copy of the foregoing instrument was served on all known counsel of record in accordance with the Texas Rules of Civil Procedure, *to-wit:*

Bogdan Rentea, Esq.
Texas Bar No. 16781000
700 Lavaca, Suite 1400
Austin, Texas 78701
Tel. 512-472-6291
Fax. 512-472-6278
brentea@rentealaw.com

/s/ Silvia T. Hassell

# EXHIBIT
# 26

**EXHIBIT B**

PROCEEDING BEFORE THE
AMERICAN ARBITRATION ASSOCIATION
In Houston, Texas

| | | |
|---|---|---|
| JAMES C. HASSELL and HASSELL<br>CONSTRUCTION COMPANY, INC. | § | |
| | § | |
| | § | |
| Claimant, | § | |
| | § | |
| vs. | § | Case No. 01-14-0000-3178 |
| | § | |
| R. HASSELL HOLDING CO., INC, R. | § | |
| HASSELL & COMPANY, INC., R. HASSELL | § | |
| BUILDERS, INC. AND G.R. GROUP | § | |
| RESOURCES LLP, ROYCE J. HASSELL | § | |
| AND SILVIA T. HASSELL | § | |
| | | |
| Respondents. | | |

---

## AFFIDAVIT OF JAMES PHILLIP HASSELL

---

Before me, the undersigned notary public, on this day personally appeared James Phillip Hassell who, personally known to me to be the person whose name is subscribed to this Affidavit, being by me first duly sworn, stated under oath as follows:

My name is James Phillip Hassell. I am over the age of eighteen (18), of sound mind, and competent to make this Affidavit. I have never been convicted of a crime of moral turpitude. I am the President and a Director of Hassell Construction Company, Inc., a Texas corporation ("HCCI"), and a Director and Member of Hassell Management Services, LLC, a Texas limited liability corporation ("HMS"). I am authorized to make this Affidavit on behalf of HCCI and HMS. HCCI and HMS shall be collectively referred to herein as HCCI.

In January 2012, James C. Hassell, Chief Executive Officer and Chairman of the Board of Directors of HCCI, and I met with Patrick Gaas and Heather Asselin, Directors of the law firm of Coats, Rose, Yale, Ryman & Lee, P.C. ("Coats|Rose") to evaluate various secured transactions and potential defensive strategies related to transaction or matters involving R. Hassell Builders, Inc., R. Hassel & Company, Inc. and Royce and Silvia Hassell. At no time during that meeting or thereafter, have James C. Hassell or I ever requested that Coats|Rose represent, provide advice or any other services for or on behalf of R. Hassell Holding Co., Inc., R. Hassell & Company, Inc. R. Hassell Builders, Inc., G.R. Group Resources, LLP (collectively, the "R. Hassell Entities") Royce J. Hassell, Silvia T. Hassell or any joint venture. At all times during our discussions with Coats|Rose and their subsequent engagement, the R. Hassell Entities, Royce J. Hassell, and Silvia T. Hassell were adverse parties. At no point during our discussions with and engagement of Coats|Rose have James C. Hassell or I disclosed any R. Hassell Entity confidential information to Coats|Rose. Following the initial meeting, we were sent an

engagement agreement. We signed the engagement agreement and sent a retainer to Coats|Rose, but at that time did not provide Coats|Rose with the information necessary to proceed with any work. It was not until September 6, 2013, that Coats|Rose was formally engaged by James C. Hassell and HCCI, provided documentation and authorized to perform legal services.

HCCI is a party to Cause No. 2012429; *Hassell Construction Co., Inc. v. Springwoods Realty, Co. et. al,*; In the 333rd Judicial District Court of Harris County, Texas (hereafter, the "Springwoods Litigation"). At no time has Coats|Rose represented or counseled HCCI or any other party with respect to the Springwoods Litigation.

Royce and Silvia Hassell have directly benefited from the joint venture agreement, and numerous requests to HCCI for payment of their personal expenses became a regular course of conduct. The following is a small sample of such requests: (i) a request for funding by Royce and Silvia Hassell, to pay the notes on their lakehouse which secures the line of credit; (ii) a request for funding by Royce and Silvia Hassell, to pay personal property taxes on their two Buffalo Speedway residences and their ranch; and (iii) a request for funding by Royce and Silvia Hassell, to pay personal real estate maintenance expenses and insurance.

I have personal knowledge of each of the facts set forth in this Affidavit based on my personal involvement in these matters. Such facts are true and correct.

_____

James P. Hassell

STATE OF TEXAS            §
                         §
COUNTY OF HARRIS         §

SWORN AND SUBSCRIBED to before me on this the ___ day of October, 2014.

_____
Notary Public in and for the State of Texas
My Commission Expires: _____

DEBRA ANNE GARCIA
Notary Public, State of Texas
My Commission Expires 06-03-2017

2

# EXHIBIT
# 27

10/13/2014 5:07:19 PM
Chris Daniel - District Clerk Harris County
Envelope No. 2815876
By: Euniecy Gentry
Filed: 10/13/2014 5:07:19 PM

NO. 2012-42981

| | | |
|---|---|---|
| HASSELL CONSTRUCTION CO., INC. | § | IN THE DISTRICT COURT OF |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| SPRINGWOODS REALTY COMPANY | § | |
| AND HARRIS COUNTY IMPROVEMENT | § | |
| DISTRICT # 18 | § | 333rd JUDICIAL DISTRICT |

**VERIFIED ANSWER OF HASSELL CONSTRUCTION COMPANY, INC.
TO THE PETITION IN INTERVENTION**

NOW COMES HASSELL CONSTRUCTION COMPANY, INC ("HCCI") and in response to the Petition in Intervention filed by Intervenors R. HASSELL & COMPANY, INC., R. HASSELL BUILDERS, INC., and R. HASSELL HOLDING COMPANY, INC., ROYCE HASSELL and SILVIA HASSELL, states as follows:

## I.   GENERAL DENIAL

1.  Plaintiff HCCI denies each and every, all and singular, the allegations made against it by the intervenors in the Petition in Intervention and demands strict proof thereof.

## II.  VEFIFIED DENIAL

2.  Pursuant to the provisions of Rule 93 of the T.R.C.P., HCCI, in further response to the Petition in Intervention, states as follows:

   a.  HCCI denies that there existed a partnership between it and any of the intervenors, at any time, including but not limited to, the Springwoods project.

   b.  HCCI denies that the intervenors, or any of them, have the legal capacity to sue as partners of HCCI.

   c.  HCCI denies that it may be sued in the capacity of a partner of the intervenors, or any of them.

d.   HCCI further states that there is another suit pending in this state between HCCI and the intervenors, involving the same or similar claims.

e.   HCCI denies that intervenors are entitled to recover in the capacity of partners of HCCI, because no partnership exists.

WHEREFORE, Plaintiffs pray for judgment of the Court as follows:

1.   That Intervenors take nothing by their suit; and

2.   That Intervenors' petition be struck as requested in its motion to strike already on file in this cause; and

3.   That Plaintiff recovers all costs and be awarded such other and further relief to which it may be entitled.

Respectfully submitted,

**RENTEA & ASSOCIATES**

505 W. 12th Street, Suite 206
Austin, Texas  78701
(512) 472-6291 Telephone
(512) 472-6278 Facsimile
brentea@rentealawoffices.com

By:      /s/ Bogdan Rentea
          Bogdan Rentea
          State Bar No. 16781000

## **VERIFICATION**

STATE OF TEXAS          §
Harris_____ COUNTY    §

Before me, the undersigned notary, on this day personally appeared Phillip Hassell, a duly authorized representative of Hassell Construction Company, Inc., and stated under oath that the matters set forth in Section II subsections 1,2,3,4 and 5, are within his personal knowledge, and are true and correct.

Phillip Hassell

SUBSCRIBED AND SWORN TO before me on this 13th day of October, 2014



PATRICIA JANE HARLESS
NOTARY PUBLIC
State of Texas
Comm. Exp. 02/04/2015

By: _____

Notary Public, State of Texas

Unofficial Copy Office of Chris Daniel District Clerk

Verified Answer of HCCI to Petition in Intervention
Page 3 of 5

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served on all parties by delivering a true and correct copy to the attorneys of record in the method indicated below on the **13th day of October, 2014** as follows:

**By e-mail:  gziegler@macdonalddevin.com,
jburris@macdonalddevin.com,
dsiotos@macdonalddevin.com**
Gregory N. Ziegler, Jason A. Burris,
Dean J. Siotos
Macdonald, Devin, P.C.
(Counsel for Walter P. Moore)

**By e-mail: ehohlt@mcdanielfirm.com,
tmcdaniel@mcdanielfirm.com**
Eileen M. Hohlt, Timothy M. McDaniel
McDaniel, Hohlt, P.C.
2 Greenway Plaza, Suite 1030
Houston, Texas 77046
(Counsel for Springwoods Realty)

**By e-mail: jengvall@elhouston.com,
kflittner@elhouston.com,
bcravens@elhouston.com**
John Engvall, Jr., Kala Flittner
Brittany Cravens
Engvall & Lopez, LLP
1811 Bering Drive, Suite 210
Houston, Texas 77057
(Counsel for HCID 18)

**By e-mail: john.cahill@leclairryan.com**
John P. Cahill, Jr.
LECLAIRRYAN
1233 W. Loop South, Suite 1000
Houston, Texas 77027
(Counsel for Costello, Inc.)

Verified Answer of HCCI to Petition in Intervention
Page **4** of **5**

**By email: sehassell@aol.com**
Silvia T. Hassell
12512 Cutten Road, Suite A
Houston, Texas 77066
T:  (713) 665-2442
F:  (713) 665-0360
(Counsel for Intervenors R. Hassell
& Company, Inc., R. Hassell Builders, Inc.,
R. Hassell Holding Company, Inc.,
and Royce and Silvia Hassell)

**By email: bshepherd@sschlaw.com,**
**amiller@sschlaw.com**
Billy Sheperd
Allison Standish Miller
2777 Allen Parkway, 7th Fllor
Houston, Texas 77019-2133
T: (713) 650-6600
F: (713) 650-1720
(Attorneys for Defendant in Intervention
Coatesǀ Roseǀ Yaleǀ RymanǀLee, P.C.)

/s/ Bogdan Rentea
Bogdan Rentea

Verified Answer of HCCI to Petition in Intervention
Page **5** of **5**

# EXHIBIT
# 28

10/3/2016 6:52:05 PM
Chris Daniel - District Clerk Harris County
Envelope No. 13037833
By: Euniecy Gentry
Filed: 10/3/2016 6:52:05 PM

Cause No. 2012-42981

| | |
|---|---|
| HASSELL CONSTRUCTION CO., INC. §<br>  Plaintiffs §<br> §<br>v. §<br> §<br>SPRINGWOODS REALTY COMPANY §<br>and HARRIS COUNTY IMPROVEMENT §<br>DISTRICT # 18 §<br>  Defendants §<br> §<br>v. §<br> §<br>WALTER P. MOORE & ASSOCIATES, §<br>INC., d/b/a WALTER P. MOORE §<br> §<br>v. §<br> §<br>COSTELLO, INC., §<br>  Third-Party Defendants § | IN THE DISTRICT COURT OF<br><br><br><br><br><br><br><br>HARRIS COUNTY, TEXAS<br><br><br><br><br><br>333rd JUDICIAL DISTRICT |

## PLAINTIFF'S NOTICE OF NON-SUIT

Plaintiff, Hassell Construction Company, Inc, hereby non-suits and dismisses, without prejudice, its claims against Defendants, Springwoods Realty Company and Harris County Improvement District #18 in the referenced case, with all parties to bear their own costs of court.

Respectfully submitted,

/s/ Bogdan Rentea
Bogdan Rentea
Texas Bar No. 16781000
RENTEA & ASSOCIATES
700 Lavaca, Suite 1400-2678
Austin, Texas 78701
Tele: (512) 472-6291
Fax: (512) 472-6278
brentea@rentealaw.com

Unofficial Copy Office of Chris Daniel District Clerk

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Notice of Non-Suit has been served on the parties on this 3rd day of October, 2016 as follows:

Gregory N. Ziegler                    Via Email: gziegler@macdonalddevin.com
Dean J. Siotos                        Via Email: dsiotos@macdonalddevin.com
MACDONALD DEVIN, P.C.
3800 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270-2130
Attorneys for Walter P. Moore
and Associates, Inc. d/b/a Walter P. Moore

Timothy M. McDaniel                   Via Email: tmcdaniel@imtexaslaw.com
Kelly Conklin                         Via Email: kconklin@imtexaslaw.com
Debra Hovnatanian                     Via Email: dhovnatanian@imtexaslaw.com
IRELAND MCDANIEL
440 Louisiana, Suite 1800
Houston, Texas 77002
Attorneys for Springwoods Realty Company

John Engvall, Jr.                     Via Email: jengvall@elhouston.com
Kala Flittner                         Via Email: kflittner@elhouston.com
Brittany Cravens                      Via Email: bcravens@elhouston.com
ENGVALL & LOPEZ, LLP
1811 Bering Dr., Suite 210
Houston, Texas 77057
Attorneys for HCID No. 18

John P. Cahill, Jr.                   Via Email: john.cashill@leclairryan.com
LECLAIRRYAN
1233 W. Loop South, Suite 1000
Houston, Teas 77027
Attorneys for Costello, Inc.

Felicia L. Harris                     Via Email: fharris@barrycongeharris.com
Barry Conge Harris LLP
1800 West Loop South, Suite 750
Houston, Texas 77027
Attorneys for Intervenors,
R. Hassell & Company, Inc.
and R. Hassell Builders, Inc.

/s/ Bogdan Rentea
Bogdan Rentea

# EXHIBIT
# 29

3/26/2014 2:27:49 PM
Chris Daniel - District Clerk Harris County
Envelope No. 821565
By: ALEX CASARES

CAUSE NO. 2013-61995

| | | |
|---|---|---|
| R. HASSELL & CO., INC.; | § | IN THE DISTRICT COURT OF |
| R. HASSELL BUILDERS, INC.; | § | |
| R. HASSEL HOLDINGS CO., INC.; | § | |
| and G.R. GROUP RESOURCES, LLP | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| HASSELL CONSTRUCTION CO., | § | |
| INC., and HASSELL MANAGEMENT | § | |
| SERVICES, LLC | § | |
| Defendants. | § | 125TH JUDICIAL DISTRICT |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' VARIOUS MOTIONS FOR RECONSIDERATION, REQUEST FOR AN EVIDENTIARY AND IN CAMERA HEARING, AND EXTENSIONS OF TIME FILED ON MARCH 19, 2014**

Defendants, Hassell Construction Co., Inc. ("HCCI") and Hassell Management Services, LLC (HMSL) (collectively referred to as "Defendants"), present this response in opposition to: [1] Plaintiffs' Motion for Reconsideration of the Courts' March 3, 2014, Order Denying Plaintiffs' Request to file "Plaintiffs' First Amended Original Petition for Declaratory Judgment" Directly With the Court in Lieu of E-Filing, Alternatively, Plaintiffs Motion for Permission to File "Plaintiffs' First Amended Petition for Declaratory Judgment" and "Plaintiffs' Amended Response in Substitution of 'Plaintiffs Amended and Supplemental Response in Opposition to Defendants Motion to Compel Arbitration and Request for Evidentiary Hearing'"; [2] Plaintiffs' Motion for Reconsideration of the Court's March 3, 2014, Order Denying Plaintiffs' Request for an Evidentiary Hearing and *in Camera* Hearing; [3] Plaintiffs' Motion for Permission to File "Confidential Affidavit of Silvia T. Hassell" *In Camera*; [4] Plaintiffs' Motion for Reconsideration of the Court's March 3, 2014, Order Denying Plaintiffs' Motion to Sever the Hassell 2008 JV and Hassell 2012 JV Causes of Action and Order Denying Plaintiffs' Motion

for Stay in this Matter Pending Resolution of the Springwoods Lawsuit; [5] Plaintiffs' Motion for Extension of Appellate Deadlines; and [6] Plaintiffs' Motion for Reconsideration of the Court's March 3, 2014, Order Granting "Defendants' Motion to Compel Arbitration and Abatement Pending Arbitration" ("Plaintiffs' Motions"), which were filed on March 19, 2014 (but not received by the undersigned counsel for the Defendants until March 25, 2014) and set for submission on March 31, 2014.

## RESPONSE

The various motions contained in the Plaintiffs' filing all seek to undo this Court's rulings of March 3, 2014, by re-packaging the arguments made during the oral hearing of that same date ("March 3rd Hearing") prior to and during this Court's rulings. To the extent these motions are nothing more than another attempt to re-package these arguments, Defendants' attach to and incorporate, as though set forth at length and pursuant to TRCP 58 and 59, their previous responses, replies and a true and correct copy of the transcript of the March 3rd Hearing as Exhibit A. The Defendants' standby the arguments they made at that time and standby the correctness of the rulings made by this Court during that hearing.

Nothing has changed since the Defendants sought arbitration, or since this Court ordered mediation and subsequently granted the motion to compel arbitration, to warrant the reconsideration that the Plaintiffs continue to seek.

This lawsuit involves a dispute arising from and related to the business relationship among the parties. That business relationship was memorialized in one, written joint-venture agreement, which contains an arbitration provision. The dispute comes within the scope of that provision, and there is no argument or evidence before this Court that contests the validity of that written provision or its enforceability. Although there were a number of provocative (though

2

false) allegations made by the Plaintiffs during the March 3rd Hearing, which are re-asserted in their current motions, they are, at best, immaterial to the legal questions before the Court. All issues that relate to the construction and application of the contract, including the construction of the letters that the Plaintiffs now contend are evidence of the existence of additional and distinct oral contracts concerning the parties' continuing business relationship, are questions for the arbitrator to address. *See Perry Homes v. Cull*, 258 S.W.3d 580, 588 (Tex. 2008) (discussing *Howsam v Dean Witter Reynolds*, 537 U.S. 79, 85 (2002); *see also, BG Group PLC v. Republic of Argentina*, ___ U.S. ___, ___ S.Ct. ___, 188 L. Ed2d 220, 2014 U.S. LEXIS 1785, *18-20 (2014); *see, e.g., In re Global Constr. Co., L.L.C.*, 166 S.W.3d 795, 798-99 (Tex. App.— Houston [14th Dist.] 2005, no pet.). Therefore, this Court was correct to compel arbitration and to strike the amended pleadings offered by the Plaintiffs. *See J.M Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003); *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 56 and 61 (Tex. 2008); *In Re Wilson Constr. Co.*, 196 S.W.3d 774 (Tex. 2006); *see also, In Re Weekly Homes*, 180 S.W.3d 132 (Tex. 2005).

Proceedings on a motion to compel arbitration are summary in nature, so there is no right to have an evidentiary hearing and this Court acted properly within its discretion to deny such a hearing. *See* TEX. CIV. PRAC. & REM. CODE sec. 171.021(b); *Jack B. Anglin Co,. Inc. v. Tipps*, 842 S.W.2d 266, 268-69 (Tex. 1992).

There is no right to an interlocutory appeal of this Court's order compelling arbitration. *See* TEX. CIV. PRAC. & REM. CODE sec. 171.098; *Materials Evolution Dev. v. Jablonowski*, 949 S.W.2d 31, 33 (Tex. App.—San Antonio 1997, no pet.); *Lipshy Motorcars, Inc. v. Sovereign Assocs.*, 944 S.W.2d 68, 69 (Tex. App.—Dallas 1997, no pet.). So, even if this Court had power to extend appellate deadlines, there are no appellate deadlines to extend.

In the end, the Plaintiffs' Motions are simply a redistilled effort to delay arbitration and resolution of the dispute. The Defendants request that these motions be denied in their entirety.

## PRAYER

WHEREFORE, premises considered, Defendants HCCI and HMSL request that all of the Plaintiffs' various motions for reconsideration, request for an evidentiary and *in* camera hearing, and extensions of time, filed on March 19, 2014 and set for submission on March 31, 2014, be denied; and that these Defendants receive such other and further relief, general and special, legal and equitable to which they may show themselves justly entitled.

Respectfully submitted,

**TYLER & DAS**

MICKY N. DAS
State Bar No. 05402300
2000 Bering Dr., Suite 401
Houston, Texas 77057
(713) 739-1900 Telephone
(713) 739-8347 Facsimile
**ATTORNEY FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 26th day of March 2014, a true and correct copy of the foregoing was served on the below-listed counsel of record as follows:

Silvia T. Hassell
12512 Cutten Road, Suite A
Houston, TX 77066
*Via Facsimile (713) 665-0369*
Attorney for Plaintiffs

MICKY N. DAS

# EXHIBIT 30

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION


| | | |
|---|---|---|
| IN RE: | § | CASE NO. 15-30781-H1-7 |
| | § | HOUSTON, TEXAS |
| HASSELL 2012 JOINT VENTURE AND | § | WEDNESDAY, |
| SPRINGWOODS JOINT VENTURES, | § | MARCH 25, 2015 |
| DEBTOR. | § | 9:01 A.M. TO 5:02 P.M. |


<u>HEARINGS ON #11 - PARTNERSHIP HEARING; #22 - MOTION</u>
<u>TO DISMISS; AND #23 - MOTION FOR RELIEF FROM STAY</u>


BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

FOR THE DEBTOR:                     SEE NEXT PAGE

FOR THE TRUSTEE:                    SEE NEXT PAGE

COURTROOM DEPUTY/ERO:               MARIO RIOS




TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
(281) 277-5325 (office) ◊ (281) 277-0946 (fax)
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

Case 19-03452 Document 1-41 Filed in TXSB on 05/02/19 Page 73 of 299
Case 15-30781 Document 43 Filed in TXSB on 05/02/19 Page 2 of 299

2

APPEARANCES:

| | |
|---|---|
| FOR THE DEBTORS, HASSELL 2012 JOINT VENTURE AND SPRINGWOODS JOINT V: | PENDERGRAFT & SIMON, LLP<br>Leonard H. Simon, Esq.<br>Robert Pendergraft, Esq.<br>The Riviana Building<br>2777 Allen Parkway, Suite 800<br>Houston, Texas 77019 |
| FOR JAMES C. HASSELL; HASSELL CONSTRUCTION COMPANY, INC.; HASSELL MANAGEMENT SERVICES, LLC: | HUGHES WATTERS ASKANASE, LLP<br>Wayne Kitchens, Esq.<br>Randall Rios, Esq.<br>333 Clay Street, 29th Floor<br>Houston, Texas 77002 |
| FOR LIBERTY MUTUAL INSURANCE CO.: | STRASBERGER PRICE, LLP<br>Christopher R. Ward, Esq.<br>901 Main Street, Suite 4400<br>Dallas, Texas 75202 |

Case 19-03452 Document 1-41 Filed in TXSB on 05/02/19 Page 74 of 299
Case 19-30731 Document 43 Filed in TXSB on 05/02/19 Page 3 of 137

3

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| STEVEN LIGON | | | | |
| By Mr. Simon | 51 | . | 120 | . |
| By Mr. Kitchens | . | 113 | . | 122 |
| | | | | |
| ROYCE HASSELL | | | | |
| By Mr. Simon | 132 | . | . | . |

| EXHIBITS: | Marked | Offered | Admitted |
|---|---|---|---|
| PETITIONER'S: | | | |
| Exhibits 1 - 9 | 7 | 7 | 7 |
| Exhibit 11 | 176 | 176 | 176 |
| Exhibits 14 - 15 | 194 | 194 | 194 |
| Exhibit 16 | 195 | 195 | 195 |
| Exhibit 20 | 7 | 7 | 7 |
| Exhibit 23 | 7 | 7 | 7 |
| Exhibit 24 | 7 | 7 | 7 |
| Exhibits 28 - 34 | 7 | 7 | 7 |
| Exhibit 36 | 7 | 7 | 7 |
| Exhibits 39 - 42 | 7 | 7 | 7 |
| Exhibits 44 - 47 | 7 | 7 | 7 |
| | | | |
| RESPONDENT'S: | | | |
| Exhibits 1 - 4, 7 - 9, 11, | | | |
| 12, 14, 16, 17, 18, 19, 20, | | | |
| 21, 22, 23, 25, 27, 30, 34, | | | |
| 35, 36, 40, 44, 49, 50, 51, | | | |
| 52, 53, 57, 61, 63, 64, 65, | | | |
| 69, 70, 74, 75, 76, 77, 79, | | | |
| 81, 84, 86, 87, 88, 89, 95, | | | |
| 96, 97, 98, 99, 101, 102, | | | |
| 103, 104, 106, 110, 112, | | | |
| 121, and 122 | 13 | 13 | 13 |
| | | | |
| LIGDON'S: | | | |
| Exhibit 1 | 33 | 33 | 33 |
| Exhibit 2 | 35 | . | . |
| Exhibit 3 | 35 | 35 | 124 |
| Exhibit 4 | 35 | . | . |
| Exhibit 6 | 40 | . | . |

4

1         HOUSTON, TEXAS; WEDNESDAY, MARCH 25, 2015; 9:01 A.M.

2         THE COURT:  Good morning.  Please be seated.

3         I understand that Mr. Kitchens is running late.  I'm

4  going to see if we can get some preliminaries done.  We won't

5  do anything substantive until he arrives.

6         The first case we have on this morning's Docket is

7  15-30781, which is the Hassell 2012 Joint Venture case.  Let's

8  go ahead and take appearances for the Court Reporter.

9         MR. SIMON:  Your Honor, Leonard Simon, S-I-M-O-N, on

10  behalf of the Petitioning Creditors -- creditor.

11         THE COURT:  Thank you.

12         MR. SIMON:  Petitioner.

13         THE COURT:  Petitioning Partner I think.  Right?

14         MR. SIMON:  Petitioning Partner.

15         THE COURT:  All right.

16         MR. PENDERGRAFT:  Your Honor, Robert Pendergraft,

17  also with Mr. Simon for the same clients.  It's

18  P-E-N-D-E-R-G-R-A-F-T.

19         THE COURT:  Thank you.

20         MR. RIOS:  Good morning, Judge Isgur.  Randy Rios,

21  along with Simon Meyer, Hughes Watters Askanase.  We're

22  appearing on behalf of James C. Hassell, Hassell Construction

23  Company, Inc., and Hassell Management Services, LLC.

24         And, Judge, I just got an update on Mr. Kitchens.

25  They're exiting downtown right now.  He estimates he'll be

Case 19-03452 Document 1-41 Filed in TXSB on 05/02/19 Page 76 of 299
Case 19-30781 Document 43 Filed in TXSB on 05/02/19 Page 5 of 199

5

1    here in 10 minutes.

2              THE COURT:  That's fine.

3              You'll need to get to the microphone.  Good morning.

4              MR. WARD:  Good morning.  Chris Ward on behalf of

5    Liberty Mutual Insurance Company.

6              THE COURT:  Thank you, Mr. Ward.

7              All right.  Let's start by seeing if we have some

8    uncontested matters to get out of the way before Mr. Kitchens

9    gets here, like admission of uncontested exhibits, things of

10   that nature.  Do we have -- I see we have a bunch of exhibit

11   books, are there some exhibits the admission of which is

12   uncontested?

13             MR. RIOS:  Your Honor, I apologize to the Court, and

14   I'm sure Mr. Simon feels the same way I do, we've been flying

15   so fast and furious we haven't even had an opportunity to

16   confer on exhibits.

17             THE COURT:  Okay.  Well, let's just -- that's what

18   we can start on then is why don't you take out -- actually the

19   first books I've got are the Petitioner's exhibit and witness

20   list.  Let's go through those and see the ones -- you don't

21   even need to tell me which one -- the nature of the objection,

22   anything you object to will have offered during the course of

23   the hearing.  I just want to know the ones to which you have

24   no objection.

25             MR. RIOS:  Your Honor, I have no objection to

Case 19-03452 Document 1-41 Filed in TXSB on 05/02/19 Page 77 of 299
Case 15-30781 Document 43 Filed in TXSB on 05/02/19 Page 6 of 197

6

1       Exhibit Number 1, no objection to Exhibit Number 2, 3, 4, 5,

2       6, 7, 8, 9, 10 -- Your Honor, I think I'll reserve any

3       objection as to Exhibit 10.

4                   THE COURT:  All right.

5                   MR. RIOS:  And 11, same.

6                   THE COURT:  All right.

7                   MR. RIOS:  Reserve at the time that the exhibit is

8       offered as to 12.

9                   THE COURT:  I'm sorry, I thought that's what you --

10                  MR. RIOS:  I mean --

11                  THE COURT:   -- already did.

12                  MR. RIOS:  I'm sorry, Judge.  Yeah, as to 12.

13                  THE COURT:  So I've got that you don't object to 1

14      through 10, and 11 and 12 you may object to.

15                  MR. RIOS:  Correct.

16                  THE COURT:  Okay.  I already have that.

17                  MR. RIOS:  Oh, 10, 11 and 12 we may object to.

18                  THE COURT:  Ten -- okay.

19                  MR. RIOS:  The same with 13.  Reserve the right to

20      object to 14; 15 the same; 16 reserve the right to object; 17

21      reserve; 18 reserve; 19 reserve; 20 no objection; 21 reserve;

22      22 reserve; 23 no objection; 24 no objection; 25 reserve; 26

23      reserve; 27 reserve; 28 no objection; 29 no objection; 30 no

24      objection; 32 -- wait, 31 no objection; 32 no objection; 33 no

25      objection; 34 no objection; 35 I'm going to reserve; 36 no

Case 19-03452 Document 1-41 Filed in TXSB on 05/02/19 Page 78 of 299
Case 19-30781 Document 43 Filed in TXSB on 05/02/19 Page 78 of 299

7

1     objection; 37 reserve; 38 reserve; 39 no objection --

2           MR. SIMON:  I'm sorry, did you say 37 reserved?

3           MALE VOICE:  He did, yeah.

4           MR. SIMON:  But 36 was no objection.  Right?

5           MR. RIOS:  Correct.

6           MR. SIMON:  Okay.

7           MR. RIOS:  What are we on, 40?  Forty, no objection.

8           MALE VOICE:  Thirty-nine there's no objection?

9           MALE VOICE:  Correct.

10           MR. RIOS:  Forty-one no objection; 42 no objection;

11     43, I don't have an Exhibit 43, it's just a page that says 43.

12     Was there --

13           THE COURT:  I will take that as an objection.

14       (General laughter.)

15           MR. RIOS:  Objection.  Forty-four no objection; 45

16     no objection; 46 no objection; 47 no objection; 48 no

17     objection; and 49 I'm going to reserve the right to object.

18           THE COURT:  All right.  Mr. Ward, do you have any

19     objection to any of the Petitioner's exhibits?

20           MR. WARD:  No, Your Honor.

21           THE COURT:  Thank you.  We're admitting Petitioner's

22     Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 9, 20, 23, 24, 28, 29, 30,

23     31, 32, 33, 34, 36, 39, 40, 41, 42, 44, 45, 46, 47 and 48.

24       (Petitioner Exhibits 1 through 9, 20, 23, 24, 28 through

25     34, 36, 39 through 42, 44 through 48 received in evidence.)

Case 19-03452 Document 1-41 Filed in TXSB on 05/02/19 Page 79 of 299
Case 19-30731 Document 43 Filed in TXSB on 05/02/19 Page 8 of 19

8

1           MR. SIMON:  Your Honor, there were certain of those

2    exhibits that I was not going to offer for all purposes, and

3    so can I go through those with Your Honor?

4           THE COURT:  Yes, sir.

5           MR. SIMON:  Thank you.  The first one is Exhibit 31.

6           THE COURT:  All right.

7           MR. SIMON:  That would not be offered for the truth

8    of --

9           THE COURT:  Not for the truth?

10           MR. SIMON:   -- the matter.

11           THE COURT:  We'll admit 31 but not for the truth.

12    You can then cross-offer it for the truth if that's

13    appropriate.

14           MR. RIOS:  I'm sorry, Judge, can you --

15           THE COURT:  Thirty-one is admitted, but not for the

16    truth.  If you want to cross-offer it for the truth, you can

17    do that in your case.

18           MR. RIOS:  Okay.

19           MR. SIMON:  Just bear with me, Your Honor.

20           THE COURT:  All right.

21           MR. SIMON:  Again, Exhibit 40 --

22           THE COURT:  Same ruling, it's not for the truth.

23           MR. SIMON:   -- is not for the truth.  Forty-three,

24    Your Honor --

25           THE COURT:  Forty-three has not been admitted.

9

1          MR. SIMON:  There's been a mix-up and I'll get that

2     exhibit.  I apologize.  Everybody knows what it is, it's a

3     pleading that's been filed in the State Court action.  I don't

4     know why it's not there, but I'll get that resolved.

5          THE COURT:  Actually and 44 and 45 are the same.

6          MR. SIMON:  44 also not for the truth.

7          THE COURT:  Not for the truth.

8          MR. SIMON:  45 not for the truth.

9          THE COURT:  Same ruling.  All right.

10          MR. SIMON:  And I think that's it.

11          THE COURT:  Thank you.

12          And now let's take care your objections to

13     Mr. Rios's exhibits.  Again, I don't need the nature of any

14     objection, I just want to know what you're not objecting to.

15          (Pause in the proceedings.)

16          MR. SIMON:  No objection to 1; no objection to 2; no

17     objection to 3; no objection to 4; reserve on 5; reserve on 6;

18     no objection to 7; no objection to 8; no objection to 9;

19     reserve on 10; no objection to 11; no objection to 12; reserve

20     on 13; no objection to 14; reserve on 15; no objection to 16;

21     no objection to 17; no objection to 18; no objection to 19; no

22     objection to 20; no objection to 21; no objection to 22; no

23     objection to 23; reserve on 24; no objection to 25; reserve on

24     26; no objection to 27; reserve on 28; reserve on 29; no

25     objection to 30; reserve on 31; reserve on 32; reserve on 33;

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 81 of 299
Case 15-30781 Document 481 Filed in TXSB on 04/02/15 Page 101 of 197

10

1    no objection to 34; no objection to 35; no objection to 36;

2    reserve on 37; reserve on 38; reserve on 39; no objection to

3    40 --

4              MR. KITCHENS:  Your Honor, if I may.

5              THE COURT:  Good morning, Mr. Kitchens.

6              MR. KITCHENS:  My apologies.

7              THE COURT:  It's not a problem.  All that we've done

8    so far is taken uncontested exhibits.

9              MR. KITCHENS:  My car pool partner, Mr. Tim Million,

10   and I have been sitting on 290 immobile for over an hour, so

11   my sincere apologies to the Court.

12             THE COURT:  It's just not been a problem.  The only

13   thing we've done is taken in what exhibits are uncontested.

14             MR. KITCHENS:  Thank you, Your Honor.

15             THE COURT:  That's been it.  Thank you.

16             So the last one was -- we had -- 40 there is no

17   objection to.

18             MR. SIMON:  Reserve on --

19             THE COURT:  So I'm waiting on 41.

20             MR. SIMON:  Reserve on 41.

21             THE COURT:  All right.

22             MR. SIMON:  Reserve on 42; reserve on 43; no

23   objection to 44, but not for the truth of the matter;

24   objection to 45, and when I say objection, should I just say

25   reserved, Your Honor, just to be --

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 82 of 299
Case 15-30781 Document 481 Filed in TXSB on 04/02/15 Page 132 of 197

11

1          THE COURT:  It doesn't matter.

2          MR. SIMON:   -- consistent?

3          THE COURT:  All I'm trying to worry about right now

4     is what I'm admitting.  I don't care why I'm not admitting

5     something right now.

6          MR. SIMON:  Reserve on 45; reserve on 46; reserve on

7     47; reserve on 48; no objection to 49; no objection to 50; no

8     objection to 51; no objection to 52; no objection to 53;

9     reserve as to 54; reserve as to 55; reserve as to 56; no

10    objection to 57; reserve as to 58; reserve to 59; reserve --

11    no, take that away, no objection to 61.

12         THE COURT:  I'm sorry, what about 60?

13         MR. SIMON:  Sixty is reserved.

14         THE COURT:  Okay.  Thank you.

15         MR. SIMON:  Sixty-one no objection; reserve as to

16    62; no objection to 63; no objection to 64; no objection to

17    65; reserve 66; reserve as to 67; reserve as to 68; no

18    objection to 69; no objection to 70 with the understanding

19    that our missing exhibit, which is a Motion to Compel, I

20    believe -- is it -- I don't know whether they objected to our

21    Motion to Compel, but for optional completeness I just have --

22    we'd have to go in and see if they objected to my exhibit on

23    the Motion to Compel.

24         MR. RIOS:  What's the exhibit number?

25         MR. SIMON:  Just one second.

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 83 of 299
Case 15-30781 Document 41 Filed in TXSB on 04/02/15 Page 12 of 197

12

1    (Pause in the proceedings.)

2         MR. SIMON:  That would be Exhibit 40.  I show no

3    objection --

4         MR. RIOS:  Yeah, we didn't object to it.

5         MR. SIMON:  And I have no objection to 70; reserve

6    on 71; reserve on 72; reserve on 73; no objection to 74,

7    except for the truth of the matters stated therein, we don't

8    have any objection, so long as it's offered not for the truth

9    of the matter asserted.  We have no objection to 75, so long

10   as it's not being offered for the truth of the matter.  If

11   they want to use it for impeachment, they can.

