# EXHIBIT
# 34

# AMERICAN ARBITRATION ASSOCIATION
# ONLINE FILING ACKNOWLEDGEMENT

**This confirmation serves as the Demand for Arbitration or Request for Mediation for this filing.**
**To institute proceedings, please send a copy of this form and the parties' dispute resolution agreement to the opposing party.**
**Case # : 01-14-0000-3178**
This will acknowledge receipt of a request for dispute resolution services for the claim and parties detailed below.

| | |
|---|---|
| This claim has been filed for | Arbitration |
| This matter has been filed in accordance with | Construction Industry Arbitration Rules |
| The fee paid at the time of filing was | $10,200.00 |
| This request was received by the AAA on | 02-May-2014 |

**Claim Description**
Breach of Contract (Debt / Foreclosure); Fraud; Breach of Fiduciary Duty; Business Disparagement

| | |
|---|---|
| Claim Amount | $10,000,000.00 |
| Do you have a Non-monetary aspect to your claim? | N |
| Additional Damages | |

Amount

Exemplary
Attorney fees
Interest

**Fee Schedule Option**   Standard
**ADR Agreement**   " Dispute Resolution
a. If a dispute arises that cannot be resolved through direct discussions, Joint Ventures shall participate in mediation before recourse to any other form of binding dispute resolution. The location of the mediation shall be in Houston, Texas. Agreements reached in mediation shall be binding and enforceable as any other settlement agreement. If the Joint Venturers are not able to resolve the dispute in Mediation, then such disputes shall be resolved through binding arbitration carried out in accordance with the rules and regulations of the American Arbitration Association. The decision of the arbitrator in any such proceeding shall be fully enforceable in any court of competent jurisdiction."

**Parties and Representatives**

**Party 1**

| | |
|---|---|
| Category | Owner |
| Name | James  C. Hassell |
| Company Name | Hassell Construction Company, Inc. |
| Address |  16111 Hollister Road |
| | Houston, TX 77066 |
| Phone | ()- |
| Fax | ()- |
| Email | |

The Party is the                    Both

**Representative 1**

Name                            Patrick E. Gaas
Firm Name                       Coats Rose Yale Ryman & Lee, PC
Address                         3 East Greenway Plaza
                                Suite 2000
                                Houston, TX 77046
Phone                           (713)653-7387
Fax                             (713)651-0220
Email                           pgaas@coatsrose.com

**Party 2**

Category                        Other
Name                            Royce J Hassell
Company Name                    R. Hassell Holding Co., Inc.
Address                          12512 Cutten Road, Suite A
                                Houston, TX 770669
Phone                           ()-
Fax                             ()-
Email
The Party is the                Individual

**Representative 2**

Name                            Royce J Hassell
Firm Name                       R. Hassell Holding Co., Inc.
Address                          12512 Cutten Road, Suite A
                                Houston, TX 770669
Phone                           ()-
Fax                             ()-
Email

**Party 3**

Category                        Other
Name                            Royce J Hassell
Company Name                    R. Hassell & Company, Inc.
Address                          12512 Cutten Road, Suite A
                                Houston, TX 77066
Phone                           ()-
Fax                             ()-
Email
The Party is the                Individual

**Representative 3**

Name                            Royce J Hassell
Firm Name                       R. Hassell & Company, Inc.
Address                          12512 Cutten Road, Suite A
                                Houston, TX 77066
Phone                           ()-
Fax                             ()-
Email

**Party 4**

| | |
|---|---|
| Category | Other |
| Name | Royce J Hassell |
| Company Name | R. Hassell Builders, Inc. |
| Address | 12512 Cutten Road, Suite A |
| | Houston, TX 77066 |
| Phone | ()- |
| Fax | ()- |
| Email | |
| The Party is the | Individual |

**Representative 4**

| | |
|---|---|
| Name | Royce J Hassell |
| Firm Name | R. Hassell Builders, Inc. |
| Address | 12512 Cutten Road, Suite A |
| | Houston, TX 77066 |
| Phone | ()- |
| Fax | ()- |
| Email | |

**Party 5**

| | |
|---|---|
| Category | Other |
| Name | Royce J Hassell |
| Company Name | G.R. Group Resources LLP |
| Address | 12512 Cutten Road, Suite A |
| | Houston, TX 77066 |
| Phone | ()- |
| Fax | ()- |
| Email | |
| The Party is the | Individual |

**Representative 5**

| | |
|---|---|
| Name | Royce J Hassell |
| Firm Name | G.R. Group Resources LLP |
| Address | 12512 Cutten Road, Suite A |
| | Houston, TX 77066 |
| Phone | ()- |
| Fax | ()- |
| Email | |

**Party 6**

| | |
|---|---|
| Category | Other |
| Name | Royce J Hassell |
| Company Name | |
| Address | 5303 Maple Street |
| | Bellaire, TX 77401 |
| Phone | (713)-66-5-18 |
| Fax | ()- |
| Email | conrcrete@gmail.com |
| The Party is the | Individual |

**Representative 6**

| | |
|---|---|
| Name | Royce J Hassell |

| | |
|---|---|
| Firm Name | |
| Address | 5303 Maple Street |
| | Bellaire, TX 77401 |
| Phone | (713)-66-5-18 |
| Fax | ()- |
| Email | conrcrete@gmail.com |

**Party 7**

| | |
|---|---|
| Category | Other |
| Name | Silvia T Hassell |
| Company Name | |
| Address | 5303 Maple Street |
| | Bellaire, TX 77401 |
| Phone | (713)-66-5-18 |
| Fax | ()- |
| Email | sehassell@aol.com |
| The Party is the | Individual |

**Representative 7**

| | |
|---|---|
| Name | Silvia T Hassell |
| Firm Name | |
| Address | 5303 Maple Street |
| | Bellaire, TX 77401 |
| Phone | (713)-66-5-18 |
| Fax | ()- |
| Email | sehassell@aol.com |

**Party 8**

| | |
|---|---|
| Category | Construction Company |
| Name | James C Hassell |
| Company Name | Hassell Construction Company, Inc. |
| Address | 16111 Hollister Road |
| | Houston, TX 77066 |
| Phone | (281)-89-3-25 |
| Fax | (281)-58-0-9170 |
| Email | jphassell@hassellconstruction. |
| The Party is the | Individual |

**Representative 8**

| | |
|---|---|
| Name | Patrick E. Gaas |
| Firm Name | Coats Rose Yale Ryman & Lee, PC |
| Address | 3 East Greenway Plaza |
| | Suite 2000 |
| | Houston, TX 77046 |
| Phone | (713)653-7387 |
| Fax | (713)651-0220 |
| Email | pgaas@coatsrose.com |

PROCEEDING BEFORE THE
AMERICAN ARBITRATION ASSOCIATION
In Houston, Texas

JAMES C. HASSELL and HASSELL          §
CONSTRUCTION COMPANY, INC.            §
                                      §
        Claimants,                    §
                                      §
                                      §
vs.                                   §          Case No. _____
                                      §
R. HASSELL HOLDING CO., INC, R.       §
HASSELL & COMPANY, INC., R. HASSELL   §
BUILDERS, INC. AND G.R. GROUP         §
RESOURCES LLP, ROYCE J. HASSELL       §
AND SILVIA T. HASSELL                 §
                                      §
        Respondents.

**DEMAND FOR ARBITRATION**

Respectfully submitted,

COATS | ROSE
*A Professional Corporation*

By: _____
     Patrick E. Gaas, SBN:  07562790
     pgaas@coatsrose.com
     Heather Asselin, SBN:  00797143
     hasselin@coatsrose.com
     Sam Arora SBN:  24034287
     sarora@coatsrose.com
     3 E. Greenway Plaza, Suite 2000
     Houston, Texas  77046
     (713) 651-0111
     (713) 651-0220 facsimile

ATTORNEYS FOR CLAIMANTS JAMES C. HASSELL AND
HASSELL CONSTRUCTION COMPANY, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via certified and regular mail on May 2, 2014 to the following:

R. Hassell Holding Co., Inc.
R. Hassell & Company, Inc.
R. Hassell Builders, Inc. and
G.R. Group Resources LLP
Through their registered agent:
Royce J. Hassell
12512 Cutten Road, Suite A
Houston, TX 77066

Royce J. Hassell
5302 Maple St.
Bellaire, TX 77401

Silvia T. Hassell
5302 Maple St.
Bellaire, TX 77401

Heather Asselin

## PARTIES

1. Claimant Hassell Construction Company, Inc. (herein, "HCCI") is a Texas corporation with its principal place of business in Houston, Harris County, Texas.  HCCI is a concrete paving company that was founded by James C. ("Jim") Hassell (sometimes referred to herein as "Mr. Hassell") a few decades ago.  Mr. Hassell remains the Chairman of the Board of Directors and CEO for HCCI.  The other officers of HCCI include its President James Phillip ("Phil") Hassell, Executive Vice-President Mike Hassell and Secretary/Treasurer Shawn Potts, the half-brothers/sister, respectively, of Respondent Royce Hassell.

2. Respondents Royce Hassell and his wife Silvia Hassell are individuals of the full age of majority residing in Harris County.  Together, they own Respondents R. Hassell Holding Co., Inc, R. Hassell & Company, Inc., R. Hassell Builders, Inc. and G.R. Group Resources LLP, each a Texas company with its principal place of business in Harris County. Each of the respondents has been notified of the filing of this Demand for Arbitration as set forth in the attached certificate of service.

## JURISDICTION / HEARING LOCALE

3. In 2012, Claimant HCCI, and Respondents R. Hassell Holding Company, Inc., R. Hassell & Company, Inc., R. Hassell Builders, Inc., and G.R. Group Resources LLP formed a joint venture and executed a Construction Joint Venture Agreement (the "JVA") dated July 1, 2012, a copy of which is attached as Exhibit "A".  The JVA contains a broad arbitration provision which mandates the arbitration of all disputes that arise between the parties.

