# EXHIBIT "G"

201102597122
07/19/2011  RP2  $32.00

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER**

## DEED OF TRUST

**DATE:**      June 13, 2011

**GRANTOR:**   Royce J. Hassell and Silvia T. Hassell

**GRANTOR'S MAILING ADDRESS (INCLUDING COUNTY):**

P. O. Box 20487, Houston, Harris County, Texas 77225-0487

**TRUSTEE:**   Shawn Potts, Trustee

**TRUSTEE'S MAILING ADDRESS (INCLUDING COUNTY):**

25043 Huffsmith Cemetery Road, Tomball, Texas 77375

**BENEFICIARY:**     Vista Bank

**BENEFICIARY'S MAILING ADDRESS (INCLUDING COUNTY):**

14561 Northwest Freeway, Houston, Harris County, Texas 77040

**INSTRUMENT SECURED:**

James C. Hassell's obligation as a guarantor to pay any principal, interest or other amount based upon any funds received by R. Hassell under that certain Line of Credit between Jim Hassell , as Borrower, and Vista Bank, as Lender (and any amendments, extensions, renewals, substitutions, modifications, and supplements) in an amount never to exceed the principal amount of $2,500,000 plus any accrued interest thereon (the "Obligation").

**PROPERTY (INCLUDING ANY IMPROVEMENTS):**

This is a deed of trust lien against that certain real property located 6417 Buffalo Speedway, Houston, Harris County, Texas and more particularly described as the North Fifty Feet (N. 50') of Block Nine (9), in Block Twelve (12), of WEST UNIVERSITY PLACE, an addition in Harris County, Texas, according to the map or plat thereof, recorded in Volume 444, Page 563 of the Official Real Property Records of Harris County, Texas. (the "Property").

This deed of trust lien is subordinate to that certain Deed of Trust, dated July 6, 2007, between Royce J. Hassell and Silvia T. Hassell, as Grantor, James W. Goolsby, Jr., as Trustee, and Sterling Bank, as Beneficiary, recorded at File Code 2007-0423777.

**OTHER EXCEPTIONS TO CONVEYANCE AND WARRANTY:**

Subject to any and all valid and subsisting restrictions, easements, rights of way, mineral and royalty reservations, maintenance charges, zoning laws, ordinances of municipal and/or other governmental authorities, conditions and covenants, if any, applicable to and enforceable against the Property and properly of record respectively in the office of the County Clerk of the county in which the Property is located in whole or in part.

For value received and to secure payment of the Note, Grantor conveys all right, title and interest in, to and under the Property to Trustee in trust. Grantor warrants and agrees to defend the title to the property. If Grantor performs all the covenants and there is no Event of Default under this Deed of Trust, this Deed of Trust shall have no further effect, and Beneficiary shall release it at Grantor's expense.

**GRANTOR'S OBLIGATIONS AND EVENTS OF DEFAULT:**

Grantor agrees to:

1.  keep the property in good repair and condition;

2.  pay all taxes and assessments on the property when due;

3.  preserve the respective Lien's priority as it is established in this Deed of Trust; and

4.  maintain the current insurance on the real property for the full replacement value of all improvements with Grantor as beneficiaries; and

The failure of Grantor to comply with any of the foregoing four (4) obligations after thirty (30) days written notice to comply shall constitute an Event of Default.

If (a) Grantor is in default under the Trustmark Loan, (b) Beneficiary has paid any amount under the Jim Hassell Guaranty, and (c) Grantor does not reimburse Beneficiary all such amounts paid by Beneficiary in full after sixty (60) days written notice, then, upon the condition that all of these three events have occurred, there is an Event of Default.

**BENEFICIARY'S RIGHTS:**

1.   Beneficiary may appoint in writing a substitute or successor trustee, succeeding to all rights and responsibilities of Trustee.

2.   If there is an Event of Default, Beneficiary may:

    a.   request Trustee to foreclose this Lien, in which case Beneficiary or Beneficiary's agent shall give notice of the foreclosure sale as provided by the Texas Property Code as then amended; and

    b.   purchase the property at any foreclosure sale by offering the highest bid and then have the bid credited to the Note.

**TRUSTEE'S DUTIES:**

If requested by Beneficiary to foreclose this Lien, Trustee shall:

1.   either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then amended;

2.   sell and convey all or part of the property to the highest bidder for cash with a general warranty binding Grantor, subject to prior liens and to other exceptions to conveyance and warranty; and

3.   from the proceeds of the sale, pay, in this order:

    a.   expenses of foreclosure, including a commission to Trustee of 5% of the bid;
    b.   to Beneficiary, the full amount paid by Beneficiary under the Jim Hassell Guaranty;
    c.   any amounts required by law to be paid before payment to Grantor; and
    d.   to Grantor, any balance.

**GENERAL PROVISIONS:**

1.   If any of the Property is sold under this Deed of Trust, Grantor shall immediately surrender possession to the purchaser. If Grantor fails to do so, Grantor shall become a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

2.   Recitals in any Trustee's deed conveying the property will be presumed to be true.

3.   Proceeding under this Deed of Trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

4.   This lien shall remain superior to liens later created even if the time of payment of all or part of the Note is extended or part of the property is released.

5.      If there is a casualty loss which can be restored to the pre-loss condition of the Property with the proceeds from the insurance, then Grantor shall so restore the Property to the its pre-loss condition. If there is any other casualty loss or a whole or partial condemnation of the Property, then Grantor shall receive the proceeds from the insurance or the condemning authority and deposit those proceeds in a certificate of deposit with a market interest rate. Grantor grants a security interest to Beneficiary in the right to receive those proceeds, in the proceeds, and in the certificate of deposit.   Grantor agrees to sign any documents necessary to perfect this security interest and agreement. Grantor also grants a limited power of attorney to Beneficiary to sign any document necessary to perfect this security interest and agreement. The rights in this paragraph are subordinate to any respective prior deed of trust lien or vendor's lien.

6.      When context requires, singular nouns and pronouns include the plural.

7.      This Deed of Trust shall bind, inure to the benefit of, and be exercised by successors in interest of all parties.

8.      If Grantor and Maker are not the same person, the "Grantor" shall include Maker.

9.      As evidence of the discharge of Grantor's responsibility to pay all taxes and assessments and to keep said premises insured, Grantor shall deliver to any holder of the indebtedness the official receipts for said taxes and assessments before the same shall become delinquent and shall deliver to any holder of the indebtedness receipts showing said insurance premiums as having been paid in advance for each succeeding year for any and all parcels of secured property named herein.

10.     Beneficiary may remedy any Event of Default without waiving it and may waive any Event of Default without waiving any prior or subsequent Even of Default.

_____          _____
ROYCE J. HASSELL                         SILVIA T. HASSELL

STATE OF TEXAS          §
                        §
COUNTY OF HARRIS        §

This instrument was acknowledged before me on this ___18th___ day of June, 2011, by Royce J. Hassell.

CYNTHIA L. GROOMS
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
06-15-2012

_____
Notary Public -- State of Texas

STATE OF TEXAS            §
                         §
COUNTY OF HARRIS          §

   This instrument was acknowledged before me on this ___18th___ day of June, 2011, by Silvia T. Hassell.

                                   _____
                                   Notary Public -- State of Texas

**AFTER RECORDING PLEASE RETURN TO:**

   Shawn Potts
   25034 Huffsmith Cemetery Road
   Tomball, TX 77375

CYNTHIA L. GROOMS
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
06-16-2012

ANY PROVISION HEREIN WHICH RESTRICTS THE SALE, RENTAL, OR USE OF THE DESCRIBED REAL
PROPERTY BECAUSE OF COLOR OR RACE IS INVALID AND UNENFORCEABLE UNDER FEDERAL LAW.
THE STATE OF TEXAS
COUNTY OF HARRIS
   I hereby certify that this instrument was FILED in File Number Sequence on the date and at the time
stamped hereon by me, and was duly RECORDED, in the Official Public Records of Real Property of Harris
County, Texas

JUL 19 2011

                                   Stan Stanart
                                   COUNTY CLERK
                                   HARRIS COUNTY, TEXAS

Stan Stanart
COUNTY CLERK
HARRIS COUNTY, TEXAS

2011 JUL 19  PM 3: 00

FILED

<u>RELEASE</u>

### 1.   Definitions

<u>Deed of Trust</u> shall mean that certain Deed of Trust, dated June 13, 2011, between Royce J. and Silvia T. Hassell, as Grantor, Shawn Potts, as Trustee, and Vista Bank, as Beneficiary, and recorded at File No. 20110297122 of the Official Real Property Records of Harris County, Texas;

<u>Property</u> shall mean the real property described in the Deed of Trust;

<u>Liens</u> shall mean any and all claims, vendor's liens, deed of trust liens, security interests, or other liens, charges, or encumbrances against the Property;

<u>Holder</u> shall mean the undersigned as the sole owner of all right, title and interest in, to or under the Debt, the Deed of Trust, and the Liens who has not otherwise pledged, assigned, conveyed or transferred, or agreed to pledge, assign, convey or transfer, any whole or part of any right, title and interest in, to or under the Debt, the Deed of Trust, and the Liens

<u>Maker</u> shall mean each person obligated under the Debt.

