BEFORE THE
AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| JAMES C. HASSELL and HASSELL | § | |
| CONSTRUCTION COMPANY, INC., | § | |
| Claimants | § | |
| | § | |
| v. | § | No. 01-14-0000-3178 |
| | § | |
| R. HASSELL HOLDING COMPANY, INC., | § | |
| R. HASSELL & COMPANY, INC., | § | |
| R. HASSELL BUILDERS, INC., | § | |
| G.R. GROUP RESOURCES, LLC, ROYCE | § | |
| J. HASSELL and SILVIA HASSELL, | § | |
| Respondents | § | |

## MOTION TO JOIN ADDITIONAL PARTIES
## OF RHHC AND ROYCE AND SILVIA HASSELL[1]

Without waiver of jurisdictional objection R. Hassell & Company, Inc., R. Hassell Builders, Inc., R. Hassell Holding Company, Inc. and G. R. Group Resources, L.L.C (hereinafter jointly "RHHC") and Royce and Silvia Hassell move to join parties to these arbitration. This motion for joinder is filed under protest and in an abundance of caution, to attempt to ensure fairness and protect the due process rights of Movants, to attempt to avoid inconsistent judgments and multiple proceedings, and to allow RHHC and Royce and Silvia Hassell ("Movant") to present their full case and defenses.[2] In support of this motion Movants respectfully show as follows:

---

[1]   R. Hassell & Company, Inc., R. Hassell Builders, Inc., R. Hassell Holding Company, Inc., G.R. Group Resources LLC, ("RHHC"), Royce Hassell and Silvia Hassell have been granted a running objection to the jurisdiction of the AAA and file this motion under protest and without waiver. RHHC and Royce and Silvia Hassell have also previously noted objection to and continue to object to the participation of the law firm of Coats Rose and its attorneys as attorneys for HCCI herein, as well as attorney Micky Das and his law firm.

[2]   As a result of the conduct of HCCI, Movants have been forced to arbitrate these disputes. Movants' objections to jurisdiction include, among others, contract formation defenses to the arbitration clause. Separately Movants have objected to arbitration, on grounds including the impossibility of Movants to proceed in arbitration due to lack of

Exhibit
B

## INTRODUCTION

1.     In this consolidated arbitration wherein RHHC initially asserted causes of action against Hassell Construction Co., Inc. and Hassell Management Services, L.L.C. (herein jointly "HCCI") for an breach of a joint venture agreement, conversion, and an accounting of a partnership agreement between RHHC and HCCI which had been proposed by HCCI entered into between RHHC and HCCI in 2012, .  HCCI and James C. Hassell individually have asserted claims against RHHC and Royce and Silvia Hassell individually in a separately filed arbitration for "Breach of Contract (Debt/Foreclosure)," "Fraud," "Breach of Fiduciary Duty," and "Business Disparagement."

2.     This motion is filed in an abundance of caution and in an effort not to waive any rights of RHHC or Royce and Silvia Hassell.  Although the statute of limitations have not expired on joining parties or claims, the AAA Arbitrator Panel has set January 12 as the deadline for a motion to join additional parties and claims.  Therefore, although additional discovery will need to be conducted this motion is filed at this time based on the information available at this time.

## FACTS RELEVANT TO THIS MOTION FOR JOINDER

3.     Together with Royce Hassell, Phillip Hassell ("JPH"), Michael Hassell ("MLH") and Shawn Hassell Potts ("SHP") are equal beneficiaries of the James C. Hassell Intervivos Trust ("JCH Trust") which has owned the appreciating stock of Hassell Construction Company, Inc. since 1986. MLH has been the Trustee of the JCH Trust for approximately twenty years.  Together

---

funds to pay the costs of arbitration as set out in Movants previously filed Motion for Equitable and Injunctive Relief. As stated therein, the conduct of HCCI has rendered Movants unable to pay the arbitration costs with no expectation of acquiring such funds until after the conclusion of this litigation.  HCCI has placed movants in an unfair position which will prevent Movants from presenting their case.  Additionally, Movants have also argued that they have been forced to arbitrate matters which do not fall under the scope of the CJVA arbitration provision.  For instance, HCCI has made claims against RHHC based on losses incurred in the Springwoods Project, which prior to such claims HCCI and RHHC had been jointly litigating in court, in a case which has not been abated, for over a year before HCCI moved for arbitration in this case.

JPH, MLH and SHP also control Hassell Construction Company, Inc. and are owners, directors and officers of Hassell Management Services, L.L.C.

4.      Beginning in 2008, by mutual agreement HCCI and RHHC entered into a partnership to perform certain construction projects using the forces of RHHC and excess bonding capacity of HCCI. The nature of this relationship changed when Royce became gravely ill with end-stage renal disease in 2010, at the same time he made the mistake of trusting his family and believing they would deal with him fairly during his illness.

5.      Unknown to Royce things at the family owned corporations, Hassell Construction Company, Inc. and Hassell Management Services, L.L.C., were not as they had appeared or were represented to him by his siblings. When in the summer of 2010 after Royce's father found out how ill Royce was he offered and agreed to have HCCI return a $350,000 fee which HCCI had received from RHHC on one of the partnership projects, JPH, MLH and SHP objected on the grounds that the $350,000 was essentially the only profit of HCCI for the year and that Royce's father had never done such a thing for them so he should not be allowed to do it for Royce. Thus, JPH, MLH and SHP overrode Royce's father's decision and insisted that instead the corporation make a personal loan to Royce of $350,000 which they agreed would be paid out of future operations of RHHC or the future sale of personally owned real estate of Royce and Silvia Hassell. Simultaneously, his family promised Royce and Silvia that they would cause HCCI to bond up to $15,000,000 in work for R. Hassell & Company, Inc. and $10,000,000 in work for R. Hassell Builders, Inc. so that the companies could make enough profit to pay back the personal loan through RHHC's operations.

6.      In October of 2010, being faced with his own illness and its daunting and uncertain prospects Royce had to make the decision of whether to accept the terms of his siblings or reduce

operations drastically until his health and the economy improved. After much consideration, Royce agreed to the loan only on the condition that RHHC would be provided future bonding such that RHHC would have the means of generating income to repay the loan. In conjunction with this agreement and understanding Royce's family asked Royce and Silvia to become co-principals and co-indemnitors on the bonds issued by Liberty Mutual on the projects to be performed by or subcontracted to RHHC. (Exhibit "A") As his illness progressed in 2011 to the point where Royce needed regular hemodialysis to survive, Royce's family asked him to sign deeds of trust to Royce's personal real estate to secure James C. Hassell's guarantee of a line of credit with Vista Bank for Hassell Construction in an amount never to exceed $2.5 million. Thus, Shawn Hassell Potts became trustee to deeds of trust on all of Royce and Silvia's real property in favor of James C. Hassell as beneficiary.

7.      In July of 2011, pursuant to these agreements R. Hassell & Company, Inc. bid and was low bidder on a $15,000,000 project to construct the infrastructure and improvements for Exxon's new worldwide campus hereinafter called the Springwoods Project under contract with Harris County Improvement District 18 ("HCID 18") and Springwoods Realty Company. As agreed between HCCI and RHHC, although the project was bid under the name used by the partnership "Hassell Construction Company, Inc.," it was independently performed almost exclusively by RHHC forces in exchange for a 99% interest in the contract. HCCI received a 1% interest in the Springwoods Project contract. Unfortunately, the plans for this project provided by HCID 18 and Springwoods Realty Company were not ready for construction as represented by the owners, and, as a result, the deadlines set by Exxon on HCID 18 and Springwoods Realty were not being met.

8.      Already by January of 2012, the losses from the Springwoods Project were so grave that the family members jointly decided that an attorney should be consulted to determine how the family and the family's business should proceed under the circumstances given debt of RHHC to HCCI resulting from the losses.  Although requested to attend the meeting, being just out of a kidney transplant and on restrictions as to people contact because of suppressed immunity, Royce did not attend the legal consultation trusting and relying on his father and brother to go for the family instead.  Thus, in January of 2012 JPH and Royce' father met with Coats Rose attorneys Patrick Gaas and Heather Asselin and purported to inform Royce, SHP and MLH about what the attorneys advised.

9.      It was not discovered until much later that at the time of this legal consultation, Coats Rose had been laboring under severe conflicts of interest and under no circumstances should have undertaken to advise the Hassell family or any of their related entities involved in the Springwoods Project as to how to proceed under the circumstances of the Springwoods Project losses.  Specifically, it was later discovered that at the time of this January of 2012 consultation Coats Rose President and Managing Director, Richard L. Rose directed the conduct and decisions of Harris County Improvement District 18 with regards to the Springwoods Project, Coats Rose attorneys including Richard L. Rose represented Exxon as a client with regard to Exxon's reimbursements to HCID 18 and Springwoods Realty Company for RHHC's work and the Springwoods Project contract in HCCI's name,  and Coats Rose attorneys represented Liberty Mutual, the bonding company which issued the surety bonds RHHC and HCCI on the Springwoods Project in favor of HCID 18 and Springwoods Realty Company.  Thus, when giving advice to the family about how to proceed on the Springwoods Project in light of the losses being incurred on the Springwoods Project, Coats Rose attorneys were laboring under severe conflicts

as to other clients Exxon and Liberty Mutual, and interests of the firm's President and Managing Director as Director of HCID 18. (Exhibit "B") Coats Rose later represented that prior to meeting with the Hassell family and Hassell entities, Coats Rose's conflict of interest checks did not catch the conflicts because only family members' names were checked and not corporate entities because it was represented that advice was being sought for the family.  Liberty Mutual was directly aware of the asserted conflict claims of RHHC and HCCI beginning when Coats Rose undertook to represent Liberty Mutual against RHHC just months after the January of 2012 consultation in a separate case.

10.    Although JPH and James C. Hassell represented that the January of 2012 consultation had been made on behalf of the family and all the family entities (Exhibit "C"), however, based on newly filed affidavits of both Coats Rose and JPH in this case, what had been represented to Royce Hassell about the consultation in order to cause him to cooperate and follow the purported advice, now is shown to have been a ruse used to obtain RHHC's cooperation for purposes of laying the framework for an eventual takeover of RHHC's assets and business and to get Royce and Silvia Hassell to "sign over" all their personal real estate to James C. Hassell at less than fair market value so that Royce's father could "bundle the properties" and obtain a loan on the properties.  Royce and Silvia Hassell were not aware when these ultimatums were being made to them that Hassell Management Services, L.L.C. needed use of the equity in the real properties of Royce and Silvia Hassell in order to finance a loan on the three subdivisions they had purchased and developed in Navasota which were under water and could not support a loan to repay Hassell Construction Company, Inc. for the money borrowed from the company to develop subdivisions.

11.    Coats Rose and JPH's newly sworn affidavits demonstrate that James C. Hassell, JPH and HCCI intended to deceive and did deceive Royce Hassell and RHHC as to the nature of

the January 2012 consultation and the results of that meeting.   The result of this deliberate deception was that Royce continued to trust his family and cooperate with their demands on him under the guise of partnership while his family plotted with Coats Rose to obtain his assets.  Thus, without knowing the intentions behind the advice which Coats Rose was purported to have given HCCI which was represented to be that the ongoing Springwoods Project should be completed regardless of the losses being incurred, RHHC did just that.  If that was the advice of Coats Rose, it obviously was intended to and did favor the interests of Harris County Improvement District 18, Springwoods Realty Company, and the bonding company for HCCI and RHHC, Liberty Mutual, to the detriment of RHHC and its relationship with HCCI.  RHHC thereafter did complete the project at great loss for which HCCI now sues RHHC in this case, and for which James C. Hassell and Shawn Hassell Potts, Trustee, seek to foreclose on the personal real property of Royce and Silvia Hassell in this case.

12.     HCID 18, Springwoods Realty Company, Liberty Mutual, HCCI, and Exxon are all aware of the conflict of interest claims of RHHC and Royce and Silvia Hassell as these claims were made in a Petition of Intervention which RHHC and Royce and Silvia Hassell filed in the Springwoods Project litigation which is incorporated herein by reference and includes claims against HCCI, Coats Rose, the agent for Coats Rose before Judge Carter Micky Das, and Springwoods Realty Company.  (Exhibit D).  The Petition for Intervention of HCCI and Royce and Silvia Hassell were stricken, however, on the motion of HCCI and Coats Rose, *on the alleged basis that HCCI and RHHC have never been partners "at any time" as verified by Phillip Hassell.* These conflicted parties consented to and/or failed to object to the conflicts of Coats Rose in simultaneously directing and/or advising the Hassell family and entities with regards to the Springwoods Project and other entities who each directly have an interest in the Springwoods

Project and its losses. HCID 18 and Springwoods Realty Company have been aware that Coats Rose advised the Hassell family and related entities with regard to the Springwoods Project but continued to allow Richard L. Rose to direct the conduct of HCID 18 and be part of and privy to the legal decisions in the case. Liberty Mutual has been aware that Coats Rose advised the Hassell family and related entities with regard to losses being incurred in the Springwoods Project and later allowed Coats Rose to represent Liberty Mutual against the interests of RHHC in a separate case.

13.     After a failed mediation against Harris County Improvement District 18 and Springwoods Realty in July of 2012, HCCI and RHHC jointly sued Harris County Improvement District 18 and Springwoods Realty under the name used by their partnership, Hassell Construction Company, Inc. That lawsuit was jointly pursued for over a year until Coats Rose caused HCCI to oust RHHC from that case to the exclusion of RHHC and Coats Rose asserted claims against RHHC for the Springwoods losses in this matter while at the same time aiding and assisting HCCI to wrongfully convert all the ongoing 2012 partnership projects and income to the exclusion of RHHC.

14.     After the failed July 2012 mediation in Springwoods HCCI and RHHC had an acrimonious parting. (Exhibit "E"). To Royce's surprise at the time, however, JPH then immediately turned around and proposed that the corporations enter into a new joining of forces partnership. The intent behind this surprising development has become clear in light of the affidavits of Coats Rose and JPH which were subsequently filed stating that at all time during and after the consultation with Coats Rose in January of 2012, the interests of HCCI and RHHC have been adverse. This admission, viewed in light of JPH's proposed joining of forces and combining of resources partnership proposed in August of 2012 explains the true intent behind the family's

desire to integrate RHHC and HCCI together in partnership to such an extent that at the end of the day there was no more RHHC or HCCI, there was just "Hassell" and the "Hassell" turned out to be Hassell Construction Company unilaterally converting all the partnership assets and repudiating the partnership with RHHC.