12        No objection to 76; no objection to 77; reserve on

13   78; no objection to 79; reserve on 80; no objection to 81;

14   reserve on 82; reserve on 83; no objection to 84; reserve on

15   85; no objection to 86 through 89; reserve on 90; reserve on

16   91; reserve on 92; reserve on 93; no objection -- no, I'm

17   going to reserve on 94 for the moment; no objection to 95; no

18   objection to 96; no objection to 97; no objection to 98; no

19   objection to 99.

20        Reserve on 100; no objection to 101, 102, 103; no

21   objection to 104; reserve on 105; no objection to 106 so long

22   as it's being offered not for the truth of the matter stated

23   therein; reserve on 107; reserve on 108; reserve on 109; no

24   objection to 110; reserve on 111; no objection to 112; reserve

25   on 113; reserve on 114 through 120; no objection to 121; no

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 84 of 299
Case 15-36781 Document 181 Filed in TXSB on 04/02/15 Page 134 of 199

13

1    objection to 122; reserve as to 123; reserve as to 124;

2    reserve a to 125; reserve as to 126.

3         THE COURT:  All right.  Mr. Ward, any objections?

4         MR. WARD:  No objections.

5         THE COURT:  Thank you.

6         We are admitting 1, 2, 3, 4, 7, 8, 9, 11, 12, 14,

7    16, 17, 18, 19, 20, 21, 22, 23, 25, 27, 30, 34, 35, 36, 40, 44

8    but not for the truth asserted therein, 49, 50, 51, 52, 53,

9    57, 61, 63, 64, 65, 69, 70, 74 but not for the truth, 75 but

10   not for the truth, 76, 77, 79, 81, 84, 86, 87, 88, 89, 95, 96,

11   97, 98, 99, 101, 102, 103, 104, 106 but not for the truth,

12   110, 112, 121, and 122.

13       (Respondent Exhibits 1, 2, 3, 4, 7, 8, 9, 11, 12, 14, 16,

14   17, 18, 19, 20, 21, 22, 23, 25, 27, 30, 34, 35, 36, 40, 44,

15   49, 50, 51, 52, 53, 57, 61, 63, 64, 65, 69, 70, 74, 75, 76,

16   77, 79, 81, 84, 86, 87, 88, 89, 95, 96, 97, 98, 99, 101, 102,

17   103, 104, 106, 110, 112, 121, and 122 received in evidence.)

18       THE COURT:  I have a question for both sides before

19   we get started, and I don't know if you all then also want to

20   do opening statements or just incorporate the question into

21   opening statements, or waive opening statements.  But I do

22   want an answer to my question.  And that is, on the

23   construction joint venture agreement there's a reference to a

24   term called -- it's all caps, or initial caps, Construction

25   Contract.  I want to know what each side is going to tell me

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 85 of 299
Case 15-30781 Document 481 Filed in TXSB on 04/02/15 Page 14 of 197

14

1    at the end of today's trial construction contract references.

2    What does that mean in the construction joint venture

3    agreement?  So --

4                MR. SIMON:  You want to know that now, Your Honor,

5    or --

6                THE COURT:  I want to know at the front what you're

7    going to tell me to look for in the evidence and what you're

8    going to claim at the end of the trial it means.  And I don't

9    know if you all want to do -- if you're going to want to do

10   opening statements anyway, you can incorporate that into the

11   opening statement; you all can waive opening statements.

12               But in preparing for the trial, I wanted to read and

13   carefully understand the construction joint venture agreement,

14   believing it to be the most operative document from at least

15   what I've seen so far, and I couldn't figure out what that

16   term meant.  And so I will need you all to tell me what it

17   means.  It may be unambiguous, it may be ambiguous, whatever.

18               What do you want to do on opening statements, let's

19   start with that.

20               MR. KITCHENS:  Your Honor, as I understand it, and

21   Mr. -- I and Mr. Rios understand it, today's hearing is on are

22   there entities.

23               THE COURT:  Correct.

24               MR. KITCHENS:  And I think that's the only issue

25   before the Court today.  If I misunderstood that, I would like

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 86 of 299
Case 15-30781 Document 481 Filed in TXSB on 04/02/19 Page 156 of 197

15

1    the Court to instruct me otherwise.

2         THE COURT:  No, I think that's right.  I think

3    that's right.  Let me tell you then why I think this question

4    matters to me, if that may make sense.

5         MR. KITCHENS:  I know why you think it matters.

6         THE COURT:  Okay.  Well, it seems to me that there

7    may be -- if there's a contract without any assets to it --

8    I'm not even sure why do we have a contract.  If there's a

9    contract with assets to it, it'll tend to prove that we have a

10   partnership.  And so I can't tell whether -- I can't tell what

11   that term means.

12        MR. KITCHENS:  Your Honor, the Petitioning Partner,

13   I believe, has the burden of proof here today and the burden

14   of going forward on whether there are actually entities.

15   Having said that, and not trying to usurp Mr. Simon's right

16   for an opening statement, what I believe the evidence is going

17   to show you today is that the construction joint venture

18   agreement was solely for the purpose of Mr. Royce Hassell and

19   his entities obtaining bonding capacity from my client.

20        Construction contracts, or the term as you

21   referenced, is undefined in the agreement, and I think the

22   evidence will show you that there are no construction

23   contracts in the name of any purported joint venture.  Having

24   said that, if Mr. Simon wants to make an opening statement --

25        THE COURT:  But what do you think then that means?

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 87 of 299
Case 15-36781 Document 41 Filed in TXSB on 04/02/15 Page 187 of 199

16

1    I mean what -- at the end of the trial what am I supposed to

2    conclude that the word -- that the two-word phrase,

3    construction contract, means in that contract -- it means in

4    the construction joint venture agreement.

5          MR. KITCHENS:  Your Honor, I am going to have to

6    defer to the Court's hearing of the evidence, because as I

7    have analyzed the case, construction contracts has no meaning

8    because there were never any.

9          THE COURT:  Okay.  Was there any consideration?

10         MR. KITCHENS:  Pardon me?  I'm sorry, Your Honor?

11         THE COURT:  Was there any consideration for the

12    construction joint venture agreement?

13         MR. KITCHENS:  I do not believe there was any

14    consideration, Your Honor, because what it was for, and the

15    evidence -- and you will see documentary evidence from

16    Mr. Royce Hassell that the only reason for the construction

17    joint venture agreement was to obtain insurance and bonding

18    capacity.

19         THE COURT:  So there -- if there wasn't any

20    consideration, how do we have a binding contract?

21         MR. KITCHENS:  I don't think we do, Your Honor.

22         THE COURT:  But I thought you all relied on it to

23    arbitrate.  You relied on that to get arbitration.  Right?

24         MR. KITCHENS:  Recall first, Your Honor, that we

25    were the ones that were sued initially.

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 88 of 299
Case 15-36781 Document 41 Filed in TXSB on 04/02/15 Page 17 of 197

17

1        THE COURT:  You relied though on this contract to

2    get it referred to arbitration, and I don't understand how you

3    can rely on this contract to get it referred to arbitration if

4    there was no consideration for the contract.

5        MR. KITCHENS:  Your Honor, I think we're going to

6    have to go through the evidence and you're going to have to

7    make a hard decision here.  I mean it is -- there are disputes

8    and there is a lot of evidentiary contracts evident -- not

9    contracts but documents that I think will invoke the parol

10   evidence rule, et cetera.

11       THE COURT:  Right.

12       MR. KITCHENS:  Also, Your Honor, before we get

13   started, and I don't -- I do need to know how the Court wants

14   to proceed, I do want to invoke the rule.

15       THE COURT:  Okay.  Well, let's go ahead and take

16   that up right now then.  Who's going to be your client

17   representative?

18       MR. KITCHENS:  Mr. Phil Hassell.

19       THE COURT:  And who's going to be your client

20   representative?

21       MR. SIMON:  Mr. Royce Hassell.

22       THE COURT:  All right.  Would all other persons who

23   are here today as witnesses, not just as public observers but

24   as witnesses, come forward and tell me your name, please.

25       MR. SIMON:  Your Honor, we are not going to be

Case 1:19-cv-03452  Document 1-41  Filed in TXSB on 05/03/19  Page 89 of 299
Case 1:25-30781  Document 1-41  Filed in TXSB on 04/02/15  Page 189 of 197

18

1    calling Sylvia Hassell.  She is an attorney and she is

2    assisting me in this case.  And so they have not put her on

3    their exhibit list, and we would ask that she be excluded.

4    She's not going to testify.

5              THE COURT:  If she's not going to be a witness, then

6    the rule doesn't apply to her.

7              MR. KITCHENS:  She was listed on Mr. Simon's witness

8    list.

9              MR. SIMON:  That was in error, Your Honor, and we

10   withdraw that.

11             THE COURT:  Are you going to call her?

12             MR. KITCHENS:  I'm not going to call her, no.

13             THE COURT:  Okay.  Then she can stay.

14             Why don't you all come forward, please.

15             MR. SIMON:  We have one other thing to take up on

16   witnesses.  I don't know whether you --

17             THE COURT:  Well, let's get this part done here.

18             MR. SIMON:  Okay.

19             THE COURT:  Good morning.  Tell me your name,

20   please, sir.

21             MR. BLUZARD:  James Bluzard.

22             THE COURT:  Could you spell you last name, please?

23             MR. BLUZARD:  B-L-U-Z-A-R-D.

24             THE COURT:  Thank you, sir.

25             And who do we have next?

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 90 of 299
Case 15-30781 Document 48 Filed in TXSB on 04/02/15 Page 19 of 197

19

1          And just if you'll stay up front here, Mr. Bluzard.

2          Good morning, sir.

3          MR. REBECEK:  Earnest Rebecek.

4          THE COURT:  And how do we spell your last name?

5          MR. REBECEK:  I might be listed as Joe.

6          THE COURT:  And your last name is spelled how, sir?

7          MR. REBECEK:  R-E-B-E-C-E-K.

8          THE COURT:  Thank you.

9          MR. REBECEK:  Yes, sir.

10          THE COURT:  And if you'd stay up front here just for

11   a second, please --

12          MR. REBECEK:  Yes, sir.

13          THE COURT:   -- as well.

14          Good morning.

15          MR. M. HASSELL: Good morning, sir.  Michael Hassell,

16   H-A-S-S-E-L-L.

17          THE COURT: Good morning, sir.

18          MR. HASSELL:  Thank you, sir.

19          MR. LIGON:  Steven Ligon.

20          THE COURT:  L-I-G-G --

21          MR. LIGON:  L-I-G-O-N.

22          THE COURT:  L-I-G.

23          All right.  If each of the four of you would raise

24   your right hand.

25       (Witnesses are sworn.)

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 91 of 299
Case 15-36781 Document 481 Filed in TXSB on 04/02/15 Page 91 of 197

20

1          THE COURT:  All right.  Each of them has answered in

2     the affirmative.  Under the federal rules one witness isn't

3     allowed to hear what other witnesses have to say.  And so what

4     has occurred here is that the parties are asking that we apply

5     that rule to this hearing.  We're going to do that.

6          That means that you'll have to be excused from the

7     courtroom until you're called as a witness.  You may not

8     discuss this case from this moment forward, until we reach a

9     decision and announce it, with each other, with the lawyers,

10    with any other witness, or with any other person.  So you all

11    got to talk about, you know, what's going on in the basketball

12    tournament.

13         If you -- were all of you all called as witnesses by

14    Mr. Kitchens' side or -- who called you all as witnesses?

15         MALE VOICE:  The Royce Hassell side.

16         THE COURT:  Okay.  But you all are actually

17    favorable to -- are they aligned with you or -- not

18    necessarily?

19         MR. KITCHENS:  Certainly Mr. Michael Hassell and

20    Mr. Rebecek are aligned with us.  They work for the company.

21         THE COURT:  Why don't you all leave cell phone

22    numbers with the lawyer that you're closest to, whoever you

23    want, and you all can go down to the snack bar and have coffee

24    or whatever, and instead of just having to sit on the hard

25    benches downstairs you can kind of wander the building and

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 92 of 299
Case 15-30781 Document 481 Filed in TXSB on 04/02/15 Page 21 of 197

21

1    they'll call you when it's time for you to come up.

2         I'm not going to make you just sit on-call.  There's

3    also, immediately after you leave the room, comfortable chairs

4    to the right in a little conference room.  There are Wi-Fi

5    instructions if you want to use your iPads or something, and

6    they're on a bulletin board just outside the front door.  So

7    you're free to go about your business, but you've got to be

8    generally available when they call you, so if you'll leave

9    contact information with one side or the other.

10        Who's going --

11        MR. SIMON:  Your Honor --

12        THE COURT:   -- to be the first witness today?

13        MR. SIMON:   -- I wanted to honor the request made

14   in the Motion to Quash with Mr. Ligon about his conflicts that

15   he has coming up.  I wanted to take him out of order first so

16   that we can get him in and get him out because he said that --

17        THE COURT:  You can call him first.  That's fine.

18        MR. SIMON:  That's what I wanted to do.  And also

19   he -- I've asked for documents, I don't know whether he's

20   brought them, but we certainly would like to see them before

21   we proceed forward.

22        THE COURT:  All right.  You have brought some

23   documents with you today?

24        MR. LIGON:  Yes.

25        THE COURT:  Would you go ahead and produce those?

Case 19-03452  Document 141  Filed in TXSB on 05/03/19  Page 93 of 299
Case 19-36781  Document 41  Filed in TXSB on 04/02/19  Page 22 of 197

22

1       And the others of you all can go ahead, if you'll

2   leave your phone number?

3       MR. KITCHENS:  Your Honor, those documents are

4   subject to our Motion to Quash that was filed yesterday.  I

5   don't know if the Court knows that.

6       THE COURT:  Right.

7   (Pause in the proceedings.)

8       MR. SIMON:  Your Honor, we provided them with the --

9       THE COURT:  Why don't you give the documents to me

10  if you would, please, sir.  Just right here.  You'll need to

11  speak nice and loudly because it's all got to be recorded.

12      MR. LIGON:  I've got some other documents that the

13  attorneys for Hassell asked me to produce.  They were

14  basically emails back and forth from me to them.  This is

15  everything they requested --

16      THE COURT:  Thank you.  Thank you, sir.  All right.

17  And, Mr. Ligon, if you would just wait outside just for a few

18  minutes and we'll figure what we're going to do.  Thank you.

19  We'll get you on as the first witness though.

20      MR. SIMON:  Your Honor, as to Exhibit 43, I'll tell

21  you what happened.  We sent them the electronic copy of it,

22  it's one of those Harris County documents, even though it's a

23  certified copy.  When we uploaded it to Adobe and tried to

24  combine the file so that we could send it off to get it

25  copied, the books made up, it won't combine because they have

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 94 of 299
Case 15-30781 Document 48 Filed in TXSB on 04/02/15 Page 23 of 197

23

1   those locks on the documents.  And so we had to not put it in

2   there, we had to put a moniker in there for that exhibit.  But

3   we did deliver an electronic copy to them.

4          And I can -- I forgot all about it to be quite

5   honest with you, and I can print it off and stick it in the

6   book.  We probably won't be using it until --

7          THE COURT:  Let's worry about 43 --

8          MR. SIMON:   -- much later --

9          THE COURT:   -- at a break and see if they have any

10  problem with what you're going to do with it and we'll deal

11  with it when you get it.

12         MR. RIOS:  Are we talking about Exhibit 43?

13         MR. SIMON:  Yeah.

14         MR. RIOS:  Okay.

15         THE COURT:  Any other preliminaries, or can we go to

16  Mr. Ligon.

17         MR. KITCHENS:  I'm just wondering, Your Honor, about

18  the Court's time line.  I know you've got a CLE event this --

19  at noon or --

20         THE COURT:  I've got a CLE event at noon, I've got a

21  couple of short hearings in the afternoon, and I'm planning to

22  work throughout the day on this case, and then to come back

23  tomorrow.

24         MR. KITCHENS:  Fine, Your Honor.  Thank you.

25         THE COURT:  What's your answer to what the word

1    construction -- the word --

2        MR. SIMON:  Well, I'd like to make an opening

3    argument if I could, Your Honor, but my answer to that is

4    that -- may I approach the podium?  I don't want this to be my

5    opening argument.  The honest to God truth is as stated in a

6    couple of paragraphs that are in one of the affidavits of

7    Mr. Royce Hassell, and that is that the joint venture was

8    created on September 1, 2012.  It was an oral joint venture.

9    And this agreement was signed some time at the end of I

10   believe April, or beginning of May 2013.

11       And it was -- the agreement was put together for the

12   purposes of obtaining insurance for HCCI, not for RHHC.  RHHC

13   had already gotten its insurance back in November, and because

14   of the fiscal year for HCCI, their insurance came up in the

15   spring of 2013.  And so in order to obtain insurance, the

16   insurance company asked for a joint venture agreement, a

17   written joint venture agreement.

18       And so the parties then endeavored to draft up a

19   joint venture agreement.  And they took a form off of the

20   internet and started marking it up.  And as Mr. Hassell will

21   testify, and is the position that he has taken throughout

22   these proceedings, is that it contained some of the terms of

23   the joint venture that had been created back in September, but

24   not all of them, and inadvertently included this arbitration

25   clause which he did not focus on at the time.  He didn't think

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 96 of 299
Case 15-36781 Document 81 Filed in TXSB on 04/02/15 Page 296 of 197

25

1    it was important, it was not -- his testimony will be that it

2    was not part of the oral agreement that they had entered into.

3           And it was sent off to the insurance company, it was

4    signed by both parties and sent off to the insurance company.

5    And on the same day Philip Hassell asked Royce Hassell to sign

6    a one-page -- or to prepare a handwritten one-page document

7    which said that this joint venture agreement doesn't really

8    change things between us and we're going to continue operating

9    the way we've operated, which was pursuant to the oral joint

10    venture, and we're signing this for insurance purposes only.

11           THE COURT:  So what does the word -- what do the

12    words --

13           MR. SIMON:  Contract mean?

14           THE COURT:   -- construction contract mean?

15           MR. SIMON:  To me it includes all of the

16    construction contracts that occurred from and after July 1,

17    2012 all the way through today, because I don't believe that

18    the joint venture has ever been terminated.  I believe these

19    folks, for whatever reason, signed that agreement, and my

20    client may say whatever he wants to say about it, and

21    Mr. Philip Hassell may say anything that he wants to say about

22    it.  You know, whether they did it for insurance purposes only

23    or whatever, it's an agreement between the parties, and I am

24    not going to stand before this Court and tell Your Honor that

25    my client, who's got an MBA, signed an agreement and doesn't

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 87 of 299
Case 15-30781 Document 481 Filed in TXSB on 04/02/15 Page 26 of 197

26

1     think that it's important.

2             THE COURT:  So if I have a contract --

3             MR. SIMON:  He thinks it's enforceable --

4             THE COURT:   -- if I had a Texas contract, the

5     construction joint venture agreement, and it has a bunch of

6     unambiguous terms --

7             MR. SIMON:  Right.

8             THE COURT:   -- and it has an ambiguous term, at

9     least one, meaning -- which is construction contract --

10            MR. SIMON:  Right.

11            THE COURT:   -- I'm pretty sure the Texas law allows

12    parol evidence to define what the term construction contract

13    means.

14            MR. SIMON:  I would think so.

15            THE COURT:  But it doesn't take parol evidence to

16    vary any other term, the unambiguous terms of the contract are

17    just the parol evidence -- once you have one ambiguous term,

18    does parol evidence come in as to the whole contract or only

19    as to the ambiguous term under Texas law.

20            MR. SIMON:  I think it's just as to the ambiguous

21    term, Your Honor.

22            THE COURT:  What do you think, Mr. Kitchens?

23            MR. SIMON:  There's one more ambiguous term in that

24    contract you may have picked up.

25            THE COURT:  Well, let's -- in theory once we have

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 98 of 299
Case 15-30781 Document 181 Filed in TXSB on 04/02/15 Page 29 of 197

27

1    this term construction contract that appears to be ambiguous
2    from your statement and from Mr. Simon's statement, can
3    extrinsic evidence be admitted to vary terms of the contract
4    other than to define what construction -- what the ambiguous
5    terms are?  In other words, if you have an unambiguous term,
6    can you still nevertheless use parol evidence to vary it once
7    you get one ambiguous term?

8            MR. SIMON:  I think so, Your Honor.

9            THE COURT:  All right.  You think you can.

10           What do you think?

11           MR. KITCHENS:  I think you can as well, Your Honor,
12   because regardless of what Mr. Simon is telling you, there is
13   no construction contract between the parties to whatever that
14   agreement is.

15           THE COURT:  Right.  So this term construction
16   contract, I'm going to have to figure out what it means.

17           MR. KITCHENS:  Yes.

18           THE COURT:  And I'm going to have to use parol
19   evidence to figure out what it means.

20           MR. KITCHENS:  Yes.

21           THE COURT:  I've also got, and let's just take the
22   arbitration provision, can parol evidence come in to vary the
23   arbitration provision once the term construction contract is
24   determined to be ambiguous, or can parol evidence only come in
25   to define construction contract?  I thought you said only to

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 99 of 299
Case 15-36731 Document 481 Filed in TXSB on 04/02/15 Page 28 of 197

28

1    define construction contract.

2              MR. SIMON:  Just construction contract, Your Honor.

3              THE COURT:  Or whatever other ambiguous terms there

4    are.

5              MR. SIMON:  Yeah.

6              THE COURT:  Do you think it can come in --

7              MR. KITCHENS:  Well, I think Mr. Simon just says you

8    can use parol evidence to interpret the contract as a whole.

9    However, if you are going to accept the fact that -- and let's

10   go back to Judge Rosenthal's decision in the *Barrett* case.

11   Your Honor, I think our entire opposition to this -- to the

12   fact that there's an entity, relies on the factors of what

13   creates a partnership.

14             There is a signed joint venture agreement.  Nobody

15   disputes that fact.

16             THE COURT:  Right.

17             MR. KITCHENS:  However, that is only one little

18   factor of what constitutes a partnership.  We have to look,

19   and the evidence is going to show you, no bank accounts, no

20   agreement on -- no contracts set up.

21             THE COURT:  Right now though I want to focus on sort

22   of what I can do about what this contract means.  Can I vary

23   the terms of the contract by parol evidence, or do I have to

24   live with the terms of this contract?

25        (Pause in the proceedings.)

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 100 of 299
Case 15-36781 Document 44 Filed in TXSB on 04/02/19 Page 29 of 139

29

1          MR. KITCHENS:  Your Honor, in conferring with co-

2    counsel, I think the contract is taken as a whole.

3          THE COURT:  Meaning if there's one ambiguous term,

4    that parol evidence can vary the whole contract?

5          MR. KITCHENS:  Yes, Your Honor.

6          THE COURT:  Okay.  I don't know that answer.

7          MR. RIOS:  Your Honor, may I interject?  Judge

8    Rosenthal, in her opinion that we've been relying on, their

9    petroleum case, she says that when considered as a whole, a

10    contract is ambiguous only if it's reasonably susceptible to

11    more than one meaning, so --

12          THE COURT:  But I don't know if that means though

13    that -- the arbitration provision, and again, I know that that

14    may not even be the focus of today's trial, I'm just trying to

15    use it as an example, it's not ambiguous.  Can somebody come

16    and vary that just because the term construction contract is

17    ambiguous?  Mr. Simon says no, and you all say --

18          MR. KITCHENS:  Well, I mean, Your Honor, the

19    enforceability -- I don't think that you can vary the

20    enforceability of the arbitration provision.

21          THE COURT:  Well, then you're telling me that you

22    can't use parol evidence to vary the balance of the contract,

23    only to interpret the ambiguous terms.

24          MR. KITCHENS:  Yes, Your Honor.

25          THE COURT:  Okay.  Then you all are on the same --

1    that's what I think the law is, but I wasn't sure and I wanted

2    to understand that.  So let's deal with Mr. --

3              MR. SIMON:  Your Honor, there's two ambiguous terms.

4    There's also two mentions of the sharing in profits.  One says

5    it's 50-50, and one says it's 75 -- I'm sorry the losses.  One

6    says it's equal, the other says it's 75-25.  And our

7    position --

8              THE COURT:  I'm not sure that's going to matter for

9    today's hearing.

10             MR. SIMON:  I realize that.  I just wanted to let

11   Your Honor know that.

12             THE COURT:  Yeah, I got that.  But it seems to me

13   the term construction contract may have a big effect on --

14             MR. SIMON:  Sure.

15             THE COURT:   -- today's --

16             MR. SIMON:  And, Your Honor, in all things, you

17   know, we're going to tell the unvarnished truth about all of

18   this and so --

19             THE COURT:  Let's move ahead on the --

20             MR. SIMON:   -- let Your Honor decide what happened

21   here.  This is a family feud.

22             THE COURT:  Right.  So we have Mr. Ligon's exhibits.

23   You asked him to bring them, he's brought them.  You moved to

24   quash.  How do you all want to proceed?  He's handed them to

25   me, so I'm the only one that's got them.  Do you all want me

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 102 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/15 Page 31 of 137

31

1    to go through what he's provided without giving the

2    confidential details of it so you can then argue document-by-

3    document?  Or how do you want to handle that?

4             MR. RIOS:  Your Honor --

5             THE COURT:  Right.

6             MR. RIOS:   -- I believe in the response that we

7    filed to the Court's order of a couple of days ago, we agreed

8    that there were responsive documents related to Mr. Simon's

9    request as to a Footnote 14 in year-end financials.  We had

10    agreed that we were going to produce those.  I think that

11    everything else would be -- remains subject to our Motion to

12    Quash.

13             MR. SIMON:  I think that it goes more than to just

14    Footnote 14, I think it goes to Footnote 16 and --

15             THE COURT:  Yeah, but let's assume that I have an

16    email from Philip Hassell that refers to the JV profits.  Is

17    that -- do they get that?  Why wouldn't they get that?

18             MR. RIOS:  Your Honor, I think they would get that.

19             THE COURT:  So how do you want to go about deciding

20    what they get and what they don't get?

21             MR. KITCHENS:  Judge, it pains me to say this to no

22    extent, I don't -- can we do that right now, can we do that

23    right here?  I don't know.

24             THE COURT:  What do you mean?

25             MR. KITCHENS:   I mean we have produced 60,000

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 103 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/15 Page 32 of 137

32

1    documents.

2                THE COURT:  Right.

3                MR. KITCHENS:  And to be able to decide on the spot

4    right here, I'm not sure we can -- I'm not sure we actually

5    can do that right now.

6                THE COURT:  Do what?

7                MR. KITCHENS:  Decide whether you can -- we can

8    allow them to have items subject to our Motion to Quash.

9                THE COURT:  How else can we proceed?

10               MR. KITCHENS:  Your Honor, we have had a monumental

11   task in a short amount of time, and I do want to proceed and I

12   want to proceed on the merits.

13               THE COURT:  Right.

14               MR. KITCHENS:  However, Mr. Simon has asked for

15   things that we believe are highly confidential and that should

16   be inspected by the Court prior to admitting them into

17   evidence or producing them to the other side.

18               THE COURT:  Well --

19               MR. SIMON:  I have a solution, Your Honor.

20               THE COURT:  First of all, there's not that much

21   and --

22               MR. KITCHENS:  No, we have --

23               MR. SIMON:  No, those don't --

24               THE COURT:  Tell me about this one, what's

25   confidential about that?  I'm going to hand you the first of

Case 19-03452 Document 1-41 Filed in TXSB on 05/02/19 Page 104 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/15 Page 33 of 137

33

1    the documents produced by him.

2         (Pause in the proceedings.)

3              MR. KITCHENS:  That document's responsive, Your

4    Honor.

5              THE COURT:  All right.  Then you're going to label

6    this Ligon Production 1, we're admitting Ligon Production 1.

7         (Ligon Production 1 marked for identification and

8    received in evidence.)

9              THE COURT:  And we need to now figure out a way to

10   make copies for everybody, but we'll do that in a moment.  So

11   I'll give you Ligon Production 1, but hang on to it.

12             MR. SIMON:  May I approach?

13             THE COURT:  Yes, sir.

14             Who is Ed Hubbard?

15             MR. KITCHENS:  Ed Hubbard is an attorney at Coats

16   Rose.

17             THE COURT:  Okay.  Why would items sent by Mr. Ligon

18   to Mr. Hubbard at Coats Rose, Mr. Simon, why would you need

19   those?

20             MR. SIMON:  I'm sorry, excuse me?

21             THE COURT:  You requested apparently items emailed

22   to Mr. Hubbard at Coats Rose.

23             MR. SIMON:  I don't think I requested that.

24             THE COURT:  Okay.  I have a stack of documents that

25   Mr. Ligon has labeled Items Emailed to Ed Hubbard.

Case 19-03452 Document 1-41 Filed in TXSB on 05/02/19 Page 105 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/15 Page 34 of 139

34

1        MR. SIMON:  Ed Hubbard?  What I asked for, Your

2    Honor, was the -- well, any evidence that was presented to the

3    accountants that backed up these Notes 14 and 16.  So I think

4    that's what it is, that's a litigation letter, if you will, to

5    the accountant that the accountant relies on in order to

6    develop these notes to the financial statement, and

7    principally these are Notes 14 and 16.  Without seeing the --

8        THE COURT:  Yeah.  No, let's assume that's right --

9        MR. SIMON:   -- I imagine that's what it is.

10        THE COURT:   -- but why are you entitled to that

11    stuff, communication with counsel till you break -- you may

12    break the privilege at some point, I got it that you may do

13    that, but if you don't break the privilege why are you going

14    to be entitled to stuff between Hassell Construction Company,

15    Inc.'s lawyers and accountants?

16        MR. SIMON:  Well, I was pondering that the other

17    day, and I was wondering whether -- let me just turn this

18    thing off, I apologize, Your Honor -- whether or not an agent

19    who is sending things to an accountant, whether that would be

20    part of the attorney-client privilege.  And I don't know the

21    answer to that.  It might be, it might not be.  I don't know.

22        THE COURT:  I'm going to hand you Ligon 2 and we're

23    going to reserve it's admission until we see what you develop

24    in the Ligon cross --

25        MR. SIMON:  Sure.

1      THE COURT:   -- if we get somewhere.  But these are

2    labeled Items Emailed to Ed Hubbard and we'll give you

3    Ligon 2.

4         (Ligon Production 2 marked for identification.)

5         MR. KITCHENS:  Thank you, Judge.

6         THE COURT:  Ligon 3 are labeled 2014 to 2011

7    Attorney Letters, and I'm going to treat these the same as

8    Ligon 2 --

9         MR. SIMON:  Okay.

10         THE COURT:   -- and hand these to --

11         MR. KITCHENS:  Thank you, Judge.

12         (Ligon Production 3 marked for identification.)

13         THE COURT:  Next I have a work-in-progress support

14    statement.  It's an accounting run off, schedule of contracts

15    from 6/30/2014, I've got another schedule of contracts from

16    6/30/2013, another schedule from 6/30/2012 and another

17    schedule from 6/30/2011.  Those include detailed financial

18    information on the projects, and I would understand why that

19    might be confidential.  I don't understand why which contracts

20    are listed would itself be confidential.

21         And I'll show you one of these so you can maybe give

22    me an example.  I'll label this one Ligon 4, which is the

23    June 30, 2014 work-in-process support.

24         (Ligon Production 4 marked for identification.)

25         MR. KITCHENS:  Your Honor, as to the financials, I

Case 19-03452 Document 1-41 Filed in TXSB on 05/02/19 Page 107 of 299
Case 19-36781 Document 43 Filed in TXSB on 04/02/19 Page 36 of 99

36

1      agree with you, as to the -- there's a list of contracts,

2      those are probably responsive, but I'm not sure as of today

3      and what we're doing at the hearing today that they're

4      relevant.  I mean it may develop later.

5            THE COURT:  Well, I think it is relevant what people

6      were working on so that I can figure out what, if anything,

7      was part of the joint venture.  I don't think that the profit

8      percentages are relevant, or the gross revenues or the amounts

9      collected or the receivables or any of the normal things, you

10     know, the percent completions.  I don't know why that would

11     plainly rule in his case, but the actual identity of the

12     contracts -- first of all, these are all public contracts, I

13     just don't see what would be confidential about their

14     identity.

15           MR. KITCHENS:  Your Honor, if I can have our

16     consultant look at these and cull what we think may be

17     confidential and we can have that --

18           THE COURT:  Right.

19           MR. KITCHENS:   -- and we can have that --

20           THE COURT:  Sure.  And do you agree that what you

21     really need are the names of the contracts and not the percent

22     profits and gross margins and all that stuff?

23           MR. SIMON:  Well, the percent in profits, Your

24     Honor, would go to whether or not there's a sharing in the

25     profits.

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 108 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/15 Page 37 of 137

37

1      THE COURT:  Yeah, but the question we got is should

2  there be a sharing of the profits.  Once there should be, the

3  amount is for another day.  So these may become --

4      MR. SIMON:  The amounts of the sharing is for

5  another day.  I think these -- from what you're describing to

6  me, I think all of these have been produced in our exhibit

7  books.  If I'm not mistaken, we have --

8      THE COURT:  Can you give me an example in your

9  exhibit book?

10      MR. SIMON:  Not in my exhibit book, but I saw them

11  in their exhibit book where they have these lists of

12  contracts, and also they're attached to the financial

13  statements.

14      THE COURT:  Well, this is -- this gives a lot of

15  detail about each contract, so give me an example of something

16  you think is already there.

17      MR. SIMON:  Why don't you take a look at -- okay,

18  let me start with my exhibit book, it'll be easier.  The two

19  exhibits that you should refer to are Exhibit 42 and Exhibit

20  40 -- I'm sorry, Exhibit 42 --

21      THE COURT:  Right.

22      MR. SIMON:   -- and Exhibit 39.  And let me explain

23  what they are.  They are two versions of the audit --

24      THE COURT:  Okay.

25      MR. SIMON:   -- that have been -- audits that have

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 109 of 299
Case 15-30781 Document 41 Filed in TXSB on 04/02/19 Page 38 of 137

38

1    been produced to us by the other side.  One was redacted for

2    whatever reason, and the other one was unredacted.  And the

3    financial statements are also attached to their exhibits, and

4    if you go back to the portion of the financial statement

5    beyond the signature, you'll see the schedules.

6              THE COURT:  Right.

7              MR. SIMON:  And I believe those schedules set out

8    everything that you're looking at.

9              THE COURT:  These set out more information than what

10   is there.

11             MR. SIMON:  Okay.

12             THE COURT:  But I can read the columns, as to each

13   contract it sets out the contract income, the amended contract

14   cost, the amended profit amount, the amended percentage of

15   income, the income build, the actual cost, the profit or loss,

16   the percentage complete, the field profit earned, and the over

17   and under build amount.

18             And then attached to the cover list are individual

19   job reports that give even more detail than that.  So there's

20   a lot of job detail information, and I don't know why job

21   detail information matters.  I think what matters to you is

22   job existence.

23             MR. SIMON:  Yeah.

24             THE COURT:  And so I'm inclined to -- that's why I

25   was asking him, can we just, on these cover pages, delete the

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 110 of 299
Case 15-30781 Document 143 Filed in TXSB on 04/02/19 Page 39 of 139

39

1    numeric data, give you the first two cover pages -- the first

2    two pages, you know, which is just the summary.  I don't see

3    why you need the backup as to how they got the numbers.  I

4    don't even care if the numbers are right, wrong or indifferent

5    for the purpose of determining what goes in here.

6           Now if you were to win that your joint venture in

7    the FM865 Project, then as a joint venture you're going to be

8    entitled to everything.  But if you lose that you're a joint

9    venture in the FM865 Project, I don't know why you're entitled

10   to anything.  And that's why I'm thinking, just tell you what

11   the projects are and not the financial detail until we reach

12   today's decision.

13          And I want to know if that protects your client's

14   interests and whether that protects you all's interest.

15          MR. KITCHENS:  I think it does, Your Honor.

16          THE COURT:  You okay with that?

17          MR. SIMON:  I'm okay with that.

18          THE COURT:  Then that's what we're going to do.  I'm

19   going to -- would you hand back that one to me?  Thank you.

20          MR. KITCHENS:  Your Honor, I ask in advance for all

21   this back and forth, I mean it's okay --

22          THE COURT:  Yeah, me too.

23          Okay.  So I'm labeling these Ligon 4, is the June of

24   '14, Ligon 5 is June of '13, Ligon 6 is June of '12, Ligon 7

25   is June of '11.

1          (Ligon Production 5 through 7 marked for identification.)

2                    MR. SIMON:  Did you want this back, Your Honor?

3                    THE COURT:  That's yours, and then we need to find a

4      way to make copies of it so that they have a copy of what

5      we're going to admit.  We're admitting one --

6                    MR. SIMON:  I think we can go up to six and make

7      copies, if I'm not mistaken, to the library.

8                    THE COURT:  Yeah, I don't know if we have anybody to

9      do that right now or not.  Well, let me see.  I'll get you

10     copies.

11                   MR. SIMON:  Are you sure?

12                   THE COURT:  Yeah, it's not very long.  Right?  So

13     let me get these started, and then if you want an opening

14     statement, I'll let you do that.

15                   MR. SIMON:  Thank you, Your Honor.

16                   THE COURT:  And I'll let you make a rebuttal

17     statement.  I don't know if you want to make one or not.

18                   MR. KITCHENS:  Thank you, Judge.

19          (Pause in the proceedings.)

20                   THE COURT:  All right.  Let's move ahead.

21     Mr. Simon, you want to do an opening?

22                   MR. SIMON:  Yes, Your Honor.  Bear with me for a

23     second.