4. Specifically, paragraph 25 of the JVA contains an express and detailed dispute resolution and arbitration clause:

> If a dispute arises that cannot be resolved through direct discussions, Joint Venturers shall participate in mediation before recourse to any form of binding dispute resolution . . .  If the Joint Venturers are not able to resolve the dispute in Mediation, then such disputes shall be resolved through binding arbitration carried out in accordance with the rules and regulations of the American Arbitration Association.  The decision of the arbitrator in any such proceeding shall be fully enforceable in any court of competent jurisdiction.

The mediation of this dispute occurred on February 17, 2014, and the claims herein were not resolved. Each claim asserted herein is significantly related to and factually intertwined with the JVA.

5. Claimants request a hearing locale of Houston, Harris County, Texas.

## PROCEDURAL BACKGROUD

6. Despite the existence of an express contractual obligation to arbitrate Respondents' claims against Claimants, on October 15, 2013, Respondents filed their Original Petition for Declaratory Judgment, a copy of which is attached as Exhibit "B", in the 125th District Court of Harris County. The parties to that lawsuit included R. Hassell Holding Co., Inc, R. Hassell & Company, Inc., R. Hassell Builders, Inc. and G.R. Group Resources LLP, Hassell Construction Co., Inc. and Hassell Management Services, LLC.

7. On March 3, 2014, the Honorable Kyle Carter signed an order, attached as Exhibit "C", granting a motion to compel arbitration of the entire dispute. In the order, the court mandated that arbitration be initiated within 60 days.

8. Although denominated defendants below, Claimants have initiated this arbitration since they are the proper claimants in this matter, and because to their knowledge, Respondents have not done so.

## SUMMARY OF CLAIM

9. Many years after forming HCCI, Mr. Hassell helped his first son, Royce Hassell, start his own company. Since that time, Mr. Hassell and HCCI (and the rest of the Hassell family – most of whom work for HCCI) have continuously made special efforts to help extricate Royce Hassell and his companies from the adverse effects of his financial mismanagement. Along the way, Royce Hassell has broken nearly every promise to reform his business practices, curb his lavish lifestyle and wasteful spending habits and repay debts to Mr. Hassell and HCCI, which are now almost $4 million. This has harmed HCCI's financial condition, its banking and surety relationships, and last but not least, its ability to procure and perform new work. As a result of these unpaid debts, as well as other acts and omissions, HCCI has been damaged in an amount up to $10,000,000. Claimant's damages are continuing, and as such Claimants reserve the right to specify a claim in excess of $10,000,000 at the appropriate time as determined by the arbitrator(s). Claimants will pay any additional fees associated with any increase of the amount of their claim after the initial filing date.

## FACTUAL STATEMENT OF CLAIM

10. At the end of 2008, Royce Hassell would negotiate an arrangement with Claimants whereby his company, R. Hassell, would bid work under HCCI's name, and therefore bonded by HCCI's surety. Royce Hassell would seek this arrangement because his financial condition and that of his companies was so poor that he/they could no longer qualify for a surety relationship through which to procure payment and performance bonds, which are required by law to perform public work. At that time, Royce Hassell would admit to his family that he had performed poorly on several projects and that his financial condition was so weak that further surety relationships were becoming impossible. To make matters worse, Royce Hassell's projects were (a) under funds control (meaning that his surety had taken over control of his companies' contract funds since Royce Hassell had proven himself incapable of properly paying his companies' debts), and (b) in "claims" (meaning that his surety had received several claims for nonpayment of project debts from unpaid subcontractors and suppliers). Because of these issues, Royce Hassell's surety had refused to extend his bonding capacity (also known as the amount of surety credit available to a company) so that Royce Hassell and his companies could not bid more work. As part of his arrangement with HCCI, Royce Hassell would split projected profits for those projects bid under the name of Hassell Construction Company, such profits to be calculated at the time the bid was made. For instance, if Royce Hassell projected a 7% profit, his company would pay 3.5% of the contract sum to HCCI, regardless of the actual performance on the project. Royce's reasoning would be that he would rather force his subcontractors to make up his margin than have to prove up project costs, as he had been required to do in the past working with Mr. Hassell. Royce Hassell would be in total control of all contracts awarded under this arrangement.

11. In January 2009, Royce Hassell and R. Hassell Builders would begin work on the Wayne Gray Aquatic Center, a project procured under HCCI's name and surety relationship. Royce Hassell would request payment each month from HCCI for the estimated amount that was sent to the Owner, less HCCI's agreed upon percentage. HCCI in turn would pay Royce Hassell the amount requested, unless the owner made any adjustment to the billing. It was not long thereafter that HCCI would start receiving a large number of lien notices that were being sent by unpaid subcontractors and suppliers to its surety company for non-payment on projects that were being performed by R. Hassell Builders. HCCI would meet with Royce Hassell on many occasions about this issue and he would dismiss HCCI's concerns, typically stating words to the effect "that is how the GC business is run". Additionally, Royce Hassell would claim (usually falsely) that the notices were due to nonpayment for defective work or disagreements with a subcontractor's performance or pricing.

12. The notices of nonpayment, bond claims and project debts would continue to mount through October 2010, when Royce Hassell and Silvia Hassell finally admitted they were having cash flow issues, at which time they would ask HCCI if they could borrow $350,000. It was then represented that this amount would put Royce Hassell and his company back on a sound financial footing. In an attempt to help him and mitigate HCCI's potential surety losses on his projects, Royce Hassell would be allowed to borrow the money from HCCI on October 5, 2010, at which time he signed a promissory note, a true and correct of copy of which is attached as Exhibit "D", in the amount of $350,000 together with interest at 5%. This amount would be procured from HCCI's line of credit with Vista Bank of Texas, and Royce Hassell would agree to make interest only payments at the rate being charged by Vista Bank, until the note was due on October 15, 2011.

13. The $350,000 would prove to be too little too late for Royce and his companies. Later, Royce and Silvia Hassell would ask Mr. Hassell to personally loan Royce Hassell money. To accommodate his son, Mr. Hassell would personally co-sign a note with Trustmark Bank for approximately $700,000. Sometime later, Royce Hassell would again approach Mr. Hassell for help, this time requesting Mr. Hassell to reduce the profit split on the projects bid under the name of Hassell Construction Company, so that Royce could receive more money needed to heal his ailing financial condition. Mr. Hassell would once more accommodate his son, and would reduce the percentage owed to HCCI down to as little as 1%.

14. In the beginning of 2011, it would become clear to HCCI after several meetings that Royce Hassell was not being honest with HCCI regarding his retained earnings and cash flow position. Royce Hassell had misused project funds and was not appropriately paying bills on projects that were procured under HCCI's name with HCCI's bonding. Royce Hassell would again dismiss HCCI's concerns, stating that this was only a cash flow issue from "robbing Peter to pay Paul" because he did not have the resources to cash flow his work during the time period between when it was performed and when it was paid for by the project owners. By March 2011, Royce Hassell would borrow up to $1,116,342.00 on HCCI's line of credit. A receivable for Royce's company was set up on HCCI's books. Similarly, the liability would be continuously reflected on the combined financial statements for Royce Hassell and his companies. The HCCI line of credit would be used by Royce Hassell to fund his projects and overhead. Royce and Silvia Hassell would promise that Silvia would take charge of overseeing the payables, and HCCI would no longer have nonpayment issues.

15. By June 2011, Royce Hassell and Silvia would draw down HCCI's line of credit in the amount of $1,509,884.69. To assuage the family's concerns, they would prepare liens on

their properties to secure the line of credit. True and correct copies of the deeds of trust for their lake house, their country club estate, and two homes in West University Place are attached as Exhibits "E", "F", "G" and "H", respectively. All aspects of these transactions would be handled by Royce Hassell and Silvia Hassell -- from the preparation of the deeds of trust to the filing of the paperwork with the county. A lien would also be filed on an office building that Royce and Silvia owned, in addition to 4 other properties. In connection with these transactions, they would name Shawn Potts the trustee over the liens without ever consulting her.

16. In July 2011, Royce and Silvia Hassell desired to sell their office building and would ask HCCI to release the lien. HCCI would accommodate Royce and Silvia Hassell because the family was told that a substantial amount of the debt would be paid back to HCCI. Although predictable in hindsight, this would not happen - the bank that held the loan for the office building also held a substantial note for the equipment belonging to Royce's company, as well as another line of credit on which he owed a significant amount of money. As a result, all excess funds from the sale of the office building would be applied to other notes on which he was in default, and HCCI would receive nothing. HCCI would therefore lose its security and receive no payment on the debt. As such, the only ones benefitting from the transaction would be Royce and Silvia Hassell.

17. Notwithstanding their bad behavior, just months later, in August 2011, Royce and Silvia Hassell would ask that HCCI release the liens held on 2 of the single family residence properties (6417 Buffalo Speedway and 6421 Buffalo Speedway) so that Allegiance Bank could become the first lien holder securing yet another line of credit in the amount of $500,000.00. Incredibly, HCCI would again accommodate Royce and Silvia, releasing the original liens. Royce Hassell would not refile the deeds of trust until May 2012, when HCCI would again become a second lien holder on the properties. True and correct copies of these Deeds of Trust are attached as Exhibits "I" and "J". To ease the concerns of HCCI relating to these transactions, Royce and Silvia would again and again promise to pay back the line of credit with proceeds from the sale of their real estate. Again, this would not happen. The maturity date of October 15, 2011 on the original promissory note would come and go, and the money loaned by HCCI would never be paid back.

18. As time went on, Royce Hassell would be provided summaries of the line of credit charges/reimbursements regularly. He and Silvia would both be aware of where the debt stood at all times. Silvia Hassell would periodically visit HCCI's office to review all the back up for the payments and back charges applied to Royce's projects (at times, she would even be allowed to take home the information and return it when she was finished). At all times, HCCI would be completely transparent with Royce and Silvia Hassell regarding the line of credit. Royce Hassell would receive many updated summaries relating to the line of credit. The last time one would be provided to him,

Royce Hassell would slide it back, saying he did not want it shoved in his face, and asking what he was supposed to do about it. HCCI would explain that it was given to him so he would be aware of where the line of credit stood. Royce Hassell would be repeatedly advised of the effects his debt would have on HCCI's financial condition and bonding capacity.