### 2.   Recitals

Maker has now paid the Debt secured by the Liens. Holder executes this Release to release and discharge the Liens.

### 3.   Text

For good and valuable consideration (the receipt and sufficiency of which has been acknowledged), the Holder, through the undersigned fully authorized and binding signature, do **HEREBY RELEASE, ACQUIT AND FOREVER DISCHARGE**, and by this instrument do **RELEASE, ACQUIT AND FOREVER DISCHARGE**, the Liens and do hereby **CONFIRM**, and by this instrument do **CONFIRM**, that the Property is free and clear of the Liens.

Signed this _31_ day of _August_ , 2011 at _1522 Cattlefld, Harris_ County, Texas.


By: _____
Name:  SHAWN POTTS
Position:  Trustee

1

State of Texas

County of Harris

This instrument was acknowledged before me on the _31_ day of _August_, 2011 by Shawn Potts, Trustee.



_____
Notary Public - State of Texas

After Recording, Please Return:

Royce J. Hassell
P.O. Box 20487
Houston, TX 77225

2

# EXHIBIT "H"

2011029712O
07/19/2011  RP2  $32.00

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER**

## DEED OF TRUST

**DATE:**      June 13 , 2011

**GRANTOR:**  Royce J. Hassell and Silvia T. Hassell

**GRANTOR'S MAILING ADDRESS (INCLUDING COUNTY):**

P. O. Box 20487, Houston, Harris County, Texas 77225-0487

**TRUSTEE:**  Shawn Potts, Trustee

**TRUSTEE'S MAILING ADDRESS (INCLUDING COUNTY):**

25034 Huffsmith Cemetery Road, Tomball Texas 77375

**BENEFICIARY:**      Vista Bank

**BENEFICIARY'S MAILING ADDRESS (INCLUDING COUNTY):**

14561 Northwest Freeway, Houston, Harris County, Texas 77040

**INSTRUMENT SECURED:**

James  C. Hassell's obligation as a guarantor to pay any principal, interest or other amount based upon any funds received by R. Hassell under that certain Line of Credit between Jim Hassell  , as Borrower, and Vista Bank, as Lender (and any amendments, extensions, renewals, substitutions, modifications, and supplements) in an amount never to exceed the principal amount of $2,500,000 plus any accrued interest thereon (the "Obligation").

**PROPERTY (INCLUDING ANY IMPROVEMENTS):**

This is a deed of trust lien against that certain real property located respectively at 6421 Buffalo Speedway, Houston, Harris County, Texas and more particularly described as the South Fifty Feet (S. 50') of Lots Nine (9), in Block Twelve (12), of WEST UNIVERSITY PLACE, an addition in Harris County, Texas, according to the map or plat thereof, recorded in Volume 444, Page 563 of the Official Real Property Records of Harris County, Texas. (the "Property").

This deed of trust lien is subordinate to that certain Deed of Trust, dated August 7, 2007, between Royce J. Hassell and Silvia T. Hassell, as Grantor, Daryl D. Bohls, as Trustee, and Allegiance Bank Texas, as Beneficiary, recorded at File Code 2009-0367116 of the Official Real Property Records of Harris County, Texas as modified by that certain Modification of Deed of Trust, dated August 8, 2010, between Royce J. Hassell and Silvia T. Hassell, on one hand, and Allegiance Bank Texas, as Beneficiary, on the other hand, recorded at File Code 2010-0393975 of the Official Real Property Records of Harris County, Texas.

**OTHER EXCEPTIONS TO CONVEYANCE AND WARRANTY:**

Subject to any and all valid and subsisting restrictions, easements, rights of way, mineral and royalty reservations, maintenance charges, zoning laws, ordinances of municipal and/or other governmental authorities, conditions and covenants, if any, applicable to and enforceable against the Property and properly of record respectively in the office of the County Clerk of the county in which the Property is located in whole or in part.

For value received and to secure payment of the Note, Grantor conveys all right, title and interest in, to and under the Property to Trustee in trust. Grantor warrants and agrees to defend the title to the property. If Grantor performs all the covenants and there is no Event of Default under this Deed of Trust, this Deed of Trust shall have no further effect, and Beneficiary shall release it at Grantor's expense.

**GRANTOR'S OBLIGATIONS AND EVENTS OF DEFAULT:**

Grantor agrees to:

1. keep the property in good repair and condition;

2. pay all taxes and assessments on the property when due;

3. preserve the respective Lien's priority as it is established in this Deed of Trust; and

4. maintain the current insurance on the real property for the full replacement value of all improvements with Grantor as beneficiaries; and

The failure of Grantor to comply with any of the foregoing four (4) obligations after thirty (30) days written notice to comply shall constitute an Event of Default.

If (a) Grantor is in default under the Allegiance Loan, (b) Beneficiary has paid any amount under the Jim Hassell Guaranty, and (c) Grantor does not reimburse Beneficiary all such amounts

paid by Beneficiary in full after sixty (60) days written notice, then, upon the condition that all of these three events have occurred, there is an Event of Default.

**BENEFICIARY'S RIGHTS:**

    1.    Beneficiary may appoint in writing a substitute or successor trustee, succeeding to all rights and responsibilities of Trustee.

    2.    If there is an Event of Default, Beneficiary may:

        a.    request Trustee to foreclose this Lien, in which case Beneficiary or Beneficiary's agent shall give notice of the foreclosure sale as provided by the Texas Property Code as then amended; and

        b.    purchase the property at any foreclosure sale by offering the highest bid and then have the bid credited to the Note.

**TRUSTEE'S DUTIES:**

    If requested by Beneficiary to foreclose this Lien, Trustee shall:

    1.    either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then amended;

    2.    sell and convey all or part of the property to the highest bidder for cash with a general warranty binding Grantor, subject to prior liens and to other exceptions to conveyance and warranty; and

    3.    from the proceeds of the sale, pay, in this order:

        a.    expenses of foreclosure, including a commission to Trustee of 5% of the bid;
        b.    to Beneficiary, the full amount paid by Beneficiary under the Jim Hassell Guaranty;
        c.    any amounts required by law to be paid before payment to Grantor; and
        d.    to Grantor, any balance.

**GENERAL PROVISIONS:**

    1.    If any of the Property is sold under this Deed of Trust, Grantor shall immediately surrender possession to the purchaser. If Grantor fails to do so, Grantor shall become a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

    2.    Recitals in any Trustee's deed conveying the property will be presumed to be true.

3.     Proceeding under this Deed of Trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

4.     This lien shall remain superior to liens later created even if the time of payment of all or part of the Note is extended or part of the property is released.

5.     If there is a casualty loss which can be restored to the pre-loss condition of the Property with the proceeds from the insurance, then Grantor shall so restore the Property to the its pre-loss condition. If there is any other casualty loss or a whole or partial condemnation of the Property, then Grantor shall receive the proceeds from the insurance or the condemning authority and deposit those proceeds in a certificate of deposit with a market interest rate. Grantor grants a security interest to Beneficiary in the right to receive those proceeds, in the proceeds, and in the certificate of deposit. Grantor agrees to sign any documents necessary to perfect this security interest and agreement. Grantor also grants a limited power of attorney to Beneficiary to sign any document necessary to perfect this security interest and agreement. The rights in this paragraph are subordinate to any respective prior deed of trust lien or vendor's lien.

6.     When context requires, singular nouns and pronouns include the plural.

7.     This Deed of Trust shall bind, inure to the benefit of, and be exercised by successors in interest of all parties.

8.     If Grantor and Maker are not the same person, the "Grantor" shall include Maker.

9.     As evidence of the discharge of Grantor's responsibility to pay all taxes and assessments and to keep said premises insured, Grantor shall deliver to any holder of the indebtedness the official receipts for said taxes and assessments before the same shall become delinquent and shall deliver to any holder of the indebtedness receipts showing said insurance premiums as having been paid in advance for each succeeding year for any and all parcels of secured property named herein.