15.    Liberty Mutual was paid fees for bonds issued on behalf of RHHC and Royce and Silvia Hassell as principals and indemnitors.  As agents for Liberty Mutual, Rosalyn Hassell and her employer CHS Surety were paid commission on the bonds issued by Liberty Mutual on behalf of RHHC and Royce and Silvia Hassell and also on the insurance policies issued to RHHC and HCCI.  Despite the payments made by RHHC, Liberty Mutual, Rosalyn Hassell and CHS Surety have failed to recognize the relationship which has been formed as a result of their agreement and have refused to communicate with RHHC or Royce and Silvia Hassell regarding the relationship, or to provide information requested regarding the bonds issued on their behalf.  Liberty Mutual, and their agents in fact, Rosalyn Hassell, who is also Phillip's Hassell's wife, and CHS Surety have conspired with JPH and HCCI to repudiate the relationship between surety and principal and bonding agent and principal.  Both Rosalyn Hassell and CHS Surety were paid fees by RHHC based on the value of bonds issued for which RHHC and Royce and Silvia Hassell are principals and co-indemnitors.  RHHC and Royce and Silvia Hassell requested that Liberty Mutual, Rosalyn Hassell, and CHS provide the necessary data, documents and information to allow RHHC to present their claims on an emergency basis to the Courts.  (Exhibit "F").  Liberty Mutual, Rosalyn Hassell and CHS Surety to RHHC and Royce and Silvia Hassell, wrongfully benefitted from their relationship with RHHC and Royce and Silvia Hassell and violated the contracts between them and the conditions under which they were entered into.

16.  Liberty Mutual refused to allow RHHC to file claims against the bonds on the partnership projects claiming that RHHC and Royce and Silvia Hassell as co-indemnitors on the bonds could not file claims, yet on the other hand Liberty Mutual allowed and stood by and acquiesced while HCCI inconsistently and unilaterally converted the partnership projects and their income to the exclusion of RHHC and Royce and Silvia Hassell. (Exhibit "G").  Meanwhile Liberty Mutual insisted that if RHHC and Royce and Silvia Hassell wanted to meet with them, RHHC would have to pay their attorney's fees and would not keep matter confidential.  (Exhibit "H").  As Phillip Hassell's wife and community property owner of his interest in Hassell Management Services, LLC, Rosalyn Hassell was aware at the time she procured bonds for RHHC and Royce and Silvia Hassell as principals that HCCI had lent approximately $2,000,000 to Hassell Management, L.LC., which funds were unsecured, to fund the purchase of and development of three subdivisions in Navasota thus jeopardizing the financial condition of HCCI and of the line of credit which was used to perform the projects which were being bonded. Further, JPH, SHP and MLH did not account for the funds borrowed and did not charge themselves interest for these loans.  After the continued inability of HCCI to refinance these amounts, HCCI then went after the assets of RHHC and Royce and Silvia Hassell to get these loans.

17.  In August of 2012, without consent of RHHC, and after claiming that Liberty Mutual had requested it, HCCI unilaterally took 2012 partnership trust funds pertaining to the Transtar Emergency Building Project which work was being performed by the forces of RHHC pursuant to the 2012 partnership agreement and deposited the funds with Beth Gary and her company Southwest Escrow and Construction Services Group, LLC (hereafter jointly "Southwest Escrow") (Exhibits "I" and "J").  On information and belief, Beth Gary is daughter of CHS Surety director Scott Chapman who is Rosalyn Hassell's boss.  Beth Gary and Southwest Escrow were

informed that the funds pertaining to the Transtar Projects were partnership funds over which RHHC had an interest and managerial control.  Beth Gary and Southwest Escrow denied and prevented RHHC's ownership interest in such funds to the exclusion of and damage to RHHC.

18.   JPH knew about the conflict concerns which RHHC had regarding Coats Rose and the Springwoods Project damage claims of RHHC.  Notwithstanding the patently harmful use of Coats Rose to assert claims based on the Springwoods Project against RHHC in this case, and the repeated requested that HCCI use independent counsel, JPH sent a letter withdrawing his own previous objections to the conflicts of interest of Coats Rose on the basis that he had lied about the conflicts only "as part of an effort at family reconciliation."  (Exhibit "K").

19.   JPH, SHP and MLH acting in concert with each other engaged in acts of fraud and conspiracy to defraud including signing and causing to be filed a fraudulent lien for purposes of exerting financial coercion on RHHC and Royce and Silvia Hassell.  (Exhibits "L" and "M"). Thereafter, JPH and representatives from CHS Insurance made disparaging and derogatory statements regarding RHHC and Royce Hassell which were knowingly false when made an intended to harm the interests of RHHC and Royce Hassell.

## PARTIES SOUGHT TO BE JOINED

## JPH, SHP AND MLH

20.   RHHC and Royce and Silvia Hassell seek to add claims herein against J. Phillip Hassell, Shawn Hassell Potts and Michael Lee Hassell.

### Tortious Interference

a.   Individually and acting in concert with each other both individually and as officers and directors of HCCI, JPH, SHP and MLH tortiously interfered with the rights of RHHC and Royce in its interest in the 2012 partnership projects and with RHHC's interest in the Springwoods

Project and with prospective business relations of RHHC causing RHHC to suffer actual damages and loss.

b.    'Individually and acting in concert with each other JPH, SHP and MLH have tortiously interfered with the real property interests of Royce Hassell ("RJH") individually and Silvia Hassell ("STH") individually and with the ability of RJH and STH to renew financing on their personal real estate causing  RJH and STH to suffer actual damages and loss.

### Self-Dealing, Fraudulent Inducement, Fraud,
### Fraud by Non-Disclosure and Breach of Trust and Conspiracy to Defraud

c.    JPH, SHP and MLH have engaged in self-dealing with the corporate assets of Hassell Construction Company, Inc. without security or charging of interest, and usurped the corporate opportunities of the company for themselves individually.  MLH has violated his duties as Trustee of the JCH Trust by engaging in self-dealing to the detriment of RJH as a beneficiary of the JCH trust.

d.    Individually and acting in concert with each other JPH, SHP and MLH made material false representations to RJH and STH that they knew were false at the time of the representations and that were made with the intention that RJH, STH and RHHC rely on them and act on them to their detriment and with the intent to cause harm and which did cause harm.

### Promissory Estoppel, Intentional Infliction of Emotional Distress, Business Disparagement

e.    As a result of their representations and conduct JPH, SHP and MLH made during a time of extreme illness of RJH and taking advantage of his physical condition and limitations, JPH, SHP, and MLH are promissorily estopped from seeking to foreclose on the personal real estate of RJH and STH through James C. Hassell or HCCI.  JPH has made disparaging statements to third party suppliers, owners and engineers which were false, and known to be false when made.

### Conversion and Theft

f.    JPH, SHP and MLH converted the personal property of RJH from his locked desk and locked him out of his offices.  Acting in concert they aided and abetted HCCI in converting the assets of RHHC through the use of a partnership which JPH has since sworn has never existed.

### COATS ROSE AND MICKY DAS, HCID 18, SPRINGWOODS REALTY
### COMPANY, LIBERTY MUTUAL, ROSALYN HASSELL, CHS INSURANCE
### SERVICES, LLC AND SOUTHWEST ESCROW

21.    RHHC and Royce and Silvia Hassell seek to add claims herein against the law firm

of Coats Rose and attorney Micky Das acting as agent for Coats Rose, HCID 18 as directed by

Richard L. Rose, Springwoods Realty Company, Liberty Mutual, Rosalyn Hassell, CHS Insurance Services, LLC and Southwest Escrow.

### Abuse of Process

a.     In conspiracy with HCCI and individual members of the Hassell family including JPH, SHP and MLH, Coats Rose and Micky Das caused RHHC and Royce and Silvia Hassell to be served with process which was illegal, improper and a perverted use of the process after it was issued.  Coats Rose and Micky Das has an ulterior motive or purpose for using the process and injury was suffered by RHHC and Royce and Silvia Hassell as a result.

### Fraud and Conspiracy to Defraud, Aiding and Abetting, Assisting or Participating, and Acting in Concert

b.     Acting in concert with each other and with HCCI and members of the Hassell family including James C. Hassell, JPH, SHP and MLH, Coats Rose, Micky Das, HCID 18, Springwoods Realty Company, Liberty Mutual, Rosalyn Hassell, CHS Insurance Services, Inc. and Southwest Escrow conspired to defraud RHHC and Royce and Silvia Hassell, tortiously interfered with the contract rights of RHHC in the Springwoods Project damage claims, and aided and abetted HCCI in converting the assets of RHHC.

c.     Acting in concert with each other Coats Rose, Micky Das, HCID 18, Micky Das, Springwoods Realty Company, Liberty Mutual, Rosalyn Hassell, CHS Insurance Services, Inc. and Southwest Escrow conspired to interfere with and destroy RHHC's contract rights in 2012 partnership projects and the Springwoods Project.

### LEGAL ARGUMENT & AUTHORITY

22.     Given that Arbitration is intended to alleviate issues of expense and delay, non-joinder of the parties above listed would work contrary to the principles of arbitration by requiring claims against third parties to be stayed pending arbitration and then litigated separately. Similarly, the absence of the third parties which Movants herein request be joined will irreparably affect the rights of Movants in disputes which are concurrently pending in this matter, in other litigation, and in litigation which is certain to ensue in the future.  Under the circumstances of this

case, and unless equitable protections are afforded, the effect of these proceedings will be to permanently close off claims and defenses of Movants. Movant corporations have been rendered essentially defunct by the conduct of their opponents in arbitration, 100% of the personal real estate Movants Royce and Silvia Hassell including their homestead is subject to liens wrongfully asserted by Shawn Hassell Potts, Trustee and James C. Hassell and are subject to loss, and the valuable damage claim of RHHC against third parties in Judge Halbach's court has been commandeered by HCCI although HCCI does not own the claim, HCCI did not perform the work, and HCCI is not familiar with the facts of the case or the law and is thus not qualified to pursue RHHC's cause of action although the case is scheduled to go to trial in May without the participation of RHHC.

23.    Joinder will place minimal burdens on the original parties as common issues of law or fact exist, certain claims arise out of the same transaction or occurrence, significant irreparable harms to Movants will be caused if joinder is refused, a contractual link exists between the parties sought to be joined, and the existing parties and third parties have an interest in the agreements at issue between the exiting parties. Joinder will also aid in the efficiency of arbitration and allow Movants the opportunity to present their full case. Additionally, joinder will allow for full relief to be awarded to Movants. Attendant to joinder the Arbitrators have the authority to order provisional measures and the inherent power to control the arbitral proceedings. For purposes of ensuring that justice is done the Arbitrators may order joinder, severance and/or separate trials in the interest of justice to order separate trials in conjunction with the joinder of parties. Protections are necessary because of urgency, the need to protect the status quo between the parties during arbitration, the need to stop HCCI from increasing the gravity harms to Movants pending arbitration, and the need to ensure that any arbitration award would be enforceable.

24.     HCCI has compelled arbitration under an arbitration clause contained in a "Construction Joint Venture Agreement" ("CJVA") which mandates arbitration of disputes between "Joint Venturers" defined in the CJVA as signatory corporations including RHHC and HCCI. The parties which Movants seek to join in the arbitration are not signatories to the "Construction Joint Venture Agreement" or parties to the CJVA.

25.     Texas procedural rules govern whether non-signatories are bound by arbitration provisions. *In re Weekly Homes, L.P., supra,* at 130.  Principles of equitable estoppel and agency are used to bind non-signatories to arbitration clauses.  *In re Weekly Homes, L.P.,* 189 S.W. 3d 127, 131-135 (Tex, 2005).  A party who has directly obtained a benefit from a contract can be bound by its arbitration provisions. (*In re First Merit Bank, N.A.,* 52 S.W. 3d 749, 755-56 (Tex. 2001).  Parties to a contract suing agents or affiliates of other parties to the contract for tortious interference have also been compelled to arbitrate.  *See, In re Vesta Ins. Group, Inc.,* 192 S.W. 3d 759, 762 (Tex. 2006).

26.     Under Rule 51 of the Texas Rules of Civil Procedure "JOINDER OF CLAIMS AND REMEDIES," a plaintiff or a defendant "may join either as independent or as alternate claims as many claims either legal or equitable or both as he may have against an opposing party.  .  . There may be a like joinder of cross claims or third-party claims if the requirements of Rules 38 and 97, respectively are satisfied."  Tex. R Civ. P. 38, THIRD PARTY PRACTICE, allows a defendant "[a]t any time after commencement of the action" to bring in a party "who is or may be liable to him or to the plaintiff for all or part of the plaintiff's claim against him" as a third party defendant.     Tex. R. Civ. P. 97, "COUNTERCLAIM AND CROSS-CLAIMS" permits separate trials and separate judgments on a counterclaim or cross-claim as provided in Rule 174. Tex. R.

Civ. P. 174 permits orders concerning consolidated proceedings to avoid unnecessary costs and delays and permits separate trials "to avoid prejudice." Tex. R. Civ. P. 174(a) and (b).

27.     Tex. R. Civ. P. 39 "JOINDER OF PERSONS NEEDED FOR JUST ADJUDICATION" provides that a party "shall be joined" if "in his absence complete relief cannot be accorded among those already parties" or if "he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impeded his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest."[3]

28.     Tex. R. Civ. P. 40, "PERMISSIVE JOINDER OF PARTIES" allows persons to be joined in one action as plaintiff, "if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all of them will arise in the action." And to be joined as defendants, "if there is asserted against them jointly, severally, or in the alternative any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all of them will arise in the action." Tex. R. Civ. P. 40(a). Notably, "[a] plaintiff or defendant need not be

---

[3] Notably, Rule 39 also provides that "[i]f a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, *__the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable.__*"     Factors to be considered in fashioning such relief include the extent to which a judgment rendered in that person's absence might be prejudicial to him or those already parties, the extent to which by protective provisions in the judgment, "the shaping of relief, or other measures, the prejudice can be lessened or avoided," whether judgment in the persons absence will be "adequate," and whether the party "will have an adequate remedy if the action is dismissed for non-joinder." Tex. R. Civ. P. 39.

interested in obtaining or defending against all the relief demanded. Judgment may be given for one or more of the plaintiffs according to their respective rights to relief, and against one or more defendants according to their respective liabilities." *Id.* In joinder situations separate trials may be ordered and "[t]he court may make such orders as will prevent a party from being embarrassed, delayed, or put to expense by the inclusion of a party against whom he asserts no claim and who asserts no claim against him, and may order separate trials or make other orders to prevent delay or prejudice." Tex. R. Civ. P. 40(b).

For these reasons RHHC and Royce and Silvia Hassell request that they be allowed to join the parties and claims hereinabove listed.

Respectfully submitted,

Silvia T. Hassell

# EXHIBIT A



Liberty Mutual.