24                   THE COURT:  Were you wanting to show a PowerPoint or

25     something?

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 112 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/19 Page 41 of 99

41

1      MR. SIMON:  No, I wanted to go -- I wanted to

2  project if we could.

3      THE COURT:  Yeah, I'll have to turn that on.  You

4  should be projecting at this point.

5      (Pause in the proceedings.)

6      THE COURT:  There we go.

7      MR. SIMON:  Just bear with me.

8      (Pause in the proceedings.)

9      MR. SIMON:  Your Honor, if I may do this from my

10  seat?

11      OPENING STATEMENT ON BEHALF OF THE PETITIONERS

12      MR. SIMON:  Your Honor, what I have here is a little

13  graphic that I put together, that does not seem to be working

14  too well here.  I don't know why, but I'm having some

15  technical difficulties with my computer, which does not seem

16  to want to comply with my wishes, as usual.

17      I'm just going to do this extemporaneously, and I

18  think that the big white elephant in this room is judicial

19  estoppel.  And before we spend --

20      MR. KITCHENS:  Your Honor, I completely object.

21  This is evidence, this is not opening statement.  The graphic

22  that's up is something that needs to be proved up.  I don't

23  know what Mr. Simon is doing here.

24      MR. SIMON:  Okay.  Well, I'll tell you what, these

25  have all been admitted into evidence but --

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 113 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/19 Page 42 of 199

42

1          THE COURT:  He can make an opening statement.  Let's
2     go ahead.
3          MR. SIMON:  Okay.
4          THE COURT:  Go ahead.
5          MR. SIMON:  I think that the big white elephant is
6     the room, Your Honor, is judicial estoppel.  And I think that
7     that's the first thing that this Court needs to grapple with.
8     And I think that if you take a look at the Motion to Compel
9     Arbitration that they filed in the State Court action, Your
10    Honor, you will find, and that's Petitioner's Exhibit 40,
11    which has been admitted, that it says in paragraph 2 -- I
12    believe it's paragraph 2, that,
13        "In 2012 Plaintiffs and Defendants formed a joint
14        venture, and Defendants formed a joint" -- I'm
15        sorry -- "and executed a construction joint venture
16        agreement."
17         So there were two things that were represented to
18    the State Court in order to obtain compelling of arbitration
19    of this matter.  One, that there was a contract that had an
20    arbitration clause in it, and two, that a joint venture had
21    been formed.
22         Again, in their Exhibit 74, which I have not
23    objected to, at paragraph 3, they have the exact same
24    statement.  And of course when we go to Note number 14 in the
25    financial statement, which admittedly we'll talk about that in

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 114 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/15 Page 43 of 139

43

1    a while, but this note is deafening to them, about whether or

2    not there was a joint venture.

3         But we'll talk about that.  It says that one part of

4    this, right here, this part I'm blocking out for Your Honor,

5         "All contracts entered into between June 30, 2012

6         and July 1, 2013 will be governed by the joint

7         venture agreement."

8         This is their auditor putting a note in two audits,

9    2013 and 2014, that has this statement in there.  Okay.  Now I

10   don't know what Mr. Ligon's going to testify to, but in the

11   world of audited financial statements, my understanding,

12   there's just got to be a management letter somewhere, or a

13   representation letter.  Auditors don't put them in audited

14   financial statements without having representations from the

15   company about -- well, we'll see.  He's going to testify,

16   we'll find out what he has to say.

17        Now, the arbitration clause.  It says that if a

18   dispute arises that cannot be resolved with direct

19   discussions, joint venturers shall participate in a mediation.

20   Now if there's no contracts, if there's no joint venture, this

21   provision is annulled, in my opinion.  It has no affect

22   because it says that the joint venturers.

23        If these folks were not joint venturers, then

24   somebody down in the State Court system shouldn't have been

25   making representations to Judge Carter that there was a joint

44

1   venture so that they could get my client into an arbitration

2   proceeding.

3       And I'm not here to argue about whether this should

4   or should not be arbitrated.  This is a question of judicial

5   estoppel.  It is so huge a question of judicial estoppel, I'm

6   not aware that it could be any closer.  They did it, they did

7   it for a purpose, they wanted to obtain a result, and they got

8   their result.

9       We were harmed.  Our position was cemented by virtue

10  of their representations to the State Court, and to the

11  arbitration panel.  Same provisions that I just read to you

12  that were in the Motion to Compel are identical in the section

13  of their complaint entitled Jurisdiction that they submitted

14  to the arbitration panel.

15      Now what do they say about all of this?  One second

16  here.

17      THE COURT:  I think if you'll go to view and reduce

18  your size it'll probably --

19      MR. SIMON:  I don't know what's going on here, Your

20  Honor.  I really don't.  I can't rid of this bottom screen

21  here.  I apologize.

22      Here is their position.  This is their Motion for

23  Relief From Stay that they have filed in this court.  They say

24  that the alleged debtors do not exist as a legal entity, they

25  have no bank accounts, no assets, debts or other liabilities,

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 116 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/19 Page 45 of 137

45

1    no employees and have never filed tax returns.  The only

2    documentation evidencing the creation of a joint venture was a

3    document known as a construction joint venture agreement dated

4    July 1, 2012.

5          Now, let's go down to what they say in paragraph 27

6    of ECF Document 33 filed in this court where they responded to

7    my Motion to Compel, and this is what they say, this is the

8    basis of their argument.

9          "Second, the Petitioner attempts to use pleadings

10         related to different issues to claim that HCCI has

11         brought in courts over --"

12         We'll get into that.  I don't like to get into that.

13         This is the part of interest to me, where it says,

14    "And it relied on the validity of that contract to

15    enforce the arbitration provision contained in the

16    JBA, not on the legal existence of the partnership."

17         That's what they say now.  They are now saying, and

18    excuse me if I'm a little incredulous about this, but they are

19    saying that there's a contract that provides for arbitration,

20    but it doesn't provide for anything else.  Nothing.  Nothing

21    else, just arbitration.

22         And they didn't mean to tell the District Court,

23    Judge Carter, they didn't mean to tell him that that created a

24    joint venture.  That's what they now say.  Except that when

25    you go back and read the language of their Motion to Compel,

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 117 of 299
Case 15-30781 Document 41 Filed in TXSB on 04/02/19 Page 46 of 137

46

1       that's not what it says.  It says -- it's in the conjunctive,

2       the parties created a joint venture, they formed a joint

3       venture and they signed a joint venture agreement.

4               Now, there's a lot of evidence you're going to hear

5       today, and a lot of it is not going to be pretty.  And I'm

6       just telling you, they've taken conflicting positions all over

7       the place.  And, yes, I do reserve my right to say it's fraud

8       on the Court.  They have exercised their rights to suggest

9       that my sanctions counsel should be here because they're going

10      to sanction for doing what I've done.  So I deserve the right

11      to say that this is fraud on the Court.  I've never seen an

12      example more attenuated than this one.

13              Now we can go through a lot of testimony, maybe Your

14      Honor wants to listen to it, and I think it's fine.  We're

15      here to put on that testimony.  At the end of the day,

16      however, that white elephant is still sitting here in the

17      courtroom, and that white elephant is judicial estoppel.  And

18      I don't know how they get around it, and I don't know why

19      these lawyers are in here arguing that is not a joint venture.

20      It's outrageous.  It's just simply outrageous.

21              And I'll point something else to Your Honor.  I had

22      something in here, I probably can't find it.  I put it in here

23      somewhere.

24              Now I said if there wasn't a joint venture, what was

25      the consideration for my client signing this contract?  Just

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 118 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/19 Page 47 of 137

47

1    what Your Honor said this morning.  It was the very first

2    thing that entered my mind, what in the world was the

3    consideration if there wasn't a joint venture?  What was the

4    consideration that my client got for all of this?  An

5    arbitration proceeding that they are now demanding that my

6    client pay one-half of $300,000.

7          And I'm not here to talk about the arbitration.  We

8    ought to know what the facts are.  They want my client to pay

9    $150,000 for the benefit, for the pleasure of arbitrating this

10    under an agreement where there was no consideration.  But they

11    never told the State District judge that because if they had

12    told the State District judge that, Judge Carter would have

13    had a hearing.

14          He never had a hearing.  He didn't think there would

15    be -- there needed to be a hearing.  They said there was a

16    joint venture and there was a contract.  He looked at it and

17    said, Oh, well, that's arbitral.  You'd do the same thing

18    probably.

19          I think you know where I'm going with this, Judge.

20    I don't think I need to say much more but -- and I'm sorry for

21    being a little extended over this pot a little bit about this,

22    but it requires that because this reaches the point of

23    incredulity.  It should not be -- it should not even be here

24    today talking about the 2012 hearing.

25          Now 2008 Joint Venture, open game.  The Springwoods

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 119 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/19 Page 43 of 137

48

1    Joint Venture, open game.  And again, I'm not going to hide

2    the ball from you or try to kid you or anything like that.

3    But we've got an issue on that one and you're going to have to

4    make a decision on that.

5           Not on the 2012.  We ought not even be here.  We

6    ought to be putting Steve Ligon on because what he's going to

7    say.  He says it right here in this email you gave me, and

8    that's the end of the story.  We ought to just say, Okay,

9    let's move on to the 2008 Joint Venture, guys.  Not waste this

10   Court's time, not waste my client's time, and not waste their

11   client's time on this.  Okay.  So that's it, Your Honor.

12   Thanks.

13           THE COURT:  Thank you.

14           Mr. Kitchens?

15           OPENING STATEMENT ON BEHALF OF RESPONDENTS

16           MR. KITCHENS:  Well, then, Your Honor, on the one

17   hand here's the smoke, the other hand here's the mirrors.

18   Mr. Simon filed two involuntary bankruptcies with one tax ID

19   number that was obtained three days prior to the filing.

20   Nobody's ever disputed that a joint venture agreement was

21   signed.

22           However, under the law, under the Texas Revised

23   Partnership Act, the Court must consider the totality of the

24   circumstances to determine that a partnership, not just a

25   joint venture agreement, just -- not just a piece of paper

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 120 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/15 Page 49 of 139

49

1    existed.

2         And what you need to determine is the receipt -- a

3    right to receive a share of profits of the business, the

4    expression of an intent to be partners in the business,

5    participation or the right to participate in the control of

6    the business, a sharing or a willing to share a) losses in the

7    business or liability for claims of third parties against the

8    business, and contributing or agreeing to contribute money or

9    property of the business.  Those are the factors that the

10   Texas Revised Partnership Act says that you need to consider.

11        What Mr. Simon failed to tell you is that Royce and

12   Sylvia Hassell owe millions of dollars to my client.  They

13   have resisted at every turn the liability for that money that

14   they owe them, at the State Court level, at the arbitration

15   level, and even here.

16        Why did they file two involuntary bankruptcies under

17   one case number the day before the arbitration was to go

18   forward?  Let's ask that question.  Let's not just say all of

19   these other things.  There is a motive here, an improper

20   motive.  Incredulity lies on my client's level.

21        You're not going to hear any evidence that contracts

22   were entered into with -- as a joint venture, because they

23   weren't.  You're not going to hear any evidence that there

24   were joint bank accounts, you're not going to hear any

25   evidence that there were joint employees, because that doesn't

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 121 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/19 Page 50 of 139

50

1    exist.

2            There is no indicia, other than the piece of paper

3    that was entered into so that Royce Hassell could get

4    insurance to fund his projects that he was doing in his own

5    name.  You're going to hear evidence of what's called a rent

6    bond.  That's what all this was about, and nothing more.

7            Your Honor, I don't think I have to go -- you're

8    going to hear a lot of evidence today, I don't think I have to

9    say a whole lot more, but for Mr. Simon to suggest that it is

10   incredulous that we would even be here before is itself

11   incredulous.

12           You're going to hear evidence of a very rich life

13   style that the Hassells, Royce and Sylvia Hassell, enjoyed at

14   the expense of my clients.  This is nothing more than another

15   delaying tactic that they brought before you because they

16   couldn't do it at State Court, they couldn't with the

17   arbitration, and they were desperate to do something else.

18   This is just wrong, Your Honor.

19           THE COURT:  Thank you.

20           All right.  Then let's call Mr. Ligon in and let's

21   get started on the testimony.  Can somebody go get him?

22       (Pause in the proceedings.)

23           THE COURT:  Right up here, please --

24           THE WITNESS:  Right here?

25           THE COURT:   -- Mr. Ligon.  Right here in the --

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 122 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/19 Page 51 of 137

51

1     THE WITNESS:  Okay.

2     THE COURT:   -- seat.

3     THE COURT:  Mr. Simon?

4     MR. SIMON:  Yes.  Has the witness been sworn?

5     THE COURT:  He was -- I sworn in all four witnesses.

6     MR. SIMON:  Oh, that's right.

7                  DIRECT EXAMINATION OF STEVEN LIGON

8  BY MR. SIMON:

9  Q    So would you state your name for the record, please?

10 A    Steven Layton (phonetic) Ligon.

11 Q    How are you employed?

12 A    I'm a principal with Morris, Ligon & Rodriguez, PC.

13 Q    Are you a certified public accountant?

14 A    Yes, sir.

15 Q    What areas of accounting practice do you focus on in your

16 practice?

17 A    Test functions, audits, reviews, compilations, business

18 taxes and some individual taxes.

19 Q    Now, have you acted as the accountant for Hassell

20 Construction Company, Inc. in the past?

21 A    Yes.

22 Q    And can we have an agreement that when we refer to HCCI,

23 we're referring to Hassell Construction Management -- let's

24 see, Hassell --

25        MR. RIOS:  Your Honor, no objection.

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 123 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/15 Page 52 of 197

52

1          Excuse me, Mr. Simon.

2          We're having trouble hearing Mr. Simon.  Can he get

3     the microphone a little closer to him so --

4          THE COURT:  Thank you.

5          MR. SIMON:  Thank you.

6          THE COURT:  Thank you.

7          MR. KITCHENS:  Thank you.

8     BY MR. SIMON:

9     Q    Have you performed accounting functions and services for

10    Hassell Construction Company, Inc. in the past.

11    A    Yes.

12    Q    Can we have an agreement that when we refer to HCCI, we

13    are referring to Hassell Construction Company, Inc.?

14    A    Yes.

15    Q    When did you start performing accounting services for

16    HCCI?

17    A    Is that me personally, or our firm?

18    Q    Your firm.

19    A    Approximately -- it was before I was even there, I'm

20    going to say around 1981 or '82.

21    Q    And at the time who was the President and Chief Executive

22    Officer of HCCI?

23    A    Since I was not there at that time, I'm not sure.

24    Q    From the time that you became involved who was the

25    President and Chairman of the Board, or Chief Executive

Case 19-03452 Document 1-41 Filed in TXSB on 05/02/19 Page 124 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/19 Page 53 of 137

53

1    Officer?

2    A    Jim Hassell.

3    Q    And who is Jim Hassell?

4    A    Jim Hassell was the -- is the majority stockholder of

5    HCCI.

6    Q    Is he the father of Philip Hassell?

7    A    Yes.

8    Q    Is he the father of Royce Hassell?

9    A    Yes.

10    Q    And is he -- is Royce Hassell the only child of Jim

11    Hassell's first marriage?

12    A    As far as I know.

13    Q    And how many children did Jim Hassell have --

14    A    Five.

15    Q    -- in his second marriage?

16            MR. KITCHENS:  Objection, Your Honor, relevance.

17            THE COURT:  Relevance?

18            MR. SIMON:  It's background, Your Honor.

19            MR. KITCHENS:  This is our -- this is a CPA.

20            THE COURT:  Yeah, I don't know why I need this from

21    the CPA as to the background.

22            MR. SIMON:  All right.  That's fine.

23    BY MR. SIMON:

24    Q    Now for how many years have you prepared audited

25    financials for HCCI?

1          THE COURT:  Again, are you asking for him or for the

2     company?

3     BY MR. SIMON:

4     Q     For -- let's talk about you.

5     A     Since June of 1985.

6     Q     And have you prepared a certified financial statement for

7     each year from and after the point?

8     A     Yes.

9     Q     Am I using the correct word prepare certified financial

10    statement?

11    A     Well, we prepare audited financial statements.

12    Q     Okay.  Now --

13    A     And can I clarify that even more?

14    Q     Sure.  Please.

15    A     It's basically the client's financial statement, we're

16    simply auditing those statements and putting an auditor's

17    report in there.  However, for convenience of the clients we

18    actually put the statement together, have them approve it.

19    Q     And what do you do normally to audit financial

20    statements?

21    A     You plan the audit to begin with, that involves

22    developing audit programs based on transactions testing,

23    appliance testing, you design your audit program for

24    substantive tests based on your audit of the -- your review of

25    the internal control system and test those items.

Case 19-03452 Document 1-41 Filed in TXSB on 05/02/19 Page 126 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/15 Page 53 of 137

55

1    And then you perform procedures on your test side to

2    complete the audit.  You have inquiries of attorneys, you have

3    confirmations with third parties on accounts receivable, you

4    would have confirmation of bank balances with banks, you would

5    have confirmation of notes payable balances with the various

6    lenders, amongst other things.

7    Q    Do you require a management letter in connection with

8    performing --

9    A    We require --

10   Q    -- the audit --

11   A    -- a management rep letter.

12   Q    All right.  And what does that management rep letter

13   normally contain?

14   A    Basically it's just a representation by management that

15   they've disclosed everything to us correctly that we've

16   inquired of, that there's nothing that they've not made

17   unavailable to us.

18   Q    Does that include the matters that you have placed into

19   your financial statements in the notes?

20   A    That would mean anything -- evidential matter that we

21   required to issue our audit opinion.

22   Q    And have you been able to provide those management

23   representations to us today in connection with the subpoena

24   that has been issued to you?

25   A    I believe they were in the copies, if they're not, I have

Case 19-03452 Document 1-1 Filed in TXSB on 05/02/19 Page 127 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/19 Page 56 of 137

56

1    them in my -- in another section in my briefcase.  I was --

2    they should be -- let me think.  They should be in those

3    copies.

4    Q    Okay.

5              THE COURT:  Well, let me --

6              MR. SIMON:  I don't know --

7              THE COURT:   -- let me clarify what --

8              MR. SIMON:   -- because I haven't seen them yet.

9              THE COURT:  Yeah, what I think occurred is were

10   those in the information that you transmitted over to Coat

11   Rose?

12             THE WITNESS:  They were, but I think we also -- I

13   think we included it in both places, and those management rep

14   letters should have been what I submitted to you, and the

15   other that I transmitted to Coats Rose is still in my

16   briefcase.  And I believe those were in there as well.

17             THE COURT:  There were management letters that were

18   included in the packet that had the label on it for the lawyer

19   to Coats Rose, whose name I forget.  But if you want him to go

20   get you some clean copies of those, that's fine.

21             MR. SIMON:  I would like that, Your Honor.  I think

22   that's critical.

23             THE COURT:  Yeah, I -- because they were transmitted

24   to counsel, that's why I didn't provide them.  But if you've

25   got them independently, can you go grab those real quick?

1    THE WITNESS:  Let me look and see if they're in

2    there.

3    MR. SIMON:  Your Honor, did you -- have those copies

4    been made yet?

5    THE COURT:  They're working on them.

6    MR. SIMON:  Okay.

7    (Pause in the proceedings.)

8    THE COURT:  If you get to that point -- we need to

9    take a morning break at some point anyway, so when you start

10   needing that data, we'll definitely take a morning break to be

11   sure you get it.

12   MR. SIMON:  And I can help the Court, if we're going

13   to take a break.  I can take them up to six --

14   THE COURT:  Well, that part's going to be easy, I'm

15   sure.  It's the redaction part they're having trouble with.

16   MR. KITCHENS:  Mr. Rios just told me that that's

17   what the -- you can see a copy now what the -- the management

18   rep letters --

19   THE COURT:  I don't think the rep letters are being

20   copied.

21   MR. SIMON:  They were in the packet that I gave you.

22   THE COURT:  Okay.  That's in number two that I gave

23   to you all, and I don't think they're being --

24   (Pause in the proceedings.)

25   BY MR. SIMON:

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 129 of 299
Case 19-30781 Document 43 Filed in TXSB on 04/02/19 Page 58 of 137

58

1    Q    Now, do you have a big binder up there with you, sir, of

2    the exhibit books?

3            THE COURT:  They're right here to your right is what

4    he's referring you to.

5            THE WITNESS:  Oh, okay.

6    BY MR. SIMON:

7    Q    These are our exhibits, that's --

8    A    Theirs.

9    Q     -- HCCI's exhibits.

10   A    Okay.

11   Q    Would you take a look at Exhibit 51?

12   A    Is this yours or theirs?

13   Q    Theirs.  I'm sorry.  HCCI Exhibit 51.  And would you

14   identify it for the record, please.

15          (Pause in the proceedings.)

16          THE WITNESS:  This is the long form audited

17   financial statements of Hassell Construction Company, Inc. for

18   the year ended June 30, 2013.

19   BY MR. SIMON:

20   Q    Can you direct me to the page in this exhibit where the

21   certification appears?

22   A    Independent auditor's report, page 2 and 3.

23   Q    Did you qualify your report in any way, shape or form?

24   A    Yes.

25   Q    And can you describe for the Court what those were?

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 130 of 299
Case 19-36781 Document 43 Filed in TXSB on 04/02/19 Page 59 of 139

59

1    A    We qualified our opinion in connection with verification

2    of the note receivable and accounts receivable from related

3    parties.  We were able to obtain confirmation of that from the

4    related party.

5    Q    Other than that was there anything else to qualify?

6    A    That was it.

7    Q    Other than that then, am I correct in saying that these

8    financial statements, according to the accounting vernacular,

9    fairly and accurately describe the financial condition of the

10   company as of the date of the report?

11   A    Yes.

12   Q    Now let's turn to Footnote 14.  And I believe it starts

13   on page 13 and goes to page 14.

14   A    What note are we on?

15   Q    Footnote 14.

16   A    Okay.  Mine starts on 14 and ends on 15.

17   Q    Footnote 14, if you would turn to page 13 --

18   A    And this is for 2013.  Correct?

19   Q    Yes, sir.

20           THE COURT:  Let me interrupt for a minute.  What's

21   happening is, is that if you look carefully, the audit itself

22   has a numbered page 13 and then there's a big stamped 14,

23   which reflects what was produced.  So are you referring to the

24   page of the exhibit number or the page of the audit?

25           THE WITNESS:  I believe I'm --

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 131 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/19 Page 60 of 139

60

1          MR. SIMON:  The page of the audit, Your Honor.

2          THE COURT:  So the page of the audit where

3   exhibit -- where Footnote 14 is, is on exhibit pages 14 to 15,

4   but audit pages 13 and 14.

5          THE WITNESS:  Okay.  I only see 14, but that's --

6          THE COURT:  I'll show you.  Let me just show you

7   where this is.  Right here, right under where it says, HCCI

8   Exhibit 51, if you look, there's a little 13 right there.

9          THE WITNESS:  Oh, okay.

10         THE COURT:  It's your page number 13.

11         THE WITNESS:  Okay.  All right.

12         THE COURT:  Okay.

13         MR. SIMON:  I'm sorry.  I'm going to pull this up,

14   if you'll just bear with  me.

15       (Pause in the proceedings.)

16   BY MR. SIMON:

17   Q    Okay.  I have that up on my screen now.  And it starts

18   off on page 13 there and the title to that is, Related Party

19   Transactions.

20   A    Correct.

21   Q    Now I'd like to go to the next page and ask you about

22   this paragraph that I'm blowing up here.  Here we go.  Let's

23   go through this.  On July -- the first sentence says,

24       "On July 1, 2012, the company entered into a joint

25       venture agreement with the related companies, R.

Case 19-03452 Document 1-41 Filed in TXSB on 05/02/19 Page 132 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/19 Page 61 of 79

61

1          Hassell & Co., Inc., R. Hassell Builders, Inc., the

2          R. Hassell Holding Companies, Inc., and GR Group

3          Resources to engage as joint venturers in the

4          construction of certain public and/or private

5          contracts awarded to the company, or related

6          companies, from that date until termination of the

7          agreement."

8          Now, when you were preparing this note did you have

9    any documents before you?

10   A    The joint venture agreement.

11   Q    All right.  And let's go to the joint venture agreement

12   just to make sure.

13          MR. SIMON:  And, Your Honor -- and my understanding,

14   Your Honor, is that this exhibit that I'm referring to,

15   Exhibit 51, has been admitted into evidence.

16          THE COURT:  It has been.

17          MR. SIMON:  Thank you.

18   BY MR. SIMON:

19   Q    All right.  So if you would turn to Exhibit 34 also in

20   that same book.  And I'm going to put it up here.

21          MR. SIMON:  Likewise, Your Honor, I believe that

22   this has been admitted into evidence.

23          THE COURT:  It has been.

24          MR. SIMON:  It has?

25          THE COURT:  It has been.

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 133 of 299
Case 15-30781 Document 44 Filed in TXSB on 04/02/19 Page 62 of 137

62

BY MR. SIMON:

Q    Okay.  All right.  Is this the agreement that you had

before you when you reviewed this?

A    It appears to be.

Q    Okay.  Go back to the other agreement, or the other

document for a second, back to the audit.  What other

information did you have before you as you were preparing the

first sentence of this note?

A    This was a basic document.  I had had oral communication

with Philip Hassell and Royce Hassell in regards to this as

well.

Q    And can you describe for the Court what those

conversations were?  Let's start off with Philip Hassell

first.

A    The nature of the agreement -- let me back up.  I became

aware of this agreement in or about July or August of 2013

when one of my staff accounting people came back and told me

that there was a joint venture agreement, which I'd not heard

of.  So I contacted Shawn Potts, who referred me to Philip

Hassell and --

Q    Stop there.  Who's Shawn -- who is Shawn Potts?

A    Shawn Potts is the secretary-treasurer I believe of the

company and he works --

Q    Of HCCI?

A     -- HCCI, he's over accounting.

1    Q    And her middle name is Hassell.  Correct?  Shawn Hassell

2    Potts?

3    A    Yes, she's --

4    Q    She's one of the children of Jim.

5    A    Right.

6    Q    Okay.  Go ahead, I'm sorry.

7    A    Okay.  She referred me to Philip --

8    Q    Okay.

9    A     -- who informed me of this joint venture agreement, and

10   at that time it had been, or was in the process I guess of

11   being terminated.  It started July 1 and ran through some

12   time --

13              THE COURT:  I'm sorry --

14              THE WITNESS:   -- or June --

15              THE COURT:   -- wait, wait, wait.  Wait.  You said

16   that you contacted Shawn Hobbs [sic], who referred you to

17   Philip, and then you started describing an event, and we don't

18   know whether that's coming from Shawn's mouth or from Philip's

19   mouth.

20              THE WITNESS:  Oh, this is from Philip.  Okay.  Okay.

21   Let's back up.  The event didn't come from Philip's -- the

22   event was something that -- I should have said that first.

23   The event occurred, and that's when I went to Shawn Potts and

24   then went to Philip.  The event meaning that one of my staff

25   accountants informed me that there was a joint venture.

Case 19-03452 Document 1-41 Filed in TXSB on 05/02/19 Page 135 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/19 Page 64 of 179

64

1          THE COURT:  Right.

2          THE WITNESS:  Okay.  So Philip informed me of what

3    it was, and I believe he said it had something to do with it

4    was created to enable Royce to be able to get insurance

5    through Hassell Construction as additional insured or

6    something like that.  But there were provisions in there that

7    provided for profit and loss sharing.  And it terminated some

8    time in July of '13 upon the request of HCCI I believe.

9    BY MR. SIMON:

10   Q    Did he deny the existence of a joint venture between

11   Royce Hassell's companies and HCCI?

12   A    No, it was agreed upon that there was a profit and loss

13   sharing arrangement there described as a joint venture.

14          MR. SIMON:  Excuse me one second.

15          THE COURT:  So I think we now have the documents

16   that we can hand out.

17          Do you want to give the witness --

18          MR. SIMON:  Excuse me, I'm sorry?

19          THE COURT:  Yeah, we're going to go ahead and give

20   you -- you want to give -- the originals are going to go in

21   the Court's record, and I'll go ahead and take back the one I

22   gave to you, and we're going to keep them under seal.

23          (Pause in the proceedings.)

24          THE COURT:  Thank you.  So these items are going to

25   go to Ms. Dolezel to be retained as exhibits under seal, and

Case 19-03452 Document 1-41 Filed in TXSB on 05/02/19 Page 136 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/19 Page 65 of 137

65

1    then --

2         (Pause in the proceedings.)

3              THE COURT:  So we're going to admit at this point

4    based on the earlier comment, and you all -- I want counsel to

5    correct me if I'm wrong, the non-financial document is Ligon

6    1, the other documents we're going to label as Ligon 2

7    Compilation, because it's derived from several different Ligon

8    documents.

9              MR. SIMON:  And this is two?  The one that we just

10   got is Ligon 2?

11             THE COURT:  Well, there's also the one you had

12   before, so --

13             MR. SIMON:  Which is Ligon 1.

14             THE COURT:  If you'll look -- if you'll undo that

15   document in your hand, it has both Ligon 1 and Ligon 2 in it,

16   I think.  Go to the very back document and see if that's the

17   original Ligon 1.  That's going to be Ligon 1 --

18             MR. SIMON:  Right.

19             THE COURT:   -- everything else is going to be

20   called Ligon 2 Compilation so we're not confused by what we've

21   got.  And we're admitting.  Anybody disagree that that's what

22   we're doing?

23             MR. KITCHENS:  Agreed, Your Honor.

24             MR. SIMON:  Agreed, Your Honor.

25             THE COURT:  Thank you.  And now you have those back.

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 137 of 299
Case 15-36781 Document 43 Filed in TXSB on 04/02/19 Page 66 of 139

66

1    Why don't we now take our morning break so that you can absorb

2    those during the morning break, and we'll continue with

3    Mr. Ligon's testimony at 10 after 11:00.

4              MR. SIMON:  Thank you, Your Honor.

5              THE COURT:  We'll see you all later.

6              MR. SIMON:  Ten after, Your Honor?

7              THE COURT:  Yeah, that's a 15 minute break.

8              MR. SIMON:  Okay.  Thank you.

9         (Recess from 10:55 a.m. to 11:10 a.m.)

10             THE COURT:  All right.  Please be seated.

11             Okay.  Just from a housekeeping point of view we're

12   going to work until five till 12:00 and then we'll take a

13   break until 1:45.  I have a 1:30 hearing.  There's no point in

14   you all having to sit through that; it's going to be a short

15   hearing.  So that'll be your lunch break.

16             Let's move ahead, please.

17             You remain under oath.  Thank you.

18             MR. SIMON:  Thank you, Your Honor.

19             DIRECT EXAMINATION OF STEVEN LIGON (RESUMED)

20   BY MR. SIMON:

21   Q    Now let's go to the second sentence in this Note 14

22   that's up on the screen here, which is HCCI Exhibit 51.  And

23   let's -- I'll read that into the record.  It says,

24        "The joint venture agreement calls for sharing of

25        profits with R. Hassell receiving 25 percent of net

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 138 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/19 Page 67 of 199

67

1            profits on completed contracts and the company

2            receiving 75 percent of the profits."

3            And then the next sentence says that the net losses

4     on completed contracts would be shared equally.  Where did you

5     get this understanding from?

6     A    This came from the joint venture agreement.

7     Q    By the way, where did the joint venture agreement come

8     from?

9     A    Two sources, Philip Hassell and Royce Hassell.

10    Q    And who was the associate that first learned about it?

11    A    I don't recall.  I had two of them out there and I don't

12    remember which one it was.

13    Q    All right.  And did you account for the profits and

14    losses?

15    A    Yes.

16    Q    Let's skip over -- were the profits and losses shared?

17    A    Profits and losses were determined based on the

18    percentages that you just read.

19    Q    The next sentence, I will go into, it says,

20            "The agreement provided that applicable main or

21            branch office overhead of the joint ventures may be

22            charged to the joint venture construction projects."

23            And again, where did that come from?

24    A    From the joint venture agreement.

25    Q    Okay.  And what did that mean to you?

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 139 of 299
Case 15-30781 Document 44 Filed in TXSB on 04/02/15 Page 63 of 137

68

1    A    What that meant to me was that whatever their overhead

2    rate was, when I take the total overhead cost divided by gross

3    revenues, I come up with a percentage.  I would take that

4    percentage times the gross revenues of completed joint venture

5    projects and apply that to the gross profit of the joint

6    ventures before determining the split of profits.

7    Q    The next sentence says that the agreement provided that

8    applicable -- I'm sorry, we've been through that one.  Excuse

9    me.

10        "Equipment costs and other costs of construction

11        were to be charged to contracts under the joint

12        venture agreement in accordance with sound

13        accounting practices."

14        What does that mean to you?

15   A    That means that you have to allocate equipment jobs to

16   construction contracts.  You don't charge individual

17   components of equipment and expense to each contract.  This is

18   impossible to do.  For example, depreciation.  So there's many

19   different ways of allocating equipment costs to contracts.

20   Some people use an internal developed rental rate times the

21   hours that the equipment is used on a job.

22        In Hassell's case, they're allocating equipment

23   costs based on how the job is bid, how much equipment cost is

24   bid in the job as a percentage of the contract revenue.  So

25   that's how they cost all their jobs with equipment.  As far as

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 140 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/15 Page 69 of 137

69

1    I know that's how they costed these jobs as well.

2    Q    What did you understand as to whose equipment was being

3    used on the performance of the jobs, the contracts?

4    A    Primarily most of it was from HCCI, and I understand some

5    was used from the R. Hassell companies.

6    Q    What did you understand in terms of the control over

7    these jobs?

8    A    I know some jobs that were entered into under Hassell

9    Construction, all the accounting obviously was done on their

10   books.  I'm not sure as to how the supervision went in the

11   field, if that's what you're talking about control.  There

12   were some jobs that were entered into, or contracts that were

13   entered into under the R. Hassell companies, and the

14   accounting was done over there for those contracts.  Again, I

15   don't know the field supervision, who controlled what or how

16   or supervised it.

17   Q    Did that make a difference to you, that some contracts

18   were entered into by R. Hassell and some contracts were

19   entered into by HCCI in terms of your determination of what we

20   have in this note?

21   A    Yes, in order -- in addition to getting the receivable

22   confirmed by the R. Hassell companies, there would have been

23   some accounting issues related to these jobs on the R. Hassell

24   companies where profits would have been split there, and we

25   were unable to obtain that information, which all affected

Case 19-03452 Document 1-41 Filed in TXSB on 05/02/19 Page 141 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/19 Page 70 of 137

70

1    that inner-company receivable that we qualified.

2    Q    I guess my question was a little different.  Were you

3    troubled in any way by the fact that equipment of both

4    companies were being used on these jobs?

5    A    No.

6    Q    Were you troubled at all, or concerned about the fact

7    that some of these jobs were in the name of R. Hassell and

8    some were in the name of HCCI?

9    A    No, other than not be able to verify the split on the R.

10    Hassell side.

11    Q    And I don't think I ever asked you this, but have you

12    ever done any tax work, tax litigation as an accountant?

13    A    Tax litigation?

14    Q    Yes.

15    A    No.

16    Q    And the next sentence here says the company has recorded

17    R. Hassell's share of the net profits on contracts completed

18    during year ended June 30, 2013 in the amount of $19,036,

19    under the direct costs in the statement of income and retained

20    earnings and reduced the balance to -- from the related

21    parties by the same amount.  Do you see that?

22    A    Yes.

23    Q    And is that how you account for the profit?

24    A    Yes.

25    Q    As between HCCI and RHHC.

Case 19-03452 Document 1-1 Filed in TXSB on 05/02/19 Page 142 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/15 Page 71 of 137

71

1 A Yes.

2 Q Then it says, the next sentence, that the venture

3 agreement was terminated on July 17, 2013.  How did you learn

4 that?

5 A Through discussions with Philip Hassell.

6 Q By the way, you mentioned you talked to Royce Hassell as

7 well.

8 A Right.

9 Q Can you describe for the Court what Royce told you?

10 A I don't know that we discussed that termination date or

11 not.  We had a meeting in my office early in September of

12 2013.  Primarily the focal point of that meeting was to see if

13 we could get together and reconcile the cost on the jobs for

14 both companies.

15 Q All right.  Anything else that you can recall that you

16 want to tell the Court about your conversations with Royce?

17 A At the time I believe there were allegations that HCCI

18 used his equipment on non-HCCI jobs, and he was not paid rent

19 for that equipment.  I can't think if there was anything else

20 material there.

21 Q Okay.  Did you have any discussions with Royce's wife,

22 Sylvia?

23 A There was a phone conversation that we had, I don't

24 recall exactly when, where she was presenting issues that she

25 was concerned with regarding this joint venture agreement.

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 143 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/15 Page 72 of 139

72

1    Q    And do you recall what she told you?

2            MR. KITCHENS:  Your Honor, I'm going to object.

3    Mr. Simon has said that Mrs. Hassell was not going to be a

4    witness.

5            MR. SIMON:  That's fine.

6            MR. KITCHENS:  And now we're asking questions about

7    what her conversations were, and she was not excluded under

8    the rule.

9            MR. SIMON:  I'm happy with -- I just don't -- I want

10   to make sure that I'm not hiding anything from the Court.