19. Royce Hassell would meet with HCCI to discuss renting out the single family residence properties on Buffalo Speedway on which HCCI possessed the second lien deeds of trust. HCCI would request that he not rent the properties, and instead keep them on the market in an effort to raise money to pay down his debt. He instead would do exactly the opposite, renting both houses and, effectively taking them off of the market for a year, during which time he would retain the rental income, leaving HCCI to continue paying the monthly notes on the properties.

20. As work progressed on the projects that Royce's company had bonded with its own surety, and several more projects bonded with HCCI's surety, it would become apparent that while Royce and Silvia Hassell had stated that they needed to do more work to create more cash flow, their financial issues were catching up to them and HCCI's line of credit was not being retired. In February 2012, HCCI would inform Royce Hassell that things needed to change, and that HCCI would not continue with the status quo. It was at this time, that Silvia Hassell would come to HCCI's office and threaten Royce's family for about five hours, regarding what would happen to them if HCCI did not continue supporting Royce and Silvia. Silvia would call Royce Hassell and instruct him to meet with HCCI about the current financial situation, which he would agree to do. As part of this meeting, Royce Hassell would represent that the line of credit balance would go no higher than $2,250,000, and that he would soon have a million dollars to pay down the debt. Royce Hassell would tell HCCI that it could advise those needing to know of these facts, like HCCI's accountant, bank and surety. Silvia Hassell would participate in this conversation.

21. HCCI would be misled again. Meetings would be conducted in July 2012 and financial statements and plans with various options would be provided to HCCI by Royce Hassell, which would purport to demonstrate the status of his finances. Royce would even provide a letter stating that a surety for Royce's company might be forthcoming, provided that he received yet more funding from HCCI to continue to clean up his outstanding debts. Royce Hassell would be informed that other avenues needed to be sought out, and again that problems were being created with HCCI's accountant, bank and surety by him not retiring the line of credit.

22. A plan would be discussed to salvage the terrible financial condition that Royce Hassell had created for not only his company, but HCCI. However, the plan would be rejected

when Royce Hassell would tell Mr. Hassell and that he would not work for Phil Hassell or HCCI. Mr. Hassell would accept Royce Hassell at his word, informing Royce Hassell that HCCI would no longer be his financial backstop.  Predictably, Royce and Silvia Hassell would promptly reverse course, later meet with Mike and Phil Hassell at Royce's company's office on a Sunday to discuss options to salvage the situation and retire the debt, and in September 2012, in an effort to reduce the overall overhead between the HCCI and Royce's company, Royce Hassell and some of his people would go to work for HCCI. At his request, Royce would keep his companies separate from HCCI, reasoning that he needed to repay the debt that he, Silvia and their companies owed to HCCI. HCCI would tell Royce that his companies would have to be viable and able to stand on their own.

23. The idea would be that Royce Hassell would run the office for HCCI and Phil would run the field. During this time, Royce Hassell would become an officer and director of HCCI, with access to all of HCCI's financial information and all of the daily office operations. Royce Hassell would be elected to the board of HCCI and given title of COO. However, notwithstanding attempts to integrate him, Royce Hassell would spend the majority of his time dealing with the business of his own companies and never truly set up a permanent office at HCCI's location. Instead, Royce Hassell would spend most time either at his own companies' location across the parking lot or absent all together. Royce Hassell would have keys and access to HCCI's office and personnel, but would deny HCCI access to his office and employees. Royce Hassell would insist that all communication go through him concerning matters involving his companies, and demand that HCCI employee's direct communications through him regarding HCCI work as well. Many times Royce Hassell would be asked to downsize employees and combine offices (as HCCI was willing to do) and he would make promises concerning his intention to make changes, but the promises would not be honored.

24. The insurance for Royce Hassell's companies would renew in November 2012, and Royce Hassell would be neither willing nor able pay for it.  Since he wanted to keep operating his company independently, and did not wish to change its ownership structure, Royce Hassell would hatch the idea of entering into a joint venture agreement – he would represent that this was for insurance purposes only, and it would allow him to be insured through HCCI's insurance carrier. Royce would prepare an agreement which was signed by Phil.

25. Some of the projects undertaken by Royce Hassell using HCCI's name and surety credit would include:

2009:

Wayne Gray Aquatic Center

2010:
Baytown Fire Station
NC Foote Family Aquatic Center
Research Forest Drive
Hillhouse Road

2011:
Kingwood Community Center
Treeline, Sec 4
Northlake @ Glennlock Farms
Holly Terrace @ Jacobs Reserve
The Preserve @ North Hampton
Telfair
Springwoods Village Pkwy

2012:
Transtar Emergency Building
Transtar Parking Lot
Sylvan Rodriguez Park

26. HCCI would similarly work on several projects for Royce's company, including T.C. Jester. Royce Hassell would avoid paying the retainage due to HCCI on this project as long as he could.  When questioned about it, Royce Hassell would falsely claim that he had never been paid in full, contrary to the County's confirmation that he had indeed been paid in full in the months prior to HCCI's call.  Royce would not pay the retainage that was owed to HCCI for more than 2 years, when he would do so by adding it to his balance on the line of credit. If this were not bad enough, Royce Hassell would put Cypress Forest and another project called Smart Financial on HCCI's books initially, only to remove them later and collect and retain all the monies from the projects for himself.

27. During the time period of 2012, several things would happen with the various properties that were securing the line of credit. The lake house, in which there is the most equity, would be taken off the market in May or June 2012.  The realtor listing it would not renew his contract with Royce and Silvia Hassell, stating they were too difficult with which to work, for among other reasons, demanding what he felt was an unreasonable amount for the property.  Royce Hassell would never list the property for sale again even though it had the most potential in reducing his debt to HCCI. Royce and Silvia Hassell

would also receive an offer on their ranch that was listed for sale either in December 2012 or January 2013.  The interested party would offer less than the asking price and their counter offer was purposely unreasonable in an attempt to force the loss of the sale. Royce and Silvia Hassell would continually dismiss opportunities to sell properties that they owned and reduce the debt owed to HCCI, notwithstanding earlier repeated promises by both to the contrary.

28. It was then that HCCI would tell Royce Hassell that it would no longer support anything outside of legitimate project cost, and that he was causing HCCI a severe hardship, had used up the line of credit, and would have to come up with a plan to reduce his debt. Royce would come up with the idea to sign over some of his properties and have the equity applied as payment to the line of credit. He would even ask HCCI to run it by HCCI's CPA to see how it should be done.  HCCI would agree to the proposed plan by Royce Hassell. Under this proposal, HCCI would take over the effort of trying to sell the properties. Although Royce Hassell would initially agree to do this, he would change his mind later, refusing to sign over the real estate to HCCI, not relisting it for sale, and again not reducing any of his debt to HCCI.

29. Later, Royce Hassell would procure a job named Stellar Oil Field.  HCCI would perform almost all of the work on the project and would pay the costs associated with the labor, materials and equipment used on the project.  Royce Hassell would invoice the owners for Stellar under his own company's name, while he was an officer and director for HCCI, yet retain all the monies paid to his company.  He would never reimburse HCCI for any of its costs, even after recognizing them on the cost to complete schedule that he had prepared for HCCI's financial statement.

30. After many meetings and again on July 15, 2013, Phil Hassell would meet with Royce Hassell at Royce's office to again discuss reduction of forces, the line of credit, and equipment, and to create a plan on what needed to happen.  It was at this meeting that Royce Hassell would bring up to Phil that he had several people that wanted to invest in a new company with him completely separate from HCCI and Royce's other entities.  Phil would tell Royce Hassell that he was not interested in doing such a thing, and would question how Royce Hassell thought he could do any better with someone else's money. Phil Hassell would be adamant that he did not want to take on the responsibility of someone else's money.  A few days later at a meeting with HCCI, Mr. Hassell would confront Royce Hassell about starting another company and request an explanation and plan as to how Royce Hassell would reduce his debt to HCCI.  Royce Hassell would storm out of the meeting, gather his things from his office, and tell Phil he was done - he refused to work for HCCI any longer and he quit.  Royce would walk out the door of HCCI and not return.

31. Royce Hassell would participate in many discussions about using funds control for the projects bonded by HCCI's surety. In fact, Royce would request funds control to be used at the meeting with Phil Hassell on July 15th, because he would say he could no longer work with Shawn Potts. When HCCI would later inform him that funds control was being implemented on the Transtar projects, Royce would immediately start harassing HCCI, its Surety and Southwest Escrow, the company that was handling the funds control, and would threaten litigation against all of them on nearly a daily basis. He would be asked repeatedly to submit funding requests for the subcontractors on the projects and he would refuse. Southwest Escrow would email him several times telling him that funds were available and requesting him to submit pay requests. Royce Hassell would only send funding requests for what he wanted to get paid for, which was only his bills, and he would continue to refuse to refuse to provide any pay requests submitted by the subcontractors. Instead, he would mail letters to the subcontractors and vendors, falsely stating that HCCI would not pay his company, so he could not pay them. Royce purposely would not submit the pay requests for the subcontractors, so neither Southwest Escrow nor HCCI could promptly pay them for their work. If he couldn't get his hands on this money, he would make sure that no one else did, and ruin the reputation of HCCI in the process. Silvia Hassell would launch an all-out harassment campaign to try to bully HCCI, SWEC, and HCCI's surety into doing what she and Royce Hassell wanted (i.e., to release the money to them). She would bombard the surety and funds control companies on nearly a daily basis with threatening phone calls and emails promising litigation. It is not clear in what behalf she would be acting, whether attorney, wife, or part owner of Royce's companies, because she would represent herself in various capacities, depending on which best suited her at the moment. The behavior of Royce and Silvia Hassell would be a source of great embarrassment to Mr. Hassell, who otherwise had toiled many years to cultivate a successful surety relationship not only with HCCI's surety, but its predecessors, in addition to trade creditors and clients.