10.     Beneficiary may remedy any Event of Default without waiving it and may waive any Event of Default without waiving any prior or subsequent Even of Default.

_____          _____
ROYCE J. HASSELL                                          SILVIA T. HASSELL

STATE OF TEXAS          §
                        §
COUNTY OF HARRIS        §

This instrument was acknowledged before me on this 18th day of June, 2011, by Royce J. Hassell.

_Cynthia L. Grooms_
Notary Public -- State of Texas

STATE OF TEXAS          §
                        §
COUNTY OF HARRIS        §

This instrument was acknowledged before me on this 18th day of June, 2011, by Silvia T. Hassell.

_Cynthia L. Grooms_
Notary Public -- State of Texas

**AFTER RECORDING PLEASE RETURN TO:**

Shawn Potts
25034 Huffsmith Cemetery Road
Tomball, tx 77375



ANY PROVISION HEREIN WHICH RESTRICTS THE SALE, RENTAL, OR USE OF THE DESCRIBED REAL PROPERTY BECAUSE OF COLOR OR RACE IS INVALID AND UNENFORCEABLE UNDER FEDERAL LAW.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in File Number Sequence on the date and at the time stamped hereon by me, and was duly RECORDED, in the Official Public Records of Real Property of Harris County, Texas

JUL 19 2011



_Stan Stanart_
COUNTY CLERK
HARRIS COUNTY, TEXAS

FILED
2011 JUL 19 PM 3: 00
COUNTY CLERK
HARRIS COUNTY, TEXAS

## RELEASE

### 1.  Definitions

Deed of Trust shall mean that certain Deed of Trust, dated June 13, 2011, between Royce J. and Silvia T. Hassell, as Grantor, Shawn Potts, as Trustee, and Vista Bank, as Beneficiary, and recorded at File No. 20110297120 of the Official Real Property Records of Harris County, Texas;

Property shall mean the real property described in the Deed of Trust;

Liens shall mean any and all claims, vendor's liens, deed of trust liens, security interests, or other liens, charges, or encumbrances against the Property;

Holder shall mean the undersigned as the sole owner of all right, title and interest in, to or under the Debt, the Deed of Trust, and the Liens who has not otherwise pledged, assigned, conveyed or transferred, or agreed to pledge, assign, convey or transfer, any whole or part of any right, title and interest in, to or under the Debt, the Deed of Trust, and the Liens

Maker shall mean each person obligated under the Debt.

### 2.  Recitals

Maker has now paid the Debt secured by the Liens. Holder executes this Release to release and discharge the Liens.

### 3.  Text

For good and valuable consideration (the receipt and sufficiency of which has been acknowledged), the Holder, through the undersigned fully authorized and binding signature, do HEREBY RELEASE, ACQUIT AND FOREVER DISCHARGE, and by this instrument do RELEASE, ACQUIT AND FOREVER DISCHARGE, the Liens and do hereby CONFIRM, and by this instrument do CONFIRM, that the Property is free and clear of the Liens.

Signed this _31_ day of _August_ , 2011 at _12522 Attlee Rd Harris_ County, Texas.

By: _[signature]_
Name:  SHAWN POTTS
Position:  Trustee

1

State of Texas     ,
    ,
County of Harris     ,

      This instrument was acknowledged before me on the 31st day of _August_, 2011 by Shawn Potts, Trustee.

MARY HELEN RIVERA
Notary Public, State of Texas
My Commission Expires
September 23, 2013

Notary Public - State of Texas

After Recording, Please Return:

Royce J. Hassell
P.O. Box 20487
Houston, TX 77225

2

# EXHIBIT "I"

201 20229234
05/24/2012  RP2  $32.00

NOTICE OF CONFIDENTIALITY RIGHTS:  IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS:  YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER

## DEED OF TRUST

**DATE:**     May 1, 2012

**GRANTOR:**  Royce J. Hassell and Silvia T. Hassell

**GRANTOR'S MAILING ADDRESS (INCLUDING COUNTY):**

P. O. Box 20487, Houston, Harris County, Texas 77225-0487

**TRUSTEE:**   Shaw Potts, Trustee

**TRUSTEE'S MAILING ADDRESS (INCLUDING COUNTY):**

25034 Huffsmith Cemetery Road, Tomball, Texas 77375

**BENEFICIARY:**     James C. Hassell

**BENEFICIARY'S MAILING ADDRESS (INCLUDING COUNTY):**

12211 Duncan Road, Houston, Harris County, Texas 77056

**INSTRUMENT SECURED:**

James C. Hassell's obligation as a guarantor to pay any principal, interest or other amount based upon any funds received by R. Hassell & Co., Inc. (or its affiliated companies) under that certain Line of Credit between Hassell Construction Company., Inc., as Borrower, and Vista Bank, as Lender (and any amendments, extensions, renewals, substitutions, modifications, and supplements) in an amount never to exceed the principal amount of R. Hassell's current obligation on the Line of Credit plus any accrued interest thereon (the "Obligation").

**PROPERTY (INCLUDING ANY IMPROVEMENTS):**

This is a deed of trust lien against that certain real property located 6417 Buffalo Speedway, Houston, Harris County, Texas and more particularly described as the North Fifty Feet (N. 50') of Block Nine (9), in Block Twelve (12), of WEST UNIVERSITY PLACE, an addition in Harris County, Texas, according to the map or plat thereof, recorded in Volume 444, Page 563 of the Official Real Property Records of Harris County, Texas. (the "Property").

This deed of trust lien is subordinate to that certain Deed of Trust, dated July 6, 2007, between Royce J. Hassell and Silvia T. Hassell, as Grantor, James W. Goolsby, Jr., as Trustee, and Sterling Bank, as Beneficiary, recorded at File Code 2007-0423777.

## OTHER EXCEPTIONS TO CONVEYANCE AND WARRANTY:

Subject to any and all valid and subsisting restrictions, easements, rights of way, mineral and royalty reservations, maintenance charges, zoning laws, ordinances of municipal and/or other governmental authorities, conditions and covenants, if any, applicable to and enforceable against the Property and property of record respectively in the office of the County Clerk of the county in which the Property is located in whole or in part.

For value received and to secure payment of the Note, Grantor conveys all right, title and interest in, to and under the Property to Trustee in trust. Grantor warrants and agrees to defend the title to the property. If Grantor performs all the covenants and there is no Event of Default under this Deed of Trust, this Deed of Trust shall have no further effect, and Beneficiary shall release it at Grantor's expense.

## GRANTOR'S OBLIGATIONS AND EVENTS OF DEFAULT:

Grantor agrees to:

1.   keep the property in good repair and condition;

2.   pay all taxes and assessments on the property when due;

3.   preserve the respective Lien's priority as it is established in this Deed of Trust; and

4.   maintain the current insurance on the real property for the full replacement value of all improvements with Grantor as beneficiaries; and

The failure of Grantor to comply with any of the foregoing four (4) obligations after thirty (30) days written notice to comply shall constitute an Event of Default.

If (a) Beneficiary has paid any amount under the Obligation, and (c) Grantor does not reimburse Beneficiary all such amounts paid by Beneficiary in full after sixty (60) days written notice, then, upon the condition that all of these two events have occurred, there is an Event of Default.

## BENEFICIARY'S RIGHTS:

1.    Beneficiary may appoint in writing a substitute or successor trustee, succeeding to all rights and responsibilities of Trustee.

2.    If there is an Event of Default, Beneficiary may:

a.    request Trustee to foreclose this Lien, in which case Beneficiary or Beneficiary's agent shall give notice of the foreclosure sale as provided by the Texas Property Code as then amended; and

b.    purchase the property at any foreclosure sale by offering the highest bid and then have the bid credited to the Note.

**TRUSTEE'S DUTIES:**

If requested by Beneficiary to foreclose this Lien, Trustee shall:

1.    either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then amended;

2.    sell and convey all or part of the property to the highest bidder for cash with a general warranty binding Grantor, subject to prior liens and to other exceptions to conveyance and warranty; and

3.    from the proceeds of the sale, pay, in this order:

a.    expenses of foreclosure, including a commission to Trustee of 5% of the bid;
b.    to Beneficiary, the full amount paid by Beneficiary under the Obligation;
c.    any amounts required by law to be paid before payment to Grantor; and
d.    to Grantor, any balance.