General Agreement of Indemnity

This General Agreement of Indemnity (hereinafter the "Agreement") is made and entered into by the following individuals, partnerships, corporations, and/or other business entities, as applicable, Hassell Construction Company, Inc., Hassell Management Services, LLC, James G. Hassell Inter-Vivos Trust, James G. Hassell, James G. Hassell, Royalyn D. Hassell, R.J. Robecyk, Dwayne D. Robecyk, Michael L. Hassell, Sandra A. Hassell, Shawn M. Polk, and Kurt A. Polk (individually and collectively hereinafter called the "Indemnitors") jointly and severally, in favor of Liberty Mutual Insurance Company, Employers Insurance Company of Wausau (formerly "EMPLOYERS INSURANCE OF WAUSAU A Mutual Company"), Peerless Insurance Company, and any other company that is part of or related to the Liberty Mutual Group, severally not jointly, and for which Liberty Mutual Surety underwrites surety business (individually and collectively hereinafter called the "Surety") with respect to any surety bond, undertaking, recognizance, instrument of guarantee or other surety obligations (hereinafter called the "Bond(s)") requested from and/or issued by the Surety before or after the date of this Agreement, for it Hassell Construction Company, Inc., and any Indemnitor added hereto by Amendment, or any of the Indemnitors or Principals' subsidiaries or affiliates, whether present or future, and whether directly or indirectly held, now or any entity or person in respect to a request from any Indemnitor or Principal named herein, and, or as of the foregoing, whether they act alone or in joint venture with others and whether or not said others are named herein (individually and collectively hereinafter called the "Principal(s)").

WITNESSETH

WHEREAS, the Indemnitors and Principals, in the performance of contracts and the fulfillment of obligations generally, whether in their own names solely or as co-adventurers with others, may desire, request, or be required to give or procure certain Bonds, and/or to renew, continue, extend or substitute, from time to time, the same or like Bonds with the same or different penalties, and/or conditions, as may be desired, requested or required, in the renewal, continuation, extension and/or substitution thereof, or the Indemnitors or Principals may request the Surety to refrain from cancelling the Bonds; and

WHEREAS, at the request of the Indemnitors and with the express understanding that this Agreement be given and in reliance upon this Agreement, the Surety has heretofore or has presently been requested to and/or has executed or has procured to be executed, and, from time to time hereafter, may be requested to and/or may execute or may procure to be executed, the Bonds on behalf of the Principals; and

WHEREAS, the Indemnitors have a substantial, material and beneficial interest in the obtaining of the Bonds or in the Surety's refraining from cancelling any or all Bonds.

NOW, THEREFORE, in consideration of the premises, and intending to be legally bound hereby, the Indemnitors and Principals for themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, hereby covenant and agree with the Surety, its successors and assigns, as follows:

FIRST: PREMIUMS - The Indemnitors and Principals will pay to the Surety, promptly upon demand, all premiums, costs and charges of the Surety for any Bonds requested from and/or issued by the Surety in accordance with its rate filings, its manual of rates as determined by the Surety, or as otherwise determined by the Surety, and where such premium, costs and charges are annual, continue to pay the same until the Indemnitors or Principals shall deliver evidence satisfactory to the Surety of its discharge or release from the Bonds and all liability by reason thereof.

SECOND: INDEMNITY - The Indemnitors shall exonerate, hold harmless, indemnify, and keep indemnified the Surety from and against any and all liability for losses, fees, costs and expenses of whatsoever kind or nature including, but not limited to, pre- and post-judgment interest in the minimum rate permitted by law accruing from the date of a breach of this Agreement as a breach of any other written agreements between or for the benefit of the Surety and the Indemnitor(s) and/or Principal(s) (hereinafter referred to as "Other Agreements"), court costs, counsel fees, accounting, engineering and any other outside consulting fees and from and against any and all such losses, fees, costs and expenses which the Surety may sustain or incur; (1) by reason of being requested to execute or procure the execution of any Bond, or (2) by having executed or procured the execution of any Bond; or (3) by reason of the failure of the Indemnitors or Principals to perform or comply with any of the covenants and conditions of this Agreement or Other Agreements; or (4) in enforcing any of the covenants and conditions of this Agreement or Other Agreements. Payment by reason of the aforesaid causes shall be made to the Surety by the Indemnitors and/or Principals promptly, upon demand by the Surety, whether or not the Surety shall have made any payment therefor and, at the Surety's sole option, irrespective of any deposit of collateral. If the Surety determines, in its sole judgment, that potential liability exists for losses and/or fees, costs and expenses for which the Indemnitors and Principals will be obliged to indemnify the Surety under the terms of this Agreement or Other Agreements, the Indemnitors and/or Principals shall deposit with the Surety, promptly upon demand, a sum of money equal to an amount determined by the Surety as collateral security of a type and value satisfactory to the Surety, to cover that liability, whether or not the Surety has: (i) established or increased any reserve; (ii) made any payment; or (iii) received any notice of any claims therefor. At the Surety's sole option, such collateral shall be in addition to and not in lieu of any other collateral that has been previously provided to the Surety. The Surety shall have the right to use any collateral, or any part thereof, in payment or settlement of any such liabilities for which the Indemnitors and Principals would be obliged to indemnify the Surety under the terms of this Agreement or Other Agreements. In the event of any payment by the Surety, the Indemnitors and Principals further agree that in any accounting between the Surety and the Principals, or between the Surety and the Indemnitors, or either or both of them, the Surety shall be entitled to charge for any and all disbursements made by it in good faith in and about the matters herein contemplated by this Agreement or Other Agreements under the belief that it is, or was, or might be liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by the Surety shall be prima facie evidence of the fact and amount of the liability to the Surety. Surety shall have no obligation to invest or provide a return on any collateral provided to it under this Agreement.

THIRD: ASSIGNMENT - The Indemnitors hereby consenting do assign, transfer, pledge and convey to the Surety and agree to use their best efforts to cause the Principals to assign, transfer, pledge and convey to the Surety as collateral security for the full performance of the covenants and agreements herein contained, contained in Other Agreements and for the payment of any other indebtedness or liability of the Indemnitors and/or Principals to the Surety, whether heretofore or hereafter incurred, the assignment in the case of each contract taking effective as of the date of the Bond covering such contract, the following: (a) all the right, title and interest of the Indemnitors and/or Principals in, and growing in any manner out of, all contracts referred to in the Bonds, or in, or growing in any manner out of the Bonds, or the right, title and interest of the Indemnitors and/or Principals in and to all machinery, supplies, equipment, plant, tools and materials which are now, or may hereafter be, about or upon the site or sites of any and all contractual work referred to in the Bonds or elsewhere, including materials purchased for or chargeable to any



**FOURTH: UNIFORM COMMERCIAL CODE** – This Agreement shall constitute a Security Agreement to the Surety and also a Financing Statement, both in accordance with the provisions of the Uniform Commercial Code of every jurisdiction wherein such Code is in effect and may be so used by the Surety without in any way abrogating, restricting or limiting the rights of the Surety under this Agreement or under law, or in equity. A carbon, photographic or other reproduction of this Agreement may be filed as a Financing Statement.

**FIFTH: TAKEOVER** – In the event of any of the following: breach, default, or termination asserted by the obligee in any Bond; any Principal's abandonment of the work or forfeiture of any contract covered by any Bond; any Principal's failure to pay obligations incurred in connection therewith; or if the Principal is an individual, in the event of the Principal's death, absconding, disappearance, incompetence, insolvency, conviction of a felony, or imprisonment; the bankruptcy of any Principal; the appointment of a receiver or trustee for any Principal or for the property of any Principal; an assignment for the benefit of creditors of any Principal; if any action is taken by or against any Principal under or by virtue of the Federal Bankruptcy Code; should reorganization or arrangement proceedings be filed by or against any Principal under said Code; and/or if any action is taken by or against any Principal under the bankruptcy laws of any state, possession or territory of the United States, then the Surety shall have the right, at its option and in its sole discretion and is hereby authorized, with or without exercising any other right or option conferred upon it by law or under the terms of this Agreement, to take possession of any part or all of the work under any contract or contracts covered by the Bonds, and the indemnitors hereby agree to use their best efforts to cause the Principal to permit the Surety to take possession of any part or all of the work under any contract or contracts covered by the Bonds, at the expense of the Indemnitors and Principals, to complete or arrange for the completion of the same, and the Indemnitors and Principals shall promptly, upon demand, pay to the Surety all losses, fees, costs and expenses so incurred.

**SIXTH: CHANGES** – The Surety is authorized and empowered, without notice to or knowledge of the Indemnitors or Principals, to assent to any change whatsoever in the Bonds, and/or any contracts referred to in the Bonds, and/or in the general conditions, plans and/or specifications accompanying said contracts, including, but not limited to, any change in the time for the completion of said contracts and to payments or advances thereunder before the same may be due, and to assent to or take any assignment or assignments, to execute or consent to the execution of any continuation, extension or renewals of the Bonds and to execute any substitute or substitutes therefor; with the same or different conditions, provisions and obligees and with the same or larger or smaller penalties, it being expressly understood and agreed that the Indemnitors shall remain bound under the terms of this Agreement even though any such assent by the Surety does or might substantially increase the liability of said Indemnitors. Indemnitors further represent and warrant to surety that they are currently informed and remain informed and apprised of Principal's or Principals' business activities, ventures and financial affairs, including but not limited to the type, size (single job and/or aggregate program), location and status of projects and contracts performed by Principal(s) and secured by Bond(s) requested, provided or procured by Surety. Surety has no obligation to inform the Indemnitors of any change in any aspect of Principal(s)' business activities or financial affairs.

**SEVENTH: ADVANCES** – The Surety is authorized and empowered, in its sole discretion and without any obligation to do so, to guarantee loans, to advance or lend to an Indemnitor or Principal any money, which the Surety may deem fit, for the purpose of any contracts referred to in, or guaranteed by the Bonds, or pursuant to any Other Agreement, and all money so advanced, lent, advanced, or thence guaranteed from time to time to or on behalf of any such Indemnitor or Principal in connection therewith, including costs of investigation, administration, and/or in the completion of any contract by the Surety, and any and all other costs and expenses incurred by the Surety in relation thereto, unless repaid with interest at ten maximum rate permitted by law by any Indemnitor or Principal to the Surety when due, shall be presumed to be a loss by the Surety for which the Indemnitors and Principals shall be responsible notwithstanding that said money or any part thereof should not be so used by any such Indemnitor or Principal.

**EIGHTH: BOOKS AND RECORDS** – Principal(s) and Indemnitor(s), shall provide to Surety within 120 days of their fiscal year end, financial statements prepared in accordance with Generally Accepted Accounting Principles, and reports prepared by reputable accounting firms prepared in accordance with the AICPA's Statements on Standards for Accounting and Review Services ("SARS"). If Principal(s) and/or Indemnitor(s) have reports prepared by reputable accounting firms in accordance with the AICPA's Statements on Auditing Standards in the ordinary course of their financial reporting, then such reports shall be supplied instead of the reports in accordance with SARS. Principal(s) and Indemnitor(s) shall also provide any management letter(s) received from their accountants within 30 days of receipt. In addition to the foregoing, at any time, and until such time as the liability of the Surety under any and all Bonds is terminated, or the Surety is fully reimbursed all amounts due to it under this Agreement or Other Agreements, the Surety shall have the right of reasonable access to the books, records and/or accounts of the Indemnitors and Principals for the purpose of inspection, copying or reproduction; and any financial institution, depository, warehouseman, supply house or other person, firm or corporation is hereby specifically authorized by each Indemnitor and Principal to furnish the Surety, at the Surety's request, any information peculiar (equally) including but not limited to, financial and credit reports relating to the financial condition of the Indemnitors and/or Principals, and as to any bonded or non-bonded contract performed, in progress or awarded, the status of the work, the condition of the performance of such contracts and payments of accounts. The Indemnitors and Principals agree to provide any additional releases, requests, waivers or any other documents required in order to allow the Surety access to the requested information. Failure to provide the information required in this paragraph shall be a

breach of this Agreement, and shall entitle Surety to demand, in its sole discretion, cash collateral up to the penal sum of any outstanding Bond(s).

**NINTH: DECLINE EXECUTION** – The Surety, at its sole discretion, may decline to execute, renew or extend any Bond, including final bonds, and may cancel any Bond under this fixed status otherwise, and the Indemnitors and Principals agree to make no claim to the contrary. If the Surety shall execute a Bid or Proposal Bond, it shall have the right to decline to execute any other Bond, that may be required in connection with any award that may be made under the proposal for which the Bid or Proposal Bond is given, and such declination shall not diminish or alter the liability that may arise by reason of having executed the Bid or Proposal Bond. The Indemnitors and Principals acknowledge that the Surety makes no representation as to the validity or acceptability of any Bond to any person, firm or entity of whatever sort or kind under any contract, and agree that they shall have no claim against the Surety arising out of or in any manner relating to the failure or refusal of any person, firm or entity of whatever sort or kind to award any contract to the Principals, or to accept any Bond executed and delivered by the Surety, or that the Surety has been requested to execute and delivery.

**TENTH: NOTICE OF EXECUTION** – The Indemnitors and Principals hereby waive notice of the execution of any Bond, the acceptance of this Agreement or any change in surety credit or other fact that might materially alter the Indemnitors and Principals' obligations hereunder, and the Indemnitors and Principals hereby waive all notice of any default, or any other act or acts giving rise to any claim under any Bond, as well as notice of any and all liability of the Surety under any Bond, and any and all liability on their part hereunder, to the end and effect that, the Indemnitors and Principals shall be and continue to be liable hereunder, notwithstanding any notice of any kind to which they might have been or be entitled, and notwithstanding any defenses they might otherwise have been entitled to make as a result of lack of notice.

**ELEVENTH: TRUST FUND** – To the extent permitted under applicable law, the Indemnitors and Principals covenant and agree that all of their assets, rights and rights in any contract or undertaking interest to in any Bond, or in, or growing in any manner out of any Bond, including but not limited to payments for or on account of any contract, shall be held as a trust fund and/or as a constructive or equitable trust in which the Surety has an interest, and shall inure to the benefit of the Surety for any liability or loss it may have or sustain under any Bond including but not limited to the payment of obligations required in the performance of any contract and for labor, materials, and services furnished in the prosecution of the work provided in any contract or any authorized extension or modification thereof; and, further, it is expressly understood and declared that all monies due and to become due under any contract covered by any Bond are trust funds, whether in the possession of the Indemnitors or Principals or otherwise, for the benefit of and by payment of all such obligations in connection with any such contract for which the Surety would be liable under any Bond; said trust also inures to the benefit of the Surety for any liability or loss it may have or sustain under any Bond, under this Agreement, or under any Other Agreements, and this Agreement constitutes notice of such trust.

**TWELFTH: HOMESTEAD** – To the extent permitted by applicable law, the Indemnitors and Principals hereby waive, so far as their respective obligations under this Agreement are concerned, all rights to claim any of their property including their respective homesteads, as exempt from levy, execution, sale or other legal process under the laws of any state, territory or possession.

**THIRTEENTH: SETTLEMENTS** – The Surety shall have the right, at its option and sole discretion, to adjust, settle or compromise any claim, demand, suit or judgment upon any Bond, unless any Indemnitor or Principal, providing a reasonable legal basis therefor, shall request the Surety to litigate such claim or demand, or to defend such suit, or to appeal from such judgment, and shall deposit with the Surety, at the time of such request, cash or collateral satisfactory to the Surety in kind and amount to be used in paying any judgment or judgments rendered or that may be rendered, with interest, costs, expenses and attorneys' fees, including those of the Surety.