11   There were conversations --

12           THE COURT:  I'm going to sustain the objection to

13   the question of what did she say.  That's hearsay.

14           MR. SIMON:  Okay.  Very good.

15   BY MR. SIMON:

16   Q    And then this next sentence that you have here, it says

17   that all contracts in progress at June 30, 2013 that were

18   entered into after June 20, 2012 will be governed by the joint

19   venture agreement.  And how did you determine that?

20   A    We inquire of the client of any contracts that had been

21   signed as of the year end that were audited that were not

22   started in our normal back log note, and in this particular

23   case I inquired of Philip, of those contracts were any of them

24   subject to the joint venture.  And if they had been signed by

25   June 30, they were subject to the joint venture.  So in our

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 144 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/15 Page 73 of 139

73

1   normal inquiry concerning back log that's how we found out

2   about those jobs.

3   Q    And did you mean by this that all jobs that were entered

4   into by either Hassell Construction Company, Inc., HCCI, or

5   RHHC during this time period constituted the joint venture

6   contracts?

7   A    Yes.

8   Q    Now you literally have in front of you the exhibit that

9   the Court prepared for us, but it is I believe Hassell Number

10  2.

11        THE COURT:  It's Ligon 1.

12  BY MR. SIMON:

13  Q    I'm sorry, Ligon 1, excuse me.

14        THE COURT:  I think -- you're looking at the one

15  that starts off with an email from Mr. Philip Hassell --

16        THE WITNESS:  Okay.

17        THE COURT:   -- to Mr. Michael Moore.

18  BY MR. SIMON:

19  Q    And I take it that these are a series of emails that

20  were -- that you had produced here today for us.  Is that

21  correct?

22  A    Right.

23  Q    And I would like to turn your attention to the bottom of

24  the first page --

25  A    Okay.

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 145 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/19 Page 145 of 199

74

1    Q    -- where it says, Mike, and then it says, Here is what

2    should be a complete list of the joint venture jobs.  And who

3    is Mike?

4    A    Michael Moore, he's a staff accountant with our firm.

5    Q    And I see here that you are carbon copied on this.

6    A    Yes.

7    Q    All right.  And if you go down there, they have a list of

8    contracts that begins with Contract Number 1206 and ends with

9    Contract 1310.

10   A    Right.

11   Q    See there on the next page, there are 1, 2, 3, 4, 5, 6,

12   7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22,

13   23, 24, 25 contracts that I count.

14   A    Right.

15   Q    Are those the contracts that the company advised you were

16   subject to the joint venture agreement?

17   A    Yes.

18   Q    And who was the person that signed that particular email?

19   A    It was just an email from Philip Hassell to Michael

20   Moore.

21   Q    Did you ever receive any contrary information from

22   anybody at HCCI, including Shawn Potts --

23   A    Not that I can recall.

24   Q    -- or -- let me finish --

25   A    Okay.  I'm sorry.

Case 19-03452 Document 1-41 Filed in TXSB on 05/02/19 Page 146 of 299
Case 19-36781 Document 43 Filed in TXSB on 04/02/19 Page 75 of 137

75

1    Q    -- my question -- including Shawn Potts or Philip

2    Hassell regarding what constituted the contracts that were

3    subject to the joint venture agreement?

4    A    There could have been some other correspondence.  I don't

5    know if this was final.  I would have to check my records to

6    see exactly what jobs were included in there.

7    Q    And insofar as you know, know as we sit here right now,

8    these were the jobs.

9    A    Yes.

10   Q    Now in addition to this, the management representation

11   letters --

12            MR. SIMON:  And, Your Honor, I don't know whether

13   he's got copies of those yet.

14            THE COURT:  You all were going to -- oh, I took

15   those back and sent them to be sealed.  Right?  Sorry.  Were

16   those the management rep letters in there?

17            MR. RIOS:  Your Honor, we looked through the

18   documents that were over here on counsel table, and we didn't

19   see any management representation letters.  Isn't that right?

20            MALE VOICE:  That's correct.

21            THE COURT:  Let me -- would you go pull those sealed

22   documents again?

23            MR. RIOS:  Your Honor, what we saw was multiple

24   copies of engagement letters between HCCI and the accounting

25   firm.

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 147 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/19 Page 76 of 199

76

1          THE COURT:  I'm just going to give everything back

2     to Mr. Ligon that he had given to us and we'll let him see if

3     what he's referring to as the management representation

4     letters are in there.  I'm not going to let anybody else go to

5     examine those documents while they're in his hands.

6     BY MR. SIMON:

7     Q    Is anything that is stated in this paragraph that we've

8     just gone over, is there anything in there that's false and

9     misleading?

10    A    Not that I'm aware of.

11    Q    In the management representation letter, is this one of

12    the things that management would have represented as being

13    truthful?

14    A    I would have to look at the specific representation

15    letter to see if there was a clause in there regarding a joint

16    venture.

17    Q    Okay.

18          THE COURT:  So we're going to hand you now all of

19    the documents that you brought and let you see if you can

20    locate the management representation letters.

21          (Pause in the proceedings.)

22          THE WITNESS:  I don't see them.

23          THE COURT:  Are those pretty easy to pull at your

24    office --

25          THE WITNESS:  Oh, yeah.

Case 19-03452 Document 1-1 Filed in TXSB on 05/02/19 Page 148 of 299
Case 19-36781 Document 43 Filed in TXSB on 04/02/19 Page 178 of 199

77

1          THE COURT:   -- if you were to make a phone call --

2          THE WITNESS:  I can get them sent over here.

3          THE COURT:  Okay.  Do you need to actually see the

4     management representation letters to be asking your questions?

5     He said that these are management statements.  Do you need to

6     see the letters?

7          MR. SIMON:  Well, let me ask this question.

8     BY MR. SIMON:

9     Q    In the representation letter are there general statements

10    in the representation letter that would attest to or represent

11    that all of the statements in the notes that are prepared are

12    correct?

13    A    It's not going to specifically refer to the notes, it's

14    more of a general type statement.

15    Q    And the statement would be that everything that's in

16    these financial statements are true and correct.

17    A    To the best of their knowledge, that they provided --

18    Q    To the best of their knowledge.

19    A     -- they provided me all information that I've asked for,

20    fully disclosed everything, and of course we develop these

21    notes from those -- the work we do, the evidentiary material

22    we come up with based on what's --

23    Q    And let's walk through that just for a moment.  You

24    prepare the notes from the information that they give you.

25    Correct?

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 149 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/15 Page 78 of 137

78

1    A    Yes, and what we discover.

2    Q    And then you prepare a draft of the report?

3    A    Yes.

4    Q    And do you send that to management?

5    A    Yes.

6    Q    And do they then review it?

7    A    Yes.

8    Q    And do they then thereafter send you the management

9    representation letter?

10    A    Yes.

11    Q    That's something that you retain in your file.

12    A    Yes.

13    Q    Is it something that you would review to make sure that

14    there was nothing inconsistent between what was represented in

15    the management representation letter and the financial

16    statement that you prepared, or that you audited.

17    A    Again, it's pretty much a general type statement.

18    There's not going to be anything specifically referenced to

19    anything in the statement.

20    Q    Okay.  Would you ever put the signature of your firm on a

21    certified financial statement without having that kind of

22    management representation?

23    A    No.

24    Q    Is that consistent with generally accepted accounting

25    principles?

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 150 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/15 Page 150 of 199

79

1     A     Yes.

2           (Pause in the proceedings.)

3                THE COURT:  We'll get those back from you so that

4     they're not in your way and don't become public.

5                THE WITNESS:  Okay.

6     BY MR. SIMON:

7     Q     Now, if you would, take a look in the white books, if you

8     will, that are in front of you, and pull up an exhibit here

9     that's in Petitioner's exhibit list.

10               THE COURT:  They're small, not white.

11               THE WITNESS:  Okay.

12               MR. SIMON:  I'm sorry.  Excuse me, they're the small

13    ones.  Excuse me.

14               MR. RIOS:  Your Honor, if I might, I apologize to

15    the Court and to Mr. Simon, but we have discovered that part

16    of the production that Mr. Ligon brought was not returned back

17    to the Court.  It's been sitting on our desk here.  We were

18    examining it earlier and for whatever reason it didn't get

19    returned to you.

20               THE COURT:  Okay.  Does it have the management

21    representation letters in it?

22               MR. RIOS:  It does not, but it does have various

23    exhibits to the different financial statements.  There's also

24    an exhibit to produce for Hassell Construction company notes

25    to financial statements for the period ending June 30, 2014.

Case 19-03452 Document 1-1 Filed in TXSB on 05/02/19 Page 151 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/19 Page 80 of 139

80

1    Everything else from this point back relates to a loan

2    agreement and extension modification agreement that we believe

3    that was beyond the scope of the subpoena.  But clearly this

4    part would be responsive to the subpoena, and it's not

5    privileged.  And I apologize to the Court.

6              THE COURT:  No, I think -- thank you.

7              MR. SIMON:  Yes, Your Honor, if we could just have

8    the management representations produced and tomorrow made part

9    of the record, that would be sufficient for us.

10             THE COURT:  All right.  So this is another copy of

11   the notes.  I'm not sure if you really -- do you want to see

12   these and let him tell you what they are?

13             MR. SIMON:  If you could just describe them

14   generally for me, I'm sure we won't need to belabor the Court.

15             THE COURT:  They're called the Notes to the

16   Financial Statement, as to whether there are any changes

17   between -- whether this is a draft or whether that's the

18   final.  Let me show this to Mr. Ligon, let's see --

19             Can you tell me what those are different from what's

20   in the financial statement?

21             THE WITNESS:  (Perusing documents.)  One of the

22   items they were asking for in the deposition were back up for

23   certain notes, so what we did was we simply copied the notes

24   out of the financial statements and then put the backup for

25   the ones that they wanted for those years behind it.  We'll

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 152 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/15 Page 152 of 199

81

1   have this in -- for every year there'll be one of those.

2   It's --

3               THE COURT:  Thank you.

4               MR. SIMON:  If we could just have that made a part

5   of the record, Your Honor, we won't ask any questions about

6   it, but if we could make copies and just make it part of the

7   record.

8               THE COURT:  It's the same as -- they're already in

9   the record.  These are --

10              MR. SIMON:  Okay.

11              THE COURT:   -- the notes.

12              MR. SIMON:  All right.  Thank you, Your Honor.

13              THE COURT:  So we're going to put these in the

14  sealed file as well.

15              MR. SIMON:  The only other thing, Your Honor --

16              THE COURT:  What I'm going to ask you to do is --

17              MR. SIMON:   -- I would ask --

18              THE COURT:   -- if I can get you to fax to my fax

19  number -- do you have a pen handy with you --

20              THE WITNESS:  I sure don't.  I didn't bring one.

21              THE COURT:  What's that?

22              THE WITNESS:  I didn't bring a pen.

23              THE COURT:  We'll get you a pen.

24              THE WITNESS:  We're talking and not writing.

25          (Pause in the proceedings.)

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 153 of 299
Case 15-30781 Document 41 Filed in TXSB on 04/02/15 Page 82 of 137

82

1          THE COURT:  If you'll fax to me the management

2    representation letters.

3          THE WITNESS:  Okay.

4          THE COURT:  713-250-5086.  And you can have any

5    objection to the admission of the management rep letter once

6    he sends it as being authentic.  We're going to assume it's an

7    authentic version of his business records unless I get some

8    objection.  Have them fax it to us and we'll get it --

9          THE WITNESS:  Question, what years do you want?

10          MR. SIMON:  2013 and 2014.

11          MR. KITCHENS:  Recalling, Your Honor, that the

12    company's fiscal year ends on June 30 and begins on July 1 --

13          THE COURT:  Right.

14          MR. KITCHENS:   -- so it's not a calendar year.

15          THE WITNESS:  And that was 713-250-5086.

16          MR. SIMON:  And also 2012.

17          THE WITNESS:  I'm sorry?

18          MR. SIMON:  Also 2012.

19          THE WITNESS:  '12 as well.

20          THE COURT:  Thank you for doing that for us.

21          THE WITNESS:  You bet.

22          THE COURT:  I'm trying to save you a trip.

23          THE WITNESS:  Thank you.  I can't believe I don't

24    have them.  I thought they were there.

25          THE COURT:  Okay.  Let's move ahead.

Case 19-03452 Document 1-41 Filed in TXSB on 05/02/19 Page 154 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/19 Page 83 of 137

83

1    BY MR. SIMON:

2    Q    All right.  I'm looking here at Petitioner's Exhibit 35.

3    And I've got it up here on the screen.

4    A    Okay.

5    Q    And this is an email from R. Barry (phonetic).  Do you

6    know who Ryan Barry is?

7    A    Yeah, he's a partner in the firm now, at that time he was

8    a managing -- manager.

9    Q    And it's addressed to Mr. Hassell.  That would be Royce

10   Hassell?

11   A    Okay.

12   Q    And it says,

13        "Attached are two confirmations from Hassell

14        Construction Company, Inc.  Please confirm these

15        balances as of 6/30/12, sign and date and email/fax

16        back to me at your earliest convenience."

17            And it says, Thanks, Ryan Barry.

18            MR. KITCHENS:  Objection, Your Honor, reserved our

19   rights to this exhibit.  We object as hearsay.

20   BY MR. SIMON:

21   Q    Is this --

22            THE COURT:  All right.

23   BY MR. SIMON:

24   Q    -- true and correct copy of an email that was sent by

25   your firm?

Case 19-03452 Document 1-41 Filed in TXSB on 05/02/19 Page 155 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/19 Page 84 of 139

84

1          MR. KITCHENS:  Renew the objection, Your Honor.

2          THE COURT:  He can try and prove it up as non-

3     hearsay, and I'll let him do that before we get to the

4     substance of it.

5          MR. KITCHENS:  Very good, Your Honor.

6          THE COURT:  And so go ahead if you know the answer

7     to that question.

8          THE WITNESS:  I believe this was a confirmation that

9     we sent Royce regarding the balances owed on a note receivable

10     the company had recorded from Royce personally, and on the

11     related party accounts receivable as of June 30, 2012.

12     BY MR. SIMON:

13     Q    And this is just a transmittal email.  Correct?

14     A    What do you mean by transmittal?

15     Q    Well, it just -- the purpose of the email is just simply

16     to transmit these confirmations.

17     A    Right.

18     Q    All right.  Now turning to the actual confirmations that

19     were attached, who prepared these confirmations?

20     A    Ryan Barry.

21     Q    Okay.  Why are they prepared on the company's letterhead?

22     A    Because it's the company requesting him to confirm

23     independently with us.  He's --

24     Q    And so Mr. Barry prepares that?

25     A    He prepares it and gives that to the representative of

Case 19-03452 Document 1-41 Filed in TXSB on 05/02/19 Page 156 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/15 Page 85 of 137

85

1    HCCI, who signs it, and then we mail it.

2    Q    Ah.  Okay.  And so let's go down here.  It says, Shawn

3    Potts, Secretary-Treasurer.

4    A    Right.

5    Q    Do you recognize that as being Shawn Potts' signature?

6    A    Yes.

7    Q    All right.  And then down below, this is not signed, this

8    version is not signed, and then there's a second point here

9    dealing with a different piece of indebtedness and likewise

10   it's not signed.  Do you see that?

11   A    Right.

12   Q    But it's signed by Shawn Potts.

13   A    Right.

14   Q    And then going down to the next exhibit, we have the

15   signature copies of the same documents, or at least one of

16   those documents, dated 9/14/12 signed by Royce Hassell.  Do

17   you recognize Mr. Hassell's signature?

18   A    Yes.

19   Q    Now will these be in your records?

20   A    Yes.

21   Q    Do you know whether there were more than one version of

22   these that were prepared and signed?

23   A    I'm only aware of the one, unless there was a preliminary

24   one and there was some adjustments to it.  But as far as I

25   know, this was the only one that was signed.

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 157 of 299
Case 15-30781 Document 44 Filed in TXSB on 04/02/19 Page 36 of 199

86

1    Q    How would you be able to determine which of -- which ones

2    were final?

3    A    Well, whatever signed one we have in our files would be

4    the final one.

5    Q    Okay.

6    A    And I'm not sure there was an earlier one.

7    Q    Okay.

8         MR. SIMON:  Your Honor, there are two versions of

9    these documents, and one of the versions is attached to their

10   exhibits and one of the versions is attached to our exhibits.

11   And I'd like to find out what the accountant has in his

12   records regarding this, because I think it's a very germane

13   issue, and I'll just point it out in the interest of being --

14         THE COURT:  What is their exhibit number?

15         MR. SIMON:  Their exhibit number -- I'll get it to

16   you in just a second.

17    (Pause in the proceedings.)

18         MALE VOICE:  Thirty-one and thirty-two.

19         MR. SIMON:  Thirty-one and thirty-two.

20   BY MR. SIMON:

21    Q    If you will look at their Exhibits 31 and 32.  And look

22   at 31 for starters, and you see that -- again, you recognize

23   Royce's signature?

24    A    Pardon?  I'm trying to find 31 in here.

25    Q    Oh, I'm sorry.  Thirty-one in the large black book, in

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 158 of 299
Case 15-30781 Document 44 Filed in TXSB on 04/02/19 Page 158 of 399

87

1    the --

2    A    This one?

3    Q    Yes.

4    A    Okay.

5          MR. SIMON:  May I approach, Your Honor?

6          THE COURT:  Yes, sir.

7          (Pause in the proceedings.)

8    BY MR. SIMON:

9    Q    Now, if you take a look at their Exhibit 31 --

10   A    Okay.

11   Q     -- you see that it is pretty much identical in terms of

12   the set up of this letter, except that there's one difference.

13   You see where it says, Security, down below, two-thirds of the

14   way down?

15   A    Uh-huh.

16   Q    You see that the security that's listed are three pieces

17   of property.  You see that?

18   A    Uh-huh.

19   Q    And if you go to our exhibit, which is up on the screen,

20   which is Petitioner's Exhibit 35, you see that there's a

21   fourth item that's listed there, and that is, under the word

22   Security, is claim on Harris County Improvement District

23   Number 18, Springwoods Village Parkway project.  Do you see

24   that?

25   A    Uh-huh.

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 159 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/19 Page 88 of 137

88

Q    So in one of these it's missing and in the other one it's

not.  You see that?

A    Uh-huh.

Q    Now --

A    What's --

MR. SIMON:  Your Honor --

THE WITNESS:  Could I get the date on your -- I

can't read that --

MR. SIMON:  Yeah, they're both exactly the same

date --

THE WITNESS:  I have no idea.

MR. SIMON:   -- they're both August 15, 2012.  They

look pretty much identical to me, with the exception of that

one change.

THE WITNESS:  There's --

THE COURT:  What does that change matter to me

today?

MR. SIMON:  I'll tell you why. It matters.  Because

there's a question as to what was the relationship between

HCCI and RHHCC with respect to the Springwoods contract.  They

say we were a subcontractor, they say we had no interest in

it.  They say we were not a joint venturer and in one of these

we have this entity that has no interest, allegedly has no

interest in it, granting security -- or not granting security

but describing that it has security of that contract, which

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 160 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/19 Page 89 of 179

89

1    means in order -- as Your Honor knows, in order for a debtor

2    to collateralize something with something, it's got to be an

3    owner.

4           And this comes from the company, so it's evidence

5    that RHCC was at least a part owner of that Springwoods

6    project.  Am I --

7           THE COURT:  No, I --

8           MR. SIMON:  -- not even clear?

9           THE COURT:  -- understand why you care about this.

10   How are we going to resolve this discrepancy?  The signatures

11   are different on the two documents, so --

12          MR. SIMON:  Right.

13          THE COURT:  -- what it looks like is that Mr. Royce

14   Hassell signed two versions.

15          MR. SIMON:  Exactly.

16          THE COURT:  And so -- and this witness doesn't

17   know.,

18          MR. SIMON:  And neither does Mr. Hassell, Royce

19   Hassell.

20          THE COURT:  So -- no, he's apparently signed two

21   versions.

22          MR. SIMON:  He apparently signed two versions, but

23   he doesn't know which one came first --

24          THE COURT:  Right.

25          MR. SIMON:  -- and which one came second.

Case 19-03452 Document 1-41 Filed in TXSB on 05/02/19 Page 161 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/19 Page 90 of 139

90

1          THE COURT:  Does it affect the audit which one is
2     accurate and which one is inaccurate?
3          MR. SIMON:  I don't know that it affects the audit.
4          THE COURT:  No, I'm asking Mr. Ligon.
5          THE WITNESS:  No.
6          THE COURT:  Then how are we going to resolve this
7     through Mr. Ligon?
8          MR. SIMON:  I just need to know what was in his
9     file.
10          THE COURT:  But they're both probably in his -- one
11     would presume they're both in his file, they're both --
12          MR. SIMON:  If that's the case, then I'd at least
13     like to know that.
14          MR. KITCHENS:  Your Honor, the witness's testimony
15     is that it does not affect his audit compilation.  We've got
16     more smoke and mirrors here.  I don't have an answer for you.
17          THE COURT:  Well, go ahead and ask him if he knows
18     which one came first and which one didn't.
19     BY MR. SIMON:
20     Q    Do you know which one came first?
21     A    No.
22     Q    Do you know whether your records contain one or the other
23     or both as we sit here?
24     A    Not as we sit here.
25     Q    Okay.

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 162 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/19 Page 91 of 179

91

1          MR. SIMON:  Your Honor, I think it would help the

2     Court if whichever way it comes out, it could be beneficial to

3     the other side, it could be beneficial to us.  I don't know

4     how it's going to come out.  It could be that be a non-event

5     if both are there.

6          (Pause in the proceedings.)

7          THE COURT:  If Ms. Potts signed both, and if

8     Mr. Hassell signed both, then tell me why I care what's in his

9     file.  I care that each of them signed it; I got that.

10    They've been identified as their accurate signatures.  They're

11    two signed documents from the same day that say different

12    things.  What does it matter what's in his file if it didn't

13    affect the audit?

14         MR. SIMON:  Well, only that if there's only one

15    version of this in his file, it seems to me that it was

16    probative of which one was the ultimate document.  And if you

17    don't have --

18         THE COURT:  It actually wouldn't be very probative

19    to me, and since he doesn't know, I'm not going to require

20    that to happen.  But I don't see a reason why I wouldn't admit

21    two documents signed by both of the sides to this litigation.

22         MR. KITCHENS:  Exactly, Your Honor, especially since

23    Mr. Ligon has told you that it did not affect the outcome --

24         THE COURT:  Right.

25         MR. KITCHENS:   -- of the financial statements.

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 163 of 299
Case 15-36781 Document 43 Filed in TXSB on 04/02/19 Page 92 of 139

92

1          THE COURT:  No, I -- yeah, it didn't affect the

2    outcome, but both -- I'm going to admit, subject to -- I want

3    to hear objections, I'm inclined to admit both letters, one

4    that includes the claim on Harris County Improvement District

5    and one that does not, because unless there's some evidence to

6    the contrary, Ms. Potts signed both and Mr. Hassell signed

7    both.

8          MR. KITCHENS:  Your Honor, I will have to consult

9    with my client, I do not object to such admission, but

10   reserving my rights to steal the claim if there's no

11   Springwoods joint venture.

12         THE COURT:  Oh, this doesn't -- this isn't

13   dispositive on whether there is one.

14         MR. KITCHENS:  I understand, Your Honor.  I'm just

15   making the record clear.

16         THE COURT:  It's evidence to one, but do you dispute

17   that's her signature on it?

18         MR. KITCHENS:  No.

19         THE COURT:  Then I don't think we're going to admit

20   the whole email chain.  I don't see a reason for that.  If

21   this is the document that matters, let's admit HCCI Exhibit

22   Number 31 and admit R. Hassell's Exhibit 35, page 5.  Does

23   that work for everybody?  Is that consistent with what we've

24   got?

25         MR. SIMON:  Yes, Your Honor.  That'll work for now.

Case 19-03452 Document 1-41 Filed in TXSB on 05/02/19 Page 164 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/19 Page 93 of 137

93

1          THE COURT:  You okay?

2          MR. KITCHENS:  Yes.

3          MR. SIMON:  I may want to reopen and try to get some

4    of these unsigned copies in as well.

5          THE COURT:  That's fine.  That's fine.  But right

6    now what you've got is good evidence on this one for both

7    signatures, and I don't see why we wouldn't admit them now and

8    then if you got more proof, you got more proof.

9          MR. SIMON:  All right.  Thank you.

10          THE COURT:  So I'm going to admit page 5 --

11          MR. SIMON:  Hold on a second.

12          THE WITNESS:  So to be clear, you don't want me to

13    check my files on that?

14          THE COURT:  Not -- I'm trying to not bring you back.

15          THE WITNESS:  Okay.  Thank you.

16          THE COURT:  I'm not sure I'm going to accomplish

17    that, but I'm trying.

18          (Pause in the proceedings.)

19    BY MR. SIMON:

20    Q    This is for the year ended 2012.  Do you know whether you

21    have the same type of letters in your file for 2013 and 2014?

22    A    The rep letters or --

23    Q    Yes.

24    A    Yeah, we have those.

25          MR. SIMON:  Your Honor, can we have those for 2013

Case 19-03452 Document 1-41 Filed in TXSB on 05/02/19 Page 165 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/15 Page 94 of 179

94

1    and 2014?

2              THE COURT:  You're talking representation --

3              THE WITNESS:  Representation letters, yeah, I

4    brought those in.

5              THE COURT:  He said representation letters, and

6    you're asking confirmation --

7    BY MR. SIMON:

8    Q    No, I'm talking about the confirmations.  Would you have

9    those in your file?

10   A    We should have those in the file.

11   Q    May I have those for --

12   A    There's not one for '13 or '14.  Royce wouldn't do it.

13   Q    There's not?

14   A    No, he did not confirm with us.  That's the subject of

15   the qualification of the financial statements.

16   Q    Okay.  Ah.  Gotcha.  Okay.  I withdraw it.

17             THE COURT:  Thank you.

18   BY MR. SIMON:

19   Q    Let's go through that.  For years 2013 and 2014 were you

20   able to obtain the certifications?

21   A    No.

22             THE COURT:  You said certifications.  That's not

23   what you mean.  Right?

24   BY MR. SIMON:

25   Q    I think that's what you called them.  Are these --

Case 19-03452 Document 1-11   Filed in TXSB on 05/02/19   Page 166 of 299
Case 19-30781 Document 43   Filed in TXSB on 04/02/19   Page 95 of 137

95

1    A    Confirmations?

2    Q    Confirmations.  I'm sorry.

3    A    No, we did not get those.

4    Q    You did not receive the confirmations for those years.

5    A    No.

6    Q    Okay.  Now let's -- do you know whether you sent

7    confirmation -- a request to Mr. Royce Hassell --

8    A    They were not sent.

9    Q     -- for him to sign?

10   A    They were not sent.

11   Q    They were not sent.

12   A    Right.

13   Q    Do you know why?

14   A    They instructed that we wouldn't probably get a response

15   on it.  Royce indicated to me without analyzing the jobs that

16   he wouldn't respond to it in our meeting.  He wanted to get

17   together and analyze the jobs, so there was no point in

18   sending it.  This happens quite frequently when there's a

19   contested receivable and the client says don't send it.

20   Q    All right.  Did you have an understanding -- well, strike

21   that.  Let's take a look at your 2013 audit.  I think we can

22   get through this pretty quickly here.  Let's take a look at

23   the 2013 and it's Exhibit 51, it is HCCI Exhibit 51, and I'm

24   going to go ahead and put it up on the screen for you.  You

25   can look at it in the book if you'd like.  I'll try to get

Case 19-03452 Document 1-44 Filed in TXSB on 05/02/19 Page 167 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/19 Page 96 of 139

96

1 through this a lot quicker than what we've done -- well,

2 actually I think --

3    THE COURT:  Actually, since we only have three

4 minutes --

5    MR. SIMON:  -- we were on '13.

6    THE COURT:  -- we only have three minutes left, why

7 don't we go ahead and take our break till 1:45 instead of

8 hitting in the middle of this.

9    MR. SIMON:  All right.

10    THE COURT:  So you can leave your stuff here, but

11 those tables are also going to be occupied by others, so --

12    MR. KITCHENS:  That was my question, Your Honor, I

13 knew you'd have a bunch of people in here.

14    THE COURT:  Yeah, you're also welcome to just store

15 it on the side here, but we're doing an HVA presentation, so.

16 Okay.  I'll see you all at 1:45.  Thank you.

17    MR. SIMON: All right.  Thank you.

18   (Recess from 11:52 a.m. to 1:51 p.m.)

19    THE COURT:  All right.  Mr. Ligon, if you would

20 retake the stand.  We're on Exhibit 51, and Mr. Simon was

21 asking you questions when we took our break.

22    I've reactivated your --

23    THE WITNESS:  Okay.

24    THE COURT:   -- computer there, Mr. Simon.

25   (Pause in the proceedings.)

1  DIRECT EXAMINATION OF STEVEN LIGON (RESUMED)

2  BY MR. SIMON:

3  Q   Mr. Ligon, would you take a look at the financial

4  statement for 2013, and I'm now focusing on Footnote 16, and

5  it's on the screen but it's also in your book, and it's in the

6  HCCI book, the larger book there.  Are you with me?

7  A   Yeah, what -- obviously the screen is fine.

8  Q   It is Exhibit 76.

9  A   Okay, 76.

10  Q   Or you can just look on the screen.

11  A   Yeah, I'll look on the screen and see here.

12  Q   Excuse me?

13  A   I'll look on the screen.

14  Q   Okay.  This is the 2013 -- or 2014 financial statement,

15  and it is Footnote 16.  And I also wanted to put up here the

16  financial statement for 2013 as well.  And let's start off

17  with '13 first.

18      (Pause in the proceedings.)

19      MR. SIMON:  It flipped off.  I'm sorry.  Hang on for

20  a second.  Yeah.  Okay.  Here we go.

21  BY MR. SIMON:

22  Q   And this is HCCI Exhibit 51 and we have this Note 16.

23  This is litigation contingency, and I'll read that first

24  sentence into the record.  It says,

25      "The company has a lawsuit against the owner of the

Case 19-03452 Document 1-44 Filed in TXSB on 05/02/19 Page 169 of 299
Case 19-30781 Document 44 Filed in TXSB on 04/02/19 Page 98 of 139

98

1          contract, of which the company was the general

2          contractor on behalf of a related company that was

3          the company's primary subcontractor on that

4          contract."

5               Do you see that?

6     A    Yes.

7     Q    Okay.  Now, first of all, do you know who the company it

8     filed a lawsuit against?

9     A    It was Harris County Springwoods.

10    Q    Okay.  This was the Springwoods lawsuit.

11    A    Yes.

12    Q    Okay.  And who was the related company that's referred to

13    on the second line?

14    A    It was the R. Hassell companies.

15    Q    Okay.  And it says that the related company was the

16    company's primary subcontractor on that job.

17    A    Yes.

18    Q    Okay.  Have you ever seen a subcontract between R.

19    Hassell and HCCI?

20    A    I don't recall if I've actually reviewed the subcontract

21    agreement.

22    Q    Okay.  And how did you learn about these facts that are

23    in that first sentence, who told you about those facts?

24    A    This came through the attorney's letter that we sent out

25    and discussions with Philip Hassell.

Case 19-03452 Document 1-11 Filed in TXSB on 05/02/19 Page 170 of 299
Case 15-30781 Document 43 Filed in TXSB on 04/02/15 Page 99 of 137

99

1    Q    All right.

2                THE COURT:  I'm sorry, and discussions with who?

3                THE WITNESS:  Philip Hassell.

4                THE COURT:  Thank you.

5    BY MR. SIMON:

6    Q    Did you have any discussions with Royce Hassell about

7    this?

8    A    I don't recall having discussions with Royce Hassell on

9    this, but could have.

10   Q    You just -- you don't recall if there ever were any

11   discussions.

12   A    Right.

13               THE COURT:  Can I get you to pull that microphone

14   closer to you.  The whole thing will move if you just want to

15   move the whole base, it might be more convenient for you.

16   Thank you.

17   BY MR. SIMON:

18   Q    The confirmations that you sent out, were those

19   confirmations sent out to RHHC, Royce Hassell's company?

20   A    The confirmation of the subcontract expense and payable?

21   Q    Yeah.

22   A    There was a confirmation -- 2013 we didn't send a

23   confirmation to Royce Hassell.

24   Q    Okay.  You did not.

25   A    No.

Case 4:19-cv-03451 Document 141 Filed in TXSD on 05/03/19 Page 171 of 299
Case 4:15-cv-03767 Document 48 Filed in TXSD on 04/02/15 Page 100 of 199

100

1    Q    Okay.  Now I want to now take you to the same footnote

2    for 2014, and if you'll just bear with me for a second.  We're

3    now on Exhibit HCCI 76, and I'm showing you that same

4    paragraph in 2014, and I'll read it into the record, the first

5    sentence.

6            "The company has filed a lawsuit against Springwoods

7            Realty Company and Harris County Improvement

8            District Number 18, which were owners of a contract

9            on which the company was the general contractor."

10            Now you see that the language, subcontractor, has

11    been taken out.

12    A    Right.  I see that.

13    Q    Now who -- again, who told you facts that supported what

14    you have here in the first sentence of this footnote?

15    A    It came through discussions with Philip Hassell and with

16    the attorney's letters that we solicited.

17    Q    All right.  And did you have any discussions with anybody

18    else?

19    A    No.

20    Q    And I take it you didn't have any discussions with Royce?

21    A    Not concerning that.

22    Q    What did you understand Royce's relationship was with

23    HCCI on the Springwoods contract, if any?

24    A    They were a subcontractor.

25    Q    That was your understanding.

Case 19-03452 Document 131 Filed in TXSB on 05/03/19 Page 172 of 299
Case 15-30781 Document 48-1 Filed in TXSB on 04/02/15 Page 101 of 197

101

1    A    Right.

2    Q    That was your only understanding.

3    A    Right.

4    Q    Did you know anything about how the profit was shared

5    between Royce and HCCI on that contract?

6    A    I can't recall if that was a contract that was subject to

7    this joint venture agreement or not.  I don't know without

8    looking at my work papers.  Other than that, as far as I know

9    it was -- if it wasn't subject to the split then it would have

10   just been subject to whatever the contract was with the R.

11   Hassell companies.

12        In other words, the way the relationship was before

13   Hassell Construction Company did the job, paid for the bond,

14   put their profit percentage in there, and subbed 100 percent

15   of it to the R. Hassell companies.  So it could have been

16   written that way.  I don't recall off hand.

17   Q    But you don't recall ever seeing a subcontract agreement?

18   A    No, sir.

19   Q    Would your work papers indicate how the Springwoods

20   contract was treated?

21   A    The contracts and progress schedule would show the

22   estimated profit that Hassell Construction anticipates making

23   our loss on that.  As far as the subcontract agreement, I

24   would have nothing on that other than the charges that were

25   charged to the job.

Case 4:19-cv-03451 Document 141 Filed in TXSD on 05/03/19 Page 173 of 299
Case 4:15-cv-03731 Document 48-1 Filed in TXSD on 04/02/19 Page 102 of 197

102

1    Q    Okay.  The attorney's opinion letters that you relied

2    upon in arriving at the 2013 and 2014 Footnote 16, were those

3    opinion letters from the Coats Rose firm, or were they with

4    other firms?

5    A    They were --

6    Q    I'm not asking for the substance of what they --

7    A    No, they were from Coats Rose and other law firms.

8    Q    Okay.  Coats Rose and other law firms.  On this issue?

9    A    On this issue right here I'd have to go back to the

10   attorney's letters and see just exactly which firm was

11   handling that.  I don't recall.

12   Q    Okay.  And is it possible that you also relied upon

13   attorney opinions for purposes of the Footnote 14 that I'm

14   showing you here?  The second paragraph that we've been

15   through.

16   A    Yes.

17   Q    So you would have also relied upon attorney's opinions

18   with respect to that footnote in paragraph 2 on page --

19   physical page --

20   A    Point out paragraph 2 for me, please.

21   Q    Yes, the one that says, On July 1 -- here, let me just

22   get it for you.  Bear with me.  This one right here.

23   A    Yes, I did.

24   Q    So there would have been an attorney opinion letter that

25   you would have relied on for purposes of writing this up.

Case 4:19-cv-03451 Document 41-1 Filed in TXSD on 05/03/19 Page 174 of 299
Case 4:15-cr-30781 Document 41 Filed in TXSD on 04/02/15 Page 103 of 197

103

1    A    This is on the joint venture -- no, this one was taken

2    from the joint venture agreement.

3    Q    Okay.  Now go back down to 16 though, Litigation

4    Contingency, we have here this paragraph.  And that's on

5    physical page 17 of HCCI Exhibit 76.  It is the second full

6    paragraph on that page.  And this relates to a lawsuit that

7    was filed by Royce Hassell's companies against HCCI.  Correct?

8    A    Correct.

9    Q    Regarding the joint venture.

10    A    Correct.

11    Q    Would this letter -- would this paragraph have been

12    drafted as a result of reviewing an opinion letter written by

13    a law firm regarding these matters?

14    A    Yes.

15    Q    Do you remember which law firm it was?

16    A    Not without looking at the individual --

17    Q    Okay.

18    (Pause in the proceedings.)