32. Within two weeks of walking out the door, Royce Hassell would start sending ridiculous bills to HCCI for equipment and labor, at times even billing for items for which he had already been paid. He would also immediately attack the James C. Hassell Inter-Vivos Trust, threatening Mike Hassell as Trustee, telling him to get a good Trust attorney because he would need one. Royce and Silvia both would advise HCCI on several occasions to get an attorney. When HCCI complied, they would make claims that HCCI was trying to harm them with its attorneys.

33. Royce Hassell would assert that HCCI kept his assets, presumably referring to his employees. However, anyone that wanted to leave HCCI when Royce Hassell quit, would be free to do so. All those that stayed at HCCI would do so as a matter of free

will. Some would go back to work for Royce's company. Royce Hassell would also claim that HCCI made him sell his equipment, which also harmed him; however, HCCI would spend a tremendous amount of time and resources to help Royce Hassell get his equipment ready to sell at auction. Royce would sell his equipment in an attempt to reduce his debt to Trustmark Bank. HCCI would not benefit from the sale of his equipment. While only Royce and Silvia Hassell (and their companies) would benefit from the sale, HCCI would incur the costs to get the equipment ready for sale. Moreover, Royce Hassell has a yard full of equipment that he is not using currently nor has he used it recently.

34. Royce and Silvia Hassell continue to make HCCI pay for the line of credit. They refuse to pay for anything including the monthly interest payments they owe on the line of credit. Instead they continue to force HCCI to bear the entire burden. They have slandered HCCI, made false claims, severely diminished HCCI's bonding capacity and have made it almost impossible for HCCI to continue to work. When Royce and Silvia Hassell didn't get their way regarding funds control, they would use it as an excuse to walk off the Transtar projects – effectively abandoning the jobs. To make matters worse, Royce and Silvia Hassell purposely would not provide HCCI with all the project documents that belonged on the Transtar projects, nor provide any assistance to closing out projects for which they were responsible. They would simply walk away, and the harm they caused would be purposeful, intentional and vindictive.

35. In the meantime, HCCI has been denied the ability to bid certain projects due to the situation with the line of credit and how it affects HCCI's surety credit. Royce Hassell has refused to provide any project financial information to the CPA, which has also caused tremendous harm, because HCCI has been unable to accurately reflect project costs and revenues, thus preventing HCCI's CPA from preparing its annual financial statement, which is a condition to any surety bonding program. The effect of this was that HCCI was unable to bid work with one of their primary markets, since an audited annual financial statement is also required for the bid process. Royce's company has refused to provide any of its financial statements since July 3, 2012, nor has it provided any job project accounting reconciliations.

36. Several common themes pervades this brief history - Royce and Silvia Hassell were grossly over extended and failed to take timely corrective measures at the expense of their family. They took funds that should have been released to vendors, sometimes causing HCCI to pay the same vendor for the same work 2 and even 3 times since it was HCCI that held the bond on the projects. They made numerous false promises to pay down their debt to induce other considerations. Then they diverted the funds to pay off other debts. Royce and Silvia Hassell have taken from HCCI, in virtually every way

conceivable, much to the detriment of HCCI, its stockholders, employees and their families.

## CAUSES OF ACTION

### Breach of Contract (Debt / Foreclosure)

37. Respondents borrowed money from HCCI which they have refused to pay back notwithstanding demand. The debt has been repeatedly acknowledged and secured by the multiple deeds of trust. Respondents' breach of their obligations has caused Claimants injury.

### Fraud

38. In multiple instances described above, Respondents made material representations to Claimants which were false and either known to be false or made recklessly, as a positive assertion, without knowledge of its truth. Respondents made the representations with the intent that the Claimants act on them, and Claimants relied on the representations to their detriment.

### Breach of Fiduciary Duty

39. As an officer and director of HCCI, Royce Hassell had a fiduciary relationship with HCCI, and in multiple instances set forth above, he breached his fiduciary duties to HCCI. Royce Hassell's breach resulted in injury to HCCI and/or benefit to Royce Hassell.

### Business Disparagement

40. Respondents published false, disparaging words about the Claimant HCCI's economic interests, with malice and without privilege, and the publication caused special damages to Claimant HCCI.

## REQUESTED RELIEF

41. Claimants respectfully request that an award be entered in their favor against Respondents, jointly and severally, for:

   (a) their actual damages, including balance of the HCCI line of credit, unpaid bills, unpaid overhead for 2011, 2012, 2013, and 2014, loss of revenue and profit sustained by virtue of reduced bonding capacity and available line of credit, losses from the

joint venture projects, among other damages arising out of the above stated allegations;

(b) foreclosure of the various deeds of trust attached as exhibits "E", "F", "I" and "J";

(c) exemplary damages;

(d) reasonable attorney's fees through the final hearing and award in this case, plus all proceedings to confirm or challenge the award, if any;

(e) all costs and fees relating to this proceeding;

(f) pre- and post-judgment interest as provided by law; and

(g) such other and further relief to which Claimants' may be justly entitled.

# EXHIBIT "A"

## CONSTRUCTION JOINT VENTURE AGREEMENT

THIS AGREEMENT is made this First day of July, 2012, by and between Hassell Construction Co., Inc. and R. Hassell Holding Company et. al whose principal business addresses are in Houston, Texas, are collectively, "the Joint Venturers" and by this agreement mutually agree to engage in, undertake and carry on, as Joint Venturers, certain public and/or private sector construction projects and any profits derived from and any liability for losses arising out of the performance, be defined by an agreement in writing:

THEREFORE, it is agreed as follows:

1. **FORMATION OF JOINT VENTURE**
   a. The joint venturers hereby constitute themselves as joint venturers for the purpose of performing and completing the certain public and/or private sector construction projects consummating the understanding and agreement that both Venturers have different skills and expertise in differing areas of construction and in order to expand into new markets heretofore untouched, combine their efforts as Venturers. From time to time upon written consent of all joint venturers, joint venturers may include new projects to their joint venture including any upcoming projects, ongoing projects or any others that may apply.

2. **DURATION AND TERMINATION**
   a. This agreement shall remain in full force and effect until all the purposes for which this Venture has been undertaken have been accomplished and completed or until both parties mutually agree to its termination and dissolution, whichever comes first.

3. **PLACE OF BUSINESS**
   a. The principal place of business of the joint venture shall be at a designated place or at such other place as may from time to time be agreed upon by the Joint Venturers.

4. **INTERESTS OF THE JOINT VENTURERS**
   a. The interest of the Joint Venturers in and to the Construction Contract, and in and to any and all property and equipment acquired in connection with the performance thereof and in and to any and all monies which may be derived from the performance thereof and the obligations and Construction Contract and with respect to any and all liabilities and losses in connection therewith shall be to their contribution regardless of the contractual party to the Construction Contract (either individually as Hassell Construction Co., Inc. or R. Hassell, or jointly as Hassell Construction/R. Hassell JV).

5. **CONTRIBUTIONS AND DIVISION OF PROFITS**
   a. The interest of the parties in and to any profits and assets derived from the performance of the Construction Contract, and in and to any property acquired by the joint venture in connection with the work to be performed under this instrument, and in and to all contributions required, all moneys received, and losses incurred in the performance of the Construction Contract shall be those percentages set opposite their respective names as follows:

| Name | Percentage |
|---|---|
| Hassell Construction Co., Inc. | 75% |

R. Hassell Holding Co., Inc. et. al         25%
R. Hassell & Co. Inc.
R. Hassell Builders, Inc.
G.R. Group Resources LLP.

6.  **INDEMNITY AGREEMENTS; SURETY BONDS; INSURANCE**
    a.  Each of the parties agrees to execute all applications and indemnity agreements required by the sureties on any bond or bonds required in connection with the bids and Construction Contracts executed either jointly or individually as part of this agreement. All financial obligations assumed by the parties, or any of them, in connection with the performance of the Construction Contracts under this agreement, all liabilities assumed by or charged to them, or any of them, as contractors, guarantors, or indemnitors, in connection with any surety bond or other bonds which may be given or executed in connection with the Construction Contracts of the Venturers, either jointly or individually, and all other obligations and liabilities of any kind or character which are assumed or undertaken by the parties, or any of them, in connection with and for the benefit of the performance of the Construction Contracts under this agreement shall be shared by the parties proportionately and in accordance with their respective interest as set forth in Article (5). All insurance for the Joint Venture will be provided for by Hassell Construction Co., Inc. including but not limited to : General Liability, Workers Compensation, Excess Coverage (umbrella), Auto, Equipment and Property, Builder's Risk and any other that may be necessary for all projects either jointly or individually in the above Venturers corporate names, both currently under contract and any and all future contracts.

7.  **AUTHORIZED REPRESENTATIVES**
    a.  To facilitate the handling of all matters and questions in connection with the performance of the Construction Contract, each of the Joint Venturers appoints the following representatives to act for it in all such matters, with full and complete authority to act on its behalf in relation to any matters or things in connection with, arising out of, or relative to the Joint Venture and in relation to any matters or things involving the performance of the Construction Contract.

    **Authorized Representatives of**

    **Hassell:**

    Phillip Hassell

    **Authorized Representative of R.**

    **Hassell:** Royce Hassell

    b.  Either Joint Venturer may at any time and from time to time change its representative by filing with the other a notice and duly executed appointment of a new representative or alternate, but until the appointment and filing of such notice the actions of the representative or alternate hereby appointed shall be conclusively binding on such Joint Venturer.

8.  **MANAGEMENT OF JOINT VENTURE**
    a.  The representatives of the Joint Venturers shall meet from time to time as required to act on necessary matter pertaining to the Construction contract. All decisions, commitments, agreements, undertakings, understandings, or other matters pertaining to the performance of the Construction Contract shall be mutually agreed upon by such representatives. No representative shall be liable to the Joint Venturers by reason of his acts as such, except in the case of its gross negligence or actual fraudulent or dishonest

conduct. In the event the representatives cannot agree on a matter of Joint Venture policy, the matter shall be submitted to informal, but binding, arbitration to a mutually acceptable third party. If the Joint Venturers cannot agree on an arbitrator, then the matter shall be resolved by binding commercial arbitration as provided in Article (26) below.