**GENERAL PROVISIONS:**

1.    If any of the Property is sold under this Deed of Trust, Grantor shall immediately surrender possession to the purchaser. If Grantor fails to do so, Grantor shall become a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

2.    Recitals in any Trustee's deed conveying the property will be presumed to be true.

3.    Proceeding under this Deed of Trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

4.    This lien shall remain superior to liens later created even if the time of payment of all or part of the Note is extended or part of the property is released.

5.     If there is a casualty loss which can be restored to the pre-loss condition of the Property with the proceeds from the insurance, then Grantor shall so restore the Property to the its pre-loss condition. If there is any other casualty loss or a whole or partial condemnation of the Property, then Grantor shall receive the proceeds from the insurance or the condemning authority and deposit those proceeds in a certificate of deposit with a market interest rate.  Grantor grants a security interest to Beneficiary in the right to receive those proceeds, in the proceeds, and in the certificate of deposit.  Grantor agrees to sign any documents necessary to perfect this security interest and agreement. Grantor also grants a limited power of attorney to Beneficiary to sign any document necessary to perfect this security interest and agreement.  The rights in this paragraph are subordinate to any respective prior deed of trust lien or vendor's lien.

6.   When context requires, singular nouns and pronouns include the plural.

7.     This Deed of Trust shall bind, inure to the benefit of, and be exercised by successors in interest of all parties.

8.     If Grantor and Maker are not the same person, the "Grantor" shall include Maker.

9.     As evidence of the discharge of Grantor's responsibility to pay all taxes and assessments and to keep said premises insured, Grantor shall deliver to any holder of the indebtedness the official receipts for said taxes and assessments before the same shall become delinquent and shall deliver to any holder of the indebtedness receipts showing said insurance premiums as having been paid in advance for each succeeding year for any and all parcels of secured property named herein.

10.     Beneficiary may remedy any Event of Default without waiving it and may waive any Event of Default without waiving any prior or subsequent Even of Default.


_____          _____
ROYCE J. HASSELL                                      SILVIA T. HASSELL

STATE OF TEXAS      §
     §
COUNTY OF HARRIS      §

     This instrument was acknowledged before me on this _23rd_ day of _May_, 2012, by Royce J. Hassell.



Notary Public -- State of Texas

STATE OF TEXAS      §
     §
COUNTY OF HARRIS      §

     This instrument was acknowledged before me on this _23rd_ day of _May_, 2012, by Silvia T. Hassell.



Notary Public -- State of Texas

**AFTER RECORDING PLEASE RETURN TO:**

Shawn Potts
25034 Huffsmith Cemetery Road
Tomball, Texas 77375

ANY PROVISION HEREIN WHICH RESTRICTS THE SALE RENTAL, OR USE OF THE DESCRIBED REAL
PROPERTY BECAUSE OF COLOR OR RACE IS INVALID AND UNENFORCEABLE UNDER FEDERAL LAW.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in File Number Sequence on the date and at the time
stamped hereon by me, and was duly RECORDED, in the Official Public Records of Real Property of Harris
County, Texas

MAY 24 2012

COUNTY CLERK
HARRIS COUNTY, TEXAS

# EXHIBIT "J"

20120229237
05/24/2012  RP2  $32.00

NOTICE OF CONFIDENTIALITY RIGHTS:  IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS:  YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER

## DEED OF TRUST

**DATE:**      May 1, 2012

**GRANTOR:**   Royce J. Hassell and Silvia T. Hassell

**GRANTOR'S MAILING ADDRESS (INCLUDING COUNTY):**

P. O. Box 20487, Houston, Harris County, Texas 77225-0487

**TRUSTEE:**   Shaw Potts, Trustee

**TRUSTEE'S MAILING ADDRESS (INCLUDING COUNTY):**

25034 Huffsmith Cemetery Road, Tomball, Texas 77375

**BENEFICIARY:**     James C. Hassell

**BENEFICIARY'S MAILING ADDRESS (INCLUDING COUNTY):**

12211 Duncan Road, Houston, Harris County, Texas 77056

**INSTRUMENT SECURED:**

James  C. Hassell's obligation as a guarantor to pay any principal, interest or other amount based upon any funds received by R. Hassell & Co., Inc. (or its affiliated companies) under that certain Line of Credit between Hassell Construction Company., Inc., as Borrower, and Vista Bank, as Lender (and any amendments, extensions, renewals, substitutions, modifications, and supplements) in an amount never to exceed the principal amount of R. Hassell's current obligation on the Line of Credit plus any accrued interest thereon (the "Obligation").

**PROPERTY (INCLUDING ANY IMPROVEMENTS):**

This is a deed of trust lien against that certain real property located respectively at 6421 Buffalo Speedway, Houston, Harris County, Texas and more particularly described as the South Fifty Feet (S. 50') of Lots Nine (9), in Block Twelve (12), of WEST UNIVERSITY PLACE, an addition in Harris County, Texas, according to the map or plat thereof, recorded in Volume 444, Page 563 of the Official Real Property Records of Harris County, Texas. (the "Property").

**BENEFICIARY'S RIGHTS:**

1.    Beneficiary may appoint in writing a substitute or successor trustee, succeeding to all rights and responsibilities of Trustee.

2.    If there is an Event of Default, Beneficiary may:

a.    request Trustee to foreclose this Lien, in which case Beneficiary or Beneficiary's agent shall give notice of the foreclosure sale as provided by the Texas Property Code as then amended; and

b.    purchase the property at any foreclosure sale by offering the highest bid and then have the bid credited to the Note.

**TRUSTEE'S DUTIES:**

If requested by Beneficiary to foreclose this Lien, Trustee shall:

1.    either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then amended;

2.    sell and convey all or part of the property to the highest bidder for cash with a general warranty binding Grantor, subject to prior liens and to other exceptions to conveyance and warranty; and

3.    from the proceeds of the sale, pay, in this order:

a.    expenses of foreclosure, including a commission to Trustee of 5% of the bid;
b.    to Beneficiary, the full amount paid by Beneficiary under the Obligation;
c.    any amounts required by law to be paid before payment to Grantor; and
d.    to Grantor, any balance.

**GENERAL PROVISIONS:**

1.    If any of the Property is sold under this Deed of Trust, Grantor shall immediately surrender possession to the purchaser. If Grantor fails to do so, Grantor shall become a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

2.    Recitals in any Trustee's deed conveying the property will be presumed to be true.

3.    Proceeding under this Deed of Trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

4.      This lien shall remain superior to liens later created even if the time of payment of all or part of the Note is extended or part of the property is released.

5.      If there is a casualty loss which can be restored to the pre-loss condition of the Property with the proceeds from the insurance, then Grantor shall so restore the Property to the its pre-loss condition. If there is any other casualty loss or a whole or partial condemnation of the Property, then Grantor shall receive the proceeds from the insurance or the condemning authority and deposit those proceeds in a certificate of deposit with a market interest rate. Grantor grants a security interest to Beneficiary in the right to receive those proceeds, in the proceeds, and in the certificate of deposit. Grantor agrees to sign any documents necessary to perfect this security interest and agreement. Grantor also grants a limited power of attorney to Beneficiary to sign any document necessary to perfect this security interest and agreement. The rights in this paragraph are subordinate to any respective prior deed of trust lien or vendor's lien.

6.   When context requires, singular nouns and pronouns include the plural.

7.      This Deed of Trust shall bind, inure to the benefit of, and be exercised by successors in interest of all parties.

8.      If Grantor and Maker are not the same person, the "Grantor" shall include Maker.

9.      As evidence of the discharge of Grantor's responsibility to pay all taxes and assessments and to keep said premises insured, Grantor shall deliver to any holder of the indebtedness the official receipts for said taxes and assessments before the same shall become delinquent and shall deliver to any holder of the indebtedness receipts showing said insurance premiums as having been paid in advance for each succeeding year for any and all parcels of secured property named herein.

10.      Beneficiary may remedy any Event of Default without waiving it and may waive any Event of Default without waiving any prior or subsequent Even of Default.


ROYCE J. HASSELL                              SILVIA T. HASSELL

STATE OF TEXAS      §
                      §

COUNTY OF HARRIS    §

This instrument was acknowledged before me on this _23rd_ day of _May_, 2012, by Royce J. Hassell.



_Isabel Repka_
Notary Public -- State of Texas

STATE OF TEXAS      §
                      §

COUNTY OF HARRIS    §

This instrument was acknowledged before me on this _23rd_ day of _May_, 2012, by Silvia T. Hassell.