**FOURTEENTH: SURETIES** – In the event the Surety procures the execution of any Bond by other sureties, or executes any Bond with co-sureties, or reinsures any portion of any Bond with reinsuring sureties, then all the terms and conditions of this Agreement shall inure also to the benefit of such other sureties, co-sureties and reinsuring sureties, their successors and assigns, as their interests may appear.

**FIFTEENTH: SUITS** – Separate suits may be brought hereunder as causes of action accrue, and the bringing of suit or the recovery of judgment upon any cause of action shall not prejudice or bar the bringing of other suits upon other causes of action, whether theretofore or thereafter arising.

**SIXTEENTH: OTHER INDEMNITY** – This addition to this Agreement of any Indemnitor, including any entities acquired after the date of execution of this Agreement, may be effected by written amendment executed by such Indemnitor only, notwithstanding any language herein to the contrary. The Indemnitors and Principals shall continue to remain bound under the terms of the Agreement, Other Agreements, and any other agreements containing indemnity obligations, even though if a Surety may from time to time hereafter or hereafter, with or without notice to or knowledge of the Indemnitors and Principals; accept, release, or reduce any indemnity obligations or collateral of current or future Indemnitors and Principals for any reason. The Indemnitors and Principals expressly waive notice from the Surety of any such action and, furthermore, it is expressly understood and agreed by the Indemnitors and Principals that any and all other rights which the Surety may have or acquire against the Indemnitors and Principals and/or others under any such agreements or additional agreements or collateral shall be in addition to, and not in lieu of, the rights afforded the Surety under this Agreement. No Indemnitor shall make any defense to the enforcement of this Agreement based on the execution of Other Agreements or related to the addition or non-release of any Indemnitor, and each Indemnitor explicitly confirms its joint and several liability for Bonds issued by the Surety as provided in this Agreement. Principals and Indemnitors also waive and subordinate all rights of indemnity, subrogation and contribution against each other until all obligations to the Surety under the agreement, at law or in equity, have been satisfied in full.

**SEVENTEENTH: INVALIDITY** – Invalidity of any provision of this Agreement by reason of the laws of any jurisdiction shall not render the other provisions hereof invalid. In case any of the parties are both in this Agreement fail to execute the same, or to cost the execution hereof by any of the parties be defective or invalid for any reason, including lack of authority to bind any party, such failure, defect or invalidity shall not in any manner affect the validity of this Agreement or the legally hereunder of any of the parties executing the same, but each and every party so executing shall be and remain fully bound and liable hereunder to the same extent as if such failure, defect or invalidity had not existed. Each party agrees to execute promptly and documentation necessary to cure any such failure, defect or invalidity. It is understood and agreed by the Indemnitors and Principals that the rights, powers, and remedies given the Surety under this Agreement shall be and are in addition to, and not to two of, any and all other rights, powers, and remedies which the Surety may have or acquire against the Indemnitors and Principals or others whether by the terms of any other agreement or by operation of law or otherwise.

**EIGHTEENTH: ATTORNEY-IN-FACT** – The Indemnitors and Principals hereby irrevocably nominate, constitute, appoint and designate the Surety as their attorney-in-fact with the full right and authority, but not the obligation, to execute all the rights of the Indemnitors and Principals designated, transferred and set over to the Surety in this Agreement, with full power and authority to execute on behalf of and sign the name of any Indemnitor and/or Principal to any voucher, financing statement, release, satisfaction, check, bill of sale of all or any property by this Agreement assigned to the Surety, or other documents or papers deemed necessary and proper by the Surety in order to give full effect not only to the intent and meaning of the within

assignment, but also to the full protection intended to be herein given to the ... ng under all other provisions of this Agreement. The Indemnitors and Principals hereby ratify and confirm all acts and actions taken and done by the Surety as such attorney-in-fact and agree to protect and hold harmless the Surety for acts herein granted as attorney-in-fact.

NINETEENTH: TERMINATION – Any Indemnitor may terminate its liability under this Agreement upon twenty days' written notice sent by registered and certified mail or courier requiring proof of delivery signature to the Surety, in care of Liberty Mutual Surety, Interchange Corporate Center, 450 Plymouth Road, Suite 400, Plymouth Meeting, PA 19462-1644, but any such notice of termination shall not operate to modify, bar, or discharge Indemnitor or Principals as to any Bonds (a) that may have been executed or authorized prior to the expiration of the notice period, (b) which may be executed after the expiration of the notice period in fulfillment of any commitment given by the Surety prior to the expiration of such notice period; (c) executed in connection with any project as to which any bid bond was executed or authorized prior to the expiration of such notice period; and/or (d) which are renewed, extended, substituted or modified after the expiration of such notice period. Such termination of liability as to any Indemnitor or Principal is in no way affects the obligation of any other Indemnitor or Principal who has not given notice as herein provided.

TWENTIETH: AMENDMENTS – This Agreement may not be changed or modified orally. No change or modification shall be effective unless made by written amendment executed to form a part hereof.

TWENTY-FIRST: JURISDICTION – As to any legal action or proceeding related to this Agreement, the Indemnitors and Principals consent to the general jurisdiction of any local, state or Federal court of the United States or its territories having proper subject matter jurisdiction or in any court of the United States or its territories in which any claim may be brought against the Surety under any Bonds, and waive any claim or defense in any such action or proceeding based on any alleged lack of personal jurisdiction, improper venue, forum non conveniens or any similar basis. Indemnitors and Principals further waive personal service of any and all process.

TWENTY-SECOND: CURRENCY EXCHANGE – Should the Surety, when making any payment or incurring any expense directly or indirectly related to Bonds expend funds in currencies other than U.S. Dollars, then Indemnitors shall either reimburse the Surety in U.S. Dollars equal to the amount expended by the Surety at the time the foreign currency were purchased or shall defray the cost of any exchange variation, thereby indemnifying the Surety for any decrease in the valuation of the currency purchased.

TWENTY-THIRD: CHANGE IN CONTROL – The Indemnitors agree to provide the Surety with, at least, forty five (45) days prior written notice of a Change in Control (defined below) and to designate the name and address of the Indemnitor with whom the Surety should correspond with respect to this paragraph, which Indemnitor, all Indemnitors agree is designated to act on behalf of them pursuant to this paragraph. Upon receipt of such notice, the Surety shall advise the Indemnitor designated above, in writing, of its election to (i) continue such Change in Control or (ii) demand that the Indemnitors procure the discharge of the Surety from any Bonds and all liability by reason thereof. If the Indemnitors fail to give the Surety timely notice of a Change in Control or if the Surety does not approve the Change in Control and if such discharge is not procured to the sole satisfaction of the Surety then, immediately, upon the Surety's written demand, the Indemnitors shall deposit a sum of money or collateral, of a type and value satisfactory to the Surety, equal to the aggregate penal sum of the then outstanding Bonds, as determined by the Surety in its sole discretion. The Surety shall next be, written demand to the Indemnitor designated above by overnight courier or by registered or certified mail. The Indemnitors hereby acknowledge that if they or any one of them breaches the obligations set forth in this paragraph, the Surety will not have an adequate remedy at law, will suffer irreparable harm and shall be entitled to injunctive relief, enforcing the terms of this paragraph, as well as a final decree, order or judgment granting Surety specific performance of the terms of this Agreement.

"Change in Control' shall mean: (a) the transfer, merger or consolidation (in one transaction or a series of transactions) of all or substantially all of the assets of any non-individual Principal or Indemnitor; (b) the acquisition (in one transaction or a series of transactions) by any person or group, directly or indirectly, of fifty (50%) percent or more of the beneficial ownership or control of any Principal or Indemnitor; or (c) the acquisition by any Principal or Indemnitor, directly or indirectly, of fifty (50%) percent or more of the beneficial ownership or control in any joint venture, subsidiary, division, affiliate, limited partnership, limited liability partnership, limited liability company or other entity through the issuance of ten (10%) percent or more of the voting power of the total outstanding voting stock of any Principal or Indemnitor.

TWENTY-FOURTH: DOMESTIC PRINCIPAL DOING FOREIGN CONTRACTS/GOVERNING LAW – The Indemnitors and Principals hereby agree that as to any legal action or proceeding related to any Bond(s) issued in connection with contracts to be performed outside the United States and its territories, this Agreement shall be governed by and construed in accordance with the laws of the State of New York (without giving affect to the conflict of laws principles thereof), except to the extent superseded by Federal law.

TWENTY-FIFTH: TEXAS DIVIDENDS – The Principal shall be entitled to participate in a distribution of the surplus of the surety, as determined by its Board of Directors from time to time, after approval in accordance with the provisions of the Texas Insurance Code of 1951, as amended.

TWENTY-SIXTH: REPRESENTATIONS OF TRUST – The Trustee(s) of the James C. Hassell Inter-Vivos Trust, dated January 30, 1989 (hereinafter the "Trust") represent and agree as follows: (a) that he/she/they will take or have taken whatever action is necessary to cause the Surety the ability of the Trust to indemnify under the terms of this Agreement which provides that the joint and several obligations of the Indemnitors hereunder may be satisfied by the assets of the Trust; (b) the Trustee will provide the Surety with at least forty five (45) days written notice of an amendment or revocation of the Trust agreement or any provision which clearly impacts the ability of the Trust to comply with the terms of this Agreement; and (c) the Trustee will provide to the Surety a schedule of assets of the Trust within fifteen (15) days of the Surety's request. Any breach of the covenants set forth in this Paragraph shall constitute a breach of this Agreement.

DATED as of this _1st_ day of _September_, 20 09.

By signing below, each individual executing this Agreement on behalf of a business entity, and each business entity executing this Agreement on behalf of another business entity, represents and warrants that he, she or it is duly authorized by Indemnitor to bind Indemnitor to all of the terms and conditions of this Agreement:

AMENDMENT #1 TO THE GENERAL AGREEMENT OF INDEMNITY

This Amendment shall be attached to and form part of the General Agreement of Indemnity made and entered into by Hassell Construction Company, Inc., Hassell Management Services, LLC, James C. Hassell Inter-Vivos Trust, James C. Hassell, James P. Hassell, Rosalyn D. Hassell, E.J. Rebecock, Barbara D. Rebecock, Michael L. Hassell, Sandra A. Hassell, Shawn M. Potts, and Kurt A. Potts in favor of the Surety, dated the 3rd day of September, 2009 (hereinafter "Agreement"). It is hereby agreed that:

1. All capitalized terms not defined in this Amendment shall have the meaning given them in the Agreement.

2. This Amendment shall take effect and form part of the Agreement immediately upon execution.

3. The following individual(s) and/or business entities shall be added to the Agreement as Indemnitor(s) and Principal(s) and shall be bound by all of its terms for all Bonds issued pursuant to the Agreement, whether such Bonds were issued before or after the execution of this Amendment or before or after the date of the Agreement, but only for bonded projects wherein any work is subcontracted to or performed by any of the following individuals or business entities or any of their subsidiaries or affiliates, whether present or future, and whether directly or indirectly held:

   R. Hassell Holding Companies, Inc.
   R. Hassell Builders, Inc.
   R. Hassell & Company, Inc.
   Royce J. Hassell
   Silvia T. Hassell

4. Pursuant to Paragraph SIXTEENTH of the Agreement, the addition to the Agreement of the Indemnitor(s) named in Paragraph 3 above shall be effected by written amendment executed by such Indemnitor only.

IN WITNESS WHEREOF, we have signed and sealed this 11 day of January , 2011.

By affixing their signatures hereto, each Indemnitor signing on behalf of a business entity warrants that each is duly authorized by Indemnitor to bind Indemnitor hereto.

WITNESS/ATTEST:

By: _____
Secretary

R. Hassell Holding Companies, Inc. _____ (seal)
T.I.N. 76-0857733
3550 Willowbend Blvd, Houston, TX 77054

By: _____
     Royce J. Hassell, President

By: _____
Secretary

R. Hassell Builders, Inc. _____ (seal)
T.I.N. 75-0602614
3550 Willowbend Blvd, Houston, TX 77054

By: _____
     Royce J. Hassell, President

By: _____
Secretary

R. Hassell & Company, Inc. _____ (seal)
T.I.N. 76-0946494
3550 Willowbend Blvd, Houston, TX 77054

By: _____
     Royce J. Hassell, President

By: Silvia T. Hassell

Royce J. Hassell
S.S.N. 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
5302 Maple, Bellaire, TX 77401

By: _____

Hassell-Add Indemnitors to GAI                                                    1/11

Witness                                    Royce J. Hassell

                                           Silvia T. Hassell
                                           S.S.N. 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
                                           5302 Maple, Bellaire, TX 77401

By: _____          By: _____
    Witness                                Silvia T. Hassell


CORPORATE ACKNOWLEDGMENT

STATE of Texas
                                                          ss.
County of Harris

On this 14th day of January , 20 11 , before me personally appeared _____ Royce J. Hassell
_____, known by me to be the _____ President _____ and _____ Secretary
_____ of ____ R. Hassell Holding Companies, Inc. _____, the corporation described
in and which executed the foregoing General Agreement of Indemnity; and who being by me duly sworn, depose and say that they
know the seal of said corporation; that the seal affixed to said Agreement is such corporate seal; that it was so affixed by the
order of the Board of Directors of said corporation, and that they signed their names thereto by like order.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

[NOTARY SEAL: CYNTHIA L. GROOMS
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
08-15-2012]
                                                         _____
                                                         (Signature of Notary Public)
                                           Notary Public, residing at 17063 Georgian Dr.
                                           My commission expires 8-15-12


CORPORATE ACKNOWLEDGMENT

STATE of Texas
                                                          ss.
County of Harris

On this 14th day of January , 20 11 , before me personally appeared _____ Royce J. Hassell
_____, known by me to be the _____ President _____ and _____ Secretary
_____ of ____ R. Hassell Builders, Inc. _____, the corporation described in and
which executed the foregoing General Agreement of Indemnity; and who being by me duly sworn, depose and say that they know
the seal of said corporation; that the seal affixed to said Agreement is such corporate seal; that it was so affixed by the order of the
Board of Directors of said corporation, and that they signed their names thereto by like order.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

(NOTARY SEAL)

[NOTARY SEAL: CYNTHIA L. GROOMS
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
08-15-2012]
                                                         _____
                                                         (Signature of Notary Public)
                                           Notary Public, residing at 17063 Georgian Dr.
                                           My commission expires 8-15-12


Hassell-Add Indemnitors to GAI                                         1/11

**CORPORATE ACKNOWLEDGMENT**

STATE of _Texas_

County of _Harris_ ss.

On this _14th_ day of _January_, 20_11_, before me personally appeared _Royce J. Hassell_
_____, known by me to be the _President_ and _Secretary_
of _R. Hassell & Company, Inc._ the corporation described in and
which executed the foregoing General Agreement of Indemnity; and who being by me duly sworn, depose and say that that they know
the seal of said corporation; that the seal affixed to said Agreement is such corporate seal; that it was so affixed by the order of the
Board of Directors of said corporation, and that they signed their names thereto by like order.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

CYNTHIA L. GROOMS
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
06-15-2012

_____
_(Signature of Notary Public)_
Notary Public, residing at _17063 Georgia Dr._
_Houston, TX 77084_
My commission expires _6-15-12_


**INDIVIDUAL ACKNOWLEDGMENT**

STATE of _Texas_

County of _Harris_ ss.