19    BY MR. SIMON:

20    Q    And then in this paragraph next below, it says,

21    "On May 2, 2014 the company filed its undemand for

22    arbitration, James C. Hassell and Hassell

23    Construction Company versus R. Hassell Holding

24    Company, R. Hassell & Company, Inc., R. Hassell

25    Builders, Inc., GR Group Resources, LP -- LLP, Royce

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 175 of 299
Case 15-30781 Document 481 Filed in TXSB on 04/02/15 Page 104 of 197

104

1      J. Hassell and Sylvia Hassell."

2          Would this have been as a result of an opinion

3      letter that had been reviewed by you?

4      A    Yes.

5      Q    At any time did you talk to Philip about these two

6      paragraphs that we've just reviewed?

7      A    Yes, Philip reviewed the draft financial statements,

8      these notes were included in there.

9      Q    And did you discuss these things with Royce?

10     A    No.

11     Q    Were you directed not to discuss them with Royce?

12     A    Under rules of confidentiality I couldn't discuss them

13     with Royce unless told to by the client.

14     Q    Now, were you representing the joint venture that'd be --

15     that's referred to in paragraph -- or in Footnote 14?

16     A    What do you mean by --

17     Q    Were you representing --

18     A    What do you mean by --

19     Q     -- that joint venture?

20     A     -- representing?

21     Q    Were you the accountant for that joint venture?

22     A    No.

23     Q    Do you know where the books and records for that joint

24     venture were maintained?

25     A    There's not a separate entity where there were any books

Case 4:19-03452 Document 141 Filed in TXSB on 05/03/19 Page 176 of 299
Case 4:15-30731 Document 143 Filed in TXSB on 04/02/15 Page 105 of 197

105

1 and records to my knowledge.  It was just individual contract

2 costs that were subject to the joint venture agreement on

3 Hassell Construction Company's books.

4 Q So it was all maintained on Hassell Construction

5 Company's books.

6 A Right.  The contracts were under the name of Hassell

7 Construction Company, so they had to be.

8 Q All right.  And did you ever prepare a partnership return

9 for the joint venture?

10 A No.

11 Q Did you ever ask anybody at Hassell Construction Company,

12 Inc. whether a partnership agreement needed to be prepared?

13 A No.

14 Q I take it that no K-1s were ever issued?

15 A No.

16 Q Did that concern you as to the existence of the joint

17 venture?

18 A No.

19 Q Why not?

20 A These joint -- these were contracts under the name of the

21 individual companies, the R. Hassell companies had some, HCCI

22 had some.  Those are the -- if those that are the contractor

23 that's got the contract with the owner, why would we need to

24 be concerned with a joint venture?

25 Q Well, don't partnerships and joint ventures have to file

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 177 of 299
Case 15-30721 Document 48 Filed in TXSB on 04/02/15 Page 106 of 197

106

1    partnership tax returns?

2    A    If you have one, but there's -- the assets are in HCCI.

3    If HCCI -- if there was a joint venture that had a contract

4    with the owner and the joint venturers were partners in there,

5    I would say yes.

6    Q    Maybe I'm confused, or a little --

7    A    Could I add something here?

8    Q    Sure.

9    A    A lot of joint venture agreements on construction

10   contracts are handled and accounted for by the joint venturer.

11   Not all of them are separate legal entities.  The ones that

12   are separate generally would have the contract written in the

13   name of the joint venture, they would bill the owner, and pay

14   the bills for the subcontractor that are on labor to do it.

15   And at the end the joint venturers would split the profits.

16          In this case they had a joint venture agreement to

17   share profits and losses, which we've accounted for at the end

18   of the years that those subject contracts were completed.

19   Q    And that is appropriate under GAP principles.

20   A    Yes, the way the contracts were structured.

21   Q    And what you're telling me is that this is something that

22   you've seen before.

23   A    Yes.

24   Q    Do you do a lot of work for contractors?

25   A    Yes.

Case 4:19-cv-03451 Document 141 Filed in TXSD on 05/03/19 Page 178 of 299
Case 15-30781 Document 481 Filed in TXSB on 04/02/15 Page 107 of 197

107

1  Q    And do you recall whether the joint venture agreement

2  spoke at all to the issue of tax returns?

3  A    I don't recall there being anything referring to tax

4  returns for a separate entity.

5  Q    Well, let me just refer you back to it again.  This is

6  HCCI Exhibit 34 that I have up on the screen here, and --

7       (Pause in the proceedings.)

8  BY MR. SIMON:

9  Q    -- do you see paragraph 13 there?

10 A    Uh-huh.

11 Q    And I'll read that into the record.  It says,

12      "Each joint venturer shall prepare and file all

13      required income tax returns, whether individual

14      venturers, after the distribution of profits and

15      losses."

16 A    Okay.

17 Q    And so this agreement actually provided that the taxes --

18 the income, or profit, would be addressed on the joint

19 venturer's tax returns, not on the joint venture tax return.

20 A    Okay.

21 Q    Is that your understanding?

22 A    Right.

23 Q    And what you're saying is that this is -- there's not

24 unusual about this.

25 A    Whoever picks up his share of the income, and what he's

Case 4:19-cr-03451 Document 141 Filed in TXSD on 05/03/19 Page 179 of 299
Case 4:15-cr-30781 Document 481 Filed in TXSD on 04/02/15 Page 108 of 197

108

1    paid, he pays income tax on that.

2    Q    And so nothing illegal about this.

3    A    Not that I can see, as long as he pays his taxes.

4         (Pause in the proceedings.)

5    BY MR. SIMON:

6    Q    Now we were on the 2013 tax return and I wanted to, for a

7    moment, go to the 2014 tax return -- I mean 2014 financial

8    statement.  Let me go back and say that again.

9         We were on the 2013 financial statement earlier this

10   morning, and I've touched on a few things on 2014, but I

11   wanted to go back and I wanted to go to this Note 14 again.

12   But this is on the 2014 financial statement, which is HCCI

13   Exhibit 76.  Are you with me?

14   A    I'm just -- I'm following where you are, we're --

15   Q    Okay.  And I just -- I don't want to belabor the point,

16   but if you could read this paragraph, which is the counterpart

17   of the paragraph in Note 14 that we reviewed from the 2013

18   financial statement.  You will find that they're substantially

19   similar.

20   A    Right.

21   Q    Would you agree?

22   A    Right.  Yes.

23   Q    Okay.  There might have been some numbers that changed,

24   but they're substantially the same.

25   A    Right.

Case 19-03452   Document 131   Filed in TXSB on 05/03/19   Page 180 of 299
Case 15-30781   Document 481   Filed in TXSB on 04/02/15   Page 109 of 197

109

1    Q    Is that correct?

2    A    Yes.

3    Q    And would you have gone through the same process for 2014

4    that you went through in 2013 in speaking with Philip and

5    other representatives of HCCI in order to confirm the accuracy

6    of this statement?

7    A    Yes.

8    Q    And is it your testimony today that they did confirm the

9    accuracy of this statement?

10   A    Yes.

11   Q    Now were you aware of the bonding relationship that

12   existed between HCCI and its bonding company?

13   A    In regards to what?

14   Q    Did you have copies of the indemnity agreement?

15   A    No.

16   Q    Did you have copies of any amendments to the indemnity

17   agreement?

18   A    No.

19   Q    Is it usual for a subcontractor to be a principal and an

20   indemnitor on the general contractor's indemnity agreement?

21   A    That's a question for the surety.  I don't know.

22   Q    You don't know.  Okay.

23        (Pause in the proceedings.)

24   BY MR. SIMON:

25   Q    I wanted to go to the financial statement -- do we have

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 181 of 299
Case 15-30782 Document 48 Filed in TXSB on 04/02/15 Page 110 of 197

110

1    this in -- we have it in ours I believe -- the financial

2    statement for 2012 for a minute.  Let me pull it up.  And what

3    I'm showing you here now is our -- one of the other books --

4    A    Okay.

5    Q     -- and it is Exhibit 29 --

6    A    Okay.

7    Q     -- in the RHHC, or Petitioner, exhibit book.

8    A    Okay.

9    Q    Now I wanted to just take you through something here.

10   Just bear with me for a second, I'm going to turn off my

11   wires.  Okay.  All right.  Now, first of all, can you identify

12   for the record RHCC Exhibit 29?

13   A    Is that what I'm looking at on the screen?

14   Q    Yes.

15   A    Okay.  That's our standard audit report.

16   Q    All right.  And I see that it's signed by Morris Ligon on

17   September 28, 2012.

18   A    Right.

19   Q    Okay.

20        (Pause in the proceedings.)

21   BY MR. SIMON:

22   Q    I want to turn your attention to Note 5.  And in Note 5

23   we're talking about related party transactions, and it starts

24   on the prior page.  And it says that during the year ended

25   June 30, 2011, company entered into subcontract agreements

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 182 of 299
Case 15-30781 Document 41-1 Filed in TXSB on 04/02/15 Page 111 of 197

111

1   with two related companies on various construction projects.

2   The total subcontract expense attributable to these companies

3   reported in the year ended June 30, 2011 was four million some

4   odd thousand dollars.

5        At June 30, 2011 the company is reporting a net

6   account receivable from these companies of $215,243, which

7   consists of a 1,205,617 due the company for payments to

8   related companies' material suppliers and subcontractors on

9   these contracts.

10        Do you know what this paragraph is about?

11   A   I believe those were transactions between the R. Hassell

12   Company and HCCI and it's reporting the details of those

13   transactions.

14   Q   All right.  And if you -- all right.  If you take a look

15   at the paragraph next above, and I'm pointing to a paragraph

16   here where -- right where it says, During.

17   A   Uh-huh.

18   Q   It says,

19       "During the year ended June 30, 2012 and 2011, the

20       company entered into two contracts with this

21       affiliate to provide paving services related to two

22       community developments."

23        Do you know what that's about?

24   A   Yes.

25   Q   And what is that?

Case 19-03452  Document 141  Filed in TXSB on 05/03/19  Page 183 of 299
Case 15-30781  Document 148  Filed in TXSB on 04/02/15  Page 112 of 197

112

1    A    That was for land development contracts with some

2    property owned by Hassell Management Services.

3    Q    Okay.  So this was property owned by Hassell Management

4    Services, and does Royce have anything to do with that

5    company?

6    A    No.

7    Q    And the shareholders of that company are?  Do you know?

8    A    It's an LLC, Jim Hassell was 51 percent member and

9    Philip, Shawn and Mike -- that's Philip Hassell, Mike Hassell,

10    Shawn Potts -- equally owned the rest of the company.

11    Q    All right.  And so do I understand that at the end of --

12    at June 30, 2012 and 2011, that the amount that was owed to

13    HCCI was 1,640,274?  Is that what I'm reading there?

14    A    I'm trying to find --

15    Q    Is that correct?

16    A     -- the line where you're seeing that.  Okay.  Let's see,

17    amounts due -- I see it.  Okay.  1,635,464.

18    Q    And that -- do you know where on here is there a

19    reference to the amount, the total amount owed by Royce at the

20    end of 2012 -- June -- at fiscal year --

21    A    It's the last sentence of the paragraph that you're

22    pointing on right now.

23    Q    This one right here?

24    A    Let's see.  Yes.

25

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 184 of 299
Case 15-03731 Document 48-1 Filed in TXSB on 04/02/15 Page 113 of 197

113

1          THE COURT:  Well, I think his question was 2012, not

2     2011.

3          THE WITNESS:  Oh, '12.  Okay.  I would say it's

4     right where you're pointing, 1,691,259.

5     BY MR. SIMON:

6     Q    So if I'm reading this correct, the amount that was owed

7     by Hassell Management Company, which was owned by Jim, Philip,

8     Michael, and Shawn, was roughly equivalent to the amount that

9     was owed by Royce at the end of June 2012.

10    A    Right.  1,635,464 from the company owned by Jim, and

11    1,691,259 by the company owned by Royce.

12    Q    And then the next day, on July 1, 2012, the 2012 joint

13    venture kicked off.

14    A    Uh-huh.

15    Q    Correct?

16    A    Uh-huh.

17    Q    Okay.

18         (Pause in the proceedings.)

19         MR. SIMON:  I'm going to pass the witness, Your

20    Honor.

21                   CROSS-EXAMINATION OF STEVEN LIGON

22    BY MR. KITCHENS:

23    Q    Good afternoon, Mr. Ligon.  Am I saying your name right?

24    A    Ligon.  Right.

25    Q    I'm Wayne Kitchens.  I don't believe we've met before

Case 19-03452  Document 141  Filed in TXSB on 05/03/19  Page 185 of 299
Case 15-36781  Document 181  Filed in TXSB on 04/02/19  Page 114 of 197

114

1     today.

2     A    Okay.

3     Q    I don't have that many questions for you, sir, but I do

4     want to touch -- and you said that you had experience dealing

5     with construction companies as their auditor and accountant.

6     Is that correct?

7     A    That's correct.

8     Q    So you were familiar with the way that contracts flow

9     back and forth --

10    A    Yes.

11    Q     -- with those companies and how to account for those?

12    A    Yes.

13    Q    Was it your testimony before the Court that it was not

14    unusual for two companies to joint venture a project without

15    actually creating a separate tax entity?

16    A    Yes, it actually happened with Hassell Construction

17    Company.

18    Q    That's what we're talking about here today, is it not?

19    A    Prior to this issue here with the related companies.

20    Q    And it happened often, didn't it?

21    A    Well, it happened once.  I can think of one major

22    contract that had this -- or one major joint venture they had

23    with a company called NBG.

24    Q    Well, that was not having anything to do with Royce

25    Hassell.

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 186 of 299
Case 15-30731 Document 48 Filed in TXSB on 04/02/15 Page 115 of 197

115

1    A    Nothing to do with this, but you asked if it happened.

2    Q    Correct.  Correct.  I did.

3    A    Correct.  But there's an example there.

4    Q    But in that instance there was a joint entity created,

5    was there not?

6    A    There was -- NBG kept all the accounting on their

7    books --

8    Q    Okay.

9    A     -- and they reported the joint venture interest, cost

10   and revenue each month to Hassell Construction, which put

11   their part of the joint venture --

12   Q    Okay.

13   A     -- on the books.  Each one of them did work for the

14   joint venture, so they billed the joint venture for their

15   interest, but there wasn't a separate entity.

16   Q    Okay.  But I guess I'm just trying to elicit from you

17   that it is not unusual in the construction industry to have a

18   joint venture that does not create a separate entity.

19   A    That is correct.

20   Q    When what they called the joint venture agreement

21   between -- the written one, how did Phil Hassell describe that

22   to you and what was its purpose?

23   A    He told me that it was primarily done just to satisfy

24   insurance requirements, that Royce didn't want to have to go

25   out, now that he was working with Hassell, and they pulled

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 187 of 299
Case 15-36781 Document 481 Filed in TXSB on 04/02/15 Page 116 of 197

116

1  forces together and buy his own insurance.  So he could be

2  named as an additional insured on Hassell's policy if they had

3  a joint venture agreement.

4  Q    Did Phil ever say to you, Mr. Ligon, we're going to need

5  to get a separate tax ID number here?

6  A    No.

7  Q    Mr. Ligon, to your knowledge was any job ever bid in the

8  name of a separate joint venture name or number?

9  A    No.

10  Q    Are you aware, sir, of the agreement between the four

11  Hassell children to share bonuses and profits?

12  A    No.

13  Q    Okay.  I notice from your Ligon Exhibit 1, sir, that

14  Springwoods was not included on the so-called JV job list.  Is

15  that correct?

16  A    That's -- I couldn't recall whether it was or not when I

17  just testified.

18  Q    It was the --

19        MR. KITCHENS:  May I approach, Your Honor?

20        THE WITNESS:  Sure.

21        THE COURT:  Yes, sir.

22  BY MR. KITCHENS:

23  Q    It was the email from Mr. Hassell to you right here.

24  A    Okay.  It wasn't on that one, but it's the job list.

25  Okay.

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 188 of 299
Case 15-30781 Document 148 Filed in TXSB on 04/02/15 Page 117 of 197

117

1    Q    The job list.

2    A    Yeah.  Well, that was what was completed in '14 --

3    Q    Yeah.

4    A     -- so it doesn't not appear to be, no.

5    Q    And those jobs that are prefaced with --

6              MR. SIMON:  Excuse me, Your Honor, he said

7    Mr. Hassell, and I think because we have two people called

8    Mr. Hassell, can we refer to them as Phil Hassell or just Phil

9    or, you know --

10             MR. KITCHENS:  Or Phil or Mike or Royce.  That's

11   fine, Your Honor.  No problem with that.

12             THE COURT:  I would -- I'm not going to be strict

13   about this, but my preference is to use full names.

14             MR. KITCHENS:  Fine.

15             THE COURT:  But I'm not going to do much if we

16   don't.

17   BY MR. KITCHENS:

18   Q    On that list that we're looking at, Mr. Ligon, where a

19   job is prefaced with a number, like 12, 13, would that refer

20   to the fiscal year of the company when the job was done, or

21   the job was completed?

22   A    I would assume that that would apply to the fiscal year

23   that the job was entered into.

24   Q    Entered into.  And then you are a certified public

25   accountant.  Correct?

Case 4:15-cv-03451 Document 141 Filed in TXSD on 05/03/19 Page 189 of 299
Case 4:15-cv-03451 Document 141 Filed in TXSD on 04/02/15 Page 118 of 197

118

1    A    Yes.

2    Q    So do you have knowledge of the requirements for

3    reporting a joint venture as an actual partnership?

4    A    Again, it's how it's structured, you know, amongst the

5    joint venturers.

6    Q    Correct.

7    A    If it's a separate entity, it contracts in the name of

8    the joint venture with the owners separately, then it would be

9    appropriate to say that was a separate entity.

10    Q    And if you were advising a client that wanted to do

11    something that way, would you advise it that it needed a tax

12    ID number?

13    A    Yes.

14    Q    Does this joint venture agreement, in your professional

15    opinion as a certified public accountant, meet those

16    requirements to be a separate entity?

17    A    No.

18    Q    When you were doing your audit in the various years that

19    Mr. Simon has questioned -- audits in the various years that

20    Mr. Simon has questioned you on, did you ever audit the

21    Hassell joint venture?

22    A    No, only the individual contracts --

23    Q    Which will be HCCI --

24    A    -- that were subject -- right, that were subject to the

25    joint venture agreement.

Case 4:15-cv-03451 Document 141 Filed in TXSD on 05/03/19 Page 190 of 299
Case 4:15-cv-03451 Document 141 Filed in TXSD on 04/02/19 Page 119 of 197

119

1    Q   Did your firm send any invoices in the name of the joint

2    venture?

3    A   No.

4    Q   Who paid your invoices?

5    A   Hassell Construction.

6    Q   To your knowledge, and this may be a question more

7    appropriate for the insurance company, were any bonds issued

8    in the name of the joint venture?

9    A   Not that I'm aware of.

10    Q   To your knowledge did the joint venture have any of its

11    own employees?

12    A   Not that I'm aware of.

13    Q   To your knowledge were any assets held in the name of the

14    joint venture?

15    A   Not that I'm aware of.

16    Q   To your knowledge were there any construction contracts

17    issued or accepted in the name of the joint venture?

18    A   No, not that I'm aware of.

19        MR. KITCHENS:  Your Honor, a moment to confer?

20    (Pause in the proceedings.)

21    BY MR. KITCHENS:

22    Q   Mr. Ligon, to your knowledge, as the CPA for HCCI, were

23    any bills paid by the joint venture?

24    A   No.

25    Q   Do you know if the joint venture had its own checking

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 191 of 299
Case 15-30781 Document 481 Filed in TXSB on 04/02/15 Page 120 of 197

120

 1    account?

 2    A    No.

 3    Q    Do you know, or the answer's no?

 4    A    The answer's no?

 5         MR. KITCHENS:  Your Honor, with that I'll pass the

 6    witness.  Thank you, sir.

 7         THE COURT:  Thank you.

 8         MR. SIMON:  I have a couple of questions, Your

 9    Honor, unless --

10         THE COURT:  Let me -- hold on.

11         MR. SIMON:   -- Your Honor has --

12         THE COURT:  Mr. Ward, I just want to be sure that --

13         MR. WARD:  I have nothing, Your Honor.

14         THE COURT:  Can I just rely on you to sort of speak

15    up when you're ready to do something --

16         MR. WARD:  Absolutely.

17         THE COURT:   -- and I won't keep asking you?

18         MR. WARD:  Absolutely.

19         THE COURT:  We'll just wait for you then.

20         Mr. Simon, go ahead.

21         MR. SIMON:  Thank you.

22              REDIRECT EXAMINATION OF STEVEN LIGON

23    BY MR. SIMON:

24    Q    Mr. Ligon, you mentioned that this was not an entity, and

25    my question to you is, is this, you're not a lawyer.  Correct?

Case 19-03452   Document 141   Filed in TXSB on 05/03/19   Page 192 of 299
Case 15-30781   Document 48   Filed in TXSB on 04/02/15   Page 121 of 197

121

1    A    That's correct.

2    Q    And you wouldn't know what the legal ramifications are of

3    the type of arrangements that you talked about here in terms

4    of whether or not legally this constitutes an entity under

5    Texas law.

6    A    I'm not a lawyer, but I don't see anything in here that

7    would indicate that, that indicates --

8    Q    Okay.

9    A    -- a separate entity.

10   Q    But you're not a lawyer and you wouldn't know whether

11   those facts --

12           MR. KITCHENS:  Objection, Your Honor --

13           MR. SIMON:   -- apply --

14           MR. KITCHENS:   -- asked and answered.

15           THE COURT:  Well, he didn't just answer the

16   question, he gave more than that.  I'm going to allow him to

17   reask it because I was going to ask a similar question, so.

18   BY MR. SIMON:

19   Q    But you're not a lawyer, and you wouldn't know whether or

20   not the facts that you described here as the way in which this

21   company and other companies have done joint ventures would

22   constitute a legal entity under Texas law.

23   A    That's correct.

24   Q    But you would agree with me, and your footnote so

25   describes, that this, in fact, was a joint venture.

Case 19-03452  Document 141  Filed in TXSB on 05/03/19  Page 193 of 299
Case 15-30781  Document 481  Filed in TXSB on 04/02/15  Page 122 of 197

122

1    A    It's a joint venture for the sharing of profits and

2    losses.

3            MR. SIMON:  Pass the witness.

4            MR. KITCHENS:  Just a couple, Your Honor.

5                RECROSS-EXAMINATION OF STEVEN LIGON

6    BY MR. KITCHENS:

7    Q    Mr. Ligon, as we've -- it's been clearly established,

8    you're not an attorney, for which you're to be congratulated

9    for, but as the company's CPA you would know if this joint

10   venture had a tax ID number?

11   A    That's correct.

12   Q    Had a checking account?

13   A    Correct.

14   Q    Employees?

15   A    Correct.

16   Q    Bank accounts?

17           MR. SIMON:  These questions have all been asked and

18   answered, Your Honor.

19           THE COURT:  So had yours.  I'm going to -- you know,

20   you summarized by saying this was a JV for the sharing of

21   profits and losses that he hadn't gone into and hadn't been

22   asked and answered.  I'm going to just basically -- I do have

23   all this down, but go ahead.

24           MR. KITCHENS:  That's all I have, Your Honor.

25           THE COURT:  Thank you.  May Mr. Ligon be excused

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 194 of 299
Case 15-30781 Document 48 Filed in TXSB on 04/02/15 Page 123 of 197

123

1     subject to --

2          MR. SIMON:  Yes.

3          THE COURT:   -- the fact that he is going to fax in

4     the client representation letters.

5          THE WITNESS:  You should have those.

6          THE COURT:  We already have them?  Why don't you sit

7     still for a minute, let me go get them and we'll just be sure

8     that we can prove them up in the right way.

9          THE WITNESS:  Okay.

10         THE COURT:  Hold on one second.

11      (Pause in the proceedings.)

12         THE COURT:  Please be seated.

13         Okay.  I'm going to hand you a document that's

14    labeled Ligon Compilation Number 3.  I'd just ask you to

15    describe what this is, if you would, sir.

16         THE WITNESS:  These are the management

17    representation letters for the year ended June 30, '12, '13

18    and '14.

19         THE COURT:  Okay.  Do you move to admit those?

20         MR. SIMON:  May I see them?

21         THE COURT:  You may.

22         MR. SIMON:  Thank you, Your Honor.

23         THE COURT:  If you want to look over his shoulder, I

24    didn't make copies.

25         MR. KITCHENS:  I was about to ask that, Your Honor.

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 195 of 299
Case 15-30781 Document 481 Filed in TXSB on 04/02/15 Page 124 of 197

124

1          (Pause in the proceedings.)

2          MR. KITCHENS:  Your Honor, the HCCI parties do not

3     have an objection to the admission of these documents.

4          THE COURT:  Thank you.

5          MR. SIMON:  I don't have any objection to these

6     either, Your Honor.  I'm not going to read each one of them,

7     I'm assuming they're all the same.

8          THE COURT:  All right.  The Court's admitting on its

9     own motion Ligon 3.  They've been discussed and these are now

10    the representation letters.

11         (Ligon Production 3 received into evidence.)

12         MR. SIMON:  Should we leave it up here, Your Honor,

13    and then make copies so we can take them home later?

14         THE COURT:  Yeah, do you have any questions for him

15    at all or --

16         MR. SIMON:  No.

17         THE COURT:  Okay.  Do you have any questions about

18    the representation letters?

19         MR. KITCHENS:  No, Your Honor.

20         THE COURT:  All right.  May Mr. Ligon now be excused

21    not subject to anything?

22         MR. KITCHENS:  I take that back, Your Honor.  I do

23    have one question -- two questions.

24         FURTHER RECROSS-EXAMINATION OF STEVEN LIGON

25    BY MR. KITCHENS:

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 196 of 299
Case 15-03781 Document 48 Filed in TXSB on 04/02/15 Page 125 of 197

125

1    Q    Mr. Ligon, looking at the fax that you sent to Judge

2    Isgur, which he's now admitted, who is the party requesting

3    your services, and is certifying to you that the information

4    that they have given you is correct?

5    A    This was Shawn Potts here.

6    Q    So who is the company?

7    A    The company is Hassell Construction Company, Inc.

8    Q    It doesn't refer to a joint venture, does it?

9    A    No.

10             MR. KITCHENS:  That's all I have, Your Honor.

11             THE COURT:  Thank you.  And now may he be --

12             MR. SIMON:  No questions, Your Honor.

13             THE COURT:   -- excused without recall unless

14   something new comes up?

15             MR. KITCHENS:  I'm sorry, Your Honor, I did not

16   hear --

17             THE COURT:  Well, I know he has another schedule,

18   that's why we called him out of order.  I want to be sure he

19   can -- he is free to go.

20             MR. SIMON:  He can be excused, Your Honor.

21             MR. KITCHENS:  Yes, sir.

22             THE COURT:  Mr. Ligon, thank you for putting --

23             THE WITNESS:  Thank you.

24             THE COURT:   -- up with us.

25             All right.  I'm going to have another hearing that

Case 1:15-03451 Document 131 Filed in TXSB on 05/03/19 Page 197 of 299
Case 15-30781 Document 131 Filed in TXSB on 04/02/15 Page 126 of 197

126

1     I'm going to call.  Who's going to be your next witness?

2          (No audible response.)

3               THE COURT:  Who's going to be your next witness?

4               MR. SIMON:  I'm probably going to call Mr. Royce

5     Hassell.

6               THE COURT:  All right.

7          (Pause in the proceedings.)

8               THE COURT:  This isn't going to take long.  You all

9     can take a short break if you want and just come on back on,

10    or you can stick around, whatever --

11              MR. SIMON:  May I just ask one question, Your Honor?

12    If the Court determines that there is a joint venture, and we

13    need to speak to Mr. Ligon again about the next phase of the

14    project, do we have to re-subpoena him again?

15              THE COURT:  I don't know why you need to re-subpoena

16    him again, but he's gone so I can't --

17              MR. SIMON:  He's gone, I know.

18              THE COURT:  I think he's gone.  I can't really give

19    him an instruction, but he was --

20              MR. SIMON:  Right.

21              THE COURT:   -- he was here for this phase and I'm

22    not -- when I said he's excused permanently, I did not mean to

23    imply he was excused if there is another phase.  As to whether

24    he needs to be subpoenaed again, hopefully not.  And we'll

25    deal with that in a trial management session where perhaps the

Case 19-03452   Document 141   Filed in TXSB on 05/03/19   Page 198 of 299
Case 15-30781   Document 141   Filed in TXSB on 04/02/15   Page 127 of 197

127

1     parties can cooperatively get him to come at a convenient

2     time.

3               MR. KITCHENS:  Your Honor, something troubles me.  I

4     just want to make sure the Court's aware of it.  My clients do

5     not dispute that there is a written agreement.  My clients

6     dispute that that created an entity under the -- under Texas

7     law.

8               THE COURT:  Well, up until this morning I thought

9     that your clients disputed that the joint venture agreement

10     had assets that it pertained to.

11               MR. KITCHENS:  We don't believe that it does have

12     assets.

13               THE COURT:  Well --

14               MR. KITCHENS:  I mean we believe that it was

15     formed --

16               THE COURT:  -- it had contracted --

17               MR. KITCHENS:  -- for the purpose of allowing

18     Mr. Royce Hassell to get insurance.

19               THE COURT:  No, it had a profit and loss sharing

20     agreement -- if I were to stop the testimony now, then there's

21     an agreement that certain contracts are going to have profit

22     and loss sharing arrangements between the joint venturers.

23               MR. KITCHENS:  For tax purposes, Your Honor.

24               THE COURT:  Not for tax purposes, for money

25     purposes.  And as to whether that makes for a partnership is

Case 19-03452   Document 141   Filed in TXSB on 05/03/19   Page 199 of 299
Case 15-30781   Document 143   Filed in TXSB on 04/02/15   Page 128 of 157

128

1   the argument we're going to have.  But I hadn't understood
2   that until today.
3            MR. KITCHENS:  Okay.
4            THE COURT:  I thought that was a disputed fact --
5            MR. KITCHENS:  I guess I --
6            THE COURT:  -- so.
7            MR. KITCHENS:  -- under Judge Rosenthal's opinion
8   and under the Texas Supreme Court opinion, I don't believe
9   that's enough.  The Court will look at the totality of the
10  circumstances.
11           MR. SIMON:  But, Your Honor --
12           THE COURT:  Well, we'll deal --
13           MR. KITCHENS:  And I don't have time to arguing it,
14  Your Honor, this time.
15           THE COURT:  That's fine.  We'll deal with that --
16           MR. SIMON:  And I would --
17           THE COURT:  -- when we deal with it.
18           MR. SIMON:  -- just point out, Your Honor, that the
19  organic partnership law that deals with the indicia of a
20  partnership do not mention any of the things that Mr. Kitchens
21  has referred to.  It did not one.  It doesn't say that you
22  have a bank account, it doesn't say that you have to have
23  anything like that --
24           THE COURT:  We will deal with this later.  You all
25  can either take a short break or not.  I don't think we're

Case 19-03452  Document 141  Filed in TXSB on 05/03/19  Page 200 of 299
Case 15-30781  Document 481  Filed in TXSB on 04/02/15  Page 129 of 197

129

1    going to have a very long hearing.  If you all want to step

2    out, that's fine, just don't go too far.

3            (Recess from 2:43 p.m. to 2:51 p.m.)

4            THE COURT:  I do have a question for the litigants

5    that pertains not to the Springwoods Joint Venture, over which

6    we've heard very little so far, or a little bit, but over the

7    2012, whatever the name of that document is, joint venture

8    contract.

9            I'm hearing Mr. Simon say that if I accept

10   everything that the accountant said as true, he wins.  And I'm

11   hearing you say that if I accept everything the accountant

12   says as true, that you win.  And I'm wondering if the two

13   sides, as to the 2012 Joint Venture, want to just rely on --

14   I'm not going to make you all do this, but if you just want to

15   rely on Mr. Ligon's testimony, that was quite credible, let me

16   go re-review the law and then give you all a written opinion

17   as to whether that establishes or doesn't establish --

18           MR. KITCHENS:  Your Honor --

19           THE COURT:  -- a Texas partnership.

20           MR. KITCHENS:   -- can I have five minutes outside

21   the courtroom?

22           THE COURT:  Yeah, let me -- as to whether -- and all

23   I'll do is issue a written opinion that does or doesn't

24   establish a Texas partnership, and if it does, here are the

25   assets of the partnership, and if it doesn't, I don't need to

Case 19-03452   Document 141   Filed in TXSB on 05/03/19   Page 201 of 299
Case 15-03621   Document 181   Filed in TXSB on 04/02/15   Page 130 of 197

130

1     say anything more.

2             I don't know if the parties want to do more or not.

3     And I don't mean to pre-terminate your case, but as I

4     understand it, that's all you hope to prove.  And you're

5     telling me that's not enough.  And so we essentially have a

6     dispositive situation.

7             MR. KITCHENS:  Well, Your Honor, we are here today

8     on -- when you first set the status -- when he filed a

9     motion -- Mr. Simon filed a Motion for Emergency Status

10    Conference, we came down here, we discussed with you at length

11    that if there's -- whether there's an entity or not.

12            THE COURT:  Right.

13            MR. KITCHENS:  And that's different than a

14    partnership under Texas law.  I get that.  So I hear what

15    you're saying.  I'd like to confer with co-counsel and our

16    consultants, and certainly with Mr. Simon.

17            THE COURT:  No, I just want to be sure that -- I

18    mean either one -- if he wants to say no right now because he

19    has his witness ready, either side can say no to this.  I've

20    scheduled a trial, but I'm also kind of hearing argument

21    that --

22            MR. KITCHENS:  I'm shaking my head a little up and

23    down instead of sideways, Your Honor, but I've got to confer.

24            THE COURT:  Yeah, I may just --

25            MR. SIMON:  Yeah, my only concern about that, Judge,

Case 19-03452   Document 141   Filed in TXSB on 05/03/19   Page 202 of 299
Case 15-30781   Document 48   Filed in TXSB on 04/02/15   Page 131 of 197

131

1    is that I don't think you heard all of the testimony about

2    what the parties did and whether their acts constitute a

3    partnership or not.  And --

4              THE COURT:  I mean that's what I'm saying is, if you

5    think you need more evidence to prove your case, I'm not

6    trying to stop you from doing that.

7              MR. SIMON:  I think we do need a little of it --

8              THE COURT:  Okay.

9              MR. SIMON:  -- because I think that there are other

10   elements of the Texas partnership laws that we haven't yet

11   gotten into.

12             THE COURT:  Then I -- I was just trying to save you

13   your clients' --

14             MR. KITCHENS:  I did --

15             THE COURT:  -- both some money.

16             MR. KITCHENS:  -- find it troubling that Mr. Simon

17   didn't really think that there were any indicia of what we

18   were discussing after reading Judge Rosenthal's opinion and

19   reading *Inverness*.  So that was --

20             MR. SIMON:  Well, I read Judge Rosenthal's opinion.

21   She cites the Texas Partnership Act.

22             THE COURT:  Okay.  Let's -- I was thinking that that

23   was unexpected testimony in statements by both parties, so I

24   was trying to figure out if I could save you all some money.

25   I can't.  Let's move ahead.  That's fine.  Go ahead.

Case 4:05-cv-03452 Document 141 Filed in TXSD on 05/03/19 Page 203 of 299
Case 4:05-cv-03452 Document 141 Filed in TXSD on 04/02/15 Page 132 of 197

132

1          All right.  Mr. Hassell?  Okay, you're the witness.

2  Would you raise your hand, please, sir?

3     (Witness is sworn.)

4         THE COURT:  Thank you, sir.  Have a seat, please.

5           DIRECT EXAMINATION OF ROYCE HASSELL

6  BY MR. SIMON:

7  Q    Would you state your name for the record?

8  A    Royce James Hassell.

9  Q    Mr. Hassell, can you describe for the Court your

10  educational background?

11  A    I have a BS from the University of Houston, and also an

12  MBA from there.

13  Q    When did you graduate with your MBA?

14  A    '89.

15  Q    Where are you from?

16  A    Houston.

17  Q    How long have you been in the construction business?

18  A    My whole life.  I used to ride around with my dad and his

19  construction truck when I was a kid.

20  Q    And what kind of construction was your dad involved in

21  when you were a kid?

22  A    Civil construction.

23  Q    And what is civil construction?

24  A    Underground storm sewers, underground sanitary sewers,

25  water lines, and then also site work, dirt work, earthmoving,

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 204 of 299
Case 15-30781 Document 48-1 Filed in TXSB on 04/02/15 Page 133 of 197

133

1    and paving, roadway paving.

2    Q    Describe your relationship with your brothers and sister.

3    And when I say that, I'm not asking you to say whether it's a

4    good relationship or bad, but tell the Court what the

5    relationships are.  How many brothers do you have?