9. **COST OF CONSTRUCTION**

    a. Cost of construction shall consist of the costs of all subcontracts, labor, material, plant, and equipment purchased or rented, bonds, insurance, taxes on labor and material, imports, charges, legal fees, liabilities not secured by insurance, and all other expenses and obligations incurred or suffered in and about the performance of the Construction Contract of a nature which under sound accounting practices would be properly charged as a cost of the performance of the Construction Contract. Such costs shall include any charges against the Joint Venture for any overhead expenses or charges of the main or branch offices of the Joint Venturers or for the time which may be expended in connection with the work by any of the Joint Venturers or their officers or employees. Equipment, autos, trucks etc. rented from either of the Joint Venturers shall be charged as a construction cost at a rate mutually agreed on by the representatives of the parties to the Joint Venture project cost.

10. **RECORDS**

    (a) Accounting for the performance of the Construction Contract and all matters pertaining thereto shall be kept and maintained at the main office of one of the Joint Venturers. All records of the Joint Venture shall be open for inspection of either Joint Venturer at all reasonable times.

    (b) A periodic audit of such books shall be made by an independent firm of accountants or by such individuals as may be mutually agreed upon by the Joint Venturers, and a like audit shall be made upon completion of the Construction Contract. With respect to the periodic audits there shall be included, if requested by the Joint Venturers, a periodic comparison between the items of cost and the items set up in the estimate of cost. The cost of any such audits shall be a part of the cost of construction.

    (c) Upon the completion of the Construction Contract a true and correct accounting shall be had of all costs and expenses and all accounts, vouchers, and other data relating to the Construction Contract and its performance.

    (d) To the extent that the records must be kept subsequent to the completion of the Construction Contract, pursuant to the provisions of law, the same shall be kept at such place or places as the Joint Venturers may from time to time determine, and the cost thereof shall be borne equally by the Joint Venturers.

11. **PROFITS**

    a. Upon the completion of the Construction Contract, after providing for and paying (a) all costs disbursed or incurred in the performance of the Construction Contract; (b) all other costs and charges ordinarily and usually charged as costs in the performance of such a contract; (c) any and all claims not secured by insurance; (d) proper reserves for any claims which shall have either been brought against the Joint venturers or which the Joint Venturers may reasonably anticipate will be brought against them; and (e) reserves for contingencies, if any, that shall be determined by the Joint Venturers in their discretion to be necessary, and after repaying all sums advanced by the Joint Venturers for working capital, any profits thereafter remaining, resulting from the performance of the Construction Contract, shall be distributed and divided per the above percentages between the Joint Venturers. Any reserves, when no longer required, or so much thereof as shall remain, shall be similarly distributed.

12. **LOSSES**

    a. If the performance of the Construction Contract results in a loss, the Joint Venturers shall be obligated

equally for any such loss. Such equal liability of the Joint Venturers for the bearing of losses shall continue with respect to any claims which at any time, either before or after the completion of the Construction Contract, shall be made against them or either of them by reason of this Joint Venture or any matter or thing in connection therewith.

## 13. TAX RETURNS

   a.  Each Joint Venturer shall prepare and file all required income tax returns for their individual venturers after the distribution of profits or losses.

## 14. TIME/EFFORTS DEVOTED TO JOINT VENTURE

   a.  In general, each Joint Venturer shall cooperate in whatever manner is reasonably necessary to carry out the purposes of the Joint Venture, including, but not limited, to making joint applications (with the other Joint Venturer) for and obtaining construction related bonds. Neither of the Joint Venturers shall be required to spend any fixed amount of time in Joint Venture business, however, each of the Joint Venturers shall spend a sufficient amount of time to adequately perform such Joint Venturer's respective duties and obligations under this Agreement. Joint Venturers shall have the duty to disclose to the other Joint Venturer or the Joint Venture any business opportunities of which it becomes aware, and neither Joint Venturer may take such opportunities for itself without being in breach of its duties or obligations hereunder.

## 15. PAYMENT OF JOINT VENTURE EXPENSES

   a.  The Joint Venture shall pay all reasonable and necessary expenses of the Joint Venture, including, but not limited to, reasonable rent for tools, machinery, personnel, etc., provided by one of the Joint Venturers to the Joint Venture, as agreed by the Joint Venturers in advance. In addition, the Joint Venture shall reimburse each Joint Venturer for other reasonable and necessary expenses incurred by it in the ordinary and proper conduct of the Joint Venture business and/or for the preservation of the Joint Venture business or property.

## 16. PROHIBITED ACTS

   a.  Neither Joint Venturer shall take any action in the name of the Joint Venture except in the ordinary course of the Joint Venture business, without the written consent of the other Joint Venturer.

## 17. LEASING OF MACHINERY AND EQUIPMENT

   a.  The parties shall lease to the joint venture, and the Joint Venture shall lease from the parties, for the terms respectively commencing when the Joint Venture shall require them for use in performing the Construction Contract without delay and continuing subsequently whenever and for as long as the same shall be required in such performance, such machinery, equipment, autos and trucks as the parties may have available for use on the project, at and for the unit rental rates mutually agreed on by the representatives of the parties.

   b.  Schedules of the mutually agreed rental rates shall be signed by each Venturer and attached to this agreement.

## 18. BANKRUPTCY OR DISSOLUTION OF PARTY

   a.  In the event of the bankruptcy or dissolution of any of the parties, this Joint Venture shall immediately cease and terminate on its occurrence. Then, the successors, receivers, trustees, or other legal representatives, in this agreement called "representatives" of any party so affected shall cease to have any interest in the performance of the Construction Contract and shall cease to have any interest in and to the Joint Venture or its assets. In any such case the remaining party shall have the right to wind up the affairs of the joint venture and to carry out and complete the performance of the Construction Contract. On such completion or sooner termination and receipt of payment of all amounts due under the Construction Contract, the remaining Joint Venturer shall account to the

representatives of the party or parties so affected and such representative shall then be entitled to receive from the remaining Joint Venturer an amount equal to the sums advanced by the party represented, plus such party's proportionate share of the profits, or less such party's proportionate share of the losses resulting from the performance of the Construction Contract to the date of the termination of the Joint Venture. Provided, however, that the profit or loss computed as of the day of the termination shall be in the same proportion to the whole profit or loss resulting from the performance of the Construction Contract as the amount of work done under it at such time bears to all of the work which is done under it.

### 19. ASSIGNMENTS AND TRANSFERS

a.  Neither this agreement nor the interest of the parties or any of them in this agreement, including its respective interest in any moneys belonging to or which may accrue to the Joint Venture in connection with the Construction Contract, may be assigned, pledged, transferred or hypothecated, except that in the event a party desires to obtain banking accommodations, such party may assign, pledge, or hypothecate to the lending institution as security for such banking accommodation, its interest in the moneys to be received by such party under this agreement when distributed to it in accordance with its terms, if the other parties to this agreement give their written consent to it in advance.

### 20. ADJUSTMENT OF ACCOUNTS

a.  On completion of the performance of the Construction Contract, the parties shall render a true and correct account, each to the others, of all expenses incurred on account of and all moneys received as result of, such performance. The parties mutually agree, on completion of the performance of the Construction Contract, to settle and adjust all accounts in connection with the performance of the Construction Contract, and to pay, each to the others, such sums as well result in reach of the parties receiving that portion of all profits arising from the performance of the Construction Contract, or bearing that proportion of all losses arising from it in accordance with Articles see forth in this agreement.

### 21. TRUST FUNDS

a.  All moneys contributed by the Joint Venturers to this Joint Venture and all moneys received as payments under the Construction Contract or otherwise received shall be treated and regarded as, and are hereby declared to be, trust funds for the performance of the Construction Contract and for no other purpose until the Construction Contract shall have been fully completed and accepted by owner and until all obligations of the Joint Venturers hereto shall have been paid, otherwise discharged, or provided for adequate reserves. Such reserves shall likewise be treated as trust funds until they shall have served the purposes for which they were created.

### 22. DISSOLUTION OF JOINT VENTURE

a.  Upon dissolution of the Joint Venture, except as otherwise provided herein, the operation of the Joint Venture's business shall be confined to those activities necessary to wind up the Joint Venture's affairs, discharge its obligations, and preserve and distribute its assets. Any gains or losses of the Joint Venture arising out of the liquidation of the Joint Venture's assets shall be allocated, and the cash and other property of the Joint Venture remaining after satisfaction of Joint Venture obligations shall be distributed, to the Joint Venturers in accordance with the provisions of Article (5) above.

### 23. BINDING EFFECT

a.  Except as otherwise provided in this agreement, this agreement shall inure to the benefit of, and be binding on the parties, their successors, trustees, assigns, receivers and legal representatives, but shall not inure to the benefit of any other person, firm, or corporation.

### 24. GOVERNING LAW

a.  All questions relative to the execution, validity, interpretation, and performance of this agreement

shall be governed by the laws of the State of Texas.

25. **DISPUTE RESOLUTION**
   a.  If a dispute arises that cannot be resolved through direct discussions, Joint Venturers shall participate in mediation before recourse to any other form of binding dispute resolution. The location of the mediation shall be in Houston, Texas. Agreements reached in mediation shall be binding and enforceable as any other settlement agreement. If the Joint Venturers are not able to resolve the dispute in Mediation, then such disputes shall be resolved through binding arbitration carried out in accordance with the rules and regulations of the American Arbitration Association.  The decision of the arbitrator in any such proceeding shall be fully enforceable in any court of competent jurisdiction.

26. **ENTIRE AGREEMENT**
   This agreement contains the sole and only agreement of the parties hereto relating to the Joint Venture. Any prior agreement, promises, negotiations or representations not expressly set forth in this Agreement are of no force and effect.