_Isabel Repka_
Notary Public -- State of Texas

**AFTER RECORDING PLEASE RETURN TO:**

Shawn Potts
25034 Huffsmith Cemetery Road
Tomball, Texas 77375

ANY PROVISION HEREIN WHICH RESTRICTS THE SALE, RENTAL, OR USE OF THE DESCRIBED REAL
PROPERTY BECAUSE OF COLOR OR RACE IS INVALID AND UNENFORCEABLE UNDER FEDERAL LAW.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in File Number Sequence on the date and at the time
stamped hereon by me, and was duly RECORDED, in the Official Public Records of Real Property of Harris
County, Texas

MAY 24 2012

_Stan Stanart_
COUNTY CLERK
HARRIS COUNTY, TEXAS

PROCEEDING BEFORE THE
AMERICAN ARBITRATION ASSOCIATION
In Houston, Texas

JAMES C. HASSELL and HASSELL          §
CONSTRUCTION COMPANY, INC.,            §
                                       §
        Claimants,                     §
                                       §
vs.                                    §
                                       §
R. HASSELL HOLDING CO., INC, R.        §          Case No. 01-14-0000-3178
HASSELL & COMPANY, INC., R. HASSELL    §
BUILDERS, INC. AND G.R. GROUP          §
RESOURCES LLP, ROYCE J. HASSELL        §
AND SILVIA T. HASSELL,                 §
                                       §
        Respondents.                   §

## FIRST AMENDED DEMAND FOR ARBITRATION

Claimants James C. Hassell and Hassell Construction Company, Inc. file this First

Amended Demand for Arbitration against Respondents The R. Hassell Holding Companies, Inc.,

R. Hassell & Co., Inc., R. Hassell Buildings, Inc., and G.R. Group Resources, LLC, Royce J.

Hassell and Silvia T. Hassell, and allege as follows:

## PARTIES

1.      Claimant Hassell Construction Company, Inc. (herein, "HCCI") is a Texas

corporation with its principal place of business in Houston, Harris County, Texas.  HCCI is a

concrete paving company that was founded by James C. ("Jim") Hassell (sometimes referred to

herein as "Mr. Hassell") a few decades ago.  Mr. Hassell remains the Chairman of the Board of

Directors and CEO for HCCI.  The other officers of HCCI include its President James Phillip

("Phil") Hassell, Executive Vice-President Mike Hassell and Secretary/Treasurer Shawn Potts,

the half-brothers/sister, respectively, of Respondent Royce Hassell.

2.      Respondents Royce Hassell and his wife Silvia Hassell are individuals of the full age of majority residing in Harris County.  Together, they own Respondents The R. Hassell Holding Companies, Inc., R. Hassell & Co., Inc., R. Hassell Builders, Inc. and G.R. Group Resources LLC, each a Texas company with its principal place of business in Harris County. Each of the Respondents has appeared and answered.  They have been served with this amended demand via counsel of record as set forth in the in the attached certificate of service.

3.      It is believed that there are misspellings or other minor errors in the identification of some of the Respondent entities names in this action.  However, Claimants maintain that none of these issues are material and that all of the Respondent entities at issue have appeared and answered this arbitration without objection to the manner in which they were named in the arbitration.  Specifically, Respondent R. Hassell Holding Company, Inc. should be properly named The R. Hassell Holding Companies, Inc.  Respondent R. Hassell & Company, Inc. should be properly named R. Hassell & Co., Inc.  Finally, GR Group Resources, LLP should be properly named GR Group Resources, LLC.   Claimants are presently proceeding based on the foregoing understanding and/or reserves the right to modify this pleading to assert a further claim against the properly identified entity should doing so become necessary.

### JURISDICTION / HEARING LOCALE

4.      In 2012, Claimant HCCI, and Respondents R. Hassell Holding Company, Inc., R. Hassell & Company, Inc., R. Hassell Builders, Inc., and G.R. Group Resources LLP formed a joint venture and executed a Construction Joint Venture Agreement (the "JVA") dated July 1, 2012, a copy of which is attached as Exhibit "A."  The JVA contains a broad arbitration provision which mandates the arbitration of all disputes that arise between the parties.

012637.000001\4847-3751-5553.v1

5.      Specifically, paragraph 25 of the JVA contains an express and detailed dispute resolution and arbitration clause:

> If a dispute arises that cannot be resolved through direct discussions, Joint Venturers shall participate in mediation before recourse to any form of binding dispute resolution . . . If the Joint Venturers are not able to resolve the dispute in Mediation, then such disputes shall be resolved through binding arbitration carried out in accordance with the rules and regulations of the American Arbitration Association. The decision of the arbitrator in any such proceeding shall be fully enforceable in any court of competent jurisdiction.

The mediation of this dispute occurred on February 17, 2014, and the claims herein were not resolved. Each claim asserted herein is significantly related to and factually intertwined with the JVA.

6.      Claimants request a hearing locale of Houston, Harris County, Texas.

## PROCEDURAL BACKGROUD

7.      Despite the existence of an express contractual obligation to arbitrate Respondents' claims against Claimants, on October 15, 2013, Respondents filed their Original Petition for Declaratory Judgment, a copy of which is attached as Exhibit "B", in the 125th District Court of Harris County. The parties to that lawsuit included R. Hassell Holding Co., Inc., R. Hassell & Company, Inc., R. Hassell Builders, Inc. and G.R. Group Resources LLP, Hassell Construction Co., Inc. and Hassell Management Services, LLC.

8.      On March 3, 2014, the Honorable Kyle Carter signed an order, attached as Exhibit "C", granting a motion to compel arbitration of the entire dispute. In the order, the court mandated that arbitration be initiated within 60 days.

9.      Although denominated defendants below, Claimants have initiated this arbitration since they are the proper claimants in this matter, and because to their knowledge, Respondents have not done so.

3

## SUMMARY OF CLAIM

10.     Many years after forming HCCI, Mr. Hassell helped his first son, Royce Hassell, start his own company.  Since that time, Mr. Hassell and HCCI (and the rest of the Hassell family – most of whom work for HCCI) have continuously made special efforts to help extricate Royce Hassell and his companies from the adverse effects of his financial mismanagement. Along the way, Royce Hassell has broken nearly every promise to reform his business practices, curb his lavish lifestyle and wasteful spending habits and repay debts to Mr. Hassell and HCCI, which are now almost $4 million.  This has harmed HCCI's financial condition, its banking and surety relationships, and last but not least, its ability to procure and perform new work.  As a result of these unpaid debts, as well as other acts and omissions, HCCI has been damaged in an amount up to $10,000,000. Claimant's damages are continuing, and as such Claimants reserve the right to specify a claim in excess of $10,000,000 at the appropriate time as determined by the arbitrator(s).  Claimants will pay any additional fees associated with any increase of the amount of their claim after the initial filing date.

## FACTUAL STATEMENT OF CLAIM

11.     At the end of 2008, Royce Hassell would negotiate an arrangement with Claimants whereby his company, R. Hassell, would bid work under HCCI's name, and therefore bonded by HCCI's surety.  Royce Hassell would seek this arrangement because his financial condition and that of his companies was so poor that he/they could no longer qualify for a surety relationship through which to procure payment and performance bonds, which are required by law to perform public work.  At that time, Royce Hassell would admit to his family that he had performed poorly on several projects and that his financial condition was so weak that further surety relationships were becoming impossible.  To make matters worse, Royce Hassell's

4

projects were (a) under funds control (meaning that his surety had taken over control of his companies' contract funds since Royce Hassell had proven himself incapable of properly paying his companies' debts), and (b) in "claims" (meaning that his surety had received several claims for nonpayment of project debts from unpaid subcontractors and suppliers).  Because of these issues, Royce Hassell's surety had refused to extend his bonding capacity (also known as the amount of surety credit available to a company) so that Royce Hassell and his companies could not bid more work.  As part of his arrangement with HCCI, Royce Hassell would split projected profits for those projects bid under the name of Hassell Construction Company, such profits to be calculated at the time the bid was made.  For instance, if Royce Hassell projected a 7% profit, his company would pay 3.5% of the contract sum to HCCI, regardless of the actual performance on the project.  Royce's reasoning would be that he would rather force his subcontractors to make up his margin than have to prove up project costs, as he had been required to do in the past working with Mr. Hassell. Royce Hassell would be in total control of all contracts awarded under this arrangement.