On this _14th_ day of _January_, 20_11_, before me personally appeared _Royce J. Hassell_
_____, known by me to be the person who is identified in and who executed the foregoing General Agreement
of Indemnity, and who being by me duly sworn, deposes and says that (s)he executed said Agreement.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

CYNTHIA L. GROOMS
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:

_____
_(Signature of Notary Public)_
Notary Public, residing at _17063 Georgia Dr._
_Houston, TX 77084_
My commission expires _6-15-12_


**INDIVIDUAL ACKNOWLEDGMENT**

STATE of _Texas_

County of _Harris_ ss.

On this _14th_ day of _January_, 20_11_, before me personally appeared _Silvia T. Hassell_
_____, known by me to be the person who is identified in and who executed the foregoing General Agreement
of Indemnity, and who being by me duly sworn, deposes and says that (s)he executed said Agreement.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

CYNTHIA L. GROOMS
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
06-15-2012

_____
_(Signature of Notary Public)_
Notary Public, residing at _17063 Georgia Dr._
_Houston, TX 77084_
My commission expires _6-15-12_


Hassell-Add Indemnitors to GAI                    1/11

# EXHIBIT B

05/21/2013 TUE 14:13  FAX                                                    ☑002/009

# COATS | ROSE

*A Professional Corporation*

DAVID S. LYNCH                                                           dlynch@coatsrose.com
                                                                         Direct Dial
                                                                         (713) 653-7300
                                                                         Direct Fax
                                                                         (713) 890-3935

May 21, 2013

*Via Facsimile: 713-963-9169*
*Certified Mail – Return Receipt Requested*
Mr. Pascal Piazza
Zukowski, Bresenhan, Sinex & Petry, L.L.P.
1177 West Loop South, Suite 1100
Houston, Texas 77027

Re:    Hassell Builders, LLC

Dear Mr. Piazza:

On behalf of Hassell Builders, LLC, you have advised our firm that R. Hassell Builders,
Inc. believes that a conflict of interest existed with respect to our firm's representation of Gail
Construction of America Limited. in the following matters arising out of a construction contract
between R. Hassell Builders, Inc. and Gail Construction of America Limited concerning
construction of the Bellaire Town Square Family Aquatic Center:

*Gail Construction of America, Limited v. R. Hassell Builders, Inc.*, Cause Number 2011-
70117, in the 295th Judicial District Court of Harris County, Texas; and

*In the Matter of the Arbitration Between Gail Construction of America Limited vs. R.
Hassell Builders, Inc.*, Case Number 50 110 T 00188 1, in the American Arbitration
Association.

R. Hassell Construction, Inc. consulted with Pat Gaas and Heather Asselin of our firm in
January of 2012.   It is my understanding that an initial interview took place between
representatives of R. Hassell Construction, Inc. and Mr. Gaas and Ms. Asselin, and that
subsequent attempts were made by them to obtain documentation and information to enable them
to provide advice to R. Hassell Construction, Inc.  However, it is also my understanding that the
documentation and information was never provided.  As such, the retainer provided was not
cashed, and our firm did not execute the engagement letter.  I am returning the retainer check and
attaching a copy of the engagement letter.  As a result, no attorney client relationship was
established between R. Hassell Construction, Inc. and our firm.

3 East Greenway Plaza, Suite 2000   Houston, Texas 77046-0307
Phone: 713-651-0111   Fax 713-651-0220
Web: www.coatsrose.com

HOUSTON | CLEAR LAKE | AUSTIN | DALLAS | SAN ANTONIO | NEW ORLEANS

05/21/2013  TUE 14:13  FAX                                                      ☒003/009

May 21, 2013
Page 2

I would also note that the engagement letter states that the matters upon which R. Hassell Construction, Inc. was potentially seeking legal advice were as follows:

[E]valuation of various secured transactions and potential defensive strategies related to transactions or matters involving R. Hassell Builders, R. Hassell companies and Royce and Sylvia Hassell,

A review of the two matters indicates that they are not substantially similar. As such, a conflict does not exist which would necessitate our withdrawing from the representation of Gail Construction Limited in the construction contract litigation. See Tex. R. Pro. Conduct 1.06.

You have advised that Hassell Builders, Inc. communicated confidential information to Mr. Gaas and Ms. Asselin; however, you have not articulated the exact information other than in generalities. It appears that the concern of Hassell Builders, Inc. is that somehow this information might be communicated to third parties. In light of this concern, and out of the principal of comity, the firm has taken the following steps to ensure that information that might be in the possession of Mr. Gaas or Ms. Asselin not be communicated to any person working on the construction contract litigation:

Access to the materials retained by Mr. Gaas and Ms. Asselin, although limited, will be restricted to any person other than Mr. Gaas and Ms. Asselin;

Access to the file maintained regarding the construction contract litigation will be restricted to those persons involved in that case;

Mr. Gaas and Ms. Asselin will be restricted from any access to the file relating the construction contract litigation;

Mr. Gaas and Ms. Asselin will be instructed not to discuss the construction contract litigation or any matters relating to Hassel Construction, Inc. or Hassell Builders, Inc. with any person involved in the construction contract litigation; and

All persons involved in the construction contract litigation will be instructed to refrain from discussing that matter and will be instruction to refrain from discussing R. Hassel Builders, Inc. or R. Hassell Construction, Inc. with Mr. Gaas and Ms. Asselin.

In the event that you or R. Hassell Builders, Inc. believes that a conflict of interest actually exists in this matter, we would request that you advise me in writing of the full particulars of that claim so that any new information can be evaluated.

Should you have any questions or comments please do not hesitate to contact me.

Sincerely yours,

David S. Lynch

# EXHIBIT C



**12211 DUNCAN ROAD**
**HOUSTON, TEXAS 77066**
**PH. 281 893-2570   Fax 281 580-9170**
*Established 1976*

March 26, 2013

Mr. Pascal Piazza
Zukowski Bresenhan, Sinex & Petry, L.L.P.
1177 West Loop South, Suite 1100
Houston, Texas 77027

Dear Pascal:

Hassell Construction Company, Inc. hired the law firm of Coats, Rose, Yale, Ryman Lee
to assist in assessing and proceeding in its relationship with Royce Hassell and R. Hassell
and Company, Inc. and R. Hassell Builders. This consultation was made both as a family
and on behalf of Hassell Construction and the R. Hassell Companies because these are
companies owned by members of the same family, we were jointly working on several
large projects, and it was our desire for a positive outcome for all involved. During that
consultation we provided the law firm with confidential information regarding the
relationships of Hassell Construction Company, the R. Hassell Companies, Royce
Hassell, Jim Hassell and the Hassell family.

Now Coats, Rose is representing Gall and Hassell's current bonding company,
Safeco/Liberty Mutual, against R. Hassell. Safeco/Liberty Mutual has bonded and
currently bonds joint projects of Hassell Construction Company and the R. Hassell
Companies. We want to make sure all the confidential information we shared with Coats,
Rose in the process of our consultation remains privileged and confidential from both
Gall and our current bonding company. We do not see how it is possible for Coats Rose
to represent these parties against us when we have confided in them in the process of
getting their advice and they represent our bonding company.

We think Coats Rose has a conflict and should withdraw from representing these parties against us.

Very truly yours,

J. Phillip Hassell
Hassell Construction Company, Inc.

Royce J. Hassell
R. Hassell Builders, Inc.

# EXHIBIT D

No. 2012-42981

| | | |
|---|---|---|
| HASSELL CONSTRUCTION CO., INC., | § | IN THE DISTRICT COURT OF |
|     Plaintiff | § | |
| | § | |
| v. | § | |
| | § | |
| | § | |
| SPRINGWOODS REALTY COMPANY AND | § | |
| HARRIS COUNTY IMPROVEMENT DISTRICT 18, | § | |
|     Defendants and Third-Party Plaintiffs | § | |
| | § | HARRIS COUNTY,   T E X A S |
| v. | § | |
| | § | |
| Walter P. Moore, | § | |
|     Third-party Defendant and | § | |
|     Third-party Plaintiff | § | |
| | § | |
| v. | § | |
| | § | |
| Costello Engineering, | § | |
|     Third-party Defendant | § | 333RD JUDICIAL DISTRICT COURT |

### PETITION IN INTERVENTION OF R. HASSELL & COMPANY, INC., R. HASSELL BUILDERS, INC., R. HASSELL HOLDING COMPANY, INC., AND ROYCE and SILVIA HASSELL

Intervenors, R. Hassell & Company, Inc., R. Hassell Builders, Inc., and R. Hassell Holding Company, Inc., Royce Hassell and Silvia Hassell file this petition in intervention as party-plaintiffs.

### A. Parties

1.    Intervenors R. Hassell & Company, Inc., R. Hassell Builders, Inc. and R. Hassell Holding Company, Inc. are Texas Corporations. (The R. Hassell Companies are hereinafter jointly referred to as "RHC.") Intervenors Royce Hassell and Silvia Hassell are individuals who reside in Harris County, Texas.

2.      Plaintiff, Hassell Construction Company, Inc., ("HCCI") is a Texas corporation. A copy of this petition will be forwarded to Bogdam Rentea, attorney of record for Hassell Construction Company, Inc. at 505 W. 12th Street, Suite 206, Austin, Texas 78701, under the provisions of Texas Rules of Civil Procedure 21 and 21a.

3.      Defendant and Third Party Plaintiff, Springwoods Realty Company ("Springwoods Realty"), has appeared and answered. A copy of this petition will be forwarded to Timothy M. McDaniel and Eileen Hohlt, attorneys of record for defendant Springwoods Realty at Two Greenway Plaza, Suite 1030, Houston, Texas 77046, under the provisions of Rules 21 and 21a.

4.      Defendant and Third Party Plaintiff, Harris County Improvement District 18 ("HCID 18"), has appeared and answered. A copy of this petition will be forwarded to John Engvall, Jr. and Warren Wise, attorneys of record for defendant and third party plaintiff Harris County Improvement District 18 at 1811 Bering, Suite 210, Houston, Texas 77027, under the provisions of Rules 21 and 21a.

5.      Third-Party Defendant and Third-Party Plaintiff, Walter P. Moore, has appeared and answered. A copy of this petition will be forwarded to Gregory N. Zeigler and Jason Burris, attorneys of record for third-party defendant and third-party plaintiff Walter P. Moore (hereafter sometime "WPM") at 3800 Renaissance Tower, 1201 Elm Street, Dallas, Texas 75270-2130, under the provisions of Rules 21 and 21a.

6.      Third-Party Defendant, Costello Engineering ("Costello"), has appeared and answered. A copy of this petition will be forwarded to John Cahill, attorney of record for defendant Costello at 1233 West Loop South, Suite 1000, Houston, Texas 77027, under the provisions of Rules 21 and 21a.

7.     Defendant Coats, Rose, Yale, Ryman and Lee ("Coats Rose") is a Texas legal professional corporation doing business in the state of Texas.  Coats Rose may be served with process in this case by serving its registered agent, Richard L. Rose, at 3 Greenway Plaza, Suite 2000, Houston, Texas 77046.  Individual attorneys of Coats Rose whose conduct is complained of herein include Coats Rose's President and Managing Director, Richard L. Rose, and Coats Rose Vice-Presidents Patrick Gaas and Heather Asselin.

### B.  The Original Lawsuit

8.     Intervenors R. Hassell & Company, Inc., R. Hassell Builders, Inc. and R. Hassell Holding Company, Inc. (hereafter jointly referred to as "RHC") are partners of the plaintiff, Hassell Construction Company, Inc., in a relationship which began in 2008 (hereafter sometimes referred to as the "Hassell 2008 JV" or "HCCI/RHC").  As partners, HCCI and RHC pursued and executed selected construction projects in Harris County, Texas.  Pursuant to this relationship in 2011 HCCI and RHC agreed to jointly bid, and as low bidder agreed to perform, the "Springwoods Project" made the subject of the original suit under the name Hassell Construction Company, Inc.  The joint venture relationship between HCCI and RHC on the Springwoods Project was disclosed to, and noted by, the Owners HCID 18 and Springwoods Realty prior to the contract award.  RHC provided project management and performed the work on the Springwoods Project utilizing RHC equipment and personnel.  Progress payment reports for the work that RHC performed were submitted by HCCI directly to the Owners.  HCCI and RHC split the proceeds received from the Springwoods Project with 99% to RHC and 1% to HCCI.

9.     The original lawsuit for RHC's damages was filed in July of 2012 and originally jointly pursued by partners HCCI and RHC under the name HCCI representing the partnership. Discovery in the original suit revealed HCCI/RHC had been victims of frauds perpetrated by the

original Springwoods Realty, acting in concert with others including HCID 18 and Walter P. Moore. Based on these discoveries, in the original suit HCCI amended its claims alleging that defendant Springwoods Realty perpetrated a string-a-long fraud after the Springwoods Project contract was entered into in order to meet Exxon's deadlines and to keep HCCI/RHC on the job despite plan defects, expected future plan changes and baseless threats of being found in default for questioning such plans.

10. The original suit was filed on July 26, 2012. HCCI/RHC sued defendants Springwoods Realty and HCID 18 for the damages incurred by RHC attendant to construction work performed on the Springwoods Project. On August 17, 2012, defendant HCID 18 appeared and answered. On August 31, 2012, Springwoods Realty appeared and answered. On September 23, 2013, defendant Springwoods Realty filed a third-party petition against Walter P. Moore. On September 25, 2013, defendant HCID 18 filed a third-party petition against the project engineer Walter P. Moore. On October 21, 2013, Walter P. Moore filed its original answer to the third party petitions of Springwoods Realty and HCID 18. On May 9, 2014, third-party defendant Walter P. Moore filed its third party petition against Costello. On May 22, 2014, third-party defendant Costello filed its original answer to the third party petition of Walter P. Moore.

11. Discovery in the original suit also forms the basis of the fraud claims against Springwoods Realty and those acting in concert with them form the basis of the fraud claims contained in the "Third Amended Original Petition" of HCCI/RHC. It should be noted that although substantial documents have been exchanged in this case, the defendants have forestalled oral depositions requested by HCCI. In fact, no oral depositions have yet been taken despite being noticed.

12.     The amendments to the original lawsuit are also based on the discovery in the original lawsuit demonstrating that HCCI was the victim of the further fraud involving a conspiracy by Springwoods Realty in concert with HCID 18, Exxon and Walter P. Moore to avoid pre-paying or bearing any of the increased expenses associated with defective plans, design changes and attendant delays, interruptions and increased costs resulting from the defective plans and design changes. Instead, despite hundreds of plan changes and design corrections, HCCI/RHC was nevertheless ordered and threatened to "proceed with due diligence" on the Springwoods Project construction in order to satisfy Exxon's requirements or otherwise face damage claims against them by HCID 18 and Springwoods Realty, or, worse yet, face claims by the defendants against HCCI and RHC's joint surety on the Springwoods Project, Liberty Mutual. The defendants, in fact, did file a claim against HCCI and RHC's surety bond on the Springwoods Project.