6    A    Oh, okay.  I'm the oldest from the first marriage,

7    Philip, Mike, and Shawn are from the second marriage, and

8    Jason is from the third marriage.

9    Q    Is Jason involved in the business?

10   A    Not now, no.

11   Q    Are you shareholder of Hassell Construction Company,

12   Inc.?

13   A    Yes.

14   Q    Do you own voting stock in Hassell Construction Company,

15   Inc.?

16   A    Yes.

17   Q    Are you also the owner of a 20 percent interest in a

18   trust that is also the owner of stock in Hassell Construction

19   Company, Inc.?

20   A    Yes.

21   Q    And can you describe that for the Court?

22   A    The trust?

23   Q    Yes, what the purpose of the trust was.

24   A    Back in the '80s my dad did an estate freeze and

25   recapitalization and formed the James C. Hassell Inter-Vivos

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 205 of 299
Case 15-30781 Document 48-1 Filed in TXSB on 04/02/15 Page 134 of 197

134

1    Trust and made the five kids beneficiaries of that trust.  And
2    he froze his value in the company and so all the appreciating
3    value from that time forward would go to the trust of the
4    company of R. Hassell -- I mean, excuse me, of Hassell
5    Construction Company.
6    Q    And at your father's death what happens?
7    A    At his death then his stock is bought by the trust, which
8    owns a life insurance policy on my dad, and that money that
9    would be received by the trust on that life insurance policy
10   would then buy his stock.  And so the trust would then own all
11   the voting stock and all the stock of Hassell Construction
12   Company.
13   Q    How would the -- all of that stock be divided in terms of
14   the five siblings?
15   A    Equally.
16   Q    Now Hassell Management Company.  What is Hassell
17   Management Company?
18   A    It's an employee leasing company and a development
19   company.
20   Q    And who owns that company?
21   A    My dad, Shawn, Philip and Mike.
22   Q    Do you own any interest in that company?
23   A    I do not.
24   Q    Does your youngest half-brother own any interest?
25   A    Not that I'm aware of.

Case 19-03452  Document 131  Filed in TXSB on 05/03/19  Page 206 of 299
Case 15-30783  Document 48  Filed in TXSB on 04/02/15  Page 136 of 197

135

1   Q    Did you work for Hassell Construction Company, Inc. from

2   its inception?

3   A    I did, I was one of the first three employees.

4   Q    How long did you work for Hassell Construction Company,

5   Inc.?

6   A    I worked from 1976 from its formation to the late '80s,

7   went back to school to get my MBA full time, and then once I

8   got that I started back at Hassell Construction.

9   Q    How long did you stay?

10  A    I stayed until 1991 when I started R. Hassell Holding

11  Company.

12  Q    And what does R. Hassell Holding Company and its

13  subsidiaries do?

14  A    At one point we had two subsidiaries, that one division,

15  R. Hassell & Company, did civil work, but mostly roadway

16  paving and dirt work.  And then also we had R. Hassell

17  Builders, which was a general contracting company that did

18  post offices, banks, building type work.

19  Q    Did Hassell Construction Company, Inc. engage in the

20  general contracting business?

21  A    They did not.

22  Q    Did the R. Hassell companies engage in both general

23  contracting work and the underground utility work?  I'm

24  probably saying that wrong.

25  A    Yeah, well --

Case 19-03452  Document 141  Filed in TXSB on 05/03/19  Page 207 of 299
Case 15-30781  Document 481  Filed in TXSB on 04/02/15  Page 136 of 197

136

1    Q    But the public work.

2    A    -- they both -- we both engaged in civil work.

3    Q    Civil.

4    A    Yes.

5    Q    And in addition to that your company engaged in general

6    contracting work.

7    A    That is correct.

8             THE COURT:  I'm now confused about this, so, on the

9    civil work side did both companies serve as general

10   contractors for civil work or only as subcontractors for civil

11   work?

12            THE WITNESS:  General.

13            THE COURT:  Okay.  So when you said -- or I thought

14   you said that HCCI did not engage in general contracting, you

15   mean it didn't engage in general contracting except in the

16   civil contracting field, or did I misunderstand you?

17            THE WITNESS:  Well, there's -- those are two

18   separate types of construction, so Hassell Construction, they

19   were not a general contractor.

20            THE COURT:  Even on the civil side.

21            THE WITNESS:  They did not do buildings.  That's

22   what I'm referring to when I say general construction,

23   buildings.  They did civil work, but not building work.

24   Buildings as far as --

25            THE COURT:  Let me -- I'm going to --

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 208 of 299
Case 15-36721 Document 48 Filed in TXSB on 04/02/15 Page 137 of 197

137

1        THE WITNESS:   -- banks --

2        THE COURT:   -- I'm going to get Mr. Simon to define

3   then because I'm using general contracting I think in a

4   different -- with a different definition than he is, and I

5   want to be sure we get the same --

6   BY MR. SIMON:

7   Q    When you do civil work, is there a general contractor

8   involved and subcontractors?

9   A    Yes, sometimes in the industry a company like Hassell

10  Construction would be called a general contractor.  Okay.  The

11  way I'm using general contractor is a construction company

12  that builds buildings.

13  Q    Let's refer to it that way.

14  A    Okay.

15  Q    So as we don't confuse it, so not as general contracting

16  in civil, but as civil and building construction.

17  A    Okay.

18  Q    What happened in 2008?

19  A    I talked to Phil and my dad and other family members

20  about bidding work together, joining forces doing jobs

21  together.

22  Q    What was happening in the industry at the time?

23  A    It had tanked.  There was very slim margins, very few

24  jobs to bid.

25  Q    What was the competition like?

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 209 of 299
Case 15-30781 Document 48-1 Filed in TXSB on 04/02/15 Page 138 of 197

138

1    A    It was very tight.

2    Q    And what happened to the profit margins in the jobs?

3    A    Very slim, very small.

4    Q    Did this hurt your company?

5    A    Yes, it did.

6    Q    Did it hurt Hassell Construction Company, Inc.?

7    A    Somewhat, yes.

8    Q    Did you all decide to join forces?

9    A    Yes.

10   Q    And why did you do that?

11   A    To --

12   Q    First talk about your reasons for doing it.

13   A    My reasons were because it opened a whole new avenue up

14   for us, they had excess surety; and for them I did a type of

15   work that they didn't do.  And so it expanded both of our

16   portfolios in the market.

17   Q    All right.  Did the relationship just benefit your

18   companies, or Hassell Construction Company, Inc., or was it

19   mutual?  Door A, Door B, Door C, in your opinion --

20   estimation.

21   A    It was mutual.

22   Q    All right.  Let's start going through some of the

23   exhibits.  Tell me what we're looking at here.  It is Exhibit

24   1 of Petitioner's exhibits.

25   A    This is a pre-qualification statement to bid on a project

Case 4:15-cv-03031 Document 141 Filed in TXSD on 05/03/19 Page 210 of 299
Case 4:15-cv-03031 Document 141 Filed in TXSD on 04/02/15 Page 139 of 197

139

1    called Dr. Martin Luther King, Jr. Sports Park.

2    Q   And would you read into the record the portion of this

3    that I'm pointing to here on the screen?

4    A   "Hassell Construction Company, Inc. - R. Hassell

5         Builders, Inc., a joint venture, P.O. Box 20487,

6         Houston, Texas 77225."

7    Q   And whose post office box was that?

8    A   That was mine.

9    Q   And whose telephone number was that?

10    A   Mine.

11    Q   What was the date of this submission?

12    A   The 30th of September 2010.

13    Q   Now how many of these types of bids were being made at or

14    around this time?

15    A   Probably around three a month.

16    Q   And was there any distinction between how these were

17    denominated in terms of civil construction and building

18    construction?

19    A   I'm not sure I understand the question.

20    Q   Okay.  Did you denominate these as joint venture -- as

21    being joint venturers in all instances when you making bids?

22    A   Yes.

23    Q   Okay.  Now what was the arrangement that you had with

24    Hassell Construction Company, Inc. regarding these projects?

25    A   That we would bid it in their name and sub it to the

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 211 of 299
Case 15-30781 Document 48 Filed in TXSB on 04/02/15 Page 140 of 197

140

1    joint venture.

2    Q    Okay.  And what was the split on the profits?

3    A    The split varied from 1 percent to 3 percent of the gross

4    revenue, which came out to be -- we really calculated it on

5    the -- on what the bottom line profit would be, so that would

6    be about -- anywhere from 10 to 20 percent of the bottom line

7    profit.

8    Q    That was going to Hassell Construction Company, Inc.

9    A    Correct.

10   Q    And the balance was then going to your companies.

11   A    Correct.

12   Q    And who maintained the accounting for these joint

13   ventures that were entered into during this time period, or

14   these projects that were entered into during this time period?

15   A    Hassell did most of them, we did a few.

16   Q    And when you refer to Hassell, can we -- since there's --

17   A    Yeah.

18   Q    -- everybody's named Hassell in this case, can we have

19   an agreement that we use the words HCCI and either your

20   companies or R. Hassell companies to denominate your

21   companies?

22   A    Yes.

23   Q    Would you re-answer that question with that in mind.

24   A    HCCI.

25   Q    Okay.  And who had control over the actual performance of

Case 4:15-03452 Document 141 Filed in TXSB on 05/03/19 Page 212 of 299
Case 4:15-30731 Document 141 Filed in TXSB on 04/02/15 Page 141 of 197

141

1      the work?

2      A     We both did.

3      Q     Okay.  Did crews from your company work alongside crews

4      of HCCI?

5      A     Very seldom.

6      Q     Who managed the crews that were working for -- on these

7      projects?

8      A     I did.

9      Q     And who handled the accounting?

10     A     I did, well, RHHC did during 2010, the 2010 -- the year

11     2010 mostly.  And HCCI did probably 40 percent of the time.

12     Q     Did HCCI approve all these projects?

13     A     Yes.

14     Q     Where did you office and where did HCCI office?

15     A     I officed on the south side of town near the Astrodome,

16     they were on the north side of town in Champions.

17     Q     And did you ever move to their campus?

18     A     Yes, I eventually moved across the parking lot from them.

19     Q     And when did that occur?

20     A     That occurred in 2012.

21     Q     Now did there come a time when you got sick?

22     A     Yes, in 2011 I went into end-stage renal failure, and was

23     put on the list to receive a kidney, and actually had a

24     transplant in November of '11.

25     Q     And how has that turned out?

Case 19-03452   Document 141   Filed in TXSB on 05/03/19   Page 213 of 299
Case 15-30781   Document 141   Filed in TXSB on 04/02/15   Page 142 of 197

142

1    A    Well, my brother-in-law gave me a kidney and it's changed
2    my life.
3    Q    For how many years before you went into end-stage renal
4    failure were you suffering from the effects of this disease?
5    A    Well, I was diagnosed with the disease in the mid '80s.
6    Q    When did it start to become acute?
7    A    Early 2010 to mid 2010.
8    Q    What was the effect on your physically in terms of your
9    ability to perform as an executive?
10   A    It was tough.  I had about 10 percent kidney function and
11   then in May -- excuse me, June of 2011 I went on dialysis.
12   Q    What are the effects of this disease?  Does it just slow
13   you down?
14   A    Well, your blood doesn't get clean, which is what the
15   kidneys do, so toxins build up in your body.  And it's very
16   difficult to work or have energy or think properly.
17   Q    Let's go to the next exhibit.  Did -- before we go on to
18   the next one -- did HCCI participate in the preparation of
19   these submissions that were being made?
20   A    Yes, my secretary would call over and get the information
21   from HCCI on the current job list, on their current equipment
22   list, percentage completion, insurance certificates, and just
23   whatever the package -- depending on what the package ordered.
24   We would get their information and combine it with our
25   information and submit the qualification statement as a joint

Case 4:15-03452  Document 141  Filed in TXSB on 05/03/19  Page 214 of 299
Case 4:15-30781  Document 148  Filed in TXSB on 04/02/15  Page 143 of 197

143

1    venture.

2    Q    And we're referring to Exhibit 1.

3    A    Correct.

4    Q    Let's go to Exhibit 2.  This is an email dated October 5,

5    2010, and it's going from you to Phil Hassell, and I'll read

6    it into the record.  It says,

7         "I think it would be cleaner to not complicate

8         things with your surety and just bid everything in

9         Hassell's name and then sub it to the joint venture.

10        It is working well that way now, so why complicate

11        things.  I am still going to submit our

12        qualification statements in a joint venture style so

13        that we can bring our combined strengths to the

14        table."

15        Do you recall sending this email out?

16   A    I did.

17   Q    What was going on at the time that prompted you to write

18   this email?

19   A    We were hammering out all the details of doing and

20   bidding jobs in the joint venture.

21   Q    Was the relationship becoming more involved or less

22   involved at this particular juncture?

23        THE COURT:  What relationship?

24   BY MR. SIMON:

25   Q    The relationship between your companies, R. Hassell

Case 1:19-cv-03452 Document 1-81 Filed in TXSD on 05/03/19 Page 215 of 299
Case 1:15-cv-03731 Document 1-81 Filed in TXSD on 04/02/15 Page 144 of 197

144

1    companies, and HCCI.

2    A    More.

3    Q    Okay.  I guess my question really relates -- is was there

4    was progression of the relationship that started in 2008 and

5    did it continue to progress into a more substantial

6    relationship as time went on?

7    A    Yes, it did.

8    Q    Let's go to the next exhibit.  And I'm showing you

9    another exhibit, and this is another project that was being

10   bid by you and Hassell Construction Company, Inc., and we put

11   this one because this one occurs after the email that you sent

12   out, and the one we looked at before was from before the time

13   that your email went out.  Did you continue to bid projects in

14   this fashion?

15   A    Yes, we bid many, many projects in this fashion.

16   Q    Now I wanted to turn your attention here to this letter

17   that's part of the bid package that dated November 2, 2010.

18   And do you see at the top there -- would you read the

19   letterhead into the record?

20   A    Hassell Construction Company, Inc./R. Hassell Builders,

21   Inc., joint venture.

22   Q    By the way, was R. Hassell Builders one of the

23   subsidiaries of your holding company?

24   A    Yes, it was.

25   Q    And if you have the signature page there, who is Terry

Case 19-03452  Document 141  Filed in TXSB on 05/03/19  Page 216 of 299
Case 15-30781  Document 48  Filed in TXSB on 04/02/15  Page 145 of 197

145

1   Taurielli -- Tauriello.

2   A    At the time he was vice president of R. Hassell Builders.

3   Q    Okay.  Now we have an insurance certificate -- the

4   liability insurance certificate that shows that the insured is

5   Hassell Construction Company, Inc.  Do you see that?

6   A    Correct.

7   Q    Who were the actual contracts signed by?

8   A    Hassell Construction Company.

9   Q    Now would you refer to it as HCCI?

10  A    HCCI.

11  Q    Thank you.

12           THE COURT:  Well, go back.  That's not what it looks

13  like to me.  I just want to understand it.  Why do you say

14  that's submitted by HCCI?

15           THE WITNESS:  His question to me was who actually

16  signed the contract.  We were low bidder on this job, so maybe

17  I misunderstood the question.

18           THE COURT:  The page I'm looking at shows that the

19  name of the contractor is HCCI/R. Hassell Builders, Inc.,

20  joint venture.  That's what I'm trying to understand.  Why are

21  you saying it's HCCI?  Is there a signature page that's

22  different than this cover page?

23           THE WITNESS:  For the actual construction contract,

24  yes.

25           THE COURT:  What am I looking at now?

Case 19-03452   Document 141   Filed in TXSB on 05/03/19   Page 217 of 299
Case 15-03671   Document 141   Filed in TXSB on 04/02/15   Page 146 of 197

146

1          THE WITNESS:  This is the contractor's qualification

2     statement that went to the city for us to be able to bid the

3     project.

4          THE COURT:  Okay.

5     BY MR. SIMON:

6     Q    And I just -- I'll try to be fair is disclosing this

7     report.  While bids were made in the name of the joint

8     venture, it is true that the contracts were signed in the name

9     of Hassell Construction Company, Inc.

10    A    That is correct.

11    Q    And the insurance certificate that we just looked at

12    showed that the insured was Hassell Construction Company, Inc.

13    A    That's correct.

14    Q    And the bonds that were issued in connection with these

15    projects were bonds that were issued on behalf of Hassell

16    Construction Company, Inc.

17    A    That's correct.

18    Q    And that's how you all were doing business.

19    A    Yes, sir.

20    Q    And it was all oral in nature.

21    A    Yes, sir.

22    Q    And in this bid proposal, I'm showing you the page now,

23    that included resumes of the various people involved.  And

24    here we have a resume of James C. Hassell, and that's your

25    father.

Case 19-03452  Document 131  Filed in TXSB on 05/03/19  Page 218 of 299
Case 15-30781  Document 131  Filed in TXSB on 04/02/15  Page 147 of 197

147

1    A    That is correct.

2    Q    And we have a resume for you, Royce J. Hassell.

3    A    Correct.

4    Q    And we have a resume for Terry Kevin Tauriello.

5    A    Correct.

6    Q    He worked for your companies.

7    A    He did.

8    Q    James C. Hassell obviously worked for Hassell

9    Construction Company, Inc.

10   A    Correct.

11   Q    Kenneth D. Canal (phonetic), who did he work for?

12   A    R. Hassell Builders.

13   Q    Your company.  Thomas T. Kirby, who did he work for?

14   A    My company.

15   Q    Whose equipment was used in this particular project?

16   A    RHHC.

17   Q    Your company's.

18   A    My company's.

19   Q    Who handled the disbursal of funds for this particular

20   project?

21        MR. KITCHENS:  I didn't hear that question, Your

22   Honor, I'm sorry?

23        THE COURT:  Who handled the disbursal of funds for

24   this particular project?

25        THE WITNESS:  We both did.

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 219 of 299
Case 19-03781 Document 48-1 Filed in TXSB on 04/02/15 Page 148 of 197

148

1   BY MR. SIMON:

2   Q    And how did that work?

3   A    The owner would mail a check to Hassell, Hassell would --

4   Q    Wait a minute, let's --

5   A    Okay.  The owner would mail a check to HCCI, HCCI would

6   pay for whatever suppliers or material vendors that they had

7   furnished materials on the job, and for the bond fee, and then

8   they would cut a check to my company and my company would then

9   pay all the subcontractors, et cetera.

10  Q    Was there ever a subcontract that was entered into

11  between any of your companies and HCCI in connection with this

12  project?

13  A    No, not that I'm aware of.

14  Q    Did you ever enter into a subcontract with HCCI on any of

15  the projects?

16  A    I believe the very first one, Wayne Gray, we had a

17  subcontract on, and we may have had a subcontract on a couple

18  of civil projects in '08 and '09 and possibly early '10.

19  Q    From that point forward were there any subcontracts that

20  had been entered into between you -- your companies and HCCI?

21  A    No, there were not.

22  Q    And go down here to the bond, the bid bond, and the bid

23  bond is in the name of who?

24  A    Hassell Construction Company, Inc.

25  Q    All right.  Let's go to the next project.  Moving forward

Case 4:15-cv-03451 Document 141 Filed in TXSD on 05/03/19 Page 220 of 299
Case 4:15-cv-03451 Document 141 Filed in TXSD on 04/02/15 Page 149 of 197

149

1     to the next exhibit.  Now this is an email from Philip Hassell
2     to Shawn Potts with an attachment called, Royce DOCS -- DOCX,
3     and it's addressed to Rosalind Hassell.  Who's Rosalind
4     Hassell?
5     A     She is Philip Hassell's wife, and also our insurance
6     agent.
7     Q     And when you say our insurance agent, do you mean the
8     bonding agent for HCCI?
9     A     Yes, she is, and at this time, 2010, she was also my
10    company's bonding agent and insurance agent.
11    Q     I gotcha.  And let's go through this email.  What
12    prompted the sending of this email in December of 2010?  And
13    let me just put it into context for you for a moment.  We have
14    these projects that I've shown you, and then we have the email
15    in October of 2010, and now we have this email coming back in
16    December of 2010.  Explain what this was all about.
17    A     We were trying to really cement the agreement that we
18    had.  We had a couple of projects ongoing and I believe I had
19    written Shawn an email requesting to get some early pay on
20    some invoices.  And also the economy was really still pretty
21    tough, and I know that we were both -- when I say both, RHHC,
22    my companies, and Hassell Construction Company, HCCI, were --
23    we were going through some tough times.
24    Q     And are there any particular portions of this that you'd
25    like to publish for the Court?

Case 4:15-03452 Document 141 Filed in TXSB on 05/03/19 Page 221 of 299
Case 4:15-03781 Document 148 Filed in TXSB on 04/02/15 Page 150 of 197

150

1    A    Yes.  Do you want me to read them?

2    Q    Just show me where they are first, and then we can read

3    them together.

4    A    One, two, three, four, the fifth line down where it

5    starts, "As we move forward --"

6    Q    Okay.

7    A    "-- through these difficult times together, we're going

8    to follow the things that we had laid out in our meeting.  We

9    have --"

10   Q    What meeting was that?

11   A    We'd had a family meeting about how we were to do job

12   together and, you know, try to go make money and improve our

13   bottom lines and, you know, strengthen our companies.

14   Q    Okay.  Go ahead.

15   A    "We have not had our year-end meeting with the

16        bonding company yet, but it will be coming soon, and

17        I fear it will be under great scrutiny because of

18        our interim financials and the incredible number of

19        notices that we are receiving and the amount of work

20        it is causing for the surety.

21        "I had met with the surety after we had finished our

22        year-end audit and explained to them what we would

23        be looking at going into next year.  At that time

24        they expressed concerns about our wishes to continue

25        in the GC market."

Case 4:19-cv-03452 Document 141 Filed in TXSD on 05/03/19 Page 222 of 299
Case 4:15-cr-30721 Document 48 Filed in TXSD on 04/02/15 Page 151 of 197

151

1    Q    Now GC market meaning what?

2    A    Building.

3    Q    Okay.  As opposed to civil work.

4    A    Correct.

5    Q    Go ahead.

6    A    "I explained to them what we were looking at doing

7         and they were agreeable to our appetite for that

8         area, understanding that it would take away from our

9         overall capacity, which, until our in-house

10        financials start feeling the effect of the cheap

11        work that we have under contract, which will be

12        soon, it should not be a problem.  In our

13        meeting --"

14   Q    I want to stop you right there.  What do you mean -- what

15   was Philip talking about when he was referring to cheap work?

16   A    Well, as I said earlier, the economy was tough, the

17   margins were slim, and Hassell had some, as we all did, had

18   some projects that --

19   Q    Please, don't use the word Hassell.  Please use HCCI.

20   A    Okay.

21   Q    Sorry.

22   A    No, that's okay.  It's just out of habit.  HCCI had some

23   projects that had slim margins.

24   Q    Okay.  Continue on.

25   A    "-- which until our in-house financials start

Case 19-03452  Document 141  Filed in TXSB on 05/03/19  Page 223 of 299
Case 15-30781  Document 48  Filed in TXSB on 04/02/15  Page 152 of 197

152

1     feeling the effect of the cheap work that we have

2     under contract, which will be soon, it should not be

3     a problem.

4     "In our meeting I had pitched to them a joint

5     venture/partnership scenario, but with dad making

6     the percentage changes that he made at some point,

7     it will get looked at harder because of the profit

8     margins being what they will be."

9  Q    Stop there.  What was meant by that statement?

10 A    Well, we were -- we had agreed that we were working and

11 doing these projects together as a joint venture/partnership

12 deal, and he said -- my dad, because I was sick, changed the

13 percentage of profit that they were taking from 3 percent to 1

14 percent, and he's saying that with dad doing that, that they

15 go to -- that that 1 percent on their books is going to fall

16 under scrutiny by the surety.

17 Q    And why is that?

18 A    Well, the surety --

19 Q    Why is he feeling that way, or what did he explain to you

20 he meant by that?

21       MR. KITCHENS:  Objection, Your Honor, hearsay.

22       THE COURT:  I'm going to sustain as to the first

23 part of the question, why did he feel that way; I'm going to

24 overrule as to the part of the question that says, What did he

25 say to you.

Case 19-03452 Document 131 Filed in TXSB on 05/03/19 Page 224 of 299
Case 15-30781 Document 48 Filed in TXSB on 04/02/15 Page 153 of 197

153

1    BY MR. SIMON:

2    Q    What did he say to you?

3    A    That the surety would expect -- would like to see a

4    higher profit margin.

5    Q    Continue on.

6          THE COURT:  I'm going to interrupt you just for a

7    second.  You all keep your seats; I'm going to call my 3:30

8    case.

9          (Pause in the proceedings.)

10         THE COURT:  Let's go ahead and proceed.  At some

11    point we'll take an afternoon break, I'll let you -- there are

12    no further hearings this afternoon, so when you get to a

13    breaking point we'll do a regular afternoon break and then

14    we'll come back and continue the hearing.

15         MR. SIMON:  Let's just finish off this --

16         MR. KITCHENS:  Your Honor, just an inquiry.  Do you

17    have any -- I have some arrangements to make depending on how

18    late the Court's going to --

19         THE COURT:  Oh, let's not work terribly late because

20    I have a feeling we're not going to get finished if we do.

21         MR. KITCHENS:  Is 5:00 o'clock agreeable to

22    everyone?

23         MR. SIMON:  It's agreeable to me.

24         THE COURT:  So we'll -- let's take a 10- or

25    15-minute break soon and then we'll work till 5:00.  If you

Case 1:19-cv-03451 Document 141 Filed in TXSD on 05/03/19 Page 225 of 299
Case 1:15-cv-03681 Document 148 Filed in TXSD on 04/02/15 Page 154 of 197

154

1    want to, we'll talk for just a second about tomorrow.  I've

2    got a relatively free afternoon, as afternoons go, and a

3    morning where I don't think it's going to take too long, but

4    there's one hearing that could take 30 minutes or so.

5            And so I'll either come back -- if you all think

6    it's going to take all day tomorrow, we'll start, you know, at

7    9:15, because I've got a couple of 9:00 o'clock hearings, work

8    till 10:00, we might get a 30 minute interruption, and then we

9    can just work through the day, or we can just start tomorrow

10    at 1:45, I have a 1:30 hearing, we can start you all at 1:45

11    and work till the end of the day, if that will finish it.

12            MR. SIMON:  I'd rather start as early as we can.

13            MR. KITCHENS:  You said 9:15-ish?

14            THE COURT:  I'm thinking 9:15 is what we would start

15    at in the morning if you all want to try and get as much as we

16    can in tomorrow and then --

17            MR. KITCHENS:  That's fine.

18            THE COURT:   -- if we don't finish tomorrow, I've

19    got a lot of time on Friday, we've got -- we can do things on

20    Friday, or next week.

21            MR. SIMON:  Your Honor, on Friday I'm supposed to be

22    in Dallas at 9:30.

23            THE COURT:  Well, then we won't do it on Friday, we

24    will -- I'm in pretty good shape on Monday.

25            MR. KITCHENS:  You've got the Simbaki hearing on

Case 4:15-cv-03451 Document 141 Filed in TXSD on 05/03/19 Page 226 of 299
Case 15-30781 Document 148 Filed in TXSD on 04/02/15 Page 155 of 197

155

1    Monday, Your Honor.

2              THE COURT:  Well, that's at 10:00 in the morning, so

3    you could come right after that.

4              MR. KITCHENS:  My only qualification is on the 31st,

5    if we -- if for some reason it goes that far, I will be out of

6    the country for two weeks.

7              THE COURT:  We'll miss you.  Are you going to want

8    us to continue the hearing, or are you want to have Mr. Rios

9    handle it?

10             MR. KITCHENS:  I'll have that discussion with co-

11   counsel.  I mean if you -- hopefully it's not going to go that

12   long.

13             THE COURT:  I hope not as well, but I'm available on

14   the 30th, other than the Simbaki hearing.  I don't have a

15   whole lot -- I don't know how long you think the Simbaki

16   hearing will take, but I'm assuming no more than 30 minutes

17   for that.

18             MR. KITCHENS:  Gosh, I hope not, Your Honor.

19             THE COURT:  And then on the 31st we can't do it

20   you're telling me, unless we have Mr. Rios.

21             Mr. Ward?

22             MR. WARD:  Your Honor, out witnesses have been

23   subpoenaed.  I don't think that testimony is going to take,

24   I'll leave it to counsel, but more than an hour.  If we could

25   fit that in either this afternoon or tomorrow, it certainly

1    would be very helpful to my client.

2           MR. SIMON:  Your Honor, we could do him early in the

3    morning, tomorrow morning.

4           THE COURT:  Would that work to start you all at 9:15

5    in the morning?

6           MR. WARD:  I will check with him.  I think that will

7    work.

8           THE COURT:  Great.  Thank you.

9           All right.  Thank you.

10          MR. KITCHENS:  Your Honor, I'd also say that if he

11    couldn't come back tomorrow, I don't mind taking him out of

12    order now.

13          THE COURT:  I'll leave that up to you all.

14          MR. KITCHENS:  It's up to Mr. Simon, it's his

15    witness.

16          MR. SIMON:  I'd really like to finish with this

17    witness.

18          THE COURT:  That's fine.  If he's free at 9:15 in

19    the morning, and if you see all the other witnesses, tell them

20    all to be here at 9:15 tomorrow and they can be excused for

21    the rest of the day.  I don't see any reason to make everybody

22    stick around.

23          MR. SIMON:  I would like to also talk about the

24    possibility of putting Mr. Ward's client off until the end and

25    making a determination as to whether his witness will even be

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 228 of 299
Case 15-30781 Document 148 Filed in TXSB on 04/02/15 Page 157 of 197

157

1    necessary at all.  And I'm wondering whether we can excuse him

2    and then call him back --

3            THE COURT:  Why don't you come forward and --

4            MR. SIMON:  -- you know, at a time when -- if we

5    need him at a time that would be convenient to him, rather

6    than having him sit here.

7            THE COURT:  Mr. Ward, what's your guy here to talk

8    about, do you know?

9            MR. WARD:  He's the underwriter for Liberty Mutual.

10    You've heard some talk about the surety, and that's what he

11    does.

12            THE COURT:  Is this a witness that can be done by

13    deposition over the -- is he from out of town?

14            MR. WARD:  He's from Houston.

15            THE COURT:  He's from Houston.  Okay.

16            MR. SIMON:  Well, we would be willing to take him by

17    deposition --

18            THE COURT:  I'm perfectly happy to -- even though

19    he's from Houston --

20            MR. SIMON:  -- and also --

21            THE COURT:  -- just doing a written deposition on

22    him if you all want to do that.

23            MR. SIMON:  And I think -- I don't know whether you

24    all have any intention to call him, but I'm thinking that

25    we -- you know, it may end up that we will not need him and I

Case 19-03452   Document 141   Filed in TXSB on 05/03/19   Page 229 of 299
Case 15-03071   Document 141   Filed in TXSB on 04/02/15   Page 158 of 197

158

 1    would prefer not to keep him here.  I'd like to excuse him

 2    and --

 3                MR. RIOS:  Your Honor, he's not on our witness list,

 4    so --

 5                THE COURT:  Are you going to object to taking -- to

 6    finishing the trial without him and then if he's needed either

 7    party --

 8                MR. KITCHENS:  No, Your Honor --

 9                THE COURT:   -- can take him on --

10                MR. KITCHENS:   -- because we're only -- we just may

11    cross him and --

12                THE COURT:   -- on deposition?

13                MR. KITCHENS:  Or deposition is fine too.

14                THE COURT:  Just do it on a deposition and I'll read

15    his deposition.

16                MR. KITCHENS:  If it's needed.

17                THE COURT:  I assume that you're --

18                MR. RIOS:  Or, you know, we can almost wait and if

19    Mr. Simon believes at the end of his case in chief that he's

20    not needed, he can always make that announcement to the Court.

21                THE COURT:  But if he is needed, can we do him by

22    deposition without objection?

23                MR. RIOS:  Sure.

24                MR. SIMON:  Yes.

25                MR. RIOS:  Yes.

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 230 of 299
Case 25-30781 Document 48-1 Filed in TXSB on 04/02/15 Page 159 of 197

159

1     THE COURT:  And it just doesn't sound like the
2  witness --
3     MR. SIMON:  I would like to make the same suggestion
4  with Mike Hassell and Mr. Rebecek.  Both of them work for
5  HCCI.  I don't see why they need to be sitting down here at
6  the courthouse.  I'm sure that if -- if, as and when we need
7  them, if they could be probably here in a very short period of
8  time, then I would make the offer to let them go for the time
9  being.
10     MR. KITCHENS:  For the time being, Your Honor.  I
11  will not agree that their testimony can be by deposition.
12     THE COURT:  I don't want theirs --
13     MR. KITCHENS:  I want to hear it.
14     THE COURT:   -- by deposition anyway, but do you
15  agree that they can be excused to be on -- and that you'll
16  have them on-call to come down on short notice?
17     MR. KITCHENS:  Yes, sir.
18     THE COURT:  That's great.  Why don't we take our
19  afternoon break and let you all talk to your witnesses, tell
20  them they can go.
21     MR. WARD:  So for mine, it's by deposition if at all
22  and I can let him leave.
23     THE COURT:  He's just gone, but I do need your
24  agreement that if -- that you will present him for a
25  deposition on reasonable notice and conference.

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 231 of 299
Case 15-30781 Document 481 Filed in TXSB on 04/02/15 Page 160 of 197

160

1          MR. KITCHENS:  Assuming his schedule and mine,

2     absolutely.

3          THE COURT:  Okay.  Then he is excused from the

4     hearing.  If he's needed at all, we'll do him by deposition,

5     we'll read his testimony.  Thank you.

6          MR. KITCHENS:  Thank you, Your Honor.

7          Chris --

8          THE COURT:  And then we're going to go take our

9     afternoon break.  You tell your guys they can go home, but

10    they've got to leave you ways to get in touch.

11         MR. KITCHENS:  Fine.  And we're going to work till

12    5:00, Your Honor?

13         THE COURT:  We'll work till 5:00, we'll come back at

14    4:00 and we'll work till 5:00.  Thank you.

15       (Recess from 3:44 p.m. to 4:00 p.m.)

16         THE COURT:  Mr. Simon?

17         DIRECT EXAMINATION OF ROYCE HASSELL (RESUMED)

18    BY MR. SIMON:

19    Q    Now, let's go into these bullets that we're looking at on

20    the screen, and I'll try and make them a little bit bigger

21    here.  And leading into that, the last sentence that leads

22    into the bullet points refers to a meeting.  And is that the

23    meeting, the family meeting that you were referring to a

24    moment ago?

25    A    Yes.

Case 1:19-cv-03452 Document 1-41 Filed in TXSB on 05/03/19 Page 232 of 299
Case 1:15-cv-30781 Document 1-41 Filed in TXSB on 04/02/15 Page 161 of 197

161

1    Q    All right.  Let's go to bullet point number 1.

2         "All projects that we do together must have an

3         indemnity signed for the bonding company."

4              Did you sign an indemnity with the bonding company?

5    A    Yes.

6    Q    And let me show you what has been marked as Exhibit 5,

7    that would be Petitioner's Exhibit 5.  Let me make this a

8    little bigger.  I'll make it a little smaller.  Okay.  What

9    are we looking at here?

10   A    Amendment Number 1 to the general agreement of indemnity.

11   Q    And would you read into the record the third paragraph.

12   A    "The following individuals and/or business entities

13        shall be added to the agreement as indemnitors and

14        principals and shall be bound by all of its items,

15        all of its terms for all bonds issues pursuant to

16        the agreement whether such bonds were issued before

17        or after the execution of this amendment, or before

18        or after the date of the agreement, but only for

19        bonded projects wherein any work is subcontracted

20        to, or performed by, any of the following

21        individuals or business entities or any of their

22        subsidiaries or affiliates whether present or

23        future, and whether directly or indirectly held."

24   Q    And what are the entities they're signing on?

25   A    R. Hassell Holding Companies, Inc., R. Hassell Builders,

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 233 of 299
Case 15-03071 Document 481 Filed in TXSB on 04/02/15 Page 162 of 197

162

1    Inc., R. Hassell & Company, Inc., Royce J. Hassell and Sylvia

2    T. Hassell.

3    Q    Now under these indemnity agreements, under the original

4    indemnity agreement, we'll look at that in a moment, but it's

5    attached to this document, what happens to the assets of the

6    folks that are indemnifying these bonds?

7    A    They're pledged to the surety if we default on a bond.

8    Q    Now when was this signed?

9    A    The 11th day of January 2011.

10   Q    And the letter that we just looked at a moment ago was

11   dated December 15, 2010?

12   A    Yes.

13   Q    Okay.  Now let's go back to that just for a moment.  And

14   let me just pull something else up here real quick.  And I

15   want to go to the Business Organization Act, which is on the

16   screen before you.  I'm sure you've seen this a hundred times

17   before, since we've been talking about it.

18        MR. KITCHENS:  Your Honor, is this an exhibit?

19   We're looking at a statute.

20        MR. SIMON:  I just am referring him to a --

21        THE COURT:  Let's see what the question is.

22   BY MR. SIMON:

23   Q    I just want to refer you to Item Number 4 -- first of

24   all, the lead-in paragraph says here factors indicating that

25   persons have created a partnership include the persons, and

Case 19-03452  Document 141  Filed in TXSB on 05/03/19  Page 234 of 299
Case 15-30781  Document 148  Filed in TXSB on 04/02/15  Page 163 of 197

163

1   then it lists a bunch of different things.  But the one I want

2   to just focus on right now is Item Number 4 where it says,

3   Agreements to share --

4           MR. KITCHENS:  Again, Your Honor, objection,

5   argument.  This is something for you and not Mr. Hassell.

6           THE COURT:  I want to hear what the question is.  I

7   think I -- I think the question is going to ask for a fact, so

8   let's see what it is.  If you have an objection --

9   BY MR. SIMON:

10  Q    I'm referring you to Section 4(b) of this statute.  Are

11  you reading that?

12  A    Section 4(b), Liability for --

13  Q    Yeah, just don't read it into the record, but --

14  A    Okay.

15  Q     -- I just want to ask you this question.

16  A    Yes.

17  Q    Did you believe that you were liable for the claims of

18  the joint venture?