   **IN WITNESS WHEREOF,** the undersigned have executed this Joint Venture Agreement as of the first day of July, 2012.

   HASSELL CONSTRUCTION CO., INC.

   _____
   Phillip Hassell

   R. HASSELL HOLDING CO., I NC.
      R. HASSELL & COMPANY, INC
      R. HASSELL BUILDERS, INC.
      GR GROUP RESOURCES

   _____
   Royce Hassell

# EXHIBIT "B"

Filed 13 October 15 P2:29
Chris Daniel - District Clerk
Harris County
ED101J017770292
By: Sharon Carlton

| 2013-61995 / Court: 125 |
|---|

CAUSE NO. _____

| | | |
|---|---|---|
| R. HASSELL & CO., INC., | § | IN THE DISTRICT COURT OF |
| R. HASSELL BUILDERS, INC. | § | |
| R. HASSELL HOLDING CO., INC. | § | |
| AND | § | |
| G.R. GROUP RESOURCES LLP, | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| | § | |
| **HASSELL CONSTRUCTION CO.,** | § | |
| **INC. AND** | § | |
| **HASSELL MANAGEMENT** | § | |
| **SERVICES, LLC** | § | |
| | § | |
| **Defendants.** | § | _____ JUDICIAL DISTRICT |

## PLAINTIFFS' ORIGINAL PETITION FOR DECLARATORY JUDGMENT

R. Hassell & Co., Inc. ("RHC"), R. Hassell Builders, Inc. ("RHB"), R. Hassell Holding

Co., Inc. ("RHH") and G. R. Group Resources LLP ("GRGR") (collectively "Plaintiffs") file

their Original Petition against Hassell Construction Co., Inc. and Hassell Management Services,

Inc. (hereinafter jointly referred to as "HCCI") as follows:

### PARTIES

1.      R. Hassell & Co., Inc. is a Texas corporation with its principal place of business

in Harris County, Texas.

2.      R. Hassell Builders, Inc. is a Texas corporation with its principal place of

business in Harris County, Texas.

3.      R. Hassell Holding Co., Inc. is a Texas corporation with its principal place of

business in Harris County, Texas.

4.      G. R. Group Resources LLP is a Texas limited partnership with its principal place of business in Harris County, Texas.

5.      Hassell Construction Co., Inc. is a Texas corporation with its principal place of business in Harris County, Texas. HCC may be served with process herein by serving its registered agent for service of process, James C. Hassell, 12211 Duncan, Houston, Texas 77066.

6.      Hassell Management Services, LLC is a Texas limited liability company with its principal place of business in Harris County, Texas.  HMS may be served with process herein by serving its registered agent for service of process, James P. Hassell, 12211 Duncan, Houston, Texas 77066.

## VENUE

7.      Venue is proper in Harris County, Texas pursuant to Civ. Prac. & Rem. Code § 15.002 in that Harris County is the county in which all or a substantial part of the events or omissions giving rise to the claim occurred.

## FACTUAL BACKGROUND

8.      James Hassell is the founder of HCCI. Royce Hassell, James Hassell's son from James Hassell's first marriage, worked at HCCI for many years. In the early 1990s Royce Hassell separated from HCCI and formed RHC and the other Plaintiff companies over time. Thereafter, Phillip Hassell, Mike Hassell and Shawn Hassell, James Hassell's children from James Hassell's second marriage, began working at HCCI. Phillip Hassell became the President of HCCI and runs it on a day-to-day basis.

9.      Throughout the years the parties involved one another in various separate and joint construction projects under various business arrangements.  In 2012 the parties formed a joint venture and later executed a Construction Joint Venture Agreement ("JV") dated July 1,

2012. The July 1, 2012 date was requested by HCCI to coincide with HCCI's fiscal year.  The JV reads, in part, as follows:

1.    FORMATION OF JOINT VENTURE

a.    The joint venturers hereby constitute themselves as joint venturers for the purpose of performing and completing the certain public and/or private sector construction projects consummating the understanding and agreement that both Venturers have different skills and expertise in differing areas of construction and in order to expand into new markets heretofore untouched, combine their efforts as Venturers. From time to time upon written consent of all joint venturers, joint venturers may include new projects to their joint venture including any upcoming projects, ongoing projects or any others that may apply.

9.  COST OF CONSTRUCTION

a. … Equipment, autos, trucks etc. rented from either of the Joint Venturers shall be charged as a construction cost at a rate mutually agreed on by the representatives of the parties to the Joint Venture project cost.

10.    RECORDS

(a) … All records of the Joint Venture shall be open for inspection of either  Joint Venturer at all times.
…

(c) Upon the completion of the Construction Contract a true and correct accounting shall be had of all costs and expenses and all accounts, vouchers, and other data relating to the Construction Contract and its performance.

15.    PAYMENT OF JOINT VENTURE EXPENSES

a. The Joint Venture shall pay all reasonable and necessary expenses of the Joint Venture, including, but not limited to, reasonable rent for tools, machinery, personnel, etc., provided by one of the Joint Venturers to the Joint Venture, as agreed by the Joint Venturers in advance. In addition, the Joint Venture shall reimburse each Joint Venturer for other reasonable and necessary expenses incurred by it in the ordinary and proper conduct of the Joint Venture business and/or for the preservation of the Joint Venture business or property.

17.    LEASING OF MACHINERY AND EQUIPMENT

a. The parties shall lease to the joint venture, and the Joint Venture shall lease from the parties, for the terms respectively commencing when the Joint Venture shall require them for use in performing the Construction Contract without delay and continuing subsequently whenever and for as long as the same shall be required in such performance, such machinery, equipment, autos and trucks as the parties may have available for use on the project, at and for the unit rental rates mutually agreed on by the representatives of the parties.

b. Schedules of the mutually agreed rental rates shall be signed by each Venturer and attached to this agreement.

## 21. TRUST FUNDS

a. All moneys contributed by the Joint Venturers to this Joint Venture and all moneys received as payments under the Construction Contract or otherwise received shall be treated and regarded as, and are hereby declared to be, trust funds for the performance of the Construction Contract and for no other purpose until the Construction Contract shall have been fully completed and accepted by owner and until all obligations of the Joint Venturers hereto shall have been paid, otherwise discharged, or provided for adequate reserves. Such reserves shall likewise be treated as trust funds until they shall have served the purposes for which they were created.

10.    In or around September of 2012 the JV bid and began work on various projects. After the formation of the JV Phillip Hassell stated to employees of Plaintiffs and HCCI who were performing JV work that "from now on there is no more HCCI or R. Hassell, there is just 'Hassell.'" Plaintiffs contend the JV projects include, but are not limited to, the following projects which were bid by, awarded to and are being prosecuted by the JV:

i.    Cinco Ranch Northwest Sections 7, 5 and 69.

ii.   Cy-Fair ISD Paving and Utilities for West Green

iii.  Cinco Ranch Southwest Sections 5 (Phase 2), 70 and 71

iv.   Stuebner Airline Segment B

v.    U.S. 59 Frontage Road

Other projects, such as Transtar II, are JV projects.

11.     During the course of the JV relationship HCCI took over assets of Plaintiffs under the auspices of the JV and utilized them to conduct work on HCCI projects that were not included in the JV but which were ongoing at the formation of the JV.  These assets of Plaintiffs include employees, equipment and goodwill.  Certain employees have been paid through Hassell Management Services, LLC.  No accounting has been conducted of HCCI's use of these assets.

12.     No JV accounting has been made of the JV projects and non-JV projects wherein HCCI utilized assets of Plaintiffs.  The funds from such projects as well as the records of such projects are controlled by HCCI.   Plaintiffs repeatedly objected to the lack of JV accounting and to being denied access to source documents necessary to perform an accounting.

13.     Certain JV projects have been concluded and require a final JV accounting. However, HCCI has sole control of the information necessary to account for these projects.

14.     HCCI has not reimbursed Plaintiffs for reasonable and necessary JV expenses including overhead, labor, equipment, sub-contractor costs and continues to withhold accounting and funds from JV projects.

15.     HCCI has not paid Plaintiffs for the use of equipment by the JV or nor has it paid Plaintiffs for use of Plaintiff's equipment by HCCI on non-JV projects.

16.     HCCI has appropriated JV projects, has appropriated assets of Plaintiffs, has obtained monies from construction contracts, failed to treat them as Trust Funds and has distributed money to itself while withholding money from Plaintiffs.

## CAUSES OF ACTION

*Declaratory Judgment*

17.     RHC, RHB, RHH and GRGR re-allege the allegations set forth above.

18.     RHC, RHB, RHH and GRGR are interested under the JV and requests the Court

to determine questions of validity of the JV and various other business arrangements.  RHC, RHB, RHH and GRGR seek to obtain a declaration of their rights, status or other legal relations thereunder pursuant to Tex. Civ. Prac. & Rem. Code §37.004.

*Breach of Joint Venture Agreement*

19.    RHC, RHB, RHH and GRGR re-allege the allegations set forth above.

20.    HCCI's actions as described above constitute a breach of the Joint Venture Agreement. HCCI's action as described above constitute breaches of various other business arrangements prior to and concurrent with the JV.  Because of HCC's breach, Plaintiffs have been damaged in an amount in excess of the jurisdictional limits of this court.

*Accounting*

21.    RHC, RHB, RHH and GRGR re-allege the allegations set forth above.

22.    RHC, RHB, RHH and GRGR request an accounting of the amounts owed to them pursuant to the JV agreement and the various other business arrangements of the parties.