12.     In January 2009, Royce Hassell and R. Hassell Builders would begin work on the Wayne Gray Aquatic Center, a project procured under HCCI's name and surety relationship. Royce Hassell would request payment each month from HCCI for the estimated amount that was sent to the Owner, less HCCI's agreed upon percentage.  HCCI in turn would pay Royce Hassell the amount requested, unless the owner made any adjustment to the billing.  It was not long thereafter that HCCI would start receiving a large number of lien notices that were being sent by unpaid subcontractors and suppliers to its surety company for non-payment on projects that were being performed by R. Hassell Builders.  HCCI would meet with Royce Hassell on many occasions about this issue and he would dismiss HCCI's concerns, typically stating words to the

5

effect "that is how the GC business is run".  Additionally, Royce Hassell would claim (usually falsely) that the notices were due to nonpayment for defective work or disagreements with a subcontractor's performance or pricing.

13.    The notices of nonpayment, bond claims and project debts would continue to mount through October 2010, when Royce Hassell and Silvia Hassell finally admitted they were having cash flow issues, at which time they would ask HCCI if they could borrow $350,000.  It was then represented that this amount would put Royce Hassell and his company back on a sound financial footing.  In an attempt to help him and mitigate HCCI's potential surety losses on his projects, Royce Hassell would be allowed to borrow the money from HCCI on October 5, 2010, at which time he signed a promissory note, a true and correct of copy of which is attached as Exhibit "D", in the amount of $350,000 together with interest at 5%.  This amount would be procured from HCCI's line of credit with Vista Bank of Texas, and Royce Hassell would agree to make interest only payments at the rate being charged by Vista Bank, until the note was due on October 15, 2011.

14.    The $350,000 would prove to be too little too late for Royce and his companies. Later, Royce and Silvia Hassell would ask Mr. Hassell to personally loan Royce Hassell money. To accommodate his son, Mr. Hassell would personally co-sign a note with Trustmark Bank for approximately $700,000.  Sometime later, Royce Hassell would again  approach Mr. Hassell for help, this time requesting Mr. Hassell to reduce the profit split on the projects bid under the name of Hassell Construction Company, so that Royce could receive more money needed to heal his ailing financial condition.  Mr. Hassell would once more accommodate his son, and would reduce the percentage owed to HCCI down to as little as 1%.

6

15.     In the beginning of 2011, it would become clear to HCCI after several meetings that Royce Hassell was not being honest with HCCI regarding his retained earnings and cash flow position.  Royce Hassell had misused project funds and was not appropriately paying bills on projects that were procured under HCCI's name with HCCI's bonding.  Royce Hassell would again dismiss HCCI's concerns, stating that this was only a cash flow issue from "robbing Peter to pay Paul" because he did not have the resources to cash flow his work during the time period between when it was performed and when it was paid for by the project owners.  By March 2011, Royce Hassell would borrow up to $1,116,342.00 on HCCI's line of credit.  After the funds were extended to him, in March 2011 Royce would misapply a significant portion of the funds to his personal living expenses which he represented to HCCI would be used to pay vendors and subcontractors.  Upon discovery, HCCI would confront Royce about it.  Royce would be nonplussed and effectively replied that it was unrealistic to expect him to do otherwise. Royce would respond with more pie crust promises that the future would be brighter and he'd be back on his feet soon and that everyone needed him to keep the projects moving forward.  Only later would it be discovered that Royce withheld and/or misrepresented material information about the financial condition of the R. Hassell entities.  Claimants would rely on these false and/or reckless statements representations to their detriment by allowing the R. Hassell entities to draw down on the line of credit and as a result would sustain millions of dollars in damages.

16.     A receivable was for Royce's company was set up on HCCI's books.  Similarly, the liability would be continuously reflected on the combined financial statements for Royce Hassell and his companies.  The HCCI line of credit would be used by Royce Hassell to fund his projects and overhead.  Royce and Silvia Hassell would promise that Silvia would take charge of overseeing the payables, and HCCI would no longer have nonpayment issues.

012637.000001\4847-3751-5553.v1

17.     By June 2011, Royce Hassell and Silvia would draw down HCCI's line of credit in the amount of $1,509,884.69.  To assuage the family's concerns, they would prepare liens on their properties to secure the line of credit.  True and correct copies of the deeds of trust for their lake house, their country club estate, and two homes in West University Place are attached as Exhibits "E", "F", "G" and "H", respectively.  All aspects of these transactions would be handled by Royce Hassell and Silvia Hassell – from the preparation of the deeds of trust to the filing of the paperwork with the county.  A lien would also be filed on an office building that Royce and Silvia owned, in addition to 4 other properties. In connection with these transactions, they would name Shawn Potts the trustee over the liens without ever consulting her.

18.     In July 2011, Royce and Silvia Hassell desired to sell their office building and would ask HCCI to release the lien.  HCCI would accommodate Royce and Silvia Hassell because the family was told that a substantial amount of the debt would be paid back to HCCI.  Although predictable in hindsight, this would not happen - the bank that held the loan for the office building also held a substantial note for the equipment belonging to Royce's company, as well as another line of credit on which he owed a significant amount of money.  As a result, all excess funds from the sale of the office building would be applied to other notes on which he was in default, and HCCI would receive nothing.  HCCI would therefore lose its security and receive no payment on the debt.  As such, the only ones benefitting from the transaction would be Royce and Silvia Hassell.

19.     Notwithstanding their bad behavior, just months later, in August 2011, Royce and Silvia Hassell would ask that HCCI release the liens held on 2 of the single family residence properties (6417 Buffalo Speedway and 6421 Buffalo Speedway) so that Allegiance Bank could become the first lien holder securing yet another line of credit in the amount of $500,000.00.

8

Incredibly, HCCI would again accommodate Royce and Silvia, releasing the original liens. Royce Hassell would not refile the deeds of trust until May 2012, when HCCI would again become a second lien holder on the properties. True and correct copies of these Deeds of Trust are attached as Exhibits "I" and "J". To ease the concerns of HCCI relating to these transactions, Royce and Silvia would again and again promise to pay back the line of credit with proceeds from the sale of their real estate. Again, this would not happen. The maturity date of October 15, 2011 on the original promissory note would come and go, and the money loaned by HCCI would never be paid back.

20. As time went on, Royce Hassell would be provided summaries of the line of credit charges/reimbursements regularly. He and Silvia would both be aware of where the debt stood at all times. Silvia Hassell would periodically visit HCCI's office to review all the back up for the payments and back charges applied to Royce's projects (at times, she would even be allowed to take home the information and return it when she was finished). At all times, HCCI would be completely transparent with Royce and Silvia Hassell regarding the line of credit. Royce Hassell would receive many updated summaries relating to the line of credit. The last time one would be provided to him, Royce Hassell would slide it back, saying he did not want it shoved in his face, and asking what he was supposed to do about it. HCCI would explain that it was given to him so he would be aware of where the line of credit stood. Royce Hassell would be repeatedly advised of the effects his debt would have on HCCI's financial condition and bonding capacity.

21. Royce Hassell would meet with HCCI to discuss renting out the single family residence properties on Buffalo Speedway on which HCCI possessed the second lien deeds of trust. HCCI would request that he not rent the properties, and instead keep them on the market in

an effort to raise money to pay down his debt. He instead would do exactly the opposite, renting both houses and, effectively taking them off of the market for a year, during which time he would retain the rental income, leaving HCCI to continue paying the monthly notes on the properties.

22.     As work progressed on the projects that Royce's company had bonded with its own surety, and several more projects bonded with HCCI's surety, it would become apparent that while Royce and Silvia Hassell had stated that they needed to do more work to create more cash flow, their financial issues were catching up to them and HCCI's line of credit was not being retired. In February 2012, HCCI would inform Royce Hassell that things needed to change, and that HCCI would not continue with the status quo. It was at this time, that Silvia Hassell would come to HCCI's office and threaten Royce's family for about five hours, regarding what would happen to them if HCCI did not continue supporting Royce and Silvia. Silvia would call Royce Hassell and instruct him to meet with HCCI about the current financial situation, which he would agree to do. As part of this meeting, Royce Hassell would represent that the line of credit balance would go no higher than $2,250,000, and that he would soon have a million dollars to pay down the debt. Royce Hassell would tell HCCI that it could advise those needing to know of these facts, like HCCI's accountant, bank and surety. Silvia Hassell would participate in this conversation.