13.     Discovery in the original lawsuit further reveals HCID 18, Springwoods Realty, and Walter P. Moore jointly conspired to force RHC to front the expense and finance the enormous additional costs associated with secretly known future changes combined with gross errors in the plans. Further, HCID 18, Springwoods Realty, Exxon and Walter P. Moore jointly conspired to misrepresent the nature of the required corrections, design changes and extra costs attendant to such changes with the intention of later improperly recouping these  costs from the tax-paying public through future bond offerings.

14.     Intervenors incorporate by reference the allegations asserted by HCCI/RHC against defendants contained in the "Plaintiff's Third Amended Original Petition" which was filed on August 29, 2014.  (Exhibit "A").  The defendants Springwoods Realty and HCID 18 have previously filed answers denying liability. The defendants Springwoods Realty and HCID 18 sued as Third Party Defendants Walter P. Moore, project engineers, and with a certificate of merit

affidavit of engineer Douglas E. Bell, P.E. asserted that if Hassell's claims are successful that Walter P. Moore "contributed to or caused, in whole or in part, the damages sought by Hassell." Third Party Defendant Walter P. Moore, in turn, interpleaded Costello, Inc. ("Costello") as Third Party Defendant seeking contribution from Costello for the damages claimed by HCCI for the reason that if plaintiff's allegations are true then WPM alleges that Costello was "negligent in the performance of its services and or failed to provide services within the applicable standard of care in the construction industry and in accordance with generally accepted practices and procedures."

### C. Intervenors' Causes of Action

### INTRODUCTION

15.     Rule 60 of the Texas Rules of Civil Procedure allows parties with a justiciable interest in a pending suit to intervene in the suit as a matter of right. *In re Union Carbide Corp.*, 273 S.W.3d 152, 154 (Tex. 2008) (orig. proceeding) (per curiam) (citing *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 657 (Tex. 1990)). The claims of Intervenors RHC against defendants HCID 18 and Springwoods Realty arise from the claims made in the original suit by their partner, HCCI. RHC, as partner of HCCI, could have brought part or all of the original suit in its own name. The claims of Intervenor RHC against the law firm of Coats Rose arise from the claims in the original suit and Coats Rose's attempts to defend the original claims made by HCCI/RHC against HCID 18 and Springwoods Realty by tortious interference in the relationship of HCCI and RHC. The Intervention claims against HCCI and Coats Rose of Royce and Silvia Hassell, who are co-owners of RHC and as such agreed to personally guaranty certain debts incurred by RHC arising from the Springwoods Project frauds perpetrated by Springwoods Realty, HCID 18, and Coats Rose.

16.     As additional grounds for this Intervention, Rule 28 of the Texas Rules of Civil Procedure permits a partnership or unincorporated association which has been doing business under a common name to sue or be sued in its common name. HCCI and RHC, as partners, performed the Springwoods Project under the name HCCI. Because of its partnership relationship with HCCI pertaining to the Springwoods Project, and RHC's work performed on the Springwoods Project., RHC is permitted to pursue the damage claims of the partnership against the defendants in this cause under in its own name.  RHC's damage claims arise from the Springwood Project, are an integral part of the damage claims brought by its partner HCCI in the original suit, and essentially must be resolved in this case for proper adjudication.  As a result of HCCI's breaches of fiduciary duty and repudiation of its Hassell 2008 JV partnership with RHC, however, HCCI no longer is representing the interest of RHC in this case.

17.     Intervenors incorporate the facts and causes of action alleged in the "Plaintiff's Third Amended Original Petition" previously filed in this case.  In further support of their "Petition In Intervention" Intervenors make the allegations contained in paragraphs 1 through 61 herein.

18.     R. Hassell & Company, Inc., R. Hassell Builders, Inc. and R. Hassell Holding Company, Inc. are corporations owned by Intervenors Royce and Silvia Hassell and managed by Royce J. Hassell ("Royce") who is President of each of the companies. Original Plaintiff HCCI is owned by various Hassell family members, including Royce Hassell.  Phillip Hassell, Royce's brother, is currently President and a Director of Hassell Construction Company, Inc., although in the past James C. Hassell, Royce's father, and Royce Hassell have each served terms as President of HCCI. James C. Hassell, Royce's father is currently C.E.O. of HCCI although at 79 years of age is retired.  Royce owns stock individually in HCCI and, is also a beneficial owner of shares of Hassell Construction Co., Inc. through the James C. Hassell Intervivos Trust.   Royce's brother,

Michael Hassell, also an officer and Director of HCCI, is the Trustee of the James C. Hassell Intervivos Trust. Royce was the original Trustee of the James C. Hassell Intervivos Trust. At various times throughout the existence of HCCI Royce Hassell has also held positions as employee, officer and director of HCCI.

19.   In 2008 HCCI and RHC entered into an oral partnership agreement, the Hassell 2008 JV to carry on a business for profit pertaining to selected construction projects. Beginning in January of 2011, the Hassell 2008 JV agreed to jointly obtain bonding for such projects. To that end RHC as well as Royce and Silvia Hassell became Principals and Co-Indemnitors of the Hassell 2008 JV for bonds issued by Liberty Mutual Insurance Company, Employers Insurance Company of Wausau, and Peerless Insurance Company (hereafter "Liberty Mutual"). Thereafter, the partners agreed to bid on and perform the Springwoods Project.

20.   The agreement between HCCI and RHC pertaining to the Springwoods Project and the Hassell 2008 JV gave RHC the right to receive its share of the profits of the business, the right to participate in control of the business, the duty to share in the losses of the business and/or liability for claims by third parties against the business, and the duty to contribute money or property to the business. (Tex. Bus. Org. Code § 152.052(a).) RHC faithfully fulfilled its duties and obligations pertaining to the Springwoods Project under the partnership agreement.

21.   An association of two or more businesses to carry on a business for profit as owners creates a partnership, regardless of whether businesses intend to create a partnership, or the association is called a "partnership," "joint venture," or other name. Tex. Bus. Org. Code § 152.051(b). A joint venture is governed by the same rules as a partnership. *Ingram v. Deere,* 288 S.W.2d 886, 894 n.2 (Tex. 2009) ("We see no legal or logical reason for distinguishing a joint

venture from a partnership on the question of formation of the entity. In fact, a joint venture that satisfies the definition of 'partnership' is a partnership subject to TRPA." (citations omitted)).

22.     The Hassell family relationships, as well as the relationship of HCCI and RHC in the Hassell 2008 JV was questioned by and discussed with the Owners' representatives on the Springwoods Project prior to contract award. Phillip Hassell personally answered the query and described the extensive relationship of closeness and trust of the family members and their related corporations. Phillip Hassell used words to the effect of "Royce and I are brothers. These are Hassell family corporations. On this project HCCI and RHC are the same: when you see one you see the other." The combined family and business relationship created a special relationship of confidence between HCCI and RHC as well as between Royce and Phillip Hassell. The special nature of this relationship was particularly affected by the facts that just weeks prior to that meeting Royce had almost died from pulmonary embolisms related to the end stage renal disease from which he was suffering and through which his family had agreed to "help" him.

23.     As a result of its relationships with plaintiff HCCI, Intervenor RHC, has a present, justiciable interest in the original subject matter of this suit, *i.e.*, pursuant to its agreement with HCCI, RHC is the owner of and entitled to the damages sought against the defendants HCID 18 and Springwoods Realty in the original suit. Intervenors, Royce and Silvia Hassell, have a present justiciable interest in the original subject matter of this suit as owners of RHC and guarantors of RHC's debts which were incurred as a result of the frauds perpetrated on HCCI/RHC by the defendants in the original suit acting in concert with Exxon, Walter P. Moore and Coats Rose.

24.     Intervenors RHC and Royce and Silvia Hassell meet the three part test for Intervention enunciated by the Texas Supreme Court in *Guaranty Federal Savings Bank v. Horseshoe Operating Company*, 793 S.W.2d 652, 657 (Tex. 1990): (1) Intervenors have a

justiciable interest in the case-i.e., Intervenors could have brought the same action in their own name; (2) the intervention will not complicate the case by an excessive multiplication of the issues, and (3) the intervention is almost essential to effectively protect the intervenor's interest.

25.     Defendant Springwoods Realty has recognized that Intervenors have justiciable interest in this litigation citing relevant factors in its "Motion to Compel Compliance with Subpoenas and Production Documents from Royce Hassell Companies" filed August 8 in this case (document number 61898149).  Springwoods Realty alleges that:  "Some if not all of these [RHC] companies have performed work and/or rendered services for Plaintiff Hassell Construction Company, Inc. ("Hassell Construction") in connection with the project at issue in this litigation (the "Springwoods Project").  Some if not all of the [RHC] companies have claims back against Hassell Construction relating to intra-family loans and the Springwoods Project." (para. 1).

### INTERVENOR'S CLAIMS AGAINST SPRINGWOODS REALTY AND HCID 18 FOR FRAUDULENT INDUCEMENT

26.     Intervenor RHC asserts claims against original defendants Springwoods Realty and HCID 18 for fraudulent inducement pertaining to the Springwoods Project contract.  Discovery in the original suit demonstrates that at the time the Springwoods Project contract was awarded Exxon's campus designs were not complete and finalized.  Despite knowledge that the plans provided to bidders and relied on by HCCI/RHC were not final, complete, or intended to be constructed as shown, HCID 18 and Springwoods Realty made false representations to HCCI/RHC which they relied on in bidding the project and entering into the Springwoods Project contract.  Although not ready for construction, HCID 18 and Springwoods Realty did not desire to delay the Exxon required improvements to service the development of Exxon's campus:

> A continued downturn in the economic conditions of Houston and further decline in the nation's condition could adversely affect development in the District and restrain the growth of the District's property tax base. Furthermore, development

in the District is almost entirely dependent upon the development of a campus to be developed in the District by ExxonMobil or an affiliate thereof. . . . Failure of ExxonMobil to complete its campus or to limit development of its campus could severely decrease property values in the District and negatively affect the ability of existing taxpayers in the District to make payment or timely payments of property taxes. If any one or more of the principal District taxpayers did not pay taxes due, the District might need to levy additional taxes or use other debt service funds available to meets its debt service requirements. (Harris County Improvement District 18 "Official Statement" dated February 27, 2013, pp. 14, http://www.i-dealprospectus.com/PDF/2_58662.pdf).

27.     Notwithstanding the prior knowledge that the Springwoods Project plans would have to be changed as decisions were made, Springwoods Realty and HCID 18 made representations to HCCI/RHC that the plans issued were to be the plans constructed, that time was of the essence and that the construction was expected to be completed within 270 calendar days of the Notice to Proceed. After contract award and after RHC commenced construction, RHC was delayed in the construction so that Exxon's designs and the Grand Parkway drainage changes could be incorporated into the plans already under construction. Additionally, the defendants were aware that the Springwoods Project plans also contained errors which HCID 18, Springwoods Realty, Exxon, and Walter P. Moore intended to correct in the future as construction was on-going.

28.     Discovery in this case demonstrates that before the Springwoods Project contract was put out for bid and before the Springwoods Project contract was awarded, HCID 18, Springwoods Realty, Exxon and Walter P. Moore knew that the designs for the Springwoods Project construction would be changed, were intended to be substantially revised and that the project would essentially be a "design as you go" project due to several contingencies which had yet to be worked out of which the defendants were aware. For many of these known future contingencies HCID 18 and Springwoods Realty were acting as the agents of Exxon and taking direction from Exxon on changes to be made to the plans. HCID 18, Springwoods Realty, Walter

P. Moore and Exxon had entered into agreements pertaining to the Springwoods Project contract for the work to be performed by HCCI and RHC which entailed strict deadlines for certain milestones. Such agreements included Exxon created deadlines which Springwoods Realty, HCID 18 and Walter P. Moore agreed to meet. HCID 18, Springwoods Realty, and Walter P. Moore in turn, incorporated deadlines into HCCI's contract knowing, however, that because of outstanding contingencies meeting such deadlines would entail enormous additional costs.

29.    Discovery further demonstrates that HCID 18 and Springwoods Realty, aided, abetted, encouraged, assisted and acted in concert with Exxon and Walter P. Moore, jointly deceived HCCI and RHC as to the readiness, completeness and accuracy of the construction plans knowing they would necessarily be extensively changed. Additionally, HCID 18, Springwoods Realty and Walter P. Moore were aware that the bioswales plans were experimental, part of a pilot study, would probably require substantial revisions and might even be eliminated altogether depending on unknown contingencies.

30.    Discovery further demonstrates that HCID 18, Springwoods Realty, Walter P. Moore and Exxon had no desire or intention of paying the increased costs that the plan changes due to contingencies and future changes would entail. As such when HCCI/RHC began making claims for delays, interruptions and inefficiencies resulting from the hundreds of plan changes, HCID 18, Springwoods Realty, Walter P. Moore, and Exxon conspired to delay paying and shift these costs first to RHC, and eventually to the taxpaying public through public bond offerings.

31.    The false representations regarding the completeness and final nature of the plans provided to HCCI and RHC were material as they formed the basis of RHC's bid, its calculation of costs and its calculation of anticipated profits. The representations were false when made as demonstrated by the documents produced in this case as well as further supported by the hundreds

of plan changes which were subsequently made to the Springwoods Project plans to accommodate the relocation of certain Exxon facilities and changed requirements, as a result of design changes required by the subsequent approval of a drainage plan for the entire Springwoods Village facility, and as a result of the multiple re-designs and uncertainties associated with the bio-swales. Discovery also demonstrates that HCID 18, Springwoods Realty, Walter P. Moore and Exxon knew that the plans relied on by HCCI/RHC for its bid were not intended to be the actual plans for construction, yet the defendants conspired to conceal these fact from HCCI and RHC by making false and misleading representations to the contrary. The false and misleading representations were made with the intent that HCCI and RHC rely on them. HCCI and RHC did rely on the false and misleading representations in making its bid. The falseness of the representations caused HCCI and RHC injury.

## INTERVENORS' CROSS CLAIMS AGAINST HCCI FOR BREACH OF FIDUCIARY DUTY AND REPUDIATION OF PARTNERSHIP AGREEMENT

32.     Intervenor RHC makes cross-claim against HCCI for breach of the Hassell 2008 JV partnership between HCCI and RHC pertaining to the Springwoods Project and for HCCI's violations of its fiduciary duties to the HCCI/RHC partnership (the "Hassell 2008 JV") pertaining to the Springwoods Project. RHC's claims against HCCI include claims for damages as a result of HCCI's breached fiduciary duties to the Hassell 2008 JV by the deliberate and malicious hiring of the egregiously conflicted law firm of Coats Rose, against the objections of RHC, to represent HCCI against RHC pertaining to damage claims related to the Springwoods Project. RHC further makes cross-claims against HCCI for breach of the duty of good faith and fair dealing with regard to the Springwoods Project contract and breach of the special and confidential relationships

existing between RHC and HCCI as a result of the health conditions of RHC President Royce Hassell of which his family took advantage.