19  A    Absolutely, yes.

20  Q    Did that have anything to do with the indemnification

21  agreement that you signed?

22  A    It did.

23  Q    All right.  Now let's go back to that December memo from

24  Philip.  The second bullet item says,

25          "All invoices will be prepared and checks cut to

Case 19-03452   Document 131   Filed in TXSB on 05/03/19   Page 235 of 299
Case 15-30781   Document 131   Filed in TXSB on 04/02/15   Page 164 of 199

164

1             vendors and subcontractors.  We will receive those

2             from you and we will prepare a check for them to you

3             and we will send them out."

4               Explain that to the Judge, what does that mean?

5   A    That means that we would -- my company would approve the

6   vendors and subcontractors invoices and pay requests, that we

7   would prepare the checks, approve the invoices, and send the

8   checks and the copies of the vouchers over to HCCI and then

9   they would cut me a check.

10   Q    And did that actually occur in these cases?

11   A    It did.

12   Q    Let's go to the third bullet point.  It says,

13          "All invoices that have issues or you wish to hold

14          because of performance quality, you will need to

15          notify them in writing and the funds will be held by

16          us until such time to release the check."

17           Was that accomplished?

18   A    Yes.

19   Q    The next one is,

20          "We will keep all bills current.  If you wish to

21          hold on to funds to get past lien rights for subs,

22          then we will hold it until such time as it is -- for

23          it to be released.  We will notify the bonding

24          company where all funds stand."

25           Explain that to the Judge.

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 236 of 299
Case 15-30781 Document 48 Filed in TXSB on 04/02/15 Page 165 of 197

165

1    A    What it means is, if we had a non-performing

2    subcontractor or non-performing material that we had to hold

3    the vendor responsible for, we had to notify Hassell so that

4    when Hassell's surety -- when the surety of the joint venture,

5    which was I believe Liberty at the time, got a lien release,

6    then Hassell would be aware of it in their office and could

7    respond accordingly.

8    Q    The next bullet point.

9         "We need to have a record of all lien releases from

10        major suppliers and all subcontractors to accompany

11        the pay requests, or to follow shortly thereafter.

12        If they follow, then we need a list so we can check

13        them off when we receive them."

14        Did that occur?

15   A    Yes.

16   Q    Then the next -- the last bullet point is,

17        "We will pay for appropriate work done.  We will not

18        pay for loaded up-front items, any items loaded will

19        be reduced to the true cost and paid accordingly."

20        What did you understand that to mean?

21   A    Sometimes in projects they have a bid item that's called

22   mobilization or move-in, and sometimes that can be as high as

23   10 percent of the total contract amount.  And so you really --

24   you would get paid that as you move on to the job, but you

25   really hadn't earned it because you hadn't incurred the cost

Case 4:15-03452  Document 141  Filed in TXSB on 05/03/19  Page 237 of 299
Case 4:15-30731  Document 141  Filed in TXSB on 04/02/15  Page 166 of 197

166

1    yet.  So they were saying until we incur that cost, we're not

2    funding you those funds, funding my company those funds.

3    Q    All right.  And were you okay with that?

4    A    Yes.

5    Q    And on the next page,

6         "We will need to see breakdown on all projects that

7         you are low bidder on.  We wish to have a supplier

8         and subcontractor list for our files, so this

9         information will need to be provided with your

10        subcontract after the job is brought out -- is

11        bought out.  If charges are made then we need to be

12        notified."

13            Was that followed?

14   A    Yes.

15   Q    The use of the word subcontract here, did you have any

16   subcontracts with Hassell Construction Company, Inc.?

17   A    At the very beginning in 2008-2009 we had a couple of

18   subcontracts with them, but not afterwards.

19   Q    Okay.  But at this particular time and going forward did

20   you have any subcontracts?

21   A    I did not.

22   Q    The next item is,

23        "No projects to be bid with subdivision or plat

24        bonds being required."

25            Explain that to the Court.

Case 19-03452  Document 141  Filed in TXSB on 05/03/19  Page 238 of 299
Case 15-30781  Document 141  Filed in TXSB on 04/02/15  Page 167 of 197

167

1     A     On some civil bids, the owner would require for you to

2     put up what's known as either a subdivision or a plat bond

3     that they have to give to the county when they register the

4     plat, file the plat with the county.

5           And that guarantees to the county that that

6     developer will finish that section that you're giving the bond

7     for.  They will complete the underground utilities and the

8     roadways and grade the lots.  That's what a plat bond means.

9     And Philip did not like to furnish or bid work together that

10    had a subdivision or plat bond requirement.

11    Q     And did you comply with that?

12    A     Yes.

13    Q     The next item down said,

14          "All jobs must flow through our office so that we

15          can stay current with the status of jobs."

16          THE COURT:  You skipped two items.

17          THE WITNESS:  You skipped --

18          MR. KITCHENS:  You skipped two.

19          MR. SIMON:  I'm sorry.  Excuse me.

20    BY MR. SIMON:

21    Q     No projects with two-year warranties.  Would you explain

22    that to the Court?

23    A     Because of the down turn in the economy, some contractors

24    had not finished or warrantied their work properly, so the

25    owners, to remedy that, had gone to a two-year warranty

Case 4:15-cv-03451 Document 141 Filed in TXSD on 05/03/19 Page 239 of 299
Case 4:15-cv-03451 Document 141 Filed in TXSD on 04/02/15 Page 168 of 197

168

1    instead of a one-year warranty.  And that required a two-year

2    warranty bond, and Philip did not want to provide those or bid

3    projects that required those.

4    Q    And did you comply with his wishes?

5    A    For the most part we did.  There was one owner that we

6    did one job for that wanted a two-year warranty that we were

7    able to get one to him because of the special relationship we

8    had with him.  But 99 percent of the time we did not.

9    Q    And the next one down says,

10        "All projects need to be sent to us with breakdowns

11        along with bonding company prior to bid bond

12        approval."

13            And did that occur?

14   A    It did.

15   Q    The next one down is,

16        "All job must flow through out office so that we can

17        stay current with status of jobs."

18            And did that occur?

19   A    Yes.

20   Q    The next one down says,

21        "Any paving jobs looked at in Harris County must be

22        discussed before bidding to see how long the jobs

23        will stay open before they are accepted, per the

24        contract and/or Harris County."

25            And did you comply with that?

Case 4:15-03452 Document 141 Filed in TXSB on 05/03/19 Page 240 of 299
Case 15-30781 Document 141 Filed in TXSB on 04/02/15 Page 169 of 197

169

1    A   We did.

2    Q   The next item down,

3    "All projects will be visited by us.  All major

4    projects we will be involved in, in the pre-cons,

5    partnering meetings, or any issue resolution

6    meetings."

7    And did all of those things occur?

8    A   Yes.

9    Q   And we're going to come back to that in just a moment.

10    "All future work under contract will be 1 percent

11    plus costs until such time as dad wishes or needs to

12    change."

13    Do you see that?

14    A   Yes.

15    Q   And could you explain what that meant?

16    A   That we would share in the profit of the projects that we

17    bid, that dad had changed it from 3 percent to 1 percent, and

18    that's how our agreement went forward.

19    Q   And then the last bullet point says,

20    "Communication with your office must be seamless for

21    us.  We need to be able to talk to any and all, if

22    need be.  We need to be treated as though we truly

23    are your partner and not just anybody."

24    Do you see that?

25    A   I do, and --

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 241 of 299
Case 15-30781 Document 481 Filed in TXSB on 04/02/15 Page 170 of 197

170

1    Q    Did you try to treat HCCI as your partner?

2    A    I did.

3    Q    And this is the last paragraph here.  Can you sort of

4    read it and summarize it for the Court as to what your

5    thoughts were about that?

6          MR. KITCHENS:  And, Your Honor, under completeness I

7    think the whole paragraph needs to be read, not just

8    summarized, into the record.

9          THE COURT:  Let me just read the whole paragraph.

10          MR. KITCHENS:  Yes.

11    BY MR. SIMON:

12    Q    Why don't you just read the whole paragraph into the

13    record.

14          THE COURT:  I can just read it.

15          MR. SIMON:  Excuse me?

16          THE COURT:  I can read it.

17          MR. SIMON:  That's what I thought.

18          THE COURT:  Yeah, I'm just going to sit and read it.

19      (Pause in the proceedings.)

20          THE COURT:  All right.  I've read it.  Thank you.

21          THE WITNESS:  Okay.

22    BY MR. SIMON:

23    Q    Did you agree with these sentiments that are in the last

24    paragraph?

25    A    Did I agree?

Case 1:5-03452 Document 141 Filed in TXSB on 05/03/19 Page 242 of 299
Case 15-30781 Document 481 Filed in TXSB on 04/02/15 Page 171 of 197

171

1    Q    Yeah.  Were you simpatico with these sentiments that your

2    half-brother, Philip, was expressing here in the last

3    paragraph?

4    A    Yes, I was.  Yeah.

5    Q    Did you feel as though there were tough times out there?

6    A    They were very tough times.

7    Q    Did you feel as though approaching those problems

8    together was better than trying to approach them apart?

9    A    Absolutely.

10   Q    And did you believe that HCCI felt the same way?

11   A    I did, and I also believed this last -- next to the last

12   sentence, that they did it because they loved me.

13   Q    Understood.  All right.  Let's go to the -- and just to

14   put it all into context here, where were you, again, with your

15   illness at this point in time in December of 2010?

16   A    2010 I had probably about 14 percent kidney function, I

17   was in end-stage renal failure, and was preparing I think in

18   October, or around this time, I had gone to get the fistule

19   put in my arm so I could become mature enough to start on

20   dialysis.

21         And then I went in May of 2011 to get a knee

22   transplant that had to be done before the transplant -- yeah,

23   a knee -- a total knee replacement which had to be done before

24   the transplant.  And after that operation I had massive blood

25   clots all over my body and almost died.

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 243 of 299
Case 15-30781 Document 181 Filed in TXSB on 04/02/15 Page 172 of 197

172

1    Q    Now let's go to the next exhibit.

2         (Pause in the proceedings.)

3    BY MR. SIMON:

4    Q    What are we looking at here, which is Petitioner

5    Exhibit 6?

6    A    This is a deed of trust, what's called a voluntary deed

7    of trust dated June 13, 2011 on a piece of property described

8    as 5302 Maple Street.

9    Q    And what obligations did this deed of trust secure?

10   A    It secured the joint venture line of credit.

11   Q    And what was the joint venture line of credit?

12   A    It was a working line of credit that we were using to do

13   these projects off of.

14   Q    So as they say in the vernacular, did you have skin in

15   this game?

16   A    I did, I had several pieces of properties.

17   Q    We're going to go through each one of them.

18   A    Okay.  Yes.

19   Q    Let's go to the next one.  And what was the date of this

20   deed of trust?

21   A    June 13, 2011.

22   Q    And what property did this cover?

23   A    (No audible response.)

24   Q    Well, let me -- I'm sorry.  Excuse me.  What property did

25   this one cover?

Case 19-03452   Document 141   Filed in TXSB on 05/03/19   Page 244 of 299
Case 25-30781   Document 41   Filed in TXSB on 04/02/25   Page 173 of 197

173

1   A    I'm looking for the address on here.  I don't see it.

2   Q    It's in Montgomery County.

3   A    Oh, this is our Conroe house.

4   Q    Is that on Lake Conroe?

5   A    It is.

6   Q    Okay.  Go to the next one, it's Exhibit 8.  And what

7   property was this?

8   A    6417 Buffalo Speedway in West University Place.

9   Q    Is that your homestead?

10  A    No, it's a rental property.

11  Q    All right.  And did this also secure the line of credit?

12  A    It did.

13  Q    And then let's go to Exhibit 9, Petitioner Exhibit 9, and

14  what deed of trust is this?

15  A    The deed for 6421 Buffalo Speedway in West University

16  Place.

17  Q    Is that your homestead?

18  A    No, it's not, it's a rental piece of property.

19  Q    Okay.  Let's go back to six for just a second.  5302

20  Maple in Bellaire.  Is that your homestead?

21  A    It is my homestead.

22  Q    So you had pledged your homestead, as well as all the

23  other rental properties, and your lakefront property.

24  A    I had.

25  Q    And what about your ranch?

Case 1:15-03452 Document 141 Filed in TXSB on 05/03/19 Page 245 of 299
Case 15-3081 Document 141 Filed in TXSB on 04/02/19 Page 174 of 197

174

1     A    I had pledged that also.

2     Q    Okay.  What was the net value that you placed on those

3     properties?

4     A    A little less than $5 million.

5     Q    When you say $5 million, you're talking about net of

6     first liens?

7     A    Correct.

8     Q    Okay.  Thank you.  Let's go to the next exhibit, and can

9     you tell the Court what this is all about?

10              MR. RIOS:  Objection, Your Honor, hearsay.

11              MR. WARD:  The exhibit is also not in evidence.

12              THE COURT:  I'm going to sustain the objection until

13    I get more.

14              MR. SIMON:  Thank you.

15    BY MR. SIMON:

16    Q    And let's take a look at Exhibit 11, Petitioner Exhibit

17    11.  Can you describe that for the Court?

18    A    We were working on this --

19              MR. KITCHENS:  Same objection, Your Honor.

20              THE COURT:  Well, it's not hearsay.

21              MR. KITCHENS:  It has not been admitted into

22    evidence.

23              THE COURT:  I'll sustain it if it's not been

24    admitted into evidence.

25              MR. SIMON:  We would offer it at this time, Your

Case 19-03452   Document 141   Filed in TXSB on 05/03/19   Page 246 of 299
Case 15-30781   Document 481   Filed in TXSB on 04/02/15   Page 175 of 197

175

1    Honor.

2            THE COURT:  So you'll need to more than offer it.

3    There's an objection, or a pending objection, you need to

4    prove it up.

5    BY MR. SIMON:

6    Q    Can you describe for the Court what Exhibit 11 is?

7    A    It is an email from me to Rosaline Hassell and Phil

8    Hassell regarding the Springwoods bid.

9    Q    All right.  And is this a true and correct copy of an

10   email that you sent out at this time?

11   A    Yes, it's sent from my Blackberry.

12           MR. SIMON:  I would like to offer Exhibit 11, Your

13   Honor, Petitioner Exhibit 11.

14           MR. KITCHENS:  Objection, Your Honor, relevance, and

15   no foundation for it.

16   BY MR. SIMON:

17   Q    Is this regarding the Springwoods project?

18   A    Yes.

19   Q    And is the Springwoods project one of the projects that

20   you claim to be a joint venture property?

21   A    Yes.

22           MR. SIMON:  Well, I certainly think it's relevant,

23   Your Honor.

24           THE COURT:  What's the purpose of the admission?

25           MR. SIMON:  The purpose of the admission is to just

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 247 of 299
Case 15-30781 Document 48-1 Filed in TXSB on 04/02/15 Page 176 of 197

176

1   basically lead up to the actual letting of the contract to

2   show the Court what was going on between the parties as they

3   were getting ready to bid the contract, and the joint

4   participation of both Philip and Royce in that process.

5           MR. KITCHENS:  Well, only for that extent it has no

6   probative value whatsoever.  It doesn't tell the Court

7   anything, other than it was an email exchange that has the

8   word 14 million in it.

9           MR. SIMON:  Well, Your Honor, it talks --

10          THE COURT:  I'm going to admit 11; however, I'm not

11  admitting it for the truth of the statements in it.  The offer

12  that I'm admitting it on is to show a course of dealing

13  between the parties.  But it's a statement made by the witness

14  out of court on a fact that he's not testifying to today, so

15  it does contain hearsay.  But it is admitted for the purpose

16  of showing course of conduct and not for the truth, which is

17  really the fundamental offer that you're making.

18          MR. SIMON:  Thank you, Your Honor.

19          THE COURT:  So I'm admitting it but not for the

20  truth.

21          (Petitioner's Exhibit 11 received into evidence.)

22  BY MR. SIMON:

23  Q    Let's go to the next exhibit, which is Exhibit 12.  And

24  as we were getting close to the Springwoods project being bid

25  and accepted, I want to take you back to the email that we

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 248 of 299
Case 15-30781 Document 141 Filed in TXSB on 04/02/15 Page 148 of 197

177

1    looked at before where Phil had listed the bullet points that

2    we went through.  And let's go back to that for just a moment

3    because I wanted to tie that into what we're talking about

4    here.

5          One of the bullet points -- let me see if I can find

6    it quickly here -- talked about going to pre-cons and

7    partnering meetings or any issue resolution meetings, and I'm

8    pointing to that right here, which is mid-way down the page.

9    Do you see that?

10    A   I do.

11    Q   Okay.  Did that occur with respect to the Springwoods

12    project?

13    A   Yes, it did.

14    Q   And can you describe for the Court what happened?

15    A   The owner's engineer, after we were low bidder, sent me

16    an email asking to go to a meeting.

17          MR. KITCHENS:  Objection, Your Honor, hearsay.

18          THE COURT:  Sustained.

19    BY MR. SIMON:

20    Q   Just did you go to a meeting with your brother that took

21    place with the engineer on the project, on the Springwoods

22    project?

23    A   I did.

24    Q   And did your father -- or did your brother attend with

25    you?

Case 4:15-cv-03451  Document 141  Filed in TXSD on 05/03/19  Page 249 of 299
Case 4:15-cv-03451  Document 141  Filed in TXSD on 04/02/19  Page 178 of 197

178

1    A    He did.

2    Q    Why did you and your brother go to the meeting?

3    A    Because we were doing the project together.

4    Q    And what did your brother, Philip, tell the Springwoods

5    engineers at the meeting in your presence, and what did you

6    tell them?

7             MR. KITCHENS:  Objection, Your Honor, calls for

8    hearsay.  The witness is in court and can testify on cross-

9    examination.

10             THE COURT:  Overruled.

11             MR. SIMON:  Admission against interest, Your Honor.

12             THE COURT:  Statement of a party opponent, it's not

13   hearsay.  Go ahead.

14             THE WITNESS:  I told him that --

15             THE COURT:  No, no, that wasn't the question.

16   BY MR. SIMON:

17   Q    What did your brother tell them?

18   A    Oh, I thought you asked me.  My brother told them that we

19   could do the job, we had the manpower to do the job, that when

20   the owner asked the question regarding Hassell versus R.

21   Hassell, who was going to be doing the job, he said, We're a

22   family, we work together.  If you see one of us, you see both

23   of us.  And he went on to say that we were very safety

24   conscious.  They asked us when we could get started; we told

25   them.  He asked -- they talked to us about some paving issues,

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 250 of 299
Case 15-30781 Document 148 Filed in TXSB on 04/02/15 Page 179 of 197

179

1    we had some --

2            THE COURT:  No, no, no.  The question is, what did

3    your brother say to them.  You've got to stick to that

4    question.

5            THE WITNESS:  Okay.  I'm sorry, Your Honor.

6            THE COURT:  And maybe you've answered it at this

7    point, which is fine.

8            THE WITNESS:  I think so.

9            THE COURT:  You've told me a lot of what he said.

10           THE WITNESS:  Okay.

11   BY MR. SIMON:

12   Q    Did you follow, at least in your mind, all the tenets of

13   the bullet points that were set out in the December 15, 2010

14   email that your brother sent to you?

15   A    The majority of them, yes.

16   Q    In connection with the Springwoods project?

17   A    Yes.

18   Q    Was your brother fully aware of the amount of the

19   contract?

20   A    Yes, he was.

21   Q    Did he approve the contract?

22   A    He approved the contract and he approved the bid.

23   Q    Well, did he sign the contract?

24   A    I don't remember who signed the contract.

25   Q    I think there's a copy of the contract in the Defendant's

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 251 of 299
Case 15-30781 Document 48 Filed in TXSB on 04/02/15 Page 180 of 197

180

1    exhibits, and -- I mean in RHHC's exhibits, and we'll pull it

2    up in a second, but let me just continue on.  Who -- between

3    Hassell Construction Company, Inc. and R. Hassell Companies,

4    who performed services on the Springwoods project?

5    A    We both did.

6    Q    And who provided equipment for the performance of the

7    Springwoods project?

8    A    I provided probably 99 -- my companies provided probably

9    99 percent of the equipment.

10   Q    And who handled the accounting for the project?

11   A    HCCI.

12   Q    And who issued -- what name was the bond issued under?

13   A    The bond was -- the name on the bond was Hassell

14   Construction Company.

15   Q    And were the R. Hassell companies and you and your wife

16   responsible for any claims under the indemnity contract at

17   that time?

18   A    Yes, we were.

19   Q    Was there an agreement to split profits on that

20   particular job?

21   A    Yes, there was.

22   Q    And what was that agreement?

23   A    The agreement was that they would get about 10 percent of

24   what our bid profits would be, which equaled about 1 percent

25   of the total contract amount.

Case 4:19-cr-03451 Document 141 Filed in TXSB on 05/03/19 Page 252 of 299
Case 4:15-cr-30781 Document 48 Filed in TXSB on 04/02/15 Page 181 of 197

181

1    Q    And who got the remainder of it?

2    A    My companies.

3    Q    And did you company and HCCI sign any kind of a

4    subcontract agreement?

5    A    We did not.

6    Q    Were you acting as a subcontractor to your brother's

7    company in connection with the Springwoods project?

8    A    No.

9    Q    Did your brother and his personnel keep tabs on the

10   physical progress of the project?

11   A    Yes, he did.

12   Q    And let's take a look at Exhibit 18 of the Hassell

13   Construction Company, Inc. exhibits.  Let me pull it up for

14   you.  Do you recognize this?

15   A    Yes.

16   Q    And what is it?

17   A    This is the contract on Springwoods between the owner and

18   Hassell Construction Company, Inc.

19   Q    And how much was the contract for?

20   A    Fourteen million six hundred and ninety dollars seven

21   eighty-six point eight oh.

22   Q    And I know this is hard to look at, but who signed this

23   contract on behalf of Hassell Construction Company, Inc.?

24   A    Ernest Joseph Rebecek.

25   Q    And who is Ernest Joseph Rebecek?

Case 19-03452   Document 141   Filed in TXSB on 05/03/19   Page 253 of 299
Case 15-30781   Document 141   Filed in TXSB on 04/02/15   Page 182 of 199

182

1    A    The executive vice president for Hassell Construction

2    Company.

3    Q    Now did you make it perfectly clear to the owner of the

4    project who was going to be responsible for performing work on

5    the project?

6            MR. KITCHENS:  Objection, Your Honor, the response

7    calls for hearsay.

8            THE COURT:  Tell me why.

9            MR. KITCHENS:  Your Honor, if -- we do not know what

10   the owner would say.  He's not here to testify.

11           THE COURT:  I'm going to sustain because you're

12   asking him for a conclusion as to what was perfectly clear to

13   somebody else.

14           MR. SIMON:  Okay.

15   BY MR. SIMON:

16   Q    Did you tell the owner that your company was going to be

17   the company that was going to be performing most of the work

18   at the project?

19   A    Yes.

20   Q    And on how many occasions did you make that statement to

21   the owner?

22   A    We made it at this meeting.

23   Q    You're talking about the pre-meeting?

24   A    We talked about it at the pre-meeting, and also out in

25   the field we talked about it.

Case 4:19-cv-03451 Document 141 Filed in TXSB on 05/03/19 Page 254 of 299
Case 4:15-cv-30731 Document 43 Filed in TXSB on 04/02/15 Page 183 of 197

183

1    Q    Whose supervisors were on the job?

2    A    My company's.

3    Q    And whose name was on the equipment that was being used

4    at the project?

5    A    My company's.

6    Q    How many different pieces of equipment had to be utilized

7    in this particular job?

8    A    Probably 40.

9    Q    What were some of the larger pieces of equipment?

10   A    We had backhoes, bulldozers, motor graders, front-end

11   loaders.

12   Q    And all of those, did they have the name of your

13   companies on them?

14   A    They did.

15          THE COURT:  I'm just trying to understand when

16   you're saying they had your name on them, are you telling me

17   they had your name on the title of them, or like emblazoned on

18   the side of the bulldozer?

19          THE WITNESS:  On the side, Your Honor.

20          THE COURT:  And what would it say on the side?

21          THE WITNESS:  RHHC, R. Hassell & Company, R. Hassell

22   Companies.

23   BY MR. SIMON:

24   Q    In other words, the name was printed or painted on the

25   equipment?

Case 19-03452   Document 141   Filed in TXSB on 05/03/19   Page 255 of 299
Case 15-30781   Document 141   Filed in TXSB on 04/02/15   Page 184 of 197

184

1    A    We had stickers.

2    Q    You had stickers?

3    A    Yes.

4    Q    Okay.

5         THE COURT:  And was that -- are these like small

6    stickers so that one can go and locate them, or were they

7    stickers to identify --

8         THE WITNESS:  The company.

9         THE COURT:   -- more as advertising?

10        THE WITNESS:  Yeah, it was advertising stickers.

11   BY MR. SIMON:

12   Q    And did Hassell Construction Company, Inc.'s equipment

13   also have stickers on them?

14   A    Yes.

15   Q    Were they also for purposes of advertising?  I mean large

16   enough to be --

17   A    Yes, yes.

18   Q     -- for the purpose of advertising.

19   A    Yes.

20   Q    Did HCCI also provide labor to the job site?

21   A    They provided a minimal amount of labor, yes.

22   Q    And where did the money come in from the owner as

23   progress payments were being paid?

24   A    They went to Hassell -- HCCI's office.

25   Q    And how would the process go for submitting pay requests

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 256 of 299
Case 15-30781 Document 141 Filed in TXSB on 04/02/15 Page 185 of 197

185

1    and obtaining payment for your company and subcontractors, how

2    did that flow?

3    A    My employee in the field, Ricardo, would fill out the pay

4    requests and send it to the owner and copy Joe Rebecek with

5    it.  And Joe Rebecek would take their profit off of it and

6    then do a net amount and turn that in for payment or credit to

7    me, and then they would deduct from that materials that had

8    been ordered on the project and write me a check.

9    Q    Who paid the subcontractors on the job -- or let me re-

10   state that.  Were there any subcontractors on the job?

11   A    Yes, there were.

12   Q    And who paid the subcontractors?

13   A    Hassell paid some and I paid some.

14   Q    All right.  And when you paid them did you pay them with

15   an R. Hassell & Company check?

16   A    I did.

17   Q    And when they paid them did they pay them with a Hassell

18   Construction Company, Inc. check?

19   A    They did.

20   Q    I want to go back here for a second to the partnership

21   law again, and I just want to ask you some questions.  Do you

22   believe that you and your company had the right to receive a

23   share of the profits in the Springwoods project?

24   A    Yes.

25   Q    And do you believe that there was an expression of intent

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 257 of 299
Case 15-36781 Document 131 Filed in TXSB on 04/02/15 Page 186 of 197

186

1    between you and your brother representing your respective

2    companies to be partners?

3    A    Yes.

4    Q    And I'm talking about with respect to the Springwoods

5    project.

6    A    I do.

7    Q    And do you believe that your company had a right to

8    participate in the control of the business?

9    A    We did.

10   Q    And do you believe that Hassell Construction Company,

11   Inc. had the right to participate in the control of the

12   business?

13   A    Yes.

14   Q    And did you have an agreement to contribute money or

15   property to the business?

16   A    Yes, I did.

17   Q    And we've been through the deeds of trust, do you believe

18   that that was a valid contribution to this business?

19   A    I do.

20   Q    Was it significant?

21   A    It's $5 million worth, yes.

22   Q    And did you also contribute equipment?

23   A    I did.

24   Q    And did you contribute manpower?

25   A    Yes.

Case 19-03452  Document 141  Filed in TXSB on 05/03/19  Page 258 of 299
Case 15-30781  Document 48  Filed in TXSB on 04/02/15  Page 187 of 197

187

1    Q    And management?

2    A    Yes.

3    Q    And did Philip and his company contribute management and

4    employees?

5    A    Yes.

6    Q    And did they contribute funding as well?

7    A    They did.

8    Q    And did they do that through the line of credit?

9    A    Yes.

10   Q    Now did there come a time when R. Hassell & Company took

11   out a separate line of credit in order to fund the Springwoods

12   project?

13   A    Yes, we did.

14   Q    And when did that happen?

15   A    September of '11 I believe is when we signed the note.

16   Q    And what was the name of the bank?

17   A    Allegiance.

18   Q    How much was the line of credit?

19   A    Half a million dollars.

20   Q    And did two of your properties get released from the

21   liens that were in favor of the line of credit?

22   A    Yes.

23   Q    And did you use those properties to secure the Allegiance

24   line of credit?

25   A    I did.

Case 4:15-cv-03721 Document 148 Filed in TXSD on 04/02/15 Page 188 of 197
Case 19-03452 Document 131 Filed in TXSB on 05/03/19 Page 259 of 299

188

1   Q    And did your company use the monies from that loan to
2   fund the payment of employees and other obligations related to
3   the Springwoods project?
4   A    Yes, we did.
5            THE COURT:  Was there ever a time when the two
6   companies disagreed on how to handle something at one of the
7   projects?
8            THE WITNESS:  Yes, sir.
9            THE COURT:  Give me an example if you would, please.
10           THE WITNESS:  We had a non-performing subcontractor
11  that we want --
12           THE COURT:  At Springwoods?
13           THE WITNESS:  I'm sorry?
14           THE COURT:  At Springwoods?
15           THE WITNESS:  Oh, no, sir, it was on a different
16  project.
17           THE COURT:  Which project?
18           THE WITNESS:  Wayne Gray.
19           THE COURT:  Okay.
20           THE WITNESS:  It was a building project.
21           THE COURT:  That was the one where you had a
22  subcontract.  Right?
23           THE WITNESS:  Yes, sir.
24           THE COURT:  Is there one though where there wasn't a
25  subcontract where you all had a disagreement over what to do?

Case 1:15-cv-03452 Document 141 Filed in TXSD on 05/03/19 Page 260 of 299
Case 15-3073-1 Document 141 Filed in TXSD on 04/02/15 Page 189 of 197

189

1        THE WITNESS:  Yes, sir, the same scenario, we had a

2   non-performing subcontractor that we withheld funds on and

3   there was discussion on whether we should really -- how much

4   we should hold and should we really be holding funds and the

5   surety -- because it would make the surety upset to be

6   receiving lien notices in.

7        THE COURT:  And you took one position and your

8   brother took a different position?

9        THE WITNESS:  My brother or my sister.

10       THE COURT:  One of them took a different position.

11       THE WITNESS:  Yes, sir.

12       THE COURT:  How did you all resolve the difference

13  of opinion?

14       THE WITNESS:  Well, we'd either talk about it and --

15  well, we'd talk about it and resolve it.  Sometimes they won,

16  sometimes I won.

17       THE COURT:  Well, but -- then, in fact, whatever

18  disagreements you had, you all would end up reaching a

19  consensus one way or the other?

20       THE WITNESS:  Well, yes, sir, we had to, yeah, to

21  move the project forward and move funding --

22       THE COURT:  Was there ever though an issue where you

23  all didn't reach a consensus so that one party had to act

24  without the consent of the other party?

25       THE WITNESS:  Not that I'm aware of.

Case 19-03452 Document 181 Filed in TXSB on 05/03/19 Page 261 of 299
Case 15-36781 Document 181 Filed in TXSB on 04/02/15 Page 190 of 197

190

1      THE COURT:  Okay.  Was there any understanding about
2  what would happen if there wasn't a consensus on how to act,
3  did you ever have a discussion with Philip or anyone else on
4  how you all would proceed if the two parties didn't agree on
5  something?
6      THE WITNESS:  No.  Normally all four of us would get
7  in a room, if it was something really major, and work it out.
8      THE COURT:  Okay.  Thank you.
9      Go ahead, please, Mr. Simon.
10 BY MR. SIMON:
11 Q   Maybe the Judge was asking you this, was there -- was the
12 word arbitration --
13     THE COURT:  I wasn't going towards arbitration at
14 all.  You're welcome to ask him that, but I --
15     MR. SIMON:  Okay.  I thought maybe that's where
16 you --
17     THE COURT:  No, I really just trying to figure out
18 if there was any understanding between the parties.  If this
19 was a partnership, one of the common things of a formal
20 partnership agreement is you would say, Decisions are made by
21 X percent vote or something of that nature.  And I didn't know
22 if they had any formal understanding about that.
23 BY MR. SIMON:
24 Q   Did you have any formal understanding as to percentages
25 in terms of who could out-vote who?

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 262 of 299
Case 15-03721 Document 41 Filed in TXSB on 04/02/15 Page 191 of 197

191

1    A     Well, since it was the four of us, three people could

2    out-vote one person.

3            THE COURT:  Well, that's within HCCI.  I'm talking

4    about a joint venture between HCCI on the one hand where they

5    could out-vote you, and then R. Hassell on the other hand, if

6    those entities have a disagreement.

7            THE WITNESS:  I never really thought about that.  I

8    think that they could have -- they didn't do this, but they

9    could have out-voted me and withheld funds.

10           THE COURT:  HCCI as an entity --

11           THE WITNESS:  Yes.

12           THE COURT:   -- could have just not given you money.

13           THE WITNESS:  Yes.

14           THE COURT:  Right.

15           THE WITNESS:  Because of the flow of the money

16   through HCCI.

17           THE COURT:  Okay.  Thank you.

18   BY MR. SIMON:

19   Q     Did that ever occur?

20   A     Only in the circumstance when we were talking about a

21   subcontractor and funding a subcontractor if we had a problem

22   with the subcontractor, like this previous bullet said, that

23   we would have to give an accounting until we got all that

24   straight, and the reasons why.  But then once we got it

25   straight, they would fund it.

Case 19-03452  Document 141  Filed in TXSB on 05/03/19  Page 263 of 299
Case 15-30781  Document 48  Filed in TXSB on 04/02/15  Page 192 of 197

192

1    Q    I guess the question I'm asking is, did they ever come to
2    you and say, with words to this effect, We don't like what
3    you're doing, we want you to do something different, and if
4    you don't do that, we're not going to pay you, that you can
5    recall?
6    A    Not during this time, no.
7    Q    Okay.  All right.  Now you heard testimony from Steve
8    Ligon as to the amounts of receivables that were in existence
9    at HCCI on June 30 -- as of June 30, 2012 from your company
10   and from HCM, the management company, Hassell Management
11   Company, HM --
12   A    S.
13   Q    -- S, Hassell Management Services, LLC.  And I guess I'm
14   jumping the gun here because that's really at the end of
15   December 2012, and so let me come back and ask you that when
16   we get closer to that point.  Okay?  Let's continue on with
17   the exhibits.
18            Can you describe for the Court what Exhibit 20 is?
19   A    Exhibit 10?
20   Q    I'm sorry.  No, HCCI -- excuse me, I'm on the wrong
21   exhibit.  Excuse me.  I apologize.  I think we're over here.
22   What is this email?
23   A    It's an email for Joe Rebecek to me, copy to Philip, the
24   subject is Springwoods.  Joe was asking me to send him a copy
25   of --

Case 19-03452   Document 131   Filed in TXSB on 05/03/19   Page 264 of 299
Case 15-30781   Document 131   Filed in TXSB on 04/02/15   Page 193 of 197

193

1          MR. KITCHENS:  Objection, Your Honor, not in
2     evidence, also hearsay.
3          MR. SIMON:  I think it's been admitted.
4          THE COURT:  Fourteen is not in evidence.
5     BY MR. SIMON:
6     Q    Is Joe Rebecek an employee of HCCI?
7     A    Yes, he is.
8     Q    Is he an executive vice president of HCCI?
9     A    Yes, he is.
10          MR. SIMON:  Your Honor, this is an admission against
11     interest.
12          MR. KITCHENS:  How's that an admission against
13     interest?
14          THE COURT:  Well, it's a statement of a party
15     opponent.
16          MR. SIMON:  A statement of a party opponent.  I
17     apologize.
18          THE COURT:  Yeah, but why is it hearsay?
19          MR. KITCHENS:  Pardon me?
20          THE COURT:  Why is it hearsay?
21          MR. KITCHENS:  Mr. Rebecek is not here.
22          THE COURT:  It doesn't matter whether he's here or
23     not.  It's a statement by -- unless you're going to allege
24     that Mr. Rebecek made the statement not in his capacity as an
25     agent of Hassell Construction --

Case 19-03452   Document 141   Filed in TXSB on 05/03/19   Page 265 of 299
Case 15-30781   Document 48-1   Filed in TXSB on 04/02/15   Page 194 of 197

194

1    MR. KITCHENS:  I'll withdraw the objection, Your

2    Honor.

3            THE COURT:  Yeah, 14's admitted.

4            MR. SIMON:  Thank you, Your Honor.

5        (Petitioner Exhibit 14 received into evidence.)

6    BY MR. SIMON:

7    Q    What spreadsheet is he talking about there, Royce?

8    A    The Springwoods spreadsheet, the bid spreadsheet that I

9    was working on.

10   Q    Okay.  And let's go to the next exhibit.  Here's another

11   email from Mr. Rebecek to Philip Hassell.  And would you tell

12   the Court what this is all about?

13           THE COURT:  I don't think 15's admitted either.

14           MR. SIMON:  Your Honor, again, this is -- these are

15   all admissions --

16           THE COURT:  I just want to be --

17           MR. SIMON:   -- of a party opponent.

18           THE COURT:  I got it, I want to be formal about what

19   we're doing here.