*Attorneys' Fees*

23.    RHC, RHB, RHH and GRGR re-allege the allegations set forth above.

24.    RHC, RHB, RHH and GRGR request the Court to award costs and reasonable and necessary attorneys' fees to RHC, RHB, RHH and GRGR from HCCI as are equitable and just pursuant to Tex. Civ. Prac. & Rem. Code §37.009 and §38.001 *et seq.*

**PRAYER**

Accordingly, R. Hassell & Co., Inc., R. Hassell Builders, Inc., R. Hassell Holding Co., Inc. and G. R. Group Resources LLP pray that Hassell Construction Co., Inc. and Hassell Management Services, Inc. be cited to appear and answer herein and that upon final trial hereof RHC, RHB, RHH and GRGR have judgment against HCCI as follows:

A.  A declaratory judgment as set forth above;

B.  Actual damages;

C.  Attorneys' fees payable to RHC, RHB, RHH and GRGR by HCCI; and

D.  Such other and further relief to which RHC, RHB, RHH and GRGR may show themselves justly entitled.

Respectfully submitted,

_____
Robert J. Kruckemeyer, SBOT # 11735700
800 Commerce Street
Houston, Texas 77002
Ph: (713) 226-5175 - Fax: (713) 225-0827

Attorneys for Plaintiffs

# EXHIBIT "C"

**FILED**
Chris Danial
District Clerk

MAR 0 3 2014

Time:_____
Harris County, Texas
By_____
Deputy

CAUSE NO. 2013-61995

| | | |
|---|---|---|
| R. HASSELL & CO, INC.; | § | IN THE DISTRICT COURT |
| R. HASSELL BUILDERS, INC.; | § | |
| R. HASSELL HOLDING CO., INC; | § | |
| G.R. GROUP RESOURCES, LLP | § | |
| | § | |
| PLAINTIFFS, | § | |
| | § | |
| VS. | § | 125TH JUDICIAL DISTRICT |
| | § | |
| HASSELL CONSTRUCTION CO., INC.; | § | |
| HASSELL MANAGEMENT | § | |
| SERVICES, LLC | § | |
| | § | |
| DEFENDANTS | § | HARRIS COUNTY, TEXAS |

## ORDER

On this the _____ day of _____, 2013, came to be heard Defendants Hassel Construction Co., Inc. and Hassell Management Services, LLC's ("Defendants")Motion to Compel Arbitration and Abatement Pending Arbitration against R. Hassell & Co, Inc., R. Hassell Builders, Inc., R. Hassell Holding Co., Inc., and G.R. Group Resources, LLP ("Plaintiffs"), and the Court having considered the motion and being of the opinion that the motion is in all things proper, it is hereby

ORDERED, that Defendants' Motion to Compel Arbitration and Abatement Pending Arbitration is granted; it is further

ORDERED that this matter is referred to arbitration in accordance with the arbitration agreement executed between Plaintiffs and Defendants; it is further

ORDERED that any and all claims and causes of action asserted by Plaintiffs against Defendants in the referenced lawsuit are abated until the arbitration award is rendered; it is further

1

ORDERED that Plaintiffs shall commence arbitration proceedings with the American Arbitration Association pursuant to the arbitration agreement within 60 days from the entry of this Order. Upon notice by any party that such arbitration has not been commenced within said period, this Court shall dismiss this case without prejudice and all costs shall be taxed against Plaintiffs.

SIGNED on this the ___ day of _March_ , 2018.

_____
JUDGE PRESIDING

2

# EXHIBIT "D"



**12211 DUNCAN ROAD
HOUSTON, TEXAS 77066
PH. 281-893-2570
FAX 281-580-9170**
*est.1976*

### Promissory Note

On this date of October 5, 2010, in return for valuable consideration received, the undersigned borrower promises to pay to Hassell Construction Company Inc., the "Lender", the sum of $(350,000.00) Three Hundred Fifty Thousand Dollars, together with the interest thereon at the initial rate of 5%.

This loan shall be repaid under the following terms:  Starting on October 15, 2010 and continuing thereafter quarterly until October 15, 2011 Royce Hassell personally shall make payments of interest only on balance of note at the current rate being charged by Vista Bank of Texas.  On October 15, 2011 final payment is due in the amount of $(350,000.00) Three Hundred Fifty Thousand Dollars.

This note may be prepaid in whole or in part at any time without premium or penalty.  All prepayments shall first be applied to the interest due, and then to the principle.

_____
Borrower Royce Hassell

Signed in the presence of:

_____
Witness

# EXHIBIT "E"

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU
MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS
INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS:
YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER

## <u>DEED OF TRUST</u>

**DATE:**    June 13, 2011

**GRANTOR:**   Royce J. Hassell and Silvia T. Hassell

**GRANTOR'S MAILING ADDRESS (INCLUDING COUNTY):**

P. O. Box 20487, Houston, Harris County, Texas 77225-0487

**TRUSTEE:**   Shaw Potts, Trustee

**TRUSTEE'S MAILING ADDRESS (INCLUDING COUNTY):**

25034 Huffsmith Cemetery Road, Tomball, Texas 77375

**BENEFICIARY:**    James C. Hassell

**BENEFICIARY'S MAILING ADDRESS (INCLUDING COUNTY):**

12211 Duncan Road, Houston, Harris County, Texas 77056

**INSTRUMENT SECURED:**

James  C. Hassell's obligation as a guarantor to pay any principal, interest or other amount based
upon any funds received by R. Hassell under that certain Line of Credit between Jim Hassell , as
Borrower, and Vista Bank, as Lender (and any amendments, extensions, renewals, substitutions,
modifications, and supplements) in an amount never to exceed the principal amount of $2,500,000
plus any accrued interest thereon (the "Obligation").

**PROPERTY (INCLUDING ANY IMPROVEMENTS):**

This is a deed of trust lien against that real property more particularly described in that certain
"General Warranty Deed with Vendor's Lien," dated May 20, 2002 between Mike Mitchell and
spouse, Debbie Mitchell, as Grantors, and Royce J. Hassell and spouse, Silvia T. Hassell, as
Grantees, as recorded at Film Code 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 of the Official Real Property Records of
Montgomery County, Texas (the "Property").



This lien is subordinate to that certain Deed of Trust, dated January 30, 2003, between Royce J. Hassell and Silvia T. Hassell, as Barrower, PRLAP, Inc., as Trustee and Bank of America, NA, as Beneficiary, recorded at Film Code 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 of the Official Real Property Records of Montgomery County, Texas.

## OTHER EXCEPTIONS TO CONVEYANCE AND WARRANTY:

Subject to any and all valid and subsisting restrictions, easements, rights of way, mineral and royalty reservations, maintenance charges, zoning laws, ordinances of municipal and/or other governmental authorities, conditions and covenants, if any, applicable to and enforceable against the Property and properly of record respectively in the office of the County Clerk of the county in which the Property is located in whole or in part.

For value received and to secure payment of the Note, Grantor conveys all right, title and interest in, to and under the Property to Trustee in trust. Grantor warrants and agrees to defend the title to the property. If Grantor performs all the covenants and there is no Event of Default under this Deed of Trust, this Deed of Trust shall have no further effect, and Beneficiary shall release it at Grantor's expense.

## GRANTOR'S OBLIGATIONS AND EVENTS OF DEFAULT:

Grantor agrees to:

1. keep the property in good repair and condition;

2. pay all taxes and assessments on the property when due;

3. preserve the respective Lien's priority as it is established in this Deed of Trust; and

4. maintain the current insurance on the real property for the full replacement value of all improvements with Grantor as beneficiaries; and

The failure of Grantor to comply with any of the foregoing four (4) obligations after thirty (30) days written notice to comply shall constitute an Event of Default.

If (a) Beneficiary has paid any amount under the Obligation and (b) Grantor does not reimburse Beneficiary all such amounts paid by Beneficiary in full after sixty (60) days written notice, then, upon the condition that all of these two events have occurred, there is an Event of Default.

## BENEFICIARY'S RIGHTS:

1. Beneficiary may appoint in writing a substitute or successor trustee, succeeding to all rights and responsibilities of Trustee.

2.      If there is an Event of Default, Beneficiary may:

   a.      request Trustee to foreclose this Lien, in which case Beneficiary or Beneficiary's agent shall give notice of the foreclosure sale as provided by the Texas Property Code as then amended; and

   b.      purchase the property at any foreclosure sale by offering the highest bid and then have the bid credited to the Note.

**TRUSTEE'S DUTIES:**

If requested by Beneficiary to foreclose this Lien, Trustee shall:

1.      either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then amended;

2.      sell and convey all or part of the property to the highest bidder for cash with a general warranty binding Grantor, subject to prior liens and to other exceptions to conveyance and warranty; and

3.      from the proceeds of the sale, pay, in this order:

   a.      expenses of foreclosure, including a commission to Trustee of 5% of the bid;
   b.      to Beneficiary, the full amount paid by Beneficiary under the Obligation;
   c.      any amounts required by law to be paid before payment to Grantor; and
   d.      to Grantor, any balance.

**GENERAL PROVISIONS:**

1.      If any of the Property is sold under this Deed of Trust, Grantor shall immediately surrender possession to the purchaser.  If Grantor fails to do so, Grantor shall become a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

2.      Recitals in any Trustee's deed conveying the property will be presumed to be true.

3.      Proceeding under this Deed of Trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

4.      This lien shall remain superior to liens later created even if the time of payment of all or part of the Note is extended or part of the property is released.

5.      If there is a casualty loss which can be restored to the pre-loss condition of the Property with the proceeds from the insurance, then Grantor shall so restore the Property to the its

pre-loss condition. If there is any other casualty loss or a whole or partial condemnation of the Property, then Grantor shall receive the proceeds from the insurance or the condemning authority and deposit those proceeds in a certificate of deposit with a market interest rate. Grantor grants a security interest to Beneficiary in the right to receive those proceeds, in the proceeds, and in the certificate of deposit. Grantor agrees to sign any documents necessary to perfect this security interest and agreement. Grantor also grants a limited power of attorney to Beneficiary to sign any document necessary to perfect this security interest and agreement. The rights in this paragraph are subordinate to any respective prior deed of trust lien or vendor's lien.

6.     When context requires, singular nouns and pronouns include the plural.

7.     This Deed of Trust shall bind, inure to the benefit of, and be exercised by successors in interest of all parties.