23.     HCCI would be misled again. Meetings would be conducted in July 2012 and financial statements and plans with various options would be provided to HCCI by Royce Hassell, which would purport to demonstrate the status of his finances. Royce would even provide a letter stating that a surety for Royce's company might be forthcoming, provided that he received yet more funding from HCCI to continue to clean up his outstanding debts. Royce

Hassell would be informed that other avenues needed to be sought out, and again that problems were being created with HCCI's accountant, bank and surety by him not retiring the line of credit. Moreover, during 2012 and at other times Royce would represent the financial condition of projects that were being performed by the R. Hassell entities either as part of the joint venture or separately. He would provide information or make statements that would suggest that a project was on track financially which would allow them to pay down the line of credit and/or to pay joint venture liabilities. As one example, Royce would make statements or projections about amounts due to subcontractors and vendors. When the amounts due did not reconcile, Royce would offer similar excuses, such as billings were behind or retainage past due. However, in many instances the funds never materialized. Instead in reliance on these promises, Claimants would extend credit, funds and pay bills and in many instances were left with little or nothing to show for it in return. Royce would make such statements intentionally, recklessly and/or negligently to induce further extensions of credit and/or to prevent the Claimants from taking action against him personally or to collect against the R. Hassell entities. The Claimants would rely on these negligent, reckless and/or false representations to their detriment by continuing to extend credit to Royce's companies and/or by not moving forward with collection.

24.     A plan would be discussed to salvage the terrible financial condition that Royce Hassell had created for not only his company, but HCCI. However, the plan would be rejected when Royce Hassell would tell Mr. Hassell and that he would not work for Phil Hassell or HCCI. Mr. Hassell would accept Royce Hassell at his word, informing Royce Hassell that HCCI would no longer be his financial backstop. Predictably, Royce and Silvia Hassell would promptly reverse course, later meet with Mike and Phil Hassell at Royce's company's office on a Sunday to discuss options to salvage the situation and retire the debt, and in September 2012, in

an effort to reduce the overall overhead between the HCCI and Royce's company, Royce Hassell and some of his people would go to work for HCCI. At his request, Royce would keep his companies separate from HCCI, reasoning that he needed to repay the debt that he, Silvia and their companies owed to HCCI. HCCI would tell Royce that his companies would have to be viable and able to stand on their own.

25.     The idea would be that Royce Hassell would run the office for HCCI and Phil would run the field. During this time, Royce Hassell would become an officer and director of HCCI, with access to all of HCCI's financial information and all of the daily office operations. Royce Hassell would be elected to the board of HCCI and given title of COO. However, notwithstanding attempts to integrate him, Royce Hassell would spend the majority of his time dealing with the business of his own companies and never truly set up a permanent office at HCCI's location. Instead, Royce Hassell would spend most time either at his own companies' location across the parking lot or absent all together. Royce Hassell would have keys and access to HCCI's office and personnel, but would deny HCCI access to his office and employees. Royce Hassell would insist that all communication go through him concerning matters involving his companies, and demand that HCCI employee's direct communications through him regarding HCCI work as well. Many times Royce Hassell would be asked to downsize employees and combine offices (as HCCI was willing to do) and he would make promises concerning his intention to make changes, but the promises would not be honored.

26.     The insurance for Royce Hassell's companies would renew in November 2012, and Royce Hassell would be neither willing nor able pay for it. Since he wanted to keep operating his company independently, and did not wish to change its ownership structure, Royce Hassell would hatch the idea of entering into a joint venture agreement – he would represent that

12

this was for insurance purposes only, and it would allow him to be insured through HCCI's insurance carrier. Royce would prepare an agreement which was signed by Phil.  As part of this process Royce prepared documents that showed the structure of the Joint Venture which he submitted in his quest to obtain insurance coverage for the R. Hassell entities, including R. Hassell Properties, Inc.  Royce represented that R. Hassell Properties, Inc. was a wholly owned subsidiary of The R. Hassell Holding Companies, Inc. which was one of the entities that was part of the Joint Venture.  HCCI would have no reason to believe that the corporate structure was not as Royce represented.  The R. Hassell Holdings Companies, Inc. did have two other wholly owned subsidiaries, R. Hassell Builders, Inc. and R. Hassell & Co., Inc.  Royce would seek insurance for those two entities as well.  However, on information and belief, R. Hassell Properties is not a wholly owned subsidiary of The R. Hassell Holding Companies, Inc.  Records of the Texas Secretary of State for both The R. Hassell Holding Companies, Inc. and R. Hassell Properties, Inc. do not show any relationship between the two entities, such as a parent, affiliate, subsidiary, etc.  *See* Exhibit "K."  Royce would negligently, recklessly, and/or intentionally misrepresent or omit material information so that he could procure insurance and so that R. Hassell Properties could obtain insurance and bonding -- all at the expense of HCCI.  HCCI would pay the insurance premiums and would R. Hassell Properties continue to operate as a result.  HCCI would detrimentally rely on Royce's representations and has been harmed in that it paid premiums for which it remains unreimbursed by R. Hassell Properties or any other R. Hassell entity or Royce and Silvia Hassell.

27.     Some of the projects undertaken by Royce Hassell using HCCI's name and surety credit would include:

2009:
Wayne Gray Aquatic Center

2010:
Baytown Fire Station
NC Foote Family Aquatic Center
Research Forest Drive
Hillhouse Road

2011:
Kingwood Community Center
Treeline, Sec 4
Northlake @ Glennlock Farms
Holly Terrace @ Jacobs Reserve
The Preserve @ North Hampton
Telfair
Springwoods Village Pkwy

2012:
Transtar Emergency Building
Transtar Parking Lot
Sylvan Rodriguez Park

28.     HCCI would similarly work on several projects for Royce's company, including

T.C. Jester. Royce Hassell would avoid paying the retainage due to HCCI on this project as long

as he could.   When questioned about it, Royce Hassell would falsely claim that he had never

been paid in full, contrary to the County's confirmation that he had indeed been paid in full in

the months prior to HCCI's call.  Royce would not pay the retainage that was owed to HCCI for

more than 2 years, when he would do so by adding it to his balance on the line of credit. If this

were not bad enough, Royce Hassell would put Cypress Forest and another project called Smart

Financial on HCCI's books initially, only to remove them later and collect and retain all the

monies from the projects for himself.

29.     During the time period of 2012, several things would happen with the various properties that were securing the line of credit. The lake house, in which there is the most equity, would be taken off the market in May or June 2012.  The realtor listing it would not renew his contract with Royce and Silvia Hassell, stating they were too difficult with which to work, for among other reasons, demanding what he felt was an unreasonable amount for the property. Royce Hassell would never list the property for sale again even though it had the most potential in reducing his debt to HCCI. Royce and Silvia Hassell would also receive an offer on their ranch that was listed for sale either in December 2012 or January 2013.  The interested party would offer less than the asking price and their counter offer was purposely unreasonable in an attempt to force the loss of the sale.  Royce and Silvia Hassell would continually dismiss opportunities to sell properties that they owned and reduce the debt owed to HCCI, notwithstanding earlier repeated promises by both to the contrary.

30.     It was then that HCCI would tell Royce Hassell that it would no longer support anything outside of legitimate project cost, and that he was causing HCCI a severe hardship, had used up the line of credit, and would have to come up with a plan to reduce his debt.  Royce would come up with the idea to sign over some of his properties and have the equity applied as payment to the line of credit.  He would even ask HCCI to run it by HCCI's CPA to see how it should be done.  HCCI would agree to the proposed plan by Royce Hassell.  Under this proposal, HCCI would take over the effort of trying to sell the properties. Although Royce Hassell would initially agree to do this, he would change his mind later, refusing to sign over the real estate to HCCI, not relisting it for sale, and again not reducing any of his debt to HCCI.

31.     Later, Royce Hassell would procure a job named Stellar Oil Field.  HCCI would perform almost all of the work on the project and would pay the costs associated with the labor,

materials and equipment used on the project. Royce Hassell would invoice the owners for Stellar under his own company's name, while he was an officer and director for HCCI, yet retain all the monies paid to his company. He would never reimburse HCCI for any of its costs, even after recognizing them on the cost to complete schedule that he had prepared for HCCI's financial statement.

32.    After many meetings and again on July 15, 2013, Phil Hassell would meet with Royce Hassell at Royce's office to again discuss reduction of forces, the line of credit, and equipment, and to create a plan on what needed to happen. It was at this meeting that Royce Hassell would bring up to Phil that he had several people that wanted to invest in a new company with him completely separate from HCCI and Royce's other entities. Phil would tell Royce Hassell that he was not interested in doing such a thing, and would question how Royce Hassell thought he could do any better with someone else's money. Phil Hassell would be adamant that he did not want to take on the responsibility of someone else's money. A few days later at a meeting with HCCI, Mr. Hassell would confront Royce Hassell about starting another company and request an explanation and plan as to how Royce Hassell would reduce his debt to HCCI. Royce Hassell would storm out of the meeting, gather his things from his office, and tell Phil he was done - he refused to work for HCCI any longer and he quit. Royce would walk out the door of HCCI and not return.

33.    Royce Hassell would participate in many discussions about using funds control for the projects bonded by HCCI's surety. In fact, Royce would request funds control to be used at the meeting with Phil Hassell on July 15th, because he would say he could no longer work with Shawn Potts. When HCCI would later inform him that funds control was being implemented on the Transtar projects, Royce would immediately start harassing HCCI, its Surety and Southwest

16

Escrow, the company that was handling the funds control, and would threaten litigation against all of them on nearly a daily basis. He would be asked repeatedly to submit funding requests for the subcontractors on the projects and he would refuse. Southwest Escrow would email him several times telling him that funds were available and requesting him to submit pay requests. Royce Hassell would only send funding requests for what he wanted to get paid for, which was only his bills, and he would continue to refuse to refuse to provide any pay requests submitted by the subcontractors. Instead, he would mail letters to the subcontractors and vendors, falsely stating that HCCI would not pay his company, so he could not pay them. Royce purposely would not submit the pay requests for the subcontractors, so neither Southwest Escrow nor HCCI could promptly pay them for their work. If he couldn't get his hands on this money, he would make sure that no one else did, and ruin the reputation of HCCI in the process. Silvia Hassell would launch an all-out harassment campaign to try to bully HCCI, SWEC, and HCCI's surety into doing what she and Royce Hassell wanted (*i.e.*, to release the money to them). She would bombard the surety and funds control companies on nearly a daily basis with threatening phone calls and emails promising litigation. It is not clear in what behalf she would be acting, whether attorney, wife, or part owner of Royce's companies, because she would represent herself in various capacities, depending on which best suited her at the moment. The behavior of Royce and Silvia Hassell would be a source of great embarrassment to Mr. Hassell, who otherwise had toiled many years to cultivate a successful surety relationship not only with HCCI's surety, but its predecessors, in addition to trade creditors and clients.

34.     Within two weeks of walking out the door, Royce Hassell would start sending ridiculous bills to HCCI for equipment and labor, at times even billing for items for which he had already been paid. He would also immediately attack the James C. Hassell Inter-Vivos Trust,

012637.000001\4847-3751-5553.v1

threatening Mike Hassell as Trustee, telling him to get a good Trust attorney because he would need one. Royce and Silvia both would advise HCCI on several occasions to get an attorney. When HCCI complied, they would make claims that HCCI was trying to harm them with its attorneys.

35.     Royce Hassell would assert that HCCI kept his assets, presumably referring to his employees. However, anyone that wanted to leave HCCI when Royce Hassell quit, would be free to do so. All those that stayed at HCCI would do so as a matter of free will. Some would go back to work for Royce's company. Royce Hassell would also claim that HCCI made him sell his equipment, which also harmed him; however, HCCI would spend a tremendous amount of time and resources to help Royce Hassell get his equipment ready to sell at auction. Royce would sell his equipment in an attempt to reduce his debt to Trustmark Bank. HCCI would not benefit from the sale of his equipment. While only Royce and Silvia Hassell (and their companies) would benefit from the sale, HCCI would incur the costs to get the equipment ready for sale. Moreover, Royce Hassell has a yard full of equipment that he is not using currently nor has he used it recently.

36.     Royce and Silvia Hassell continue to make HCCI pay for the line of credit. They refuse to pay for anything including the monthly interest payments they owe on the line of credit. Instead they continue to force HCCI to bear the entire burden. They have slandered HCCI, made false claims, severely diminished HCCI's bonding capacity and have made it almost impossible for HCCI to continue to work. When Royce and Silvia Hassell didn't get their way regarding funds control, they would use it as an excuse to walk off the Transtar projects – effectively abandoning the jobs. To make matters worse, Royce and Silvia Hassell purposely would not provide HCCI with all the project documents that belonged on the Transtar projects, nor provide

any assistance to closing out projects for which they were responsible. They would simply walk away, and the harm they caused would be purposeful, intentional and vindictive.

37.     In the meantime, HCCI has been denied the ability to bid certain projects due to the situation with the line of credit and how it affects HCCI's surety credit. Royce Hassell has refused to provide any project financial information to the CPA, which has also caused tremendous harm, because HCCI has been unable to accurately reflect project costs and revenues, thus preventing HCCI's CPA from preparing its annual financial statement, which is a condition to any surety bonding program. The effect of this was that HCCI was unable to bid work with one of their primary markets, since an audited annual financial statement is also required for the bid process. Royce's company has refused to provide any of its financial statements since July 3, 2012, nor has it provided any job project accounting reconciliations.

38.     Several common themes pervades this brief history - Royce and Silvia Hassell were grossly over extended and failed to take timely corrective measures at the expense of their family. They took funds that should have been released to vendors, sometimes causing HCCI to pay the same vendor for the same work 2 and even 3 times since it was HCCI that held the bond on the projects. They made numerous false promises to pay down their debt to induce other considerations. Then they diverted the funds to pay off other debts. Royce and Silvia Hassell have taken from HCCI, in virtually every way conceivable, much to the detriment of HCCI, its stockholders, employees and their families.

012637.000001\4847-3751-5553.v1

## CAUSES OF ACTION

**Breach of Contract (Debt / Foreclosure)**

39.     Respondents borrowed money from HCCI which they have refused to pay back notwithstanding demand.  The debt has been repeatedly acknowledged and secured by the multiple deeds of trust.  Respondents' breach of their obligations has caused Claimants injury.

**Fraud**

40.     In multiple instances described above, Respondents made material representations to Claimants which were false and either known to be false or made recklessly, as a positive assertion, without knowledge of its truth.  Respondents made the representations with the intent that the Claimants act on them, and Claimants relied on the representations to their detriment.   Respondents also intentionally concealed from or failed to disclose certain material facts to Claimants which they had a duty to disclose.  Respondents knew that Claimants were ignorant of these facts and/or did not have an equal opportunity to discover the facts. Respondents were intentionally silent when they had duty to speak and by remaining silent in multiple instances induced Claimants to take action and/or to refrain from taking actions. Claimants have sustained damages as a result.

**Negligent Misrepresentation**

41.     In multiple instances described above, Respondents made material representations to Claimants which were false.  Respondents did not exercise reasonable care or competence in obtaining or communicating the information.  Claimants reasonably and justifiably relied on the representations.  Respondents negligent misrepresentations caused Claimants to sustain damages.

012637.000001\4847-3751-5553.v1

**Breach of Fiduciary Duty**

42.     As an officer and director of HCCI, Royce Hassell had a fiduciary relationship with HCCI, and in multiple instances set forth above, he breached his fiduciary duties to HCCI.  Royce Hassell's breach resulted in injury to HCCI and/or benefit to Royce Hassell.

**Business Disparagement**

43.     Respondents published false, disparaging words about the Claimant HCCI's economic interests, with malice and without privilege, and the publication caused special damages to Claimant HCCI.

## REQUESTED RELIEF

44.     Claimants respectfully request that an award be entered in their favor against Respondents, jointly and severally, for:

(a) their actual damages, including balance of the HCCI line of credit, unpaid bills, unpaid overhead for 2011, 2012, 2013, and 2014, loss of revenue and profit sustained by virtue of reduced bonding capacity and available line of credit, losses from the joint venture projects, among other damages arising out of the above stated allegations;

(b) foreclosure of the various deeds of trust attached as exhibits "E", "F", "I" and "J";

(c) exemplary damages;

(d) reasonable attorney's fees through the final hearing and award in this case, plus all proceedings to confirm or challenge the award, if any;

(e) all costs and fees relating to this proceeding;

(f) pre- and post-judgment interest as provided by law; and

(g) such other and further relief to which Claimants' may be justly entitled.

012637.000001\4847-3751-5553.v1

Respectfully submitted,

# COATS | ROSE
*A Professional Corporation*

By: _____

      Patrick E. Gaas, SBN:  07562790
      Heather Asselin, SBN:  00797143
      hasselin@coatsrose.com
      Sam Arora SBN:  24034287
      sarora@coatsrose.com
      9 Greenway Plaza, Suite 1100
      Houston, Texas  77046
      (713) 651-0111
      (713) 651-0220 facsimile

ATTORNEYS FOR CLAIMANTS JAMES C. HASSELL AND HASSELL CONSTRUCTION COMPANY, INC.

22

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via electronic transmission on January 12, 2014 to the following:

Silvia T. Hassell, SBN 09205200
R. Hassell & Company, Inc.
12512 Cutten Road, Suite A
Houston, Texas  77066
sehassell@aol.com
(713) 665-0369 facsimile
*Attorneys for Respondents*

Heather Asselin