33.   HCCI's decision to hire Coats Rose against RHC regarding the Springwoods Project losses demonstrates willful and deliberate malice against Royce Hassell and RHC, and the deliberate desire to interfere with RHC's damage claims pertaining to the Springwoods Project. HCCI deliberately utilized Coats Rose's conflicts to harm and prejudice RHC in this case.  At the time HCCI sought out Coats Rose, HCCI was aware of Coats Rose's multiple conflicts of interest and of Richard L. Rose's participation on behalf of original defendant HCID 18 in the frauds made the subject of the original suit against Springwoods Realty and HCID 18.  Upon information and belief HCCI knowingly chose Coats Rose as its counsel against RHC regarding the Springwoods Project despite the fact that Coats Rose represents Exxon, and that Richard L. Rose, President and Managing Director of Coats Rose, as Board Director and officer also directed HCID 18 in perpetrating the frauds against HCCI/RHC made the subject of the original suit.  In September of 2013 Mr. Rose, himself requested additional confidential information of the dispute between HCCI and RHC pertaining to the Springwoods Project should have been evidence enough of his conflicts. Added to that are the facts that Coats Rose Vice Presidents undertook to consult with and advise HCCI/RHC regarding the Springwoods Project losses in January of 2012; later deliberately undertook to represent the joint bonding company of HCCI and RHC, Liberty Mutual, against R. Hassell Builders, Inc. over the joint objections of HCCI and RHC; and later accepted representation of HCCI against RHC.  HCCI had enough information to determine that hiring Coats Rose would harm the interests of the HCCI/RHC partnership in the original suit.

**INTERVENORS' CLAIMS AGAINST COATS ROSE AND HCCI FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS INVASION OF PRIVACY, AND INTRUSION ON SECLUSION**

34.     Coats Rose, acting in concert with HCCI, intentionally and recklessly inflicted harms and intruded on the solitude, seclusion and private affairs of Royce and Silvia Hassell. The conduct of Coats Rose is extreme and outrageous and proximately caused and is causing Royce and Silvia Hassell severe emotional distress and mental anguish.

35.     Coats Rose abused the confidential and privileged information it obtained from the Hassell family and RHC in January of 2012 and thereafter, used such information to divide the family and create, orchestrate and foment disputes where none existed for the purpose of defending the damage claims asserted by HCCI/RHC against the defendants in the original suit.   As a result of the wrongful actions of Coats Rose Springwoods Realty has raised new defenses to the damage claims asserted against them in this case.  Coats Rose has abused the relationships of confidence with the Hassell family and the HCCI/RHC partnership to directly and purposefully interfere with the relationship of HCCI and RHC in order to defend this case.  In November of 2013, Coats Rose deliberately terminated settlement discussions between HCCI and RHC which included attempts to continue to prosecute this case jointly.  In February of 2014, after making representations through their agent Micky Das that Coats Rose was no longer involved in the disputes between HCCI and RHC, Coats Rose ambushed RHC at a Court ordered mediation by appearing on behalf of HCCI, and thereafter proceeded to advise HCCI on whether HCCI should accept a settlement offer which included ending the harms to the Springwoods lawsuit through Coats Rose and jointly pursuing Coats Rose for damaging this claim.  HCID 18 has been aware of the fact Coats Rose's undertaking to interfere in the relationship of HCCI and RHC with regard to the Springwoods Project.  Mr. Rose a government officer, as Board member and Officer of HCID 18 who participated in the decisions made the subject of this suit, cannot consent around the conflicts of his law firm for which he is President and Managing Director.  His September of 2013 decision to

have Coats Rose represent HCCI against RHC regarding the Springwoods Project losses violates multiple fiduciary duties to and relationships of confidence with multiple parties.  It is impossible for Coats Rose to consent around the conflicts of Coats Rose representing HCCI to foreclose on the personal real estate of Royce and Silvia Hassell which secures loans that RHC financed the improvements for the benefit of Exxon on HCID 18's Springwoods Project- and which were incurred solely as a result of the frauds perpetrated on RHC by HCID 18, Springwoods Realty, Exxon and Walter P. Moore for "design as you go" construction for which RHC seeks damages in this case.  As demonstrated by the "PRIVILEGED AND CONFIDENTIAL FOR MEDIATION PURPOSES ONLY" document which Springwoods Realty nevertheless filed of public record in this case, the disputes fomented by Coats Rose are now the primary defense of the Springwoods defendants.  HCID 18, Springwoods Realty, Exxon and Walter P. Moore have knowingly used Coats Rose's conflicted representation to defend this case.

36.   In arbitration, Coats Rose has even filed contorted alleged claims against Intervenors pertaining to the Springwoods Project losses seeking $10,000,000 in damages.  Coats Rose's agent, Micky Das, has then dutifully made these "private" AAA pleadings claims public by attaching them as exhibits in the Harris County trial courts.  What is evident is that Coats Rose's damage claims should have been asserted against the Springwoods defendants in this case, but because of Coats Rose's conflicts they were instead made against RHC.  As a result of the wrongful conduct of Coats Rose and HCCI, Royce and Silvia Hassell's personal real estate has been held for ransom and Royce and Silvia are on the verge of losing their personal home which they share with Silvia's elderly parents, one of whom is suffering from severe health problems.  Coats Rose has further engaged in abuse of process by deliberately holding the personal homestead of Royce and Silvia Hassell hostage to patently unconstitutionally invalid lien claims while simultaneously

attempting to obtain first lien rights to the property from the Royce and Silvia Hassell mortgage holder.  In the same manner Coats Rose engaged in abuse of process by filing a fraudulent lien claim against RHC with regard to another HCCI/RHC partnership project, the OCB/Stellar project, which was knowingly based on the false affidavit of Phillip Hassell.  Coats Rose further engaged in abuse of process by offering to remove the invalid lien in exchange for unrelated concessions which affect the damage claims pertaining to the Springwoods Project.  Coats Rose has continued to use financial coercion to achieve its obvious goals to defeat the damage claims against the Springwoods defendants.  This extreme and outrageous conduct by a law firm which has both a personal interest in the outcome of this case, and the interests of two of its major clients, Exxon and Liberty Mutual, which are adverse of HCCI and RHC in this case, has inflicted and is continuing to inflict severe mental anguish and emotional distress on Intervenors Royce and Silvia Hassell.  <u>The interests of Intervenors are so integral to the losses asserted against the defendants in this case that if Coats Rose is permitted to continue its course of action unchecked the law firm of Coats Rose will cause the loss of Royce and Silvia Hassell's home before this case ever goes to trial.</u>

37.    Intervenors' interest in this suit is greater than a mere contingent or remote interest. Intervenors have a justiciable interest in this suit as a result of RHC's interest in the Springwoods Project contract, and as a result of RHC's work performed and accepted by the Defendants on the Springwoods Project pursuant to the agreements between HCCI and RHC, and as a result of the harms which have been caused to this lawsuit by the deliberate interference of Coats Rose in the partnership and contractual relationships of HCCI and RHC.

38.    The conflicted motivations and intentions of Coats Rose in undertaking such conflicted representation form a part of and are integral to the frauds perpetrated by the defendants

in this case against HCCI. Such frauds have resulted in the damage claims asserted in this case. In fact, during construction and at the height of the losses incurred Coats Rose undertook to consult with, obtain confidential information from, and advise the Hassell family and their related corporations regarding the very losses at issue in this case.

39.     Intervenor RHC makes this original claim in intervention against the law firm of Coats Rose for Coats Rose's deliberate, unconscionable, fraudulent and tortious interference with the business relationship of RHC and HCCI, for abuse of process, and for conspiracy with Springwoods Realty and HCID 18 to defraud RHC with regard to the Springwoods Project and the Hassell 2008 JV's partnership interest in the Springwoods Project claims. In addition to the damages sought as set out in the "Plaintiff's Third Amended Original Complaint," RHC seeks damages for destruction of the partnership relationships between HCCI and RHC.

### INTERVENORS' CLAIMS AGAINST SPRINGWOODS REALTY AND COATS ROSE FOR FRAUD, AIDING AND ABETTING, ASSISTING, ENCOURAGING, AND PARTICIPATING, CONCERT OF ACTION AND CONSPIRACY TO DEFRAUD

40.     Intervenors incorporate paragraphs 111 through 114 of Plaintiff's Third Amended Original Petition. (Exhibit "A").

41.     As further claim Intervenors assert that defendants Springwoods Realty and Coats Rose acting in concert with HCID 18 Exxon and Walter P. Moore committed acts of fraud and concealment which were intended to and which did cause Intervenors harm. In this regard the defendants were members of a group or a combination of persons with the common objective to accomplish an unlawful purpose and/or a lawful purpose by an unlawful means. To that end the defendants have entered into one or more agreements with each other and/or HCID 18, Exxon and Walter P. Moore regarding the additional costs and damages incurred by RHC and Royce and Silvia Hassell as a result of the frauds attendant to the Springwoods Project. Upon information

and belief the law firm of Coats Rose represents the interests of Exxon and Liberty Mutual. Richard L. Rose, President and Managing Director of Coats Rose directed HCID 18 and participated in its actions against HCCI and RHC related to the Springwoods Project.

42.     In January of 2012, Coats Rose Vice Presidents Patrick Gaas and Heather Asselin purported to advise HCCI and RHC regarding the losses being incurred in the Springwoods Project.   Thereafter, while Coats Rose President and Managing Director continued to make decisions on behalf of HCID 18 pertaining to the claims of HCCI/RHC, Coats Rose Vice Presidents Patrick Gaas and Heather Asselin continued to solicit additional confidential information from HCCI.  RHC contends that Coats Rose's direct interference in the relationship between HCCI and RHC is driven by Coats Rose's conflicted loyalties to Exxon, Liberty Mutual, HCID 18 and Springwoods Realty.

43.     Days after Coats Rose Vice Presidents Patrick Gaas and Heather Asselin obtained confidential information from and consulted with the Hassells regarding the hardships of the Springwoods Project losses, and while Coats Rose was requesting that the Hassell's provide Coats Rose with additional documentation pertaining to HCCI's relationship with RHC, Richard L. Rose, President and Managing Director of Coats Rose seconded a motion for HCID 18 to hire Jacobs Engineering, the company already secretly being used by Springwoods Realty to review the plans prepared by Walter P. Moore for more additional errors, changes and corrections which were to be made to the plans of HCCI/RHC.  Further, Mr. Rose along with his fellow HCID 18 Directors listened as the District's Engineer "updated the board regarding construction of water, sewer, drainage and paving to serve Springwoods Village Parkway Phase 2 by Hassell Construction Company, Inc. ("Hassell")" and "discussed the status of Hassell's claim for time extension and additional payment." (Exhibit "A" February 22, 2012, Minutes of Harris County Improvement

Board No. 18, pages 4 and 5.) Just two days after this Board meeting, and despite the fact that the Hassells had gone to consult with Coats Rose on behalf of both HCCI and RHC, a consultation which Royce Hassell had not attended because he was just two months out of a kidney transplant and was under medical restrictions, and before the Hassell's discovered the web of Coats Rose's conflicts, Coats Rose caused Phillip Hassell to sign a fee agreement for HCCI wherein Coats Rose was to "address" and "evaluat[e] secured transactions and potential defensive strategies related to transactions or matters involving R. Hassell Builders, R. Hassell Company and Royce and Sylvia Hassell." Just weeks after receiving HCCI's $2500 retainer check (which Coats Rose curiously failed to cash) Mr. Rose and his fellow directors met again.  At this second meeting after the Hassell's consultation with Coats Rose Mr. Rose and his fellow Board members "discussed the schedule for the [Springwoods P]roject and the status of Hassell's claim for time extensions and additional payment."  At the same meeting Mr. Rose "moved to approve the Master Agreement for Professional Services with WPM" whose Springwoods Project plans defects were already being investigated by Jacobs Engineering but which the HCID 18 Board nevertheless carried unanimously. Not surprisingly, HCID 18 and Springwoods have now sued WPM in this case alleging WPM is at fault in the damage claims of HCCI/RHC.  (Exhibit "B," March 28, 2012, Minutes Harris County Improvement District No. 18, pages 4 and 6.) Mr. Rose's HCID 18 Board and Springwoods also clawed back $750,000 in retainage and pay requests for work performed by RHC.  The decision to claw back these funds took place shortly after the Hassell's met with Coats Rose despite the recommendation of Costello, the District Engineer and Project Representative recommending that these amounts be paid.

44.    Currently, and despite the fact that Mr. Rose is still a Board member of HCID 18 who, along with Springwoods Realty, is being sued for millions of dollars by HCCI over claims

in which Mr. Rose directly participated, Coats Rose has also undertaken to represent HCCI against its partner RHC regarding the Springwoods Project losses. Coats Rose's reluctance to file any pleadings in the courts on behalf of HCCI in the courts is evidence of their scienter of the conflicts and attempts to hide them. Additional evidence of their knowledge of the conflicts is the decision of Coats Rose's Vice-President Patrick Gaas to "hire ethics counsel out of my own pocket" to attempt to devise ways to proceed in this conflicts minefield without personal exposure. One of the subterfuges used to hide Coats Rose's conflicts was Patrick Gaas's decision to use his own business partner and non-Coats Rose attorney Micky Das to file Coats Rose's pleadings in the courts. Micky Das, acting as agent for Coats Rose and admittedly describing himself as "just a scribe," aided and assisted Coats Rose in tortiously interfering with and destroying the partnership relationships of HCCI and RHC, their agreements pertaining to the Springwoods Project, and by interfering with the partnership's joint pursuit of the damage claims for the Springwoods Project losses. While in the courts Coats Rose attorneys terminated settlement negotiations between HCCI and RHC because of the conflicts. However, once safely in the relative "privacy" and jurisdictional protections of arbitrators Coats Rose Vice Presidents Patrick Gaas and Heather Asselin asserted claims against RHC and Royce and Silvia Hassell individually on behalf of HCCI for over $10,000,000 for damages directly relating to losses incurred by HCCI and RHC in the Springwoods Project as well as those Mr. Das represented to the trial court Coats Rose would not pursue against RHC.

45.     The conspiracy to harm HCCI/RHC's interests in this case led by, orchestrated by and controlled by Coats Rose on behalf of Springwoods Realty and others with aligned interests is self-evident. Coats Rose, acting in concert with the defendants HCID 18 and Springwoods Realty, and unnamed party Exxon has been defending against RHC's partnership damage claims

since January of 2012 using financial coercion, duress, subterfuge, stealth, deception, deceit and by violating common laws and ethics rules which govern attorney conduct. The co-conspirators committed and are committing unlawful, overt acts to further the object of their conspiracy. Intervenors have suffered injury as a proximate result of the wrongful acts of Springwoods Realty, and Coats Rose and those acting in concert with them in furtherance of the conspiracy.

46.   Coats Rose and its attorneys Richard L. Rose, Patrick Gaas, Heather Asselin, Robert Hancock and Paul Catalano as well as attorney Micky Das acting as agent for Coats Rose and who repeatedly describes himself as "just a scribe," tortiously interfered with the partnership relationship between HCCI and RHC, and particularly interfered with their agreements related to the Springwoods Project and the joint pursuit of their damage claims for the Springwoods Project losses. In summary, and not by way of limitation:

- Coats Rose and Richard L. Rose, President and Managing Director of Coats Rose, represented Exxon with regard to its agreements with Springwoods Realty and thereafter became Director and Officer of HCID 18. While attorney for Exxon and as Director and Assistant Secretary of HCID 18, Richard L. Rose directed the complained of conduct of HCID 18 with regard to the frauds against RHC and HCCI and is a witness in this case.

- In January of 2012, at the height of the Springwoods Project frauds, without disclosing Coats Rose's representation of Exxon, Liberty Mutual and Mr. Rose's directorship of HCID 18, Coats Rose Vice-Presidents Patrick Gaas and Heather Asselin, undertook to obtain confidential information from, consult with, give advice to, and request additional documents and information from the Hassell's who represented to RHC that they were making the consultation on behalf of HCCI and RHC and the Hassell family. The advice Coats Rose gave to the Hassells, to finish the projects that were being jointly pursued including the Springwoods Project, benefitted Coats Rose large and important clients Exxon and Liberty Mutual as well as benefitting HCID 18 Directed by Richard L. Rose, and Springwoods Realty. The advice caused harms to HCCI and RHC in the Springwoods Project, as demonstrated by this law suit.

- In January of 2013, Coats Rose and Robert Hancock and Paul Catalano began representing Liberty Mutual, the joint bonding company of HCCI and RHC with regard to the Springwoods Project, against Intervenor R. Hassell Builders over the expressed objections of both HCCI and RHC.

- In September of 2013, Coats Rose agreed to represent HCCI against RHC with regard to the Springwoods losses over the expressed objections of RHC and Royce Hassell on behalf of HCCI as Chief Operating Officer and Director of HCCI. After listening to these objection Mr. Rose asked counsel for RHC, "So what is going on between the Hassell corporations?"

- In September of 2013, after the conflict objections had been made Coats Rose informed Intervenors in writing that all communications between HCCI and RHC must go through Coats Rose but that Coats Rose and HCCI did not desire to discuss the Springwoods Project matter with RHC.

- Thereafter Coats Rose Vice President Patrick Gaas held a shareholders and directors meeting of HCCI at his office to vote out Royce Hassell as Director of HCCI and to remove him as Chief Operating Officer of HCCI. Thereafter Coats Rose attempted to buy out Royce Hassell's individually owned shares in HCCI citing a "Buy Sell Agreement" Coats Rose refused to produce.

- Shortly thereafter, Coats Rose Vice President Patrick Gaas filed a fraudulent lien against RHC on an HCCI/RHC project in an attempt to obtain concessions regarding joint venture projects.

- In October of 2013 Coats Rose Vice President Patrick Gaas used his business partner Micky Das to file an answer in the Declaratory Judgment action brought by RHC while Coats Rose continued to control the case.. Attorney, Micky Das, Coats Rose's agent, refused to communicate with RHC's attorney despite the fact that he was the attorney of record.

- In November of 2013 Coats Rose Vice Presidents Patrick Gaas and Heather Asselin thereafter unilaterally terminated settlement negotiations between HCCI and RHC because RHC refused to waive conflict of interest claims against Coats Rose.

- In January of 2014 Mr. Das filed pleadings before the Honorable Kyle Carter stating RHC's conflict of interest claims against Coats Rose were moot because Coats Rose was not involved in the case. As a result of these representations Judge Carter ordered that HCCI and RHC attend mediation. In February of 2014, Coats Rose ambushed RCoaHC at t Judge Carter's ordered mediation by appearing to represent HCCI against RHC. Coats Rose purported to represent HCCI on the demands of RHC that HCCI stop hurting the Springwoods lawsuit by sleeping with the enemy (Coats Rose) and to jointly pursue damage claims against Coats Rose for their conflicts.

- In May of 2014, after Micky Das as agent for Coats Rose accomplished getting the Declaratory Judgment action of RHC referred to arbitration through subterfuge and misrepresentation he conveniently stepped out of the case and Coats Rose took over filing HCCI's multimillion dollar "Demand for Arbitration" asserting claims based on the Springwoods Project losses.

- Coats Rose actively sought to prevent judicial inquiry into its grievous conflicts through misrepresentations made to the Honorable Kyle Carter on Coats Rose's behalf by attorney Micky Das and, as a result, Intervenors have did not have the opportunity to present their judicial misconduct and waiver defenses to arbitration before Judge Carter.  The failure of Judge Carter to grant an evidentiary hearing is now the subject of a "Petition for Writ of Mandamus" pending before the First Court of Appeals.

- Coats Rose is currently seeking to foreclose on the personal real estate of Royce and Silvia Hassell which secured loans taken by RHC to fund the "design as you go" Springwoods Project Construction.  Coats Rose has attempted to hold this real estate hostage knowing that RHC has no funds to defend the arbitration demand.  In this regard Coats Rose even attempted to purchase the first lien rights on Royce and Silvia Hassell's homestead from Comerica, their first mortgage holder to exert additional pressure on Intervenors.

47.    Intervenors Royce and Silvia Hassell assert claims against the law firm of Coats Rose for tortious interference with existing contract rights, abuse of process, and the use of unconscionable intentional infliction of emotional distress, financial coercion, duress, invasion of privacy and intrusion on seclusion as a means of defending against the damage claims of the RHC partnership against HCID 18 and Springwoods Realty regarding the Springwoods Project.

48.    Coats Rose has been aware since January of 2012 that as a result of the conspiracy of "design as you go" frauds perpetrated against RHC related to the Springwoods Project, RHC was forced to borrow the funds to finance the increased costs caused by HCID 18, Springwoods Realty, Exxon and Walter P. Moore.  The loans to finance Springwoods Realty and Exxon's costs for the "design as you go" construction which RHC was forced to obtain were secured by the personal real estate of Royce and Silvia Hassell.  Intervenors Royce and Silvia Hassell file this "Petition in Intervention" also seeking injunctive relief against Coats Rose's foreclosure actions against the personal real estate of Royce and Silvia Hassell.  These actions are premature as the damage claims in this case are ongoing.  Foreclosure is not ripe and cannot be determined until the damage claims in this case have been adjudicated.

49.     Intervenors have justiciable claims pertaining the Springwoods Projects frauds and

the resultant losses from such frauds which form the basis of RHC's "Petition in Intervention" in

this case.  Intervenor also have justiciable claims as a result of Coats Rose's tortious interference

in the Springwoods Project agreements between HCCI and RHC.  In this regard, after hiring Coats

Rose HCCI breached its partnership agreement with RHC pertaining to the Springwoods Project;

HCCI violated its fiduciary duties to RHC pertaining to the Springwoods Project; and HCCI

deliberately harmed RHC's interest in this case by knowingly participating in the judicial

shenanigans of the grievously conflicted law firm of Coats Rose as it represented HCCI against

RHC regarding the Springwoods Project losses over the objections of RHC.  HCCI's breaches of

fiduciary duty are so extensive and complete that on July 21, 2014, Coats Rose caused HCCI to

exclude RHC from participating in the mediation of this case.  HCCI's breaches of its fiduciary

duties directed by Coats Rose are so far reaching that HCCI knowing hired Coats Rose to represent

it against RHC even after Phillip Hassell specifically acknowledged and admitted in a previous

letter that Coats Rose has multiple conflicts of interest, most particularly with regard to the

confidential information which Coats Rose acquired during the January of 2012 consultation with

the Hassell family and related entities HCCI and RHC.  HCCI's breaches of its fiduciary duties are

so complete that HCCI has deliberately damaged RHC's pursuit of its damages in this case by

providing Coats Rose with confidential, inside information of the legal theories and attorney work

product pertaining to the pursuit of this case against the defendants including confidential and

privileged information which Coats Rose and Springwoods Realty are now using to defend RHC's

damage claims in this case.  To exert additional duress and financial coercion Coats Rose has even

caused HCCI to convert all the jointly on-going construction projects of the HCCI/RHC

partnerships, and to fail to reimburse RHC for its expenses on joint projects, leaving RHC with no

on-going projects, no cash flow, and unable to retain counsel to defend against the conduct of the

defendants in this case or to defend against Coats Rose's multimillion dollar claims against RHC

in arbitration which should have rightfully been filed against the original defendants in this case

HCID 18 and Springwoods Realty, as well as Coats Rose.

### INTERVENORS' BREACH OF CONTRACT AND CLAIM
### UNDER LOC. GOV'T CODE 271.153(A)(2)

50.   RHC incorporates paragraphs 93-106 of Plaintiff's Third Amended Original

Petition (Exhibit "A").

### INTERVENORS' CLAIMS FOR ASSUMPSIT,
### QUANTUM MERUIT AND UNJUST ENRICHMENT

51.   RHC incorporates paragraphs 107 through 110 of Plaintiff's Third Amended

Original Petition (Exhibit "A").

### E.  Damages

52.   Intervenors incorporate by reference and adopt the claims for damages against

defendants in this case HCID 18 and Springwoods Realty previously asserted by them through

their partner HCCI in the original suit.

53.   As further claim RHC asserts that the frauds perpetuated upon them by defendants

and third parties acting in concert with the defendants have caused grievous actual, proximate and

foreseeable harms which continue until present. It was foreseeable that harms would be incurred

by HCCI and RHC as a result of the extra costs associated with constructing what was initially

represented to be a $15,000,000 project but which was actually secretly intended to be a "design

as you go" project" costing millions more to construct which HCID 18, Springwoods Realty and

Exxon desired to be financed by HCCI/RHC.   It was foreseeable that the false promises of

defendants HCID 18 and Springwoods Realty that the extra costs being incurred by HCCI and

RHC would be reimbursed timely would be relied on by HCCI and RHC. It was foreseeable that in order to fund the millions of dollars in extra costs before reimbursement RHC would be required to borrow funds to complete the project. It was foreseeable that loans obtained to front these extra-costs would have to be collateralized. It was foreseeable that if the promises to pay the extra costs were violated that the collateral securing the unreimbursed loans would be placed in jeopardy.

54.     The damages suffered by RHC and Royce and Silvia Hassell directly and naturally result from reliance on the misrepresentations of the defendants and HCCI.

55.     Intervenors Royce and Silvia Hassell have also suffered severe emotion distress and mental anguish for which they seek relief against the defendants. The misrepresentations and string-a-long fraud tactics of the defendants against RHC related to the Springwoods Project frauds, the tortious interference in the partnership relationship of HCCI and RHC, and the attendant implications to the personal real estate of Royce and Silvia Hassell caused Royce and Silvia Hassell physical and emotional pain, grief, severe disappointment, despair, confusion, and resulted in misunderstandings between family members, embarrassment and public humiliation. The misrepresentations and string-a-long fraud tactics related to the Springwoods project and Coats Rose's direct and conflicted involvement caused such misunderstandings within the Hassell family which have ultimately resulted in the complete destruction of father/son, brother/sibling, and other important family relationships which will no doubt never be mended. Further, Royce Hassell was subjected to these frauds during a time of extreme illness which almost resulted in his death.

56.     The emotional distress and mental anguish which further resulted to Royce Hassell from HCCI's decision to hire the law firm of Coats Rose to represent HCCI against RHC, and Coats Rose's and HCCI's despite knowing that this decision would result in violations of

confidences, privileged communications and evidentiary protections caused further extreme and unrelenting harms.

## F. Exemplary Damages

57.     Intervenors RHC and Royce and Silvia Hassell assert claims for exemplary damages against the Springwoods Realty, Exxon, Coats Rose and HCCI.

58.     "A person who intentionally misrepresents facts for the purpose of injuring another is guilty of wanton and malicious conduct." *Dennis v. Dial Finance & Thrift Company*, 401 S.W.2d 803, 805 (Tex. 1966). Exemplary damages are properly awarded when actual damage is suffered as a result of fraud intentionally committed for the purpose of injuring. *Collins v. Miller*, 443 S.W.2d 298 (Tex.Civ.App. —Austin 1969) citing *Dennis v. Dial Finance and Thrift Company*, 401 S.W.2d 803 (Tex.1966.

## G. Attorney Fees

59.     Intervenors are entitled to recover reasonable and necessary attorney fees.

## H. Conditions Precedent

60.     All conditions precedent to Intervenors' claim have been performed or have occurred.

## I. PRAYER

61.     For these reasons, Intervenors ask that, on final trial, Intervenors be awarded a judgment for their damages, attorneys' fees, interest, court costs, and any other relief to which Intervenors may show themselves justly entitled.

Respectfully submitted,

BY:____/s/_____

SILVIA T. HASSELL
State Bar of Texas No. 09205200
12512 Cutten Road, Suite A
Houston, Texas 77066
Telephone:  (713) 665-2442
Telecopier:  (713) 665-0360

ATTORNEY FOR INTERVENORS R.
HASSELL & COMPANY, INC., R
.HASSELL BUILDERS, INC., R.
HASSELL HOLDING COMPANY, INC.,
AND ROYCE AND SILVIA HASSELL

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served upon the following counsel as indicated below on September 15, 2014.

BY E-MAIL:  brentea@rentealawoffices.com
Mr. Bogdam Rentea
505 W. 12th Street, Suite 206
Austin, Texas 78701
(512) 472-6291

(512) 472-6278 Facsimile
(Counsel for Hassell Construction Company, Inc.)

BY E-MAIL: jengvall@elhouston.com,
kflittner@elhouston.com,
bcravens@elhouston.com
John Engvall, Jr., Kala Flittner
Brittany Cravens
ENGVALL & LOPEZ, L.L.P.
1811 Bering Drive, Suite 210
Houston, Texas 77057
(Counsel for HCID 18)

BY E-MAIL: GZiegler@MacdonaldDevin.com,
jburris@macdonalddevin.com,
DSiotos@MacdonalldDevin.com
Gregory N. Ziegler, Jason A. Burris, Dean J. Siotos
MACDONALD DEVIN, P.C.
(Counsel for Walter P. Moore)

BY E-MAIL: john.cahill@leclairryan.com
John P. Cahill, Jr.
LECLAIRRYAN
1233 W. Loop South, Suite 1000
Houston, Texas 77027
(Counsel for Costello, Inc.)

BY E-MAIL: ehohlt@mcdanielfirm.com,
tmcdaniel@mcdanielfirm.com
Eileen M. Hohlt, Timothy M. McDaniel
MCDANIEL, HOHLT, PC
2 Greenway Plaza, Suite 1030
Houston, Texas 77046
(Counsel for Springwoods Realty)

/s/ _____
        Silvia T. Hassell