20           MR. SIMON:  I'd like to offer it.

21           MR. KITCHENS:  No objection, Your Honor.

22           THE COURT:  Fifteen's admitted.

23        (Petitioner Exhibit 15 received into evidence.)

24   BY MR. SIMON:

25   Q    What is this all about?

Case 19-03452   Document 141   Filed in TXSB on 05/03/19   Page 266 of 299
Case 15-30781   Document 148   Filed in TXSB on 04/02/15   Page 195 of 197

195

1    A    The subject is Springwoods pay estimate number one.  Joe

2    is writing Phil saying he just received my company's pay

3    request to them for Springwoods estimate number one, and that

4    we are billing 99 percent and they're netting 1 percent.  Joe

5    says, I don't think this is the deal, but you need to confirm

6    before I pay it.

7    Q    All right.  Did that get resolved?

8    A    Yes, it did.

9    Q    And was it 1 percent?

10   A    Yes.

11   Q    And we're now looking at an August 31, 2011 release,

12   which is Petitioner Exhibit 16.  And whose signature appears

13   on that?

14   A    Shawn Potts.

15   Q    And is this the release that we talked about with respect

16   to the real estate that was used to borrow the money from

17   Allegiance?

18   A    Yes, it is.

19           MR. SIMON:  Your Honor, I would offer Petitioner

20   Exhibit 16.

21           MR. KITCHENS:  No objection.

22           THE COURT:  It's admitted.

23       (Petitioner Exhibit 16 received into evidence.)

24           THE COURT:  So it's 5:00 o'clock, and I think

25   Mr. Kitchens had somewhere he needed to go.  Can you get to a

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 267 of 299
Case 15-36781 Document 141 Filed in TXSB on 04/02/15 Page 196 of 197

196

1    breaking point pretty quick so that --

2            MR. SIMON:  I'm at a breaking point.

3            MR. KITCHENS:  I think we're all at a breaking

4    point.

5            THE COURT:  Then we'll adjourn till -- I think we

6    said 9:15 tomorrow.  Is that right?

7            MR. KITCHENS:  That's right.

8            MR. SIMON:  Yes, sir.

9            THE COURT:  I'll see you all at 9:15 in the morning.

10           MR. RIOS:  Your Honor --

11           THE COURT:  You can -- yeah.

12           MR. RIOS:  Can we leave exhibits and things of that

13    nature in the courtroom?

14           THE COURT:  You can.  Let me look and see if you can

15    actually leave the tables cluttered.  I've got two consumer

16    hearings that are going to be at 9:00 o'clock, they aren't

17    going to take any longer than the one that I interrupted you

18    for earlier today.  If you can just leave the interior edges

19    of the tables, that'll be enough and you can leave your stuff

20    even spread out.  I can't guarantee its safety, but I've never

21    had a problem, so --

22           MR. RIOS:  Thank you, Your Honor.

23           THE COURT:   -- you all do what you need.  Thank

24    you.

25           (Hearing adjourned at 5:01 p.m.)

Case 19-03452 Document 141 Filed in TXSB on 05/03/19 Page 268 of 299
Case 15-30781 Document 481 Filed in TXSB on 04/02/15 Page 197 of 197

197

1                              * * * * *

2          I certify that the foregoing is a correct transcript

3     to the best of my ability from the electronic sound recording

4     of the proceedings in the above-entitled matter.

5          /S/  MARY D. HENRY

6     CERTIFIED BY THE AMERICAN ASSOCIATION OF

7     ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**D-337

8     JUDICIAL TRANSCRIBERS OF TEXAS, LLC

9     JTT INVOICE #53741

10    DATE:  APRIL 2, 2015

# EXHIBIT
# 31

AAA CONSTRUCTION ARBITRATION

| | | |
|---|---|---|
| JAMES C. HASSELL, ET AL., | § | |
|     *Claimants*, | § | |
| | § | Case No. 01-14-0000-3178 |
| v. | § | |
| | § | Panel Chair: James C. Phillips |
| R. HASSELL HOLDING CO., INC., | § | Case Manager: Erika Kleinschmidt |
| ET. AL. | § | |
|     *Respondents*. | § | |

## CLAIMANTS' POST HEARING BRIEF

NOW COME Claimants/Counter-Respondents, and in support of their request for an Award in their favor, submit this, their post hearing brief, and show as follows:

### Parties

1.    Claimants are James C. Hassell ("JCH") and Hassell Construction Company, Inc. ("HCCI").  Counter-Respondents are Hassell Management Services, LLC ("HMS"), Shawn Potts, James C. Hassell, and HCCI.  (Because Respondent Royce Hassell has brought a derivative claim on behalf of HCCI against HCCI's and HMS' officers and directors, putative Counter-Respondents are also those officers and directors, i.e., Phillip Hassell and Michael Hassell.)  Claimants and Counter-Respondents will be collectively referred to as Claimants when their individual names are not used.

2.    Respondents and Counter-Claimants are Royce and Silvia Hassell, ("RH" and "SH" respectively), R. Hassell Builders, ("RHB"), R. Hassell & Company ("RHC"), R Hassell Holding Company ("RHHC"), and G. R. Group Resources ("GRG"), and RH in his alleged derivative capacity as a shareholder, on behalf of HCCI.  They may be sometimes collectively referred to as Respondents, when their individual names are not used.

### Jurisdiction and Authority

**The Non-Signatory Issue**

3.    RH and SH still allege that this Panel does not have jurisdiction over them.  This is despite prior rulings to the contrary, from this Panel, as well as the District Court, in which various

# EXHIBIT
# 32

**FILED**
**Chris Daniel**
**District Clerk**

**NOV 1 7 2014**

Time:_____
Harris County, Texas

By_____
Deputy

CAUSE NO. 2013-61995

P4
C C SLX
LIFTX
CCS LZ
CSL

R. HASSELL & CO., INC.; §
R. HASSELL BUILDERS, INC.; §
R. HASSELL HOLDINGS CO., INC.; §
and G.R. GROUP RESOURCES, LLP §
    Plaintiffs, §
§
vs. §
§
HASSELL CONSTRUCTION CO., INC.; §
and HASSELL MANAGEMENT §
SERVICES, LLC §
    Defendants. §

IN THE DISTRICT COURT OF

HARRIS COUNTY, TEXAS

125TH JUDICIAL DISTRICT

## ORDER GRANTING DEFENDANTS'/THIRD-PARTY DEFENDANTS' MOTION TO CONSOLIDTE

ON THE DATE SET FORTH BELOW, came on to be heard, Defendants/Third-Party Defendants Hassell Construction Co., Inc. and Hassell Management Services, LLC's ("Defendants") Motion to Consolidate ("Motion"). The Court, after having considered the Motion, all pleadings, all exhibits, responses and argument of counsel is of the opinion that the Motion is with merit and should, in all things, be GRANTED. It is, therefore,

ORDERED that: (1) Cause No. 2014-27280, *Royce Hassell and Silvia Hassell v. James C. Hassell and Shawn Hassell Potts*, in the 157th Judicial District Court of Harris County, Texas; (2) Cause No. 2014-36326, *Royce J. Hassell and Silvia T. Hassell v. James C. Hassell and Hassell Contruction Company, Inc.*, in the 125th Judicial District Court of Harris County, Texas; and (3) Cause No. 2014-00928, with regard to the claims filed by the Third-Party Plaintiffs Royce James Hassell and Sylvia Todeschini Hassell against Third-Party Defendants Shawn Hassell Potts, individually and as trustee, and James C. Hassell, individually in *Ali Reza Motzmedi v. Royce James Hassell, et al.*, in the 125th Judicial District Court of Harris County, Texas shall be

1

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

consolidated for all purposes with the above-styled matter (Cause No. 2013-619950, *R. Hassell &*

*Co., Inc., et al v. Hassell Construction Co., Inc., et al*, in the 125th Judicial District Court of Harris

County, Texas).   It is, further

ORDERED that the Court's previous Order of March 3, 2014 (Exhibit "A") is lifted for

purposes of the pending Motion and for enforcement.   It is, further

ORDERED that all previous Orders entered by this Court in Cause No. 2013-61995, *R.*

*Hassell & Co., Inc., et al v. Hassell Construction Co., Inc., et al*, in the 125th Judicial District Court

of Harris County, Texas shall apply to the consolidated matters.

SIGNED this __17__ day of __November__, 2014.

_____
JUDGE PRESIDING

2

**FILED**
Chris Daniel
District Clerk

MAR 0 3 2014

Time:_____
Harris County, Texas
By_____
Deputy

CAUSE NO. 2013-61995

R. HASSELL & CO, INC.;                    §
R. HASSELL BUILDERS, INC.;                §
R. HASSELL HOLDING CO., INC;              §
G.R. GROUP RESOURCES, LLP                 §
                                          §
        PLAINTIFFS,                       §
                                          §
VS.                                       §
                                          §
HASSELL CONSTRUCTION CO., INC.;           §
HASSELL MANAGEMENT                        §
SERVICES, LLC                             §
                                          §
        DEFENDANTS                        §

IN THE DISTRICT COURT

*p2
ARBIX
PABAX*

125ᵀᴴ JUDICIAL DISTRICT

HARRIS COUNTY, TEXAS

**ORDER**

On this the _____ day of _____, 2013, came to be heard DefendantsHassel Construction Co., Inc. and Hassell Management Services, LLC's ("Defendants")Motion to Compel Arbitration and Abatement Pending Arbitration against R. Hassell & Co, Inc., R. Hassell Builders, Inc., R. Hassell Holding Co., Inc., and G.R. Group Resources, LLP ("Plaintiffs"), and the Court having considered the motion and being of the opinion that the motion is in all things proper, it is hereby

ORDERED that Defendants' Motion to Compel Arbitration and Abatement Pending Arbitration is granted; it is further

ORDERED that this matter is referred to arbitration in accordance with the arbitration agreement executed between Plaintiffs and Defendants; it is further

ORDERED that any and all claims and causes of action asserted by Plaintiffs against Defendants in the referenced lawsuit are abated until the arbitration award is rendered; it is further

1

ORDERED that Plaintiffs shall commence arbitration proceedings with the American Arbitration Association pursuant to the arbitration agreement within 60 days from the entry of this Order.  Upon notice by any party that such arbitration has not been commenced within said period, this Court shall dismiss this case without prejudice and all costs shall be taxed against Plaintiffs.

SIGNED on this the ___3___ day of __March__, 2013.

JUDGE PRESIDING

Unofficial Copy Office of Chris Da... District Clerk

2

# EXHIBIT
# 33

P1
RECUX
(M) TRANX

**CAUSE NO. 2013-61995**

| | | |
|---|---|---|
| R. Hassell & Co. Inc., R. Hassell Builders, Inc. | § | IN THE DISTIRCT COURT OF |
| R. Hassell Holding Co. Inc, and G.R. Group | § | |
| Resources LLP | § | |
| | § | HARRIS COUNTY, TEXAS |
| VS | | |
| | § | |
| Hassell Construction Co. Inc, and Hassell | § | |
| Management Services, LLC | § | 125th JUDICIAL DISTRICT |

**F I L E D**
Chris Daniel
District Clerk

MAR - 9 2018

Time: 1:55pm
Harris County, Texas
By_____
Deputy

**ORDER OF RECUSAL AND TRANSFER**

It is ORDERED that I recuse myself and refer this case to the Administrative Judge of the Civil Trial Division for transfer to another court.

Signed on _March 9_____ 2018.

_____
Judge Presiding, ___125th___ District Court

**ORDER**

It is ORDERED that the District Clerk of Harris County transfer the above-styled and numbered cause from the _____125th_____ District Court to the __61st__ District Court.

Signed on __MAR - 9 2018_____, 2018.

_____
~~Sylvia Mathews~~  *Mike Engelhart*
Administrative Judge, Civil Division

Unofficial Copy Office of Chris Daniel District Clerk

**RECORDER'S MEMORANDUM**
This instrument is of poor quality
at the time of imaging

# EXHIBIT 33

P1
RECUX
TRANX

**CAUSE NO. 2013-61995**

| | | |
|---|---|---|
| R. Hassell & Co. Inc., R. Hassell Builders, Inc. | § | IN THE DISTIRCT COURT OF |
| R. Hassell Holding Co. Inc, and G.R. Group | § | |
| Resources LLP | § | |
| | § | HARRIS COUNTY, TEXAS |
| VS | | |
| | § | |
| Hassell Construction Co. Inc, and Hassell | § | |
| Management Services, LLC | § | 125th JUDICIAL DISTRICT |

**FILED**
Chris Daniel
District Clerk

MAR - 9 2018

Time: 1:55pm
By
Harris County, Texas
Deputy

**ORDER OF RECUSAL AND TRANSFER**

It is ORDERED that I recuse myself and refer this case to the Administrative Judge of the Civil Trial Division for transfer to another court.

Signed on _March 9_ 2018.

_____
Judge Presiding, __125th__ District Court

**ORDER**

It is ORDERED that the District Clerk of Harris County transfer the above-styled and numbered cause from the _____125th_____ District Court to the __61st__ District Court.

Signed on ____MAR - 9 2018____, 2018.

_____
~~Sylvia Mathews~~  *Mike Engelhart*
Administrative Judge, Civil Division

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

# EXHIBIT
# 35

PROCEEDING BEFORE THE
AMERICAN ARBITRATION ASSOCIATION
In Houston

| | | |
|---|---|---|
| JAMES C. HASSELL and HASSELL | § | |
| CONSTRUCTION COMPANY, INC., | § | |
|     *Claimants*, | § | |
| | § | |
| v. | § | |
| | § | |
| R. HASSELL HOLDING CO., INC., | § | Case No. 01-14-0000-3178 |
| R. HASSELL & COMPANY, INC., | § | |
| R. HASSELL BUILDERS, INC., | § | |
| G.R. GROUP RESOURCES LLP, | § | |
| ROYCE J. HASSELL and | § | |
| SILVIA T. HASSELL, | § | |
|     *Respondents*. | § | |

## CLAIMANTS' MOTION TO JOIN ADDITIONAL PARTIES

NOW COME CLAIMANTS, and pursuant to the Panel's Order #8, file this motion to join additional parties, and would show as follows:

1.    Claimants request that the Panel join as an additional party, R. Hassell Properties Inc.

2.    Attached as Exhibit A is an organizational chart, prepared for and attested by Respondent, Royce Hassell.  It demonstrates that R. Hassell Properties Inc, is a member of the Hassell 2012 JV.

3.    Its joinder as an additional party is necessary, if not indispensable, in order to give an ultimate Award in favor of Claimants, full relief against all members of the Hassell 2012 JV.

4.    This joinder will not delay the proceeding.  This joinder will not complicate the proceeding.  This joinder will simply afford full relief to Claimants in the event of an Award in their favor.

5.    Claimants contend that after the joinder of R. Hassell Properties Inc, all proper and necessary parties are before the Panel, and that no further parties are needed or should be joined.

6.      However, based on prior pleadings filed by Respondents, Claimants fear that Respondents will seek to add a great number of additional parties.

7.      In that event, and only in response to such a request by the Respondents, the Claimants suggest that if Respondents are allowed to join any other parties herein, the following additional parties should be joined as well, as aiders and abettors or participants in the wrongdoings by Respondents, as well as for disgorgement purposes of monies received by them, which monies were wrongfully taken or appropriated by Respondents, and used in part to benefit these individuals or entities, with their knowledge and/or consent, to wit:

a.      Pascal Piazza, attorney for Royce and Silvia Hassell, and their entities

b.      Terry Terrillio, R. Hassell/Part owner (now) of R Hassell Properties

c.      Ricardo Todeshini

d.      Walter Hassell

e.      Robert Hassell

f.      Juan Gonzales

g.      Gladis Todeshini

h.      Isabel Ripka

i.      Cynthia Grooms

j.      Travis Birdwell

k.      Robert Overbey, Jr.

l.      Suretec

m.      Trustmark Bank

WHEREFORE, PREMISES CONSIDERED, Claimants respectfully request that they be granted this relief, and other and further relief to which they may show themselves justly entitled.

Respectfully submitted,

*/s/ Bogdan Rentea*
Bogdan Rentea
Texas Bar No. 16781000

2

RENTEA & ASSOCIATES
700 Lavaca, Suite 1400-2678
Austin, Texas 78701
Tele: (512) 472-6291
Fax: (512) 472-6278
brentea@rentealaw.com
ATTORNEYS FOR CLAIMANTS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served upon all counsel of record, listed below, by Certified Mail, return receipt requested, or by facsimile, or by electronic transmission of same to them on the 18th day of November, 2016.

Silvia T. Hassell                    Via Email: sehassell@aol.com
12512 Cutten Road, Suite A
Houston, Texas 77066

Leonard H. Simon                 Via Email: lsimon@pendergraftsimon.com
Pendergraft & Simon, L.L.P.
The Riviana Building
2777 Allen Parkway, Suite 800
Houston, Texas 77019

*/s/ Bogdan Rentea*
Bogdan Rentea

# EXHIBIT
# 36

Case No. 1-14-0000-3178*; James C. Hassell, Hassell Management Company, Inc., and Hassell Construction Company, Inc. v. R. Hassell Holdings Co., Inc., R. Hassell & Company, Inc., R. Hassell Builders, Inc., G.R. Group Resources LLP, Royce J. Hassell and Silvia T. Hassell; Proceeding before the American Arbitration Association.*

<div style="background-color:#f5f0a9">

**Agreement to resolve HCCI Parties' Motion To Strike Respondents' Affirmative Claims By Reason Of Their Refusal To Pay Their Share Of AAA Administrative Fees/Deposit and Motion to Add R Hassell Properties, Inc, as an Additional Party**

</div>

The parties agree as follows:

1. Claimants and Respondents agree that the final hearing of this matter shall not exceed 10 days. Each party will have equal time (using the "chess clock" method).

2. Claimants and Respondents, respectively, shall each pay half of all fees, costs and deposits required by the AAA (the "AAA deposit", whether one or more).    All fees, costs and deposits (including those paid previously) shall be subject to reallocation by the Arbitrators as part of the final award.  Claimants shall not be required to pay any further sums for Respondent's  portion of the AAA's deposit.

3. Claimants shall be allowed to fund their share of the AAA deposit required by the AAA in installments in advance of the hearing.   Failure by claimants to fully fund the deposit not later than the 30th day before the hearing, shall result in the Respondents' claims being stricken by the Arbitrators.

4. Clamaints and Respondents withdraw all pending motions to join parties to Case No. 1-14-0000-3178, and agree not to re-urge those motions hereinafter.

5. Respondents shall be permitted to market and sell one of their real properties, which is subject to a second lien deed of trust under and subject to the following terms and conditions:

    a. The specific property and the sales price shall be subject Claimants prior  approval;
    b. The proceeds of the sales price shall be applied only as follows and only in the following order: (i) closing costs and first lien deed of trust, (ii) Respondent's share of the AAA deposit;  (iii) any amounts awarded to claimants in this proceeding and/or any debt for which the deed of trust was originally executed.
    c. Claimants and Respondents shall set up an escrow account for the purpose of facilitating item "iii" above.   Respondents shall have no ability to access, use or encumber or otherwise divert the proceeds of the sale to any other purpose;
    d. Claimants shall release all interest possessed by them in the single property selected and approved for sale, if any, by reason of a deed of trust in such property; and

1

     e. Any subsequently change of their homestead exemption by Royce and/or Silvia Hassell to any property other than their residence at 5302 Maple, shall be subordinate to any interest of Claimants in such subsequently designated property.

*Agreed:*

*Claimants:*

_____
*James C. Hassell, individually*

**Hassell Construction Company, Inc.**

_____
*By: James Phillip Hassell, Pres.*

*Respondents:*

**R. Hassell Holdings Co., Inc.**

_____
*By: Royce Hassell*
*Its:_____*

**R. Hassell & Company, Inc.**

_____
*By: Royce Hassell*
*Its:_____*

**R. Hassell Builders, Inc.**

_____
*By: Royce Hassell*
*Its:_____*

**G.R. Group Resources LLP**

_____
*By: Royce Hassell*
*Its:_____*

_____
**Royce J. Hassell, individually**

_____
**Silvia T. Hassell, individually**

2

# EXHIBIT
# 37

Filed 13 December 20 P2:21
Chris Daniel - District Clerk
Harris County
FAX15676834

CAUSE NO. 2013-61995

| | | |
|---|---|---|
| R. HASSELL & CO, INC.; | § | IN THE DISTRICT COURT |
| R. HASSELL BUILDERS, INC.; | § | |
| R. HASSELL HOLDING CO., INC; | § | |
| G.R. GROUP RESOURCES, LLP | § | |
| | § | |
| PLAINTIFFS, | § | |
| | § | |
| VS. | § | 125TH JUDICIAL DISTRICT |
| | § | |
| HASSELL CONSTRUCTION CO., INC.; | § | |
| HASSELL MANAGEMENT | § | |
| SERVICES, LLC | § | |
| | § | |
| DEFENDANTS | § | HARRIS COUNTY, TEXAS |

**DEFENDANTS' MOTION TO COMPEL ARBITRATION
AND ABATEMENT PENDING ARBITRATION**

TO THE HONORABLE JUDGE OF SAID COURT:

Defendants Hassell Construction Co., Inc. and Hassell Management Services, LLC ("Defendants") file this motion to compel arbitration and abatement pending arbitration against R. Hassell & Co, Inc., R. Hassell Builders, Inc., R. Hassell Holding Co., Inc., and G.R. Group Resources, LLP ("Plaintiffs") and would respectfully show as follows.

## A. INTRODUCTION

1.      In 2012, Plaintiffs and Defendants formed a joint venture and executed a Construction Joint Venture Agreement (the "JVA") dated July 1, 2012. The JVA contains a broad arbitration provision that mandates the arbitration of all disputes that arise between the parties.

2.      Specifically, paragraph 25 of the JVA contains an express and detailed dispute resolution and arbitration clause (the "Arbitration Provision"). See, Exhibit "A." The Arbitration Provision includes the following relevant language:

If a dispute arises that cannot be resolved through direct discussions, Joint Venturers shall participate in mediation before recourse to any form of binding dispute resolution . . . If the Joint Venturers are not able to resolve the dispute in Mediation, then such disputes ***shall be resolved through binding arbitration*** carried out in accordance with the rules and regulations of the American Arbitration Association. The decision of the arbitrator in any such proceeding shall be fully enforceable in any court of competent jurisdiction.

3.      Despite the existence of an express contractual obligation to arbitrate Plaintiffs' claims against Defendants, on October 15, 2013, Plaintiffs filed their Original Petition for Declaratory Judgment in this Court.

4.      In the petition, Plaintiffs admit that the parties to this lawsuit formed a joint venture and executed a JVA dated July 1, 2012. See Plaintiffs' Original Petition for Declaratory Judgment. Plaintiffs allege that Defendants breached the JVA by taking over assets of Plaintiffs and utilizing them to conduct work on projects that were not included in the joint venture. Plaintiffs allege that no accounting was made of the joint venture and non-joint venture projects in which Defendants utilized assets of Plaintiffs in violation of the JVA. Plaintiffs also maintain that Defendants have not reimbursed Plaintiffs for reasonable and necessary joint venture expenses and for the use of equipment by the joint venture in violation of the JVA.

5.      Plaintiffs' claims and dispute against Defendants arise directly out the JVA, and fit squarely within the scope of the arbitration provision contained in the JVA between Plaintiffs and Defendants. The parties entered into a valid arbitration agreement that is enforceable under both Texas and federal laws. Each of the Plaintiffs was a signatory to the JVA containing the Arbitration Provision; each of the Plaintiffs enjoyed the benefits of the JVA; each of the Plaintiffs filed this lawsuit based on disputes arising out of the JVA, and each of the Plaintiffs is bound by the Arbitration Provision of the JVA.

6.      Accordingly, Plaintiffs' claims are subject to binding arbitration.

## B. RELIEF REQUESTED

7.      By commencing this action, Plaintiffs have ignored their obligation to arbitrate the claims they assert in the Original Petition for Declaratory Judgment. Plaintiffs are therefore in breach of the Arbitration Provision contained in the JVA. Plaintiffs' attempt to avoid their contractual obligation to arbitrate their claims should not be countenanced. Accordingly, Defendants file this Motion to Compel Arbitration and Abatement Pending Arbitration and seek and order from this Court: (i) enforcing the parties' agreement and compelling Plaintiffs to arbitrate their claims; and (ii) staying this action pending completion of the arbitration. Based on the above discussion, and the arguments and authorities set forth below, Defendants request that the Court grant their motion.

## C. ARGUMENTS AND AUTHORITIES

8.      Arbitration of disputes is strongly favored under both federal and state law. *Prudential Securities, Inc. v. Marshall*, 909 S.W.2d 896, 898-99 (Tex. 1995); *Cantella & Co. v. Goodwin*, 924 S.W.2d 943, 944 (Tex. 1996) (orig. proceeding). When the factual allegations in the petition on their face establish that the asserted claims fall within the scope of an arbitration agreement, a trial court abuses its discretion by declining to compel arbitration of the claims and stay the trial court proceedings. *Id.*; *see also Menna v. Romero*, 48 S.W.3d 247, 250-51 (Tex. App.--San Antonio 2001, pet. dism'd); *Ellis v. Schlimmer*, 337 S.W.3d 860, 862 (Tex. 2011). "[C]ourts should resolve any doubts as to the agreement's scope, waiver, and other issues unrelated to its validity in favor of arbitration." *Id.*

### THE FAA AND TAA

9.      The arbitration provision in the JVA does not specify whether it is governed by the Federal Arbitration Act ("FAA") or the Texas Arbitration Act ("TAA"). If an arbitration

3

agreement does not specify whether it is governed by the FAA or the TAA, both the FAA and the TAA may apply, and the FAA preempts the TAA to the extent they conflict. *See In re D. Wilson Constr. Co.*, 196 S.W.3d 774, 778-79 (Tex. 2006); *In re Devon Energy Corp.*, 332 S.W.3d 543, 547 (Tex. App.—Houston [1st Dist.] 2009, orig. proceeding); *See In re L & L Kempwood Assocs.*, L.P., 9 S.W.3d 125, 127–28 (Tex.1999) (orig. proceeding).

10.     Where, as here, the parties have entered into a broad agreement to arbitrate, the issue of arbitrability is subject to a virtually identical analysis under both the FAA and the TAA. *ODL Servs., Inc. v. ConocoPhillips Co.*, 264 S.W.3d 399, 418 (Tex. App.--Houston [1st Dist.] 2009, no pet.) (applying same analysis of arbitrability under the FAA and the TAA). The FAA requires that the Court compel arbitration unless it can be said with positive assurance that the arbitration clause does not cover the dispute at issue. *Dallas Cardiology Assoc., PA v. Mallick*, 978, S.W.2d 209, 214 (Tex. App. – Texarkana 1998, pet. den'd.); *Associated Air Freight, Inc. v. Meek*, 2001 WL 225516 (Tex. App. – Houston [1st Dist.] 2001); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960). Texas law takes a similarly broad view with regards to the enforceability of arbitration agreements. TEX. CIV. PRAC. & REM. § 171.001 *et. al*. Like the FAA, the TAA requires that the parties be compelled to arbitration upon a showing that an agreement to arbitrate exists. TEX. CIV. PRAC. & REM. § 171.021. Both Texas and federal courts have expressly held that, where there is any doubt as to the applicability of an arbitration agreement, such doubts are to be resolved in favor of arbitration. *Emerald Texas, Inc. v. Peel*, 920 S.W.2d 398, 402 (Tex. App. – Houston [1st Dist.] 1996, no writ); *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

11.     Under both the FAA and the TAA the legal query to be resolved when determining whether a claim or issue can be subject to an order to arbitration is (1) whether there

4

is a valid agreement to arbitrate, and (2) whether the claims raised fall within the scope of that agreement. *In re D. Wilson Constr. Co.*, 196 S.W.3d at 774, 781 (Tex. 2006); TEX. CIV. PRAC. & REM. CODE § 171.021(a); *see AT&T Technologies, Inc.. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649-50 (1986). A court has no discretion and must compel arbitration if the answer to both questions is affirmative. *In re Tenet Healthcare, Ltd.*, 84 S.W.3d 760, 765 (Tex. App.-- Houston [1st Dist.] 2002, orig. proceeding).

### A VALID, ENFORCEABLE ARBITRATION AGREEMENT EXISTS BETWEEN PLAINTIFFS AND DEFENDANTS.

12.     In evaluating a motion to compel arbitration, a court must first determine whether a valid arbitration agreement exists, and then whether the agreement encompasses the claims raised. *Am. Std. v. Brownsville Indep. Sch. Dist. (In re D. Wilson Constr. Co.)*, 196 S.W.3d 774, 781 (Tex. 2006); *see In re Dillard Dep't Stores, Inc.*, 186 S.W.3d 514, 515 (Tex. 2006) (*per curiam*). Whether a valid arbitration agreement exists is a question of law. *Id.* Although the Texas Supreme Court has repeatedly expressed a strong presumption favoring arbitration, the presumption arises only after the party seeking to compel arbitration proves that a valid arbitration agreement exists. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003) (emphasis added).

13.     In this case, the Arbitration Provision includes the following relevant language:

> If a dispute arises that cannot be resolved through direct discussions, Joint Venturers shall participate in mediation before recourse to any form of binding dispute resolution . . . If the Joint Venturers are not able to resolve the dispute in Mediation, then **such disputes shall be resolved through binding arbitration** carried out in accordance with the rules and regulations of the American Arbitration Association. The decision of the arbitrator in any such proceeding shall be fully enforceable in any court of competent jurisdiction.

14.    Here, the parties entered into a valid arbitration agreement. Each of the Plaintiffs was a signatory to the JVA, each of the Plaintiffs enjoyed the benefits of the JVA, each of the Plaintiffs filed this lawsuit based on disputes arising out of the JVA, and each of the Plaintiffs is thus bound by the Arbitration Provision of the JVA.

15.    In fact, Plaintiffs admitted in their petition that Plaintiffs and Defendants were parties to the JVA and executed the JVA dated July 1, 2012. Because the trial court is presented with a valid arbitration agreement, the burden shifts to the party opposing arbitration to raise an affirmative defense to enforcing arbitration. *Id.* Absent a defense to enforcing the arbitration agreement, the trial court has no discretion but to compel arbitration and stay its own proceedings. *In re J.D. Edwards World Solutions Co.,* 87 S.W.3d 546, 549 (Tex. 2002) (*per curiam*). Because a valid, enforceable arbitration agreement exists between Plaintiffs and Defendants, this Court has no discretion but to compel arbitration and stay this proceeding.

### PLAINTIFFS' CLAIMS FALLS WITHIN THE SCOPE OF THE PARTIES' ARBITRATION AGREEMENT.

16.    A broad arbitration clause, purporting to cover all claims, disputes, and other matters arising out of or relating to the contract, creates a presumption of arbitrability. *Am. Realty Trust, Inc. v. JDN Real Estate-McKinney, L.P.,* 74 S.W.3d 527, 531 (Tex. App.--Dallas 2002, pet. denied). Arbitration agreements are interpreted under traditional contract principles. *J.M. Davidson,* 128 S.W.3d at 227. Further, disputes regarding the interpretation of an arbitration agreement are analyzed under traditional principles of contract construction. *In re Hawthorne Townhomes, L.P.,* 282 S.W.3d 131, 138 (Tex. App.--Dallas 2009, orig. proceeding); *Jenkens & Gilchrist v. Riggs,* 87 S.W.3d 198, 201 (Tex. App.--Dallas 2002, no pet.). Thus, the language of an arbitration clause is examined in context and the language is given its plain grammatical meaning. *Jenkens & Gilchrist,* 87 S.W.3d at 201.

6

17.     An arbitration provision, such as the Arbitration Provision in the JVA, which is not limited to questions of contractual interpretation is considered to be "broad." *P&P Indus. v. Sutter Corp.*, 179 F.3d 861, 871 (10th Cir. 1999) (finding the tort-based claims alleged by the plaintiff arose out of or related to the agreement itself, and thus were subject to arbitration). When an arbitration clause is broad, the strong presumption of arbitrability "applies with even greater force." *Id.* (quoting *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 121 (2d Cir. 1991). In determining whether claims are arbitrable, the Court is to focus on the factual allegations, not the legal causes pled. *P&P Indus.*, 179 F.3d at 871-72.

18.     Here, the Arbitration Provision in the JVA provides that "if a dispute arises . . . then such disputes shall be resolved through binding arbitration." This Arbitration Provision is unquestionably broad.

19.     Plaintiffs allege that Defendants breached the JVA by taking over assets of Plaintiffs and utilizing them to conduct work on projects that were not included in the joint venture. Plaintiffs allege that no accounting was made of the joint venture and non-joint venture projects in which Defendants utilized assets of Plaintiffs in violation of the JVA. Plaintiffs also maintain that Defendants have not reimbursed Plaintiffs for reasonable and necessary joint venture expenses and for the use of equipment by the joint venture in violation of the JVA. Plaintiffs' claims and disputes against Defendants all arise directly out the JVA, and fit squarely within the scope of the Arbitration Provision contained in the JVA between Plaintiffs and Defendants. *See ARW Exploration Corp.*, 45 F.3d at 1462 (claims are arbitrable absent "positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."). Any doubt as to whether a plaintiff's claims fall within the scope of an arbitration agreement must be resolved in favor of arbitration. *Id.*; *see also In re Kellogg Brown & Root,*

166 S.W.3d at 737; *In re Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 195 S.W.3d 807, 813

(Tex. App.--Dallas 2006, orig. proceeding). Indeed, arbitration should not be denied unless it

can be said with positive assurance that the arbitration clause cannot be interpreted so as to

encompass the dispute in question. *In re Dillard Dep't Stores, Inc.*, 186 S.W.3d 514, 516 (Tex.

2006) (per curiam); *accord Graham-Rutledge & Co. v. Nadia Corp.*, 281 S.W.3d 683, 691 (Tex.

App.--Dallas 2009, no pet.); *see also Hou-Scape, Inc. v. Lloyd*, 945 S.W.2d 202, 205 (Tex. App.-

-Houston [1st Dist.] 1997, no writ) (citing *United Steelworkers v. Warrior & Gulf Navigation

Co.*, 363 U.S. 574, 582-83 (1960)). That is not the case here. Accordingly, the Court should

grant this motion.

## D. CONCLUSION

20.     As set forth above, Plaintiffs and Defendants entered into a JVA and Arbitration

Provision within the JVA. Plaintiffs' claims and dispute arise out of or relate to the parties'

JVA. Plaintiffs' claims are subject to binding arbitration. Accordingly, Defendants are entitled

to a stay of this action and an order compelling the arbitration of Plaintiffs' claims. Defendants

request that the Court issue an Order staying this action and compelling Plaintiffs to resolve their

claims in appropriate arbitration proceedings.

Respectfully submitted,

TYLER & DAS

By: _____
Micky N. Das
State Bar No: 05402300
2000 Bering Dr., Suite 401
Houston, Texas 77057
(713) 739-1900 Telephone
(713) 739-8347 Facsimile
**ATTORNEYS FOR DEFENDANTS
HASSELL CONSTRUCTION CO., INC. AND
HASSELL MANAGEMENT SERVICES, LLC**

## CERTIFICATE OF CONFERENCE

Defendants' counsel has attempted to work these matters without success with counsel for Plaintiffs. Since efforts have been unsuccessful, Court intervention is required. Defendants will continue with efforts to work out the matters up until the date and time of the hearing.

MICKY N. DAS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been forwarded to the following by facsimile on the _20th_ day of December 2013:

Robert J. Kruckemeyer
800 Commerce St.
Houston, TX 77002
*Attorney for Plaintiffs*
**Via Facsimile (713) 225-0827**

MICKY N. DAS

Unofficial Copy Office of Chris Daniel District Clerk

# EXHIBIT 38

As of : 05/14/2018 18:56:29

**This Page is Not Sufficient for Filings with the Secretary of State**

Obtain a certification for filings with the Secretary of State.

| MDPG HOLDINGS 1, LLC | |
|---|---|
| **Texas Taxpayer Number** | 32032635347 |
| **Mailing Address** | 2000 BERING DR STE 401 HOUSTON, TX 77057-3732 |
| **Right to Transact Business in Texas** | ACTIVE |
| **State of Formation** | TX |
| **Effective SOS Registration Date** | 05/21/2007 |
| **Texas SOS File Number** | 0800819194 |
| **Registered Agent Name** | PATRICK GAAS |
| **Registered Office Street Address** | COATS/ROSE 3 E. GREENWAY PLAZA, STE 2000 HOUSTON, TX 77046 |

**Public Information Report**
**MDPG HOLDINGS 1, LLC**
Report Year :2017

Information on this site is obtained from the most recent Public Information Report (PIR) processed by the Secretary of State (SOS). PIRs filed with annual franchise tax reports are forwarded to the SOS. After processing, the SOS sends the Comptroller an electronic copy of the information, which is displayed on this web site. The information will be updated as changes are received from the SOS.

You may order a copy of a Public Information Report from open.records@cpa.texas.gov or Comptroller of Public Accounts, Open Records Section, PO Box 13528, Austin, Texas 78711.

| Title | Name and Address |
|-------|------------------|
| MEMBER | **MICKEY N DAS** <br> 2000 BERING DR HOUSTON, TX 77057 |
| MEMBER | **PATRICK GASS** <br> 2000 BERING DR HOUSTON, TX 77057 |