8.     If Grantor and Maker are not the same person, the "Grantor" shall include Maker.

9.     As evidence of the discharge of Grantor's responsibility to pay all taxes and assessments and to keep said premises insured, Grantor shall deliver to any holder of the indebtedness the official receipts for said taxes and assessments before the same shall become delinquent and shall deliver to any holder of the indebtedness receipts showing said insurance premiums as having been paid in advance for each succeeding year for any and all parcels of secured property named herein.

10.     Beneficiary may remedy any Event of Default without waiving it and may waive any Event of Default without waiving any prior or subsequent Even of Default.

_____  
ROYCE J. HASSELL

_____  
SILVIA T. HASSELL

STATE OF TEXAS       §  
                       §  
COUNTY OF HARRIS    §

This instrument was acknowledged before me on this 18ᵗʰ day of July, 2011, by Royce J. Hassell.

CYNTHIA L. GROOMS  
NOTARY PUBLIC STATE OF TEXAS  
COMMISSION EXPIRES:  
06-16-2012

_____  
Notary Public -- State of Texas

4 | Page

STATE OF TEXAS      §
                               §
COUNTY OF HARRIS    §

      This instrument was acknowledged before me on this _18th_ day of _July_, 2011, by Silvia T. Hassell.



                     Notary Public -- State of Texas

**AFTER RECORDING PLEASE RETURN TO:**

Shawn Potts
25034 Huffsmith Cemetery Road
Tomball, Texas 77375

> CYNTHIA L. GROOMS
> NOTARY PUBLIC STATE OF TEXAS
> COMMISSION EXPIRES:
> 06-16-2012

Doc# 2011062057

FILED FOR RECORD
07/18/2011   3:27PM

*[signature]*

COUNTY CLERK
MONTGOMERY COUNTY, TEXAS

STATE OF TEXAS
COUNTY OF MONTGOMERY
I hereby certify this instrument was filed in file number
sequence on the date and at the time stamped herein
by me and was duly RECORDED in the Official Public
Records of Montgomery County, Texas.

07/18/2011

*[seal]*   *[signature]*

County Clerk
Montgomery County, Texas

# EXHIBIT "F"

2011029711?
07/19/201  RP2  $53.00

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER

## DEED OF TRUST

**DATE:**   June 13, 2011

**GRANTOR:**  Royce J. Hassell and Silvia T. Hassell

**GRANTOR'S MAILING ADDRESS (INCLUDING COUNTY):**

P. O. Box 20487, Houston, Harris County, Texas 77225-0487

**TRUSTEE:**   Shaw Potts, Trustee

**TRUSTEE'S MAILING ADDRESS (INCLUDING COUNTY):**

25034 Huffsmith Cemetery Road, Tomball, Texas 77375

**BENEFICIARY:**    James C. Hassell

**BENEFICIARY'S MAILING ADDRESS (INCLUDING COUNTY):**

12211 Duncan Road, Houston, Harris County, Texas 77056

**INSTRUMENT SECURED:**

James C. Hassell's obligation as a guarantor to pay any principal, interest or other amount based upon any funds received by R. Hassell under that certain Line of Credit between Jim Hassell, as Borrower, and Vista Bank, as Lender (and any amendments, extensions, renewals, substitutions, modifications, and supplements) in an amount never to exceed the principal amount of $2,500,000 plus any accrued interest thereon (the "Obligation").

**PROPERTY (INCLUDING ANY IMPROVEMENTS):**

This is a deed of trust lien against that certain real property more particularly described as 5302 Maple Street, Bellaire, Harris County, Texas and more particularly described as Lot Twenty-three (23), of BRAEBURN COUNTRY CLUB ESTATES, a subdivision in Harris County, Texas, according to the map or plat thereof, recorded in Volume 22, Page 72 of the Official Real Property Records of Harris County, Texas. (the "Property").

This deed of trust lien is subordinate to that certain Deed of Trust, dated June 6, 2007, between Royce J. Hassell and Silvia T. Hassell, as Grantor, James W. Goolsby, Jr., as Trustee, and Sterling Bank, as Beneficiary, recorded at File No. 2007-0423777 of the Official Real Property Records of Harris County, Texas as modified.

## OTHER EXCEPTIONS TO CONVEYANCE AND WARRANTY:

Subject to any and all valid and subsisting restrictions, easements, rights of way, mineral and royalty reservations, maintenance charges, zoning laws, ordinances of municipal and/or other governmental authorities, conditions and covenants, if any, applicable to and enforceable against the Property and properly of record respectively in the office of the County Clerk of the county in which the Property is located in whole or in part.

For value received and to secure payment of the Note, Grantor conveys all right, title and interest in, to and under the Property to Trustee in trust. Grantor warrants and agrees to defend the title to the property. If Grantor performs all the covenants and there is no Event of Default under this Deed of Trust, this Deed of Trust shall have no further effect, and Beneficiary shall release it at Grantor's expense.

## GRANTOR'S OBLIGATIONS AND EVENTS OF DEFAULT:

Grantor agrees to:

1. keep the property in good repair and condition;

2. pay all taxes and assessments on the property when due;

3. preserve the respective Lien's priority as it is established in this Deed of Trust; and

4. maintain the current insurance on the real property for the full replacement value of all improvements with Grantor as beneficiaries; and

The failure of Grantor to comply with any of the foregoing four (4) obligations after thirty (30) days written notice to comply shall constitute an Event of Default.

If (a) Beneficiary has paid any amount under the Obligation and (b) Grantor does not reimburse Beneficiary all such amounts paid by Beneficiary in full after sixty (60) days written notice, then, upon the condition that all of these two events have occurred, there is an Event of Default.

## BENEFICIARY'S RIGHTS:

    1.      Beneficiary may appoint in writing a substitute or successor trustee, succeeding to all rights and responsibilities of Trustee.

    2.      If there is an Event of Default, Beneficiary may:

        a.      request Trustee to foreclose this Lien, in which case Beneficiary or Beneficiary's agent shall give notice of the foreclosure sale as provided by the Texas Property Code as then amended; and

        b.      purchase the property at any foreclosure sale by offering the highest bid and then have the bid credited to the Note.

**TRUSTEE'S DUTIES:**

If requested by Beneficiary to foreclose this Lien, Trustee shall:

    1.      either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then amended;

    2.      sell and convey all or part of the property to the highest bidder for cash with a general warranty binding Grantor, subject to prior liens and to other exceptions to conveyance and warranty; and

    3.      from the proceeds of the sale, pay, in this order:

        a.      expenses of foreclosure, including a commission to Trustee of 5% of the bid;
        b.      to Beneficiary, the full amount paid by Beneficiary under the Obligation;
        c.      any amounts required by law to be paid before payment to Grantor; and
        d.      to Grantor, any balance.

**GENERAL PROVISIONS:**

    1.      If any of the Property is sold under this Deed of Trust, Grantor shall immediately surrender possession to the purchaser. If Grantor fails to do so, Grantor shall become a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

    2.      Recitals in any Trustee's deed conveying the property will be presumed to be true.

    3.      Proceeding under this Deed of Trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

    4.      This lien shall remain superior to liens later created even if the time of payment of all or part of the Note is extended or part of the property is released.

5.      If there is a casualty loss which can be restored to the pre-loss condition of the Property with the proceeds from the insurance, then Grantor shall so restore the Property to the its pre-loss condition. If there is any other casualty loss or a whole or partial condemnation of the Property, then Grantor shall receive the proceeds from the insurance or the condemning authority and deposit those proceeds in a certificate of deposit with a market interest rate. Grantor grants a security interest to Beneficiary in the right to receive those proceeds, in the proceeds, and in the certificate of deposit.  Grantor agrees to sign any documents necessary to perfect this security interest and agreement. Grantor also grants a limited power of attorney to Beneficiary to sign any document necessary to perfect this security interest and agreement.  The rights in this paragraph are subordinate to any respective prior deed of trust lien or vendor's lien.

6.      When context requires, singular nouns and pronouns include the plural.

7.      This Deed of Trust shall bind, inure to the benefit of, and be exercised by successors in interest of all parties.

8.      If Grantor and Maker are not the same person, the "Grantor" shall include Maker.

9.      As evidence of the discharge of Grantor's responsibility to pay all taxes and assessments and to keep said premises insured, Grantor shall deliver to any holder of the indebtedness the official receipts for said taxes and assessments before the same shall become delinquent and shall deliver to any holder of the indebtedness receipts showing said insurance premiums as having been paid in advance for each succeeding year for any and all parcels of secured property named herein.

10.      Beneficiary may remedy any Event of Default without waiving it and may waive any Event of Default without waiving any prior or subsequent Even of Default.


_____          _____
ROYCE J. HASSELL                                     SILVIA T. HASSELL


STATE OF TEXAS                §
                                            §
COUNTY OF HARRIS        §


This instrument was acknowledged before me on this _1 8th_ day of _July_, 2011, by Royce J. Hassell.


CYNTHIA L. GROOMS
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
06-15-2012

_____
Notary Public -- State of Texas


4 | P a g e

STATE OF TEXAS            §
                         §
COUNTY OF HARRIS          §

This instrument was acknowledged before me on this 18th day of July, 2011, by Silvia T. Hassell.

_____
Notary Public -- State of Texas

AFTER RECORDING PLEASE RETURN TO:

Shawn Potts
25034 Huffsmith Cemetery Road
Tomball, Texas 77375

CYNTHIA L. GROOMS
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
06-16-2012

ANY PROVISION HEREIN WHICH RESTRICTS THE SALE RENTAL, OR USE OF THE DESCRIBED REAL PROPERTY BECAUSE OF COLOR OR RACE IS INVALID AND UNENFORCEABLE UNDER FEDERAL LAW.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in File Number Sequence on the date and at the time stamped hereon by me, and was duly RECORDED, in the Official Public Records of Real Property of Harris County, Texas

JUL 19 2011

COUNTY CLERK
HARRIS COUNTY, TEXAS

COUNTY CLERK
HARRIS COUNTY TEXAS

FILED
2011 JUL 19 PM 2